# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 25-cv-1907 |
| Plaintiff, | |
| v. | **MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER VENUE** |
| APPROXIMATELY 225,364,961 USDT, | |
| Defendant *in rem*, | |

## **TABLE OF CONTENTS**

MEMORANDUM OF LAW ........................................................................................................1

I.      INTRODUCTION ........................................................................................................1

II.     RELEVANT FACTUAL BACKGROUND.................................................................3

       A.     This Civil Forfeiture Proceeding Arises from an Investigation Conducted in California Regarding Stolen Digital Assets from California and Other States' Residents. ..........................................................................................3

       B.     Victim Claimants are 118 Individuals Claiming Over $70M in Stolen USDT (Tether) ......................................................................................3

       C.     Significant Crypto Seizures Have Occurred in California, Including Tether .........4

III.    LEGAL STANDARD.................................................................................................6

IV.   ARGUMENT .............................................................................................................7

       A.     California is the Locus of the Operative Facts and the Government's Investigation as Well as the Residence of a Plurality of the Claimant Victims and the Near Entirety of Third-Party Witnesses and Entities. ..................7

       B.     The Factors Considered Under Section 1404(a) Favor Transfer ............................9

              1.     Factor One: Plaintiff's Choice of Forum is Afforded Little Deference Because This District Has No Meaningful Ties to the Parties and Events Giving Rise to the Civil Forfeiture. ...............................9

              2.     Factor Two: Defendant's Choice of Forum Favors Transfer....................10

              3.     Factor Three: Whether the Claim Arose Elsewhere. ...............................11

               4.     Factor Four: The Convenience of the Parties Favors Transfer. ................11

               5.     Factors Five and Six: The Convenience of the Witnesses and Sources of Proof, All Primarily Located in California, Strongly Favor Transfer..................................................................................12

              6.     The Public Interest Factors Favor Transfer. ............................................13

               7.     Transfer to California Broadly Serves the Interest of Justice ...................15

        C.     Alternatively, This Court Should Transfer This Case Under 28 U.S.C. Section 1406 Because Venue is Improper ............................................................17

              1.     Section 3238 is an Inapplicable Criminal Statute that Does Not Apply to Civil Forfeitures. ...........................................................18

               2.     Venue Under Either Sections 1355(b) or 1395 is Not Adequately Alleged...........................................................................18

               3.     Section 1355(b)(2) does Not Apply Because the Complaint Does Not Allege the Defendant Property Was Located Abroad or Seized

Abroad Under Foreign Authority.................................................................20

4.    The Court Should Cure the Defective Venue by Transferring it to where Venue is Proper: The Northern District of California....................21

D.    Venue Is a Threshold Issue. ...................................................................21

V.  CONCLUSION……………………………………………………………………23

ACTIVE 715726710v9

## MEMORANDUM OF LAW

### I.    INTRODUCTION

This is a California case.  The government explains that its investigation began in the Northern District of California.  The tracing and evidence at issue in this case is so complex, according to the government, that it was forced to fly in over a dozen U.S. Secret Service personnel from throughout the country to the Northern District of California for a week-long tracing exercise. Despite this incredible effort, the government has not been able to identify all of the victims. According to the Verified Complaint, the government could only identify approximately 60 victims out of what it believes to be more than 400.

The Victim Claimants who make this motion are 118 victims who found out about the government's investigation when they saw it announced in the news.  Their losses comprise more than $70 million of the seized assets.  When they saw that the government had seized the funds at issue, they were encouraged to see that the government had recovered their lost assets.  Victim Claimants are discouraged, however, to see the case filed in D.C.  It appears there is no connection from the underlying crime or victims at issue in this case to this District, except that the government alleges in a vague fashion that the *res* is in the custody of the Marshals Service in the District of Columbia.  This vague allegation (particularly given the nature of the digital assets at issue) is not sufficient under Section 1404(a) or Section 1406(a) of the venue statute, however, to confer venue in this District.

All of the Victim Claimants making this motion but one reside outside D.C.  A plurality reside in California and surrounding states.  A transfer is warranted because California is the locus of the operative facts and the most convenient forum for witnesses, third-parties, and the large number of claimants.  California is where the government's investigation began, with the U.S.

1

Secret Service's San Francisco Field Office (Compl. ¶ 50), where the government subsequently conducted a week-long tracing operation (Compl. ¶ 76 & n.24); and where key witnesses and entities—including OKX, Coinbase, and Kraken—are headquartered or maintain substantial operations. The Complaint includes a detailed victim example that resides in Laguna Beach, California (Compl. ¶ 94), but no D.C. residents.

Transferring this case where most victims reside as well as where the investigation was conducted would materially streamline the resolution of this action and reduce third-party discovery and testimony of key witnesses and business entities. Subpoena power is a significant factor in considering transfer, and the NDCA is uniquely located within 100 miles of all third-party exchanges identified in the Complaint. Because this dispute involves complex cryptocurrency issues, critical third-party live testimony may be needed.

Hundreds of victims should not be forced to travel across the country to recover assets that rightfully belong to them. A transfer would also align with the publicly stated goals of the Administration and the Department of Justice's enforcement priorities to compensate victims and to foster interagency collaboration nationwide.[1] For these reasons, a change of venue is warranted under 28 U.S.C. §§ 1404(a) and/or 1406(a).

A transfer is further merited because the Verified Complaint fails to adequately allege venue under 28 U.S.C. §§ 1395 or 1391(b). The Defendant Property was not found or brought into this District; nor did any material acts giving rise to the forfeiture occur in this District. Under § 1406(a), the Court can cure this defect by transferring this case to the NDCA, a district where it could have been brought and indeed which is the most convenient forum.

---

[1] U.S. Dep't of Just., Asset Forfeiture Program, https://www.justice.gov/afp (Accessed Nov. 5, 2025).

## II.    RELEVANT FACTUAL BACKGROUND

### A.    This Civil Forfeiture Proceeding Arises from an Investigation Conducted in California Regarding Stolen Digital Assets from California and Other States' Residents.

This *in rem* action seeks the forfeiture of approximately 225 million USDT (or Tether), stolen through fraud and confidence ("pig butchering") scams that victimized hundreds of people.

Following a report from the company that created Tether, "the USSS San Francisco Field Office initiated [the] investigation."  (Compl. ¶ 50.)  The Verified Complaint details the government's investigation, where it traced the theft to 144 identified OKX accounts during a "week-long law enforcement operation in Northern California."  (Compl. at 26 n.24.)  According to the Verified Complaint, the government identified these 144 OKX Accounts as belonging to the scammers and used to transfer, conceal, and launder the stolen assets.

The Verified Complaint further alleges that the malicious actors also moved funds through Coinbase, a U.S.-based, virtual-currency exchange.  (Compl. ¶¶ 88–89.)  According to SEC filings, Coinbase lists its principal place of business at 100 Pine Street, Suite 1250, San Francisco, CA 94111.[2]  Coinbase is based in San Francisco, where it maintains its largest office and core engineering operations.  The Verified Complaint also traces victim funds through Kraken, another "U.S.-based" virtual-currency exchange identified in the scheme.  (Compl. ¶¶ 86, 94.)

After concluding its investigation, the United States filed its Verified Complaint in this Court under 18 U.S.C. § 981 and 28 U.S.C. §§ 1345 and 1355, invoking Supplemental Rule G to seize over 225 million USDT.

### B.    Victim Claimants are 118 Individuals Claiming Over $70M in Stolen USDT

---

[2] Schedule 13G/A, Coinbase Global, Inc. (Nov. 14, 2024), available at U.S. Securities and Exchange Commission, https://www.sec.gov (reporting beneficial ownership and listing principal business address as 100 Pine Street, Suite 1250, San Francisco, California 94111).

3

**(Tether)**

Victim Claimants are 118 individuals whose funds were stolen through the scheme detailed in the Verified Complaint. Victim Claimants timely filed claims, asserting their ownership interests and constructive trust rights in the Defendant Property. Victim Claimants represent more than 25% of the total number of suspected victims (Compl. ¶ 51) and claim about 31% of the total seized assets. A plurality of the Victim Claimants are California residents or live near California. The Verified Complaint, by contrast, identifies only 60 confirmed victims whose losses totaled approximately $19 million—less than 10% of the total assets under seizure. (Compl. ¶¶ 45-81.)

Among the Victim Claimants, California accounts for the highest number of victims (22), with claims totaling approximately $14.4 million in losses. (Yakobi Decl. ¶ 2.) Multiple of the California Victim Claimants reside in the Northern District of California. (*Id.*) Including California's neighboring states (Arizona, Colorado, Nevada, Oregon, and Washington) with the California Victim Claimants raises the number of total victims in this area to 31, with losses of approximately $17.1 million. (*Id.* ¶ 3.) By comparison, there is only one victim in D.C., accounting for $171,000 in losses. (*Id.* ¶ 4.) When accounting for surrounding jurisdictions within 100 miles of D.C. (Delaware, Maryland, Pennsylvania, New Jersey, and Virginia), there are 16 Victim Claimants accounting for approximately $7.1 million in losses. (*Id.* ¶ 5.)

### C.    Significant Crypto Seizures Have Occurred in California, Including Tether

California is a frequent focal point for federal cryptocurrency enforcement actions.

For example, in November 2023, federal authorities seized approximately $9 million in illicit Tether (USDT) deposits traced to a Silicon Valley-based cyber scam organization that defrauded over 70 victims.[3] U.S. Attorney Ismail Ramsey stated that his San Francisco office was

---

[3] Press Release, U.S. Dep't of Just., Cyber Scam Organization Disrupted Through Seizure of

working to partner with other agencies and that "Silicon Valley remains one of the world's preeminent locations for cryptocurrency firms[,] [and] [a]s such, we remain dedicated to using all tools at our disposal to bring justice to the victims of frauds and scams." At that time, Tether Limited Inc. similarly "assisted in the seizure of the cryptocurrency."[4]

Other actions show that California is a frequent locus of cryptocurrency scam and theft investigations, like the one at issue in this case. *United States v. Approximately 1,360,000.748 Tether and $3,859,703.65 in United States Currency*, No. 23-cv-04400-TSH, 2024 U.S. Dist. LEXIS 16383 (N.D. Cal. Jan. 30, 2024) (forfeiture of $5.2 million in assets linked to a San Francisco-based victim defrauded through a crypto investment scam involving a fake exchange called NYMEX); *United States v. Approximately $23,604,815.09 in Assorted Cryptocurrencies*, 25-cv-02324-DMR (N.D. Cal. Mar. 3, 2025) (warrant of arrest of property for a multitude of different digital assets); *United States v. Hared*, No. CR 19-040 WHO, 2024 LX 121703 (N.D. Cal. Nov. 12, 2024) (vacating forfeiture order for Bitcoin, Stellar Coins, Bitcoin Cash, and Bitcoin Satoshi Vision). One of, if not the largest cryptocurrency seizure in DOJ history, also occurred in the Northern District of California: over 69,000 Bitcoin valued at more than $1 billion. *United States v. Approximately 69,370 Bitcoin (BTC)*, No. 20-cv-07811-RS, 2022 U.S. Dist. LEXIS 54291 (N.D. Cal. Mar. 25, 2022).

These cases underscore California's centrality in federal cryptocurrency enforcement. The Northern District of California, as shown in this case, has demonstrated its capacity to handle complex digital asset tracing, multi-victim restitution, and interagency coordination.

---

Nearly $9M in Crypto (Nov. 21, 2023), https://www.justice.gov/usao-ndca/pr/cyber-scam-organization-disrupted-through-seizure-nearly-9m-crypto.

[4] *Id.*

### III.    LEGAL STANDARD.

Under 28 U.S.C. § 1404(a), a district court may transfer any civil action to another district where it might have been brought for the convenience of parties and witnesses and in the interest of justice. "The decision to transfer is made by an 'individualized, case-by-case consideration of convenience and fairness[.]" *Wada v. United States Secret Serv.*, 525 F. Supp. 2d 1, 9 (D.D.C. 2007) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).

Courts balance several private and public interests in determining whether transfer is warranted. "Private interest considerations include: (1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendant; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof." *Wada v. United States Secret Serv.*, 525 F. Supp. 2d 1, 10 (D.D.C. 2007). "The public interest factors include: [] the degree to which the courts in both venues are familiar with the governing laws; [] the relative congestions of the calendars of the transferee and transferor courts; and [] the local interest in deciding local controversies at home." *Wada v. United States Secret Serv.*, 525 F. Supp. 2d 1, 10 (D.D.C. 2007) (citations omitted).

Deference normally given to a plaintiff's choice of forum is "lessened when the plaintiff's forum choice 'lacks meaningful ties to the controversy and [has] no particular interest in the parties or subject matter.'" *S. Utah Wilderness Alliance v. Norton*, 315 F. Supp. 2d 82, 86 (D.D.C. 2004) (citing *Islamic Republic of Iran v. Boeing Co.*, 477 F. Supp. 142, 144 (D.D.C. 1979)). The plaintiff's choice of forum is also "'conferred less deference by the court when [it] is not the plaintiff's home forum.'" *Wada v. United States Secret Serv.*, 525 F. Supp. 2d 1, 10 (D.D.C. 2007) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981)) (brackets in original).

ACTIVE 715726710v9

A court must dismiss an action if venue is improper, or alternatively, transfer it to a district where the matter could have been brought.  28 U.S.C. § 1406.  *See, e.g.*, *King v. Caliber Home Loans, Inc.*, 210 F. Supp. 3d 130, 134 (D.D.C. 2016) ("If the Court concludes that venue is improper, it must then decide whether to dismiss the action or to transfer the case to a district where it could initially have been instituted.").

## IV.    ARGUMENT

### A.    California is the Locus of the Operative Facts and the Government's Investigation as Well as the Residence of a Plurality of the Claimant Victims and the Near Entirety of Third-Party Witnesses and Entities.

This case should have been brought in California.  The NDCA is the most convenient and proper venue to adjudicate the forfeiture because it is the heart of the government's investigation, where most of the investigators and material third-party witnesses can be found.  *See* 28 U.S.C. § 1355(b)(1)(A), (B) (allowing for civil forfeiture actions brought in any venue where the acts or omissions giving rise to the forfeiture occurred or any venue allowed by § 1395).

The government's investigative center is in California, and its investigation began in California.  (Compl. ¶ 50.)  Specifically, "the USSS San Francisco Field Office initiated [the] investigation," after receiving a report from Tether.  *Id*.  The Complaint details the government's tracing of the theft to 144 OKX accounts during a "week-long law enforcement operation *in Northern California*."  (Compl. ¶ 26 at n.24 (emphasis added).)

The 144 OKX accounts, referenced throughout the Complaint, are hosted by the OKX exchange, which itself maintains a U.S. presence with personnel in San Jose, California.[5,6]  OKX

---

[5] Jeff John Roberts, *OKX to Relaunch U.S. Exchange with Wallet Based in San Jose, California, Under New CEO Roshan Robert*, Fortune (Apr. 15, 2025), https://fortune.com/crypto/2025/04/15/okx-relaunch-us-exchange-wallet-san-jose-california-new-ceo-roshan-robert/ (Accessed Nov. 7, 2025).

[6] Roshan Robert, *Bringing OKX to the United States: A New Era for Crypto and Web3*

appears to have aided the federal government in tracing the funds and therefore has relevant witnesses that will be needed to provide key testimony. (Compl. ¶¶ 45, 50 ("USSS received a report from Tether [] which was working with OKX").) This means critical third-party witnesses and record custodians are located within the NDCA's subpoena power.

In addition to OKX, the Verified Complaint discusses the involvement of Coinbase and Kraken, which have a presence in California. (Compl. ¶¶ 86–95.) Witnesses and record custodians for these entities are therefore also likely to be located in California and within the NDCA's subpoena power. The investigation began in Northern California, was conducted by the Secret Service's San Francisco Field Office, and was executed in conjunction with a week-long tracing operation in Northern California.

That the scheme largely affected California residents is reflected by the demographics of Victim Claimants. California accounts for the highest number of victims (22), with claims totaling approximately $14.4 million in losses. (Yakobi Decl. ¶ 2.) Including California's neighboring states (Arizona, Colorado, Nevada, Oregon, and Washington) with the California Victim Claimants raises the number of total victims in this area to 31, with losses of approximately $17.1 million. (*Id.* ¶ 3.) By comparison, there is only one victim in D.C., accounting for $171,000 in losses. (*Id.* ¶ 4.) When accounting for surrounding jurisdictions within 100 miles of D.C. (Delaware, Maryland, Pennsylvania, New Jersey, and Virginia), there are 16 Victim Claimants accounting for approximately $7.1 million in losses. (*Id.* ¶ 5.)

Accordingly, transferring this case to the NDCA will promote third-party-witness convenience, enhance access to proof, and further judicial economy.

---

*Innovation*, OKX (Apr. 15, 2025), https://www.okx.com/learn/bringing-okx-to-the-united-states-a-new-era-for-crypto-and-web3-innovation (accessed Nov. 7, 2025).

8

**B.        The Factors Considered Under Section 1404(a) Favor Transfer**

The NDCA is the center of gravity for witnesses, multiple of the Victim Claimants, the relevant records, and the investigation underlying this case. These circumstances warrant transfer.

**1.        Factor One: Plaintiff's Choice of Forum is Afforded Little Deference Because This District Has No Meaningful Ties to the Parties and Events Giving Rise to the Civil Forfeiture.**

Although a plaintiff's choice ordinarily deserves deference, where there are "no meaningful ties between the District of Columbia and the events (or parties) that gave rise to this action," the government's decision should not carry weight. *See, e.g.*, *FTC v. Cephalon, Inc.*, 551 F. Supp. 2d 21, 26-27 (D.D.C. 2008) (granting motion to transfer antitrust action brought by the FTC). As in *Cephalon*, "neither the operative events of this lawsuit nor the parties that were involved in those events have any meaningful connection to this District," precluding deference. *Cephalon,* 551 F. Supp. 2d at 26-27.

While none of the operative facts occurred in this District, a substantial part of the facts alleged occurred in California: the thrust of the government's investigation, where victims currently reside, where the illegal activities took place, and where material third-party witnesses reside. "Venue determinations of where a claim arose are based on a 'commonsense appraisal' of events having operative significance in the case." *Donnell v. Nat'l Guard Bureau*, 568 F. Supp. 93, 94 (D.D.C. 1983) (quoting *Lamont v. Haig*, 590 F. 2d 1124, 1134 (D.C. Cir. 1978)). Accordingly, the government's choice of forum deserves minimum deference.

Moreover, for venue purposes in an *in rem* action, the government does not reside and is not "at home" in the District of Columbia. The *Cephalon* court addressed this issue and concluded that just because a governmental agency (the FTC) resides in this district, that does not make this district the more convenient or proper one. *Cephalon,* 551 F. Supp. 2d at 26-27. Similarly, in *Shawnee Tribe v. United States*, this Court held that "mere involvement on the part of federal

9

agencies, or some federal officials who are located in Washington D.C. is not determinative" for purposes of Section 1404(a) transfer analysis. *Shawnee Tribe v. United States*, 298 F. Supp. 2d 21, 25-26 (D.D.C. 2002); *see also Patel v. Phillips*, 933 F. Supp. 2d 153, 165 (D.D.C. 2013) ("The location of [the Bureau of Prison's] headquarters office alone 'cannot constitute a basis for concluding that venue is appropriate in this [d]istrict.'"). Here, where the Verified Complaint does not allege any law enforcement activities in D.C. other than the Marshal's "custody" (¶ 16) of the Defendant Property, there is no basis to conclude that venue is more appropriate in D.C. than in California.

### 2.    Factor Two: Defendant's Choice of Forum Favors Transfer

Though the Victim Claimants are not technically defendants, they are real parties in interest and stand in as "nominal defendant[s]." *See, e.g.*, *United States v. $100,000 in United States Currency*, 602 F. Supp. 712, 714 (S.D.N.Y. 1985) (claimants to certificate of deposit); *United States v. All Meat & Poultry Prods.*, No. 02 C 5145, 2003 U.S. Dist. LEXIS 13174, at *8 (N.D. Ill. July 29, 2003) (citing *United States v. $ 100,000 in United States Currency*, 602 F. Supp. 712, 714 (S.D.N.Y. 1985) (claimants to meat and poultry); *see also United States v. Paraffin Wax, 141 F. Supp. 402, 403-04 (E.D.N.Y. 1956)* (purchasers of wax are, for "all intents and purposes," defendants contesting forfeiture).

Here, the Victim Claimants seek transfer to the NDCA.[7] Many of the Victim Claimants reside in California, and litigation near where the relevant witnesses are is most convenient to the Victim Claimants and will minimize costs.

The Victim Claimants' request is not based merely on convenience, but because it would

---

[7] Infiniweb has indicated that it is considering its position on transfer, but has not yet had an opportunity to review this brief. Victim Claimants anticipate Infiniweb will form its position upon review of this motion.

also serve the interests of justice. In contrast, the government, which is not a private party, cannot claim litigation in California would be prohibitively expensive or burdensome. Thus, a transfer strongly favors Victim Claimants, who stand in for defendant's interests and unanimously want a transfer. The NDCA "is the more appropriate forum because the operative events arose there and the defendant and several significant fact witnesses reside there." *FTC*, 551 F. Supp. 2d at 32.

### 3.  Factor Three: Whether the Claim Arose Elsewhere.

As far as the Victim Claimants are aware, there are no other *in rem* proceedings related to the assets referenced by the government.

### 4.  Factor Four: The Convenience of the Parties Favors Transfer.

It would be far more convenient for the Victim Claimants if this matter were to proceed in California, where many of the claimants, witnesses, and third parties reside. Trying this action closer to the locus of the investigation and key witnesses would reduce travel expenses and costs, which is a significant factor for victims of crime who only seek to recover stolen funds. As to Infiniweb, the Victim Claimants understand that it is based in Hong Kong, thus making the NDCA a more convenient forum for international travel and coordination.

In contrast, the government cannot credibly claim any inconvenience here. While government counsel is located in this District, convenience of counsel is not a factor in the analysis. *See McClamrock v. Eli Lilly & Co.*, 267 F. Supp. 2d 33, 40 (D.D.C. 2003) ("Any inconvenience to plaintiff's counsel caused by the transfer of this action is not a factor that carries considerable weight in the Court's determination of whether or not to grant a motion to transfer pursuant to section 1404(a)."); *Tuttle v. Jewell*, 952 F. Supp. 2d 203, 208 n.4 (D.D.C. 2013) (same; citing M*cClamrock*); *see also Intrepid Potash-New Mexico, LLC v. U.S. Dep't of Interior*, 669 F. Supp. 2d 88, 98 (D.D.C. 2009) ("The convenience to counsel 'is of minor, if any, importance under § 1404(a).'" (quoting *Islamic Republic of Iran v. Boeing Co.*, 477 F. Supp. 142, 143 (D.D.C. 1979))).

11

Government counsel has already demonstrated capability to investigate this matter out of the NDCA, so presumably litigating this matter in the same district would not be an inconvenience. Accordingly, this factor favors transfer.

> **5.**      **Factors Five and Six: The Convenience of the Witnesses and Sources of Proof, All Primarily Located in California, Strongly Favor Transfer.**

The convenience of witnesses and sources of proof factors, here interrelated, both favor transfer.

The convenience of witnesses is "the most critical factor to examine" under a § 1404(a) motion to transfer. *Dean v. Eli Lilly & Co.*, 515 F. Supp. 2d 18, 22 (D.D.C. 2007). As discussed, the three relevant exchanges, OKX, Coinbase, and Kraken, have connections to California and the third-party witnesses all likely reside in California. The fact that the government's operation and tracing investigations also took place in California suggests there are material witnesses who reside in California.

Critical third-party witnesses and record custodians are located within the NDCA's subpoena power. This matters because "Courts have consistently transferred actions when the majority of witnesses live near the transferee forum, or when the witnesses may not be subject to the subpoena power of the transferor court." *Pyrocap Int'l Corp. v. Ford Motor Co.*, 259 F. Supp. 2d 92, 98 (D.D.C. 2003) (citation omitted). Here, the three exchanges identified in the Complaint would be subject to the NDCA's subpoena power. By contrast, there is nothing alleged in the Complaint suggesting that any third-party witnesses reside in D.C. The Complaint does not allege any investigations, witnesses, or facts in connection with D.C.

Indeed, when the government held a press conference and issued press releases about this action, it was supervisors from San Francisco who appeared from the Secret Service and Federal Bureau of Investigation. *See* Press Release, "Largest Ever Seizure of Funds Related to Crypto

12

Confidence    Scams," U.S.    Dep't    of    Justice    (June    18,    2025),    *at*
https://www.justice.gov/opa/pr/united-states-files-civil-forfeiture-complaint-against-225m-funds-
involved-cryptocurrency (last visited Nov. 6, 2025) ("The civil action was announced by U.S.
Attorney Jeanine Ferris Pirro, Matthew R. Galeotti, Head of the Justice Department's Criminal
Division, U.S. Secret Service Special Agent in Charge Shawn Bradstreet of the San Francisco
Field Office, and FBI Special Agent in Charge Sanjay Virmani of the San Francisco Field
Office.").

Because the relevant custodians and accompanying sources of proof and information are
in California, a venue transfer is warranted.  The subpoena power of the NDCA could and will
facilitate live testimony and discovery relevant to the more than two hundred million USDT stolen.
The issue of digital assets is technically complex and will likely require live testimony of third-
party witnesses to elucidate the source of funds, their life cycle, and the accounts used by the
perpetrators of the fraud.  To the extent physical evidence, secure repositories, or in-person
inspections are needed, California is the more convenient forum.  Modern e-discovery tools
facilitate but do not eliminate practical benefits of litigating near where the custodians are located,
particularly for matters that are highly technical and specialized as here.

### 6. The Public Interest Factors Favor Transfer.

The three public interest factors—(1) familiarity with governing law, (2) relative docket
congestion, and (3) local interest in adjudicating local controversies—favor transfer to the NDCA.
*See Wada v. United States Secret Serv.*, 525 F. Supp. 2d 1, 10 (D.D.C. 2007).

*First*, courts in both districts are equally capable of applying federal forfeiture law.
However, the NDCA has developed familiarity with cryptocurrency-related evidentiary issues,
including blockchain tracing, digital asset authentication, and wallet attribution. The NDCA has

13

presided over multiple cryptocurrency enforcement actions, including prior Tether seizures, and has built institutional expertise in handling complex digital asset matters. *See, e.g.*, *United States v. Approximately 1,360,000.748 Tether and $3,859,703.65 in United States Currency*, No. 23-cv-04400-TSH, 2024 U.S. Dist. LEXIS 16383 (N.D. Cal. Jan. 30, 2024); *United States v. Approximately $23,604,815.09 in Assorted Cryptocurrencies*, 25-cv-02324-DMR (N.D. Cal. Mar. 3, 2025); *United States v. Hared*, No. CR 19-040 WHO, 2024 LX 121703 (N.D. Cal. Nov. 12, 2024); (*United States v. Approximately 69,370 Bitcoin (BTC)*, No. 20-cv-07811-RS, 2022 U.S. Dist. LEXIS 54291 (N.D. Cal. Mar. 25, 2022). This factor thus favors transfer.

*Second*, the relative congestion of this Court versus that of the NDCA is a neutral factor and does not weigh against granting the motion. Indeed, "when statistics regarding relative congestion are mixed, this factor should be deemed as neutral." *Wolfram Alpha LLC v. Cuccinelli*, 490 F. Supp. 3d 324, 336 (D.D.C. 2020) (collecting cases) (citation omitted). Here, official judiciary statistics show that, as of June 30, 2025, the District for the District of Columbia had more felony criminal filings, whereas the NDCA had more civil filings than the Northern District.[8] While these statistics also indicate a higher number of pending cases per judgeship and a higher median time from filing to disposition in the NDCA, Westlaw's advanced analytics show that the NDCA has, on average, ruled on motions substantially faster over the past year.[9] Because congestion statistics are mixed, this factor is neutral.

---

[8] *See generally* U.S. Dist. Ct., Fed. Ct. Mgmt. Stat. (June 30, 2025), https://www.uscourts.gov/sites/default/files/document/fcms_na_distprofile0630.2025.pdf.

[9] *Compare* Westlaw, U.S. Dist. Ct., D.D.C., Motion Outcomes, Time to Outcome (URL omitted) (last visited November 11, 2025), *with* Westlaw, U.S. Dist. Ct., N.D.Cal., Motion Analytics, Time to Outcome (URL omitted) (last visited November 11, 2025). Westlaw URLs are uniquely generated for each user and therefore inaccessible to other users. The analytics are accessible in Westlaw through searching for the corresponding District under "Courts," clicking on "Motions" and clicking on "Time to rule."

*Third*, California has a strong interest in adjudicating cryptocurrency controversies to vindicate the rights of its residents and to develop the legal landscape with respect to an industry with deep roots in California.  The investigation was purportedly initiated by the U.S. Secret Service's San Francisco Field Office and the Complaint confirms that the tracing operations occurred in Northern California.  The plurality of the Victim Claimants resides in California or near it, and the three exchanges referenced in the Complaint central to the laundering scheme have deep ties to the Bay Area.

California is uniquely interested in protecting its residents from cryptocurrency fraud.  The then-U.S. Attorney for the NDCA, Ismail Ramsey, two years ago stated, in connection with a prior Tether seizure, that "Silicon Valley remains one of the world's preeminent locations for cryptocurrency firms," as evidence of this interest.  California also has an interest in shaping the legal landscape of digital asset enforcement in order to continue to foster the cryptocurrency industry.  Thus, it is in California's interest to continue to partner with governmental agencies to better monitor and protect consumer rights touching on cryptocurrency or digital assets writ large.

Transferring this matter to the NDCA would allow the case to proceed in a district with deep technical expertise and local stake to adjudicate it efficiently and effectively for the benefit of its residents, businesses, and the broader digital asset ecosystem.

### 7.    Transfer to California Broadly Serves the Interest of Justice

This factor is generally recognized as "amorphous and somewhat subjective," giving the court latitude to "consider many things."  *Capitol Payment Sys. v. Di Donato*, Civil Action No. ELH-16-882, 2017 U.S. Dist. LEXIS 77864, at *30 (D. Md. May 23, 2017).  It is in the interest of justice here that this matter be resolved in California.

First, courts have held that it serves the interest of justice for a matter to be litigated in a

15

forum where the cause of action arose.  "The Court fails to see how judicial proceedings in a district outside that in which the parties, witnesses, and sources of proof may be found, and in which the cause of action arose, serve the general interests of justice where the district which is the natural focus of such litigation is both open to such proceedings and desired as a forum by one of the parties."  *Cain v. N.Y. State Bd. of Elections*, 630 F. Supp. 221, 227 (E.D.N.Y. 1986).

Importantly, a transfer also aligns with the government's stated goals.  According to the Department of Justice's Asset Forfeiture Program website, the government's primary goals include: punishing and deterring criminal activity by depriving criminals of property used in or acquired through illegal activities; promoting cooperation among law enforcement agencies; and recovering assets that may be used to compensate victims when authorized under federal law.  Transferring the case to California enhances the coordination between the agencies that commenced this investigation and facilitates the coordination with the victims and their lawyers.  A transfer also facilitates victim participation, something the government has espoused.

Transfer to the NDCA would directly advance these goals.  That court has a deep bench of judges experienced in digital asset matters and is well-positioned to oversee proceedings involving complex blockchain evidence and victim compensation, having done so in the past.

The NDCA's familiarity with cryptocurrency litigation enhances the likelihood of efficient adjudication and effective asset recovery.  It is in the interest of justice to transfer a proceeding that "will facilitate the highly technical live testimony of key third-party witnesses."  *See Paratek Microwave, Inc. v. Agile Materials & Techs., Inc.*, No. WMN-04-2534, 2005 U.S. Dist. LEXIS 37688, at *8 (D. Md. June 7, 2005).

The government's ostensible goal of returning the stolen property to victims—arguably the most important goal—is best served by litigating this matter in a district where most of the victims

reside and consent.  And as stated, Northern California is where the investigative agents, relevant third-party institutions, and witnesses are located.  Transfer would thus facilitate California-based law enforcement, third-party witness testimony and discovery, and expedite restitution of assets.

### C.    Alternatively, This Court Should Transfer This Case Under 28 U.S.C. Section 1406 Because Venue is Improper

The Court should also transfer this action to the NDCA because venue is undisputed in that court, while there are serious questions as to adequacy of venue in this District as alleged in the Complaint.  The Complaint alleges five statutory bases for venue: "Venue is proper in this judicial district under 18 U.S.C. § 3238 and 28 U.S.C. §§ 1355(b) and 1395(a), (b), and (c)."  (Compl. ¶ 5.)  None of these support venue in D.C.  As is relevant here:

- 18 U.S.C. § 3238 addresses venue for offenses committed outside the U.S.;

- 28 U.S.C. § 1395:  addresses venue where forfeiture of property (a) accrues, (b) is found, or (c) where it is brought after foreign seizure;

- 28 U.S.C. § 1355(b)(1)(A) addresses venue where "acts or omissions giving rise to the forfeiture occurred"; and

- 28 U.S.C. § 1355(b)(2) addresses venue in D.D.C. if property is located in a foreign country or has been seized under foreign authority.[10]

None of these venue provisions is adequate to support venue in this District, and the basis factually alleged in the Complaint—the location of the defendant res—is alleged in insufficiently vague terms.  In contrast, it is undisputed and admitted in the Complaint that "acts or omissions giving rise to the forfeiture occurred" in California, making venue proper there.  *See* § 1355(b). This Court should accordingly transfer this matter to California, specifically NDCA, to cure these

---

[10] None of these provisions support that just because a governmental agency is in D.C. or its law enforcement agents investigated out of D.C., venue is proper.

defective venue allegations.

1.    **Section 3238 is an Inapplicable Criminal Statute that Does Not Apply to Civil Forfeitures.**

Section 3238 is a criminal statute and governs offenses that "begun or [were] committed . . . out of the jurisdiction of any particular State or district." At the outset, this provision says nothing about civil forfeiture venue, and addresses "offenders"—not property—while providing a catchall for venue in this district if such an offender has no other known residence: "if no such residence is known the indictment or information may be filed in the District of Columbia."

The statute's reference to an "indictment or information" is plainly inapplicable, and counsel have found no case law applying this statute in a civil forfeiture case, and note that this is not identified as a basis for venue in the leading civil forfeiture treatise. *See* Cassella, Stefan D., Asset Forfeiture Law in the United States, (2d ed. 2013) § 7-7 (hereinafter "Cassella") (detailing bases for venue in civil forfeiture actions). Notably, Congress knew how to provide venue for forfeiture cases based on criminal proceedings: 18 U.S.C. § 981(h) provides that when a defendant has been charged with a crime, venue for a related civil action may lie in the same district.

> In addition to the venue provided for in section 1395 of title 28 or any other provision of law, in the case of property of a defendant charged with a violation that is the basis for forfeiture of the property under this section, a proceeding for forfeiture under this section may be brought in the judicial district in which the defendant owning such property is found or in the judicial district in which the criminal prosecution is brought.

18 U.S.C. § 981(h). This provision is facially inapplicable here, where no criminal charges have been brought.

2.    **Venue Under Either Sections 1355(b) or 1395 is Not Adequately Alleged.**

Other than the captions, the Complaint includes only a single allegation that relates to this District which might provide a basis for venue here: "The Defendant Property is currently in the

custody of the United States Marshals Service in the District of Columbia." (Compl. ¶ 16.)

This single allegation alone cannot plausibly support venue here. While it is true that venue for the civil forfeiture of property can be proper "where such property is found" or "in any district into which the property is brought," *see* Section 1395(b-c), the Complaint does not actually allege that the Defendant Property is located in this District—only that it is under the "custody" of the U.S.M.S. in this District. But the statute does not speak to the location of the custodian, it addresses the location of the property itself, which is not addressed by the Complaint.

Notably, counsel for the Victim Claimants requested during the parties' meet and confer that the government disclose whether the defendant *res* was physically held in this District, for example, on a cold hardware wallet stored within this District held by U.S.M.S., but as of the filing of this motion, the government has not provided a definitive response. This is notable, because it is a matter of public record that U.S.M.S. has a public contract with Coinbase to hold seized digital assets.[11] And as detailed above, Coinbase is a "U.S.-based virtual currency exchange" (Compl. ¶ 88) largely based in the NDCA. So, to the extent that the Defendant Property is actually being held by Coinbase under its contract with U.S.M.S., venue is proper in the NDCA, not this District. Even if the Marshals held 9 figures in digital assets on a hardware wallet located in D.C. and not secured in a centralized exchange, this does not necessarily mean the digital assets are in D.C., given the nature of the blockchain.

Further, even if the defendant *res* were first transferred to the U.S.M.S. Coinbase account,

---

[11] *See e.g.*, Brett Tejpaul, Greg Tusar, "U.S. Marshals Service chooses Coinbase to safeguard, trade its large cap digital assets portfolio," Coinbase.com, (July 1, 2024), at *https://www.coinbase.com/blog/u-s-marshals-service-chooses-coinbase-to-safeguard-trade-its-large-cap* ("the U.S. Marshals Service (USMS), an agency within the U.S. Department of Justice that is responsible for asset forfeiture, announced that it selected Coinbase Prime to provide custody and advanced trading services for the agency's "Class 1" (large cap) digital assets, which it manages centrally in support of federal law enforcement.").

and then loaded onto a hard drive and brought into this District for cold storage, courts disallow the manufacture of venue through post-seizure transportation. As one court put it, "[a] court may not treat a piece of property as being 'found' within a certain judicial district where it is physically within the district only because the government moved it there . . . . Otherwise, the government could establish jurisdiction anywhere . . . merely by transporting the seized property to a judicial district of its choosing." *United States v. $633,021.67 in U.S. Currency*, 842 F. Supp. 528, 531–32 (N.D. Ga. 1993).

> **3.    Section 1355(b)(2) does Not Apply Because the Complaint Does Not Allege the Defendant Property Was Located Abroad or Seized Abroad Under Foreign Authority.**

Finally, it is not clear how venue could be proper under 28 U.S.C. § 1355(b)(2), which applies only when the property subject to forfeiture is either located in a foreign country or seized pursuant to legal process *by a foreign government.* The Complaint does not allege that the Defendant Property was located abroad. In any event, given the ephemeral nature of Tether, such an allegation would be problematic itself: courts have found that digital assets do not reside in a particular location precisely because cryptocurrency exists only virtually or digitally and has no physical or tangible existence. *Ali Sedaghatpour v. Lemonade Ins. Co.*, 654 F. Supp. 3d 525, 528 (E.D. Va. 2023); *Consensys Software, Inc. v. SEC*, 749 F. Supp. 3d 736, 739 (N.D. Tex. 2024) ("A blockchain is a decentralized electronic ledger or database shared with a network of computers. Every blockchain has its own native token, which is also known as a 'digital asset' or 'cryptocurrency.'"). It is for this reason that a court in Michigan held that the "situs of intangible assets is the domicile of the owner unless fixed by some positive law*." Currier v. PDL Recovery Group, LLC*, No. 14-12179, *2018 WL 4057394, at 2 (E.D. Mich. Aug. 27, 2018).

Nor does the Complaint allege that the defendant property was detained or seized pursuant

ACTIVE 715726710v9

to legal process or competent authority of a foreign government.  To the contrary, the Complaint alleges that the seizure warrant was issued by a U.S. magistrate judge, and that the property is currently in the custody of the U.S.M.S.  (Compl. ¶¶ 16, 48.)  Accordingly, the Complaint's own admissions foreclose venue under § 1355(b)(2).

### 4.    The Court Should Cure the Defective Venue by Transferring it to where Venue is Proper: The Northern District of California.

For the reasons mentioned above, the government's venue allegations are defective.  Venue is proper in the NDCA, and the government is unlikely to be able to maintain that this case cannot be tried in the district where it was investigated and where acts or omissions giving rise to the forfeiture occurred.  Accordingly, the Court should transfer this case to the NDCA.

The Verified Complaint admits that the perpetrators acted in California as well.  A Laguna Beach, California, resident was apparently approached during a "real estate open house."  (Compl. ¶ 94.)  This was not only online activity directed at California, but the scammers were physically present and acting inside California as well.  Thus the government cannot credibly claim that no acts or omissions took place in California.

Another victim, this one hailing from Iowa, was apparently told by a scammer that they had an "uncle" in San Francisco.  (Compl. ¶ 93.)  This underscores California's nexus, even while an Iowan is being victimized.    Given these admissions—and Victim Claimants own demographics—it is only reasonable to conclude that California is home to a significant share of victims.  This is consistent with the fact that this investigation began in California and where a week-long operation was carried out.  Contrastingly, this case bears little to no connection to the District of Columbia.

### D.    Venue Is a Threshold Issue.

It is settled law that venue transfer is a threshold issue that should be resolved before

addressing jurisdictional questions, including standing. "Examples of [] threshold questions include abstention, forum non conveniens, [and] third-party standing[.]" *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 437 U.S. App. D.C. 270, 282 (2018) (citation omitted). Here, there can be no doubt that "[i]mproper venue, like lack of personal jurisdiction, is a threshold defense[.]" *Anger v. Revco Drug Co.*, 253 U.S. App. D.C. 54 (1986); *cf. Atlantic Marine Constr. Co. v. U.S. Dist. Court*, 571 U.S. 49, 58–59 (2013) (recognizing that venue transfer under §1404(a) is a threshold procedural issue even when enforcing contractual forum-selection clauses).

In *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, the Supreme Court confirmed that "a district court has discretion to respond at once to a defendant's *forum non conveniens* plea, and need not take up first any other threshold objection," including jurisdictional adjudication." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007). This Circuit, and others, have echoed this principle. *See, e.g.*, *Public Citizen v. U.S. Dis. Court for Dist. of Columbia*, 486 F.3d 1342, 1348 (D.C. Cir. 2007) ("*Sinochem* thus firmly establishes that certain non-merits, nonjurisdictional issues may be addressed preliminarily[.]"); *see also Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 207 (4th Cir. 2022) (*Sinochem* "held that district courts need not conclusively establish their jurisdiction before dismissing a case on *forum non conveniens* grounds").

Other courts cautioned against delays, stating that "undue delay for a motion under § 1404(a), as other district courts have found, may unnecessarily require the expenditure of judicial resources in both the transferor and transferee courts." *In re Apple Inc.*, 52 F.4th 1360, 1362 (Fed. Cir. 2022).

These authorities confirm that this Court may, and indeed should, resolve venue transfer before engaging in a standing analysis, particularly where transfer serves the interests of justice

22

and judicial economy.  To the extent the government wants to challenge the claimants' standing, it can do so in the NDCA.  Nothing precludes the government from raising any appropriate arguments in that Court, which is no less competent to hear them.

## V.    CONCLUSION

This case belongs in California.  The government's own Complaint confirms that is where the investigation began, the majority of the identifiable victims reside, the third-party exchanges and custodians are based and have ties.  California is where the operative facts unfolded, and it is the most convenient forum for all claimants.  Conversely, the only tie to the District of Columbia stems from a sole paragraph in the Complaint alleging that assets are in the custody of U.S. authorities in D.C.  This is not enough.  Consequently, Victim Claimants respectfully request that the Court transfer this action to the NDCA under 28 U.S.C. §§ 1404(a) or 1406 to cure improper venue.

Dated: November 7, 2025                              Respectfully submitted,


By:    */s/ Michael Burshteyn*

**THE CRYPTO LAWYERS PLLC**
Rafael Yakobi (CA Bar No. 312421)
(Admitted *pro hac vice*)
11035 Lavender Hill Dr, Ste. 160-220
Las Vegas, NV 89135
Telephone: 619.317.0722
rafael@thecryptolawyers.com

**THE CRYPTO LAWYERS PLLC**
Agustin M. Barbara (FL Bar No. 1002677)
(Admitted *pro hac vice*)
848 Brickell Avenue, Penthouse 5
Miami, Florida 33131
Telephone: 619.317.0722
agustin@thecryptolawyers.com

**GREENBERG TRAURIG, LLP**

ACTIVE 715726710v9

Michael Burshteyn (CA Bar No. 295320)
(Admitted *pro hac vice*)
Marcelo Barros (CA Bar No. 339069)
(Admitted *pro hac vice*)
101 Second Street, Suite 2200
San Francisco, California 94105
Telephone: 415.655.1300
Facsimile: 415.707.2010
Michael.Burshteyn@gtlaw.com
Marcelo.Barros@gtlaw.com

**GREENBERG TRAURIG, LLP**
Nathan J. Muyskens (DC Bar No. 45821)
(Admitted *pro hac vice*)
Michael A. Pusateri (DC Bar No. 1005463)
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
Telephone: 202.533.2354
pusaterim@gtlaw.com
Nathan.Muyskens@gtlaw.com

**BOIES SCHILLER FLEXNER LLP**
Dan G. Boyle (CA Bar No. 332518)
(Admitted *pro hac vice*)
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
Telephone: 213.629.9040
dboyle@bsfllp.com

*Attorneys for Claimants Identified in Schedule A*

24

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 7, 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Michael Burshteyn*

25