**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**Civil Action No. 25-cv-1907**

UNITED STATES OF AMERICA,

     Plaintiff,

v.

APPROXIMATELY 225,364,961 USDT

     Defendant *in rem*.

_____/

**<u>VICTIM'S MOTION FOR HEARING PURSUANT TO
THE CRIME VICTIMS' RIGHTS ACT, 18 U.S.C. § 3771</u>**

Respectfully submitted,

| | |
|---|---|
| **MDF LAW PLLC** | **SILVER MILLER** |
| Marc Fitapelli, Esq.* | David C. Silver, Esq. |
| 28 Liberty Street, 30th | 5411 North University Drive - Suite 203 |
| New York, NY 10005 | Coral Springs, FL 33067 |
| Phone: (212) 203-9300 | Phone: (954) 516-6000 |
| Email: Marc@mdf-law.com | Email: DSilver@SilverMillerLaw.com |

   *pro hac vice* submitted

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ...........................................................................................1

STANDARD..........................................................................................................................3

PROCEDURAL POSTURE ..................................................................................................4

BACKGROUND ...................................................................................................................6

    A. What is Civil Asset Forfeiture? ...................................................................................6

    B. Victims cannot trace without the Government's proprietary data. .....................................8

    C. The Government may have been victimized too. .............................................................12

CONCLUSION....................................................................................................................13

# TABLE OF AUTHORITIES

## Cases

*Austin v. United States*, 509 U.S. 602 (1993) ...............................................................................7

*Burnham v. Superior Court*, 495 U.S. 604 (1990).........................................................................7

*Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974)..........................................6, 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).........................................10

*Fed. Insurance Co. v. United States*, 882 F.3d 348 (2d Cir. 2018) ...............................................3

*In re Dean*, 527 F.3d 391 (5th Cir. 2008) ......................................................................................3

*Kenna v. U.S. District Court*, 435 F.3d 1011 (9th Cir. 2006)........................................................3

*Leonard v. Texas*, 137 S. Ct. 847 (2017) .......................................................................................8

*Malladi Drugs & Pharmaceuticals, Ltd. v. Tandy*, 552 F.3d 885 (D.C. Cir. 2009) .......................8

*Shaffer v. Heitner*, 433 U.S. 186 (1977) ........................................................................................7

*United States v. Gratkowski*, 964 F.3d 307 (5th Cir. 2020)...........................................................8

*United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993) ......................................6

*United States v. Monzel*, 641 F.3d 528 (D.C. Cir. 2011).................................................................3

## Statutes and Rules

18 U.S.C. § 3771...................................................................................................................2, 3, 13

18 U.S.C. § 3771(a)(4)–(8)..............................................................................................................3

18 U.S.C. § 3771(d)(2) ...............................................................................................................3, 13

18 U.S.C. § 983(c)(1)........................................................................................................................8

Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 114 Stat. 202 ..........................7

**Other Authorities**

1 William Blackstone, Commentaries *299 ...................................................................................7

Commodity Futures Trading Commission, Release No. 8450-21 (Oct. 15, 2021) ........................9

**PRELIMINARY STATEMENT**

Civil asset forfeiture, the mechanism the Government seeks to invoke in this action, has its origins in undemocratic systems that vested absolute power in monarchs while affording subjects few protections against seizure of property.  As Americans, we recognize that all living human beings, even non-citizens, possess certain inalienable rights from God.  Those rights pre-date our nation and reflect humanity's enduring belief that life, liberty, and property are sacrosanct.  This Motion seeks to resolve the question of whether the Government can remove important property rights and under what circumstances.  The Movant, Lisa Kang, a mother and plastic surgeon from California, is the victim of a sophisticated cryptocurrency romance scam that caused her losses exceeding the principal sum of $55 million between 2020 and 2024. While the scale of her losses is extraordinary, the nature of the fraud is not. Like countless victims nationwide, Dr. Kang believed she was developing genuine romantic relationships with men who were in fact part of a coordinated international fraud scheme designed to manipulate her into transferring cryptocurrency into fake websites.[1]  Dr. Kang embodies the American success story, which makes her victimization even more tragic. She was born in South Korea and immigrated to the United States as a young child without speaking a word of English. Through extraordinary discipline, she went on to become a respected surgeon, entrepreneur, and philanthropist in California. Colleagues have described Dr. Kang as a woman who is "beautiful on the inside and out."[2]

---

[1] The Government's Complaint tragically adopts the term "pig butchering" to describe the victims, including Dr. Kang.  Complaint ¶ 31. The Court should not use this term. Respectfully, although the Movant understands the phrase has become common shorthand for law enforcement, the use of criminal slang to describe a female crime victim in this context is unnecessarily dehumanizing.

[2] Maya Kachroo-Levine, "Meet Dr. Lisa Kang: A Visionary Who Beautifies and Gives Back," Tango Diva (Apr. 27, 2016), https://tangodiva.com/2016/04/meet-dr-lisa-kang-a-visionary-who-beautifies-and-gives-back/ (last visited May 16, 2026).

Although highly successful professionally, Dr. Kang became vulnerable during a difficult period in her personal life following a divorce. Tragically, fraudsters preyed upon Dr. Kang's trust, isolation, and status as an Asian-American immigrant. At the same time, they convinced her that she was building substantial wealth through cryptocurrency investments and developing romantic relationships with men who had actually been deceiving her all along. These criminals directed Dr. Kang to fraudulent cryptocurrency platforms carefully designed to appear like legitimate Asian cryptocurrency exchanges. Believing both the investments and the relationships to be real, Dr. Kang ultimately transferred more than $27 million to the scammers, an amount exceeding $55 million if she held her Bitcoin.  Adding insult to injury, Dr. Kang was forced to pay millions more in taxes as a result of the transactions -- money she did not have after being victimized for nearly everything she built in America.  The financial and emotional devastation caused by this fraud has permanently altered the course of her life.  Dr. Kang did not deserve to be victimized by sophisticated fraudsters in the first instance, nor does she deserve to be victimized a second time by the American criminal justice system.

Through this Motion, Dr. Kang respectfully seeks a hearing pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771, so that this Court may "fashion a reasonable procedure" to oversee and facilitate the fair and orderly return of cryptocurrency and other assets to the victims in this matter. Here, this matter has remained stayed since February 21, 2026, and the parties have sought four separate stays without providing any meaningful update to the Court or the public about "settlement." Respectfully, Dr. Kang submits that the stay should be lifted, no further stays should be granted absent extraordinary circumstances, and the Court should immediately hold a hearing to establish an orderly and transparent process before this case proceeds any further.

2

**STANDARD**

The Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, affords federal crime victims substantial procedural rights. Among other rights, the statute guarantees victims the right to confer with the Government, the right to be reasonably heard at public proceedings, the right to proceedings free from unreasonable delay, and the right to be treated with fairness and respect for their dignity and privacy. 18 U.S.C. § 3771(a)(4)–(8); *Kenna v. U.S. Dist. Court*, 435 F.3d 1011, 1016-17 (9th Cir. 2006) (fairness and dignity are substantive, enforceable rights); *In re Dean*, 527 F.3d 391, 394-95 (5th Cir. 2008) (government must confer with victims before making consequential case decisions). There is no doubt that victims, like the Dr. Kang, are entitled to come before this Court to be heard, especially on matters pertaining to settlement and victim restitution. This is because:

> CVRA confers standing on victims to seek restitution on their own behalf, rather than relegating them to bystander status while the government decides, for its own reasons and pursuant to its own strategy, whether, for whom, and in what amount to seek restitution. Moreover, the CVRA makes clear that its procedural tools are also available to vindicate a victim's entitlement to restitution. In fact, the CVRA's mechanisms are currently "a crime victim's only recourse for challenging a restitution order." *United States v. Monzel*, 641 F.3d 528, 540, 395 U.S. App. D.C. 162 (D.C. Cir. 2011) (collecting cases).

*Fed. Ins. Co. v. United States*, 882 F.3d 348, 359 (2nd Cir. 2018).

"Where the court finds that the number of crime victims makes it impracticable to accord all of the crime victims the rights described in subsection (a), the court shall fashion a reasonable procedure to give effect to this chapter [this section] that does not unduly complicate or prolong the proceedings." 18 U.S.C.§ 3771(d)(2). Pursuant to 18 U.S.C. § 3771(d)(2), the Movant respectfully requests that the Court fashion a reasonable procedure leading to the fair resolution of this matter by ordering a hearing and directing the parties to confer in advance regarding

3

procedures that would adequately protect and address the rights and concerns of the victims of the widespread fraudulent scheme that stole from those victims the seized assets constituting the Defendant *in rem* in this matter. The Movant does not seek to complicate these proceedings, but simply asks for basic fairness, transparency, and dignity for victims of extraordinary fraud.

## PROCEDURAL POSTURE

On June 18, 2025, the Government commenced this action by filing a Verified Complaint with forty exhibits. *United States v. Approximately 225,364,961 USDT*, No. 1:25-cv-1907, Docket No. 1. According to the Government's notice, which was only published for thirty (30) days on an internet website, claims were due on August 22, 2025, which date was sixty (60) days following the publication date. ECF No. 5.[3] On October 3, 2025, after the deadline for claims had passed, one hundred eighteen (118) claims were belatedly filed by purported victim-claimants ("Victim Group 1"). ECF No. 14. Victim Group 1 filed only an Excel spreadsheet identifying claim numbers, victim initials, and alleged loss amounts. On November 7, 2025, Infiniweb Technologies, Inc. filed a motion to dismiss, asserting ownership rights to the Defendant Property. ECF No. 28. That same day, Victim Group 1 also filed a motion to transfer the case to California.[4] ECF No. 29. On December 22, 2025, an additional one hundred forty-seven (147) victims ("Victim Group 2") filed belated claims. ECF No. 34. Like Victim Group 1, those claims consisted of an Excel spreadsheet with no identities beyond claim numbers, victim initials, and alleged loss amounts.

---

[3] This website was not continuously accessible twenty-four hours per day and, instead, was unreachable to some victims for portions of nearly every day during the thirty-day statutory notice period. ECF No. 5, Pg. 5 (see column "Total Hours Web Site Was Available during Calendar Date")

[4] The Movant agrees with the Government that this matter should remain in the District of Columbia but disagrees with the Government regarding victim standing. ECF No. 45 (Government's Opposition to Motion to Transfer).

Importantly, Victim Group 1 and Victim Group 2 both filed claims after the August 22, 2025 deadline.

On February 21, 2026, the Court granted the parties' joint motion to stay the case until March 13, 2026 due to ongoing "settlement negotiations" and ordered the parties to provide a status update by that date. On March 13, 2026, the parties requested additional time to continue settlement negotiations, and the stay was extended until April 13, 2026. On April 14, 2026, the parties submitted a third request to stay the matter, which the Court granted, ordering a further status update on settlement by May 8, 2026.  Predictably, the parties then submitted, and the Court approved, a fourth request seeking to continue the stay through June 8, 2026, again to engage in "settlement."  ***Movant takes exception to Victim Group 1 and Victim Group 2's attempts to obtain special treatment through the Courts***.[5]  Essentially, Victim Group 1 and Victim Group 2 filed untimely claims and now seek to bootstrap their own untimely claims to vault themselves to the front of the line for restitution and recovery from the assets seized by the Government -- all to the detriment of other victims (including Movant) who are following the previously established proper procedures for victim restitution and recovery.

While the Movant disagrees with the Government's position regarding standing, the Movant likewise does not believe it is appropriate to afford certain victim's preferential treatment unavailable to others (i.e. premature settlements).  Under the DOJ's official policies governing asset forfeiture, victims must wait until the conclusion of the forfeiture proceedings before filing

---

[5] Based on information filed in a related case, Movant understands that Victim Group 2 also includes an individual named Edmond Rambod, who filed a RICO claim against Infiniweb Technology in California. No parties to that matter have answered or moved, and that Court has been advised that a resolution before this Court will also resolve that matter. *Rambod v. Defendant 1*, No. 2:24-cv-07215, Dkt. 53 (C.D. Cal. Western Div.) (filed on May 1, 2026) ("There are productive and ongoing settlement discussions between the United States, individual claimants, and Infiniweb, with the goal of reaching a global resolution of the civil-forfeiture action.").

a petition for remission. Ex. 1 (U.S. Dep't of Just., Asset Forfeiture Policy Manual 2025).[6] This rule reflects a basic principle of due process and basic common sense: the Government cannot agree to distribute private property until a court determines that the Government has a lawful right to do so. The Government's official position is as follows:

> Once assets have been forfeited, the authority to distribute them to owners, lienholders, or victims rests solely with the Attorney General. Congress granted complete discretion to the Attorney General to remit or mitigate forfeitures, ***and no judicial review of remission or mitigation decisions is available.***

*Id*. at pg. 13-1 (footnotes omitted; emphasis added).  The practical consequences of allowing the Government to seize and prematurely redistribute property privately, without any Court order and designed to benefit certain procedure-ignoring victims over others, is deeply disturbing and unlawful in this circumstance.

## BACKGROUND

A.  <u>What is Civil Asset Forfeiture?</u>

Under the Due Process Clause of the Fourteenth Amendment, the government ordinarily may not seize real property without providing notice and a hearing. *See*, *United States v. James Daniel Good Real Property*, 510 U. S. 43, 62, 114 S. Ct. 492, 126 L. Ed. 2d 490 (1993).  However, the Government may immediately seize personal property (for example, a vehicle) that is subject to civil forfeiture when the property otherwise could be removed, destroyed, or concealed before a forfeiture hearing. *See*, *Calero-Toledo v. Pearson Yacht Leasing Co*., 416 U. S. 663, 679-680, 94 S. Ct. 2080, 40 L. Ed. 2d 452 (1974). Civil asset forfeiture traces its origins to ancient English legal doctrines developed during a time when subjects owed allegiance to the Crown and property

---

[6] Movant did not file a claim in this Court on reliance of the Government's published instructions contained in this manual.

rights existed largely at the pleasure of the sovereign. The historical basis for common law forfeiture was that a breach of the criminal law was an offense to the "king's peace," which was felt to justify denial of the right to own property. *Calero-Toledo*, 416 U.S. at 682 (citing 1 W. Blackstone, Commentaries *299); *Austin v. United States*, 509 U.S. 602, 613, 113 S. Ct. 2801, 125 L. Ed. 2d 488 (1993) (discussing history of civil asset forfeiture). Although civil asset forfeiture has roots in the common law, it is statutory in nature in the United States; and Congress last comprehensively reformed the federal civil asset forfeiture framework in 2000, eight years before Bitcoin and decentralized cryptocurrency even existed. *See*, Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 114 Stat. 202 (2000).

Statutory civil asset forfeiture is controversial and has long been viewed with skepticism by many jurists, most prominently U.S. Supreme Court Justice Antonin Scalia. In *Burnham v. Superior Court*, 495 U.S. 604, 110 S. Ct. 2105, 109 L. Ed. 2d 631 (1990), Justice Scalia quoted from *Shaffer v. Heitner*, 433 U.S. 186, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977): "[t]he fiction that an assertion of jurisdiction over property is anything but an assertion of jurisdiction over the owner of the property supports an ancient form without substantial modern justification." As Justice Scalia wisely recognized, American civil asset forfeiture law is nothing other than an ancient form that existed when Americans were subjects, not citizens. In denying *certiorari* review in a case several years later, U.S. Supreme Court Justice Clarence Thomas said the following about forfeitures:

> This system, where police can seize property with limited judicial oversight and retain it for their own use, has led to egregious and well-chronicled abuses. According to one nationally publicized report, for example, police in the town of Tenaha, Texas, regularly seized the property of out-of-town drivers passing through and collaborated with the district attorney to coerce them into signing waivers of their property rights. In one case, local officials threatened to file unsubstantiated felony charges against a Latino

driver and his girlfriend and to place their children in foster care unless they signed a waiver. In another, they seized a black plant worker's car and all his property (including cash he planned to use for dental work), jailed him for a night, forced him to sign away his property, and then released him on the side of the road without a phone or money. He was forced to walk to a WalMart, where he borrowed a stranger's phone to call his mother, who had to rent a car to pick him up.

These forfeiture operations frequently target the poor and other groups least able to defend their interests in forfeiture proceedings. Perversely, these same groups are often the most burdened by forfeiture. They are more likely to use cash than alternative forms of payment, like credit cards, which may be less susceptible to forfeiture. And they are more likely to suffer in their daily lives while they litigate for the return of a critical item of property, such as a car or a home.

*Leonard v. Texas*, 137 S. Ct. 847, 847, 197 L. Ed. 2d 474, 475 (U.S. 2017) (Thomas, J.) (statement respecting the denial of *certiorari*) (internal citations omitted)

Here, the Court should approach the Government's forfeiture assertions with substantial skepticism, particularly where the property at issue belongs not to an alleged wrongdoer, but to the victims of the underlying crimes. In civil forfeiture proceedings, the plaintiff (here, the Government) "bears the burden of proving, by a preponderance of the evidence, that the property [at issue] is subject to forfeiture." *Malladi Drugs & Pharmaceuticals, Ltd. v. Tandy*, 552 F.3d 885, 887, 384 U.S. App. D.C. 232 (D.C. Cir. 2009) (citing 18 U.S.C. § 983(c)(1)).

B. Victims cannot trace without the Government's proprietary data.

Cryptocurrencies were first introduced in 2008 through Bitcoin, the first and most popular type of cryptocurrency. The Fifth Circuit once explained Bitcoin as follows: "[e]very Bitcoin user has access to the public Bitcoin blockchain and can see every Bitcoin address and its respective transfers. Due to this publicity, it is possible to determine the identities of Bitcoin address owners by analyzing the blockchain." *United States v. Gratkowski*, 964 F.3d 307, 312 (5th Cir. 2020). While the Fifth Circuit's description is accurate in theory, it is often far more difficult in practice

8

to trace cryptocurrency transactions, including the cryptocurrency at issue in this matter: Tether (USDT). Tether is the company that issues USDT, the cryptocurrency that the Government is holding.[7] This is because most individual users rely on centralized cryptocurrency exchanges, and exchanges use what are known as omnibus wallets. An omnibus wallet is a large, shared wallet that holds cryptocurrency belonging to many different customers at the same time, rather than assigning each customer a separate on-chain wallet.[8] As a result, cryptocurrency deposited by one customer may be combined with funds belonging to thousands of other users before later being redistributed. This process makes blockchain tracing impossible without priority data from the centralized exchange and every similar intermediary. Importantly, in addition to lawful exchanges, there are also a variety of unlawful cryptocurrency services known as "mixers," which are specifically designed to obfuscate the identity of users and make blockchain tracing substantially impossible.[9]  Because the Government repeatedly alleged in its Complaint in this matter that the victims' funds were heavily laundered to obscure their origin, it is especially important that the Government disclose the precise methodology it used to conduct its tracing analysis.  Complaint ¶¶ 45–49 (describing steps allegedly taken by criminals to launder funds and frustrate blockchain

---

[7]  Tether to Pay $41 million Over Claims that Tether Stablecoin was Fully Backed by US Dollars Release No. 8450-21 (Oct. 15, 2021) https://www.cftc.gov/PressRoom/PressReleases/8450-21 (last visited May 20, 2026) (explaining how Tether lied to the public about being pegged to the U.S. dollar); compare Complaint ¶ 28 ("For example, Tether (also known as USDT) is a stablecoin pegged to the U.S. dollar.").

[8] *See*, *e.g.*, the User Agreement promulgated by Coinbase, the largest centralized cryptocurrency exchange in the United States.  "Coinbase may use shared blockchain addresses, controlled by Coinbase, to hold Supported Digital Assets . . . [and] shall have no obligation to create a segregated blockchain address for your Supported Digital Assets." Coinbase User Agreement § 2.7.4 (Omnibus Accounts), https://www.coinbase.com/legal/user_agreement/united_states (last visited May 19, 2026).

[9] U.S. Dep't of the Treasury, Press Release, Treasury Designates Roman Semenov, Co-Founder of Sanctioned Virtual Currency Mixer Tornado Cash (Aug. 23, 2023), https://home.treasury.gov/news/press-releases/jy1702 (describing mixers).

tracing).  This lack of transparency is compounded by the fact that the Government's exhibits to its Complaint contain abbreviated cryptographic hashes shortened with ellipses. Without full cryptographic data, neither the Court nor third parties can independently verify the Government's tracing claims or, by extension, its allegations.  Attention should be drawn to Exhibit 31 of the Complaint, wherein the Government "*condenses* transactions in arrows (describing multiple transactions) and shapes described as intermediary addresses to streamline the illustration of the flow of funds." Complaint ¶ 196 (emphasis added). Again, without full data, the Government's exhibits require more information for verification and the victims cannot prove their losses.  The Complaint further alleges, "[t]o conduct blockchain analysis, law enforcement officers use reputable, free open source blockchain explorers, as well as commercial tools and services. *These commercial tools are offered by different blockchain-analysis companies*." Id. ¶ 19 (emphasis added). Notably, the Complaint never identifies the name of the Government's "commercial tools" nor does the Government even explain its methodology.  *See*, *e.g.*, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).[10]

As the Court can appreciate, Dr. Kang faced substantial difficulty proving her entitlement to the Defendant Property. Despite these challenges, on May 18, 2026, her counsel submitted a Petition to the Department of Justice in accordance with Exhibit 1, substantiating her ownership claims, including forensic tracing analysis linking her stolen assets to OKX, the same cryptocurrency exchange identified in the Government's Complaint.  *See* Complaint ¶ 45.  By way of example, set forth below is a summary tracing of 364.51 Bitcoin belonging to Dr. Kang

---

[10] The Government refers to its tracing methodology only as "last in, first out," but its description is facially insufficient to satisfy a *Daubert* analysis. *See*, Complaint ¶ 46 n.11. Merely labeling a tracing methodology as "last in, first out" does not resolve the concerns raised herein, namely that third parties within the chain of custody, including exchanges utilizing omnibus wallets and other intermediaries, substantially obfuscate blockchain tracing.

through intermediary wallets and ultimately to OKX, in a manner consistent with the laundering

patterns alleged by the Government:



In addition to Bitcoin, Dr. Kang also sent USDT to the men who scammed her. USDT is the same

type of cryptocurrency currently being held by the Government. Dr. Kang's expert witnesses are

likewise prepared to testify that her USDT was laundered through intermediary wallets and OKX

accounts in a manner consistent with the following summary:



**Flow of Funds**
USDT was moved from Kang's Kraken account through the suspect wallets, consolidated with additional funds, before being sent through Tokenlon and received at OKX.

**BTC Wallet Addresses**
SW1 - 2175c0082d052872501f7fe54e1ac59858aaf7d9
SW2 - abb07822f471773ff00b9444308ceeb7cf0daca7

These above-cited excerpts are taken from Dr. Kang's confidential submission to the Government and are provided to the Court for illustrative purposes only. Dr. Kang's submission was supported by robust evidence, including bank records, forensic tracing analysis, and communications with the United States Secret Service. Indeed, no individuals from Victim Group 1 or Victim Group 2 have even come forward publicly by name.[11] Dr. Kang, by contrast, should be commended for the courage it took to speak openly about the personally embarrassing fraud perpetrated against her.

C.  The Government may have been victimized too.

Unlike traditional bank deposits held at FDIC-insured financial institutions, digital assets are often maintained through cryptocurrency exchanges or custodians operating outside the ordinary protections associated with the United States banking system. Notably, the Complaint

---

[11] It is undignified to require victims of crimes to publicly plead with the Government for the return of their own money.  The entire point of this motion is that victims should not be forced to do what Dr. Kang must do here.

does not explain where the digital assets are presently custodied, who controls their private keys, or whether the institution holding the assets is reputable and secure. The Complaint only alleges that the cryptocurrency is in the "custody of the United States Marshals Service in the District of Columbia." Complaint ¶ 16. That distinction is significant because cryptocurrency, by its nature, can be transferred and stolen instantly. These concerns are not hypothetical. ***Government contractors and custodians may have stolen funds associated with this very case, but only the Government knows for sure***. For example, on March 5, 2026, a contractor working with the United States Marshals Service was reportedly arrested for allegedly stealing approximately $46 million in cryptocurrency connected to government-controlled assets.[12] There are only a handful of civil asset forfeiture matters involving more than $40 million in cryptocurrency, making it reasonably likely that the theft involved assets connected to this case. Again, these concerns are neither intended to delay these proceedings nor merely hypothetical. Victims, including Dr. Kang, are entitled to basic answers concerning their own property and the procedures governing its potential return.

---

[12] Shayne Gal/Stefan Jeremiah, U.S. Gov't Contractor Busted on Ritzy Caribbean Island for Stealing $46M in Crypto from U.S. Marshals Service, FBI Says, N.Y. Post (Mar. 5, 2026), https://nypost.com/2026/03/05/us-news/us-govt-contractor-busted-on-ritzy-caribbean-island-for-stealing-46m-in-crypto-from-us-marshals-service-fbi-says/ (last visited May 16, 2026).

## CONCLUSION

For the foregoing reasons, and pursuant to 18 U.S.C. § 3771(d)(2), the Movant respectfully requests that the Court fashion a reasonable procedure leading to the fair resolution of this matter by ordering a hearing and directing the parties to confer in advance regarding procedures that would adequately protect and address the rights and concerns of the victims and their counsel.

Dated: May 22, 2026

Respectfully submitted,

| | |
|---|---|
| **MDF LAW PLLC** | **SILVER MILLER** |
| _/s/ Marc Fitapelli_ . | _/s/ David C. Silver_ . |
| Marc Fitapelli, Esq.* | David C. Silver, Esq. |
| 28 Liberty Street, 30th | 5411 North University Drive - Suite 203 |
| New York, NY 10005 | Coral Springs, FL 33067 |
| Phone: (212) 203-9300 | Phone: (954) 516-6000 |
| Email: Marc@mdf-law.com | Email: DSilver@SilverMillerLaw.com |
| *_pro hac vice_ submitted | |