**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br>     v.<br><br>APPROXIMATELY 225,364,961 USDT,<br><br>          Defendant *in rem*, | Case No. 25-cv-01907-AHA<br><br><br>**CLAIMANTS 1-118'S OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE**<br>**(ECF No. 44)** |

Claimants 1-118, as identified in Schedule A to their verified claims filed on October 3, 2025 (ECF No. 14) ("Claimants"), hereby respond to and oppose the Motion to Strike filed by Plaintiff United States of America (ECF No. 44) (the "Motion").

This Opposition is based on the accompanying Memorandum of Points and Authorities and the files and records in this case.

Dated: June 23, 2026

Respectfully submitted,

By:    */s/ Dan G. Boyle*

**THE CRYPTO LAWYERS PLLC**
Rafael Yakobi (CA Bar No. 312421)
(Admitted *pro hac vice*)
11035 Lavender Hill Dr, Ste. 160-220
Las Vegas, NV 89135
Telephone: 619.317.0722
rafael@thecryptolawyers.com

**THE CRYPTO LAWYERS PLLC**
Agustin M. Barbara (FL Bar No. 1002677)
(Admitted *pro hac vice*)
848 Brickell Avenue, Penthouse 5
Miami, Florida 33131
Telephone: 619.317.0722

agustin@thecryptolawyers.com

**GREENBERG TRAURIG, LLP**
Michael Burshteyn (CA Bar No. 295320)
(Admitted *pro hac vice*)
Marcelo Barros (CA Bar No. 339069)
(Admitted *pro hac vice*)
101 Second Street, Suite 2200
San Francisco, California 94105
Telephone: 415.655.1300
Facsimile: 415.707.2010
Michael.Burshteyn@gtlaw.com
Marcelo.Barros@gtlaw.com

**GREENBERG TRAURIG, LLP**
Nathan J. Muyskens (DC Bar No. 45821)
(Admitted *pro hac vice*)
Michael A. Pusateri (DC Bar No. 1005463)
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
Telephone: 202.533.2354
pusaterim@gtlaw.com
Nathan.Muyskens@gtlaw.com

**BOIES SCHILLER FLEXNER LLP**
Dan G. Boyle (CA Bar No. 332518)
(Admitted *pro hac vice*)
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
Telephone: 213.629.9040
dboyle@bsfllp.com

*Attorneys for Claimants 1-118*

2

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.    BACKGROUND ................................................................................................2

III.    RELEVANT LAW .............................................................................................5

IV. ARGUMENT.........................................................................................................7

      A.    The Motion is Limited to the Pleadings ................................................8

      B.    Claimants Have Sufficiently Pled an Ownership Interest in the Defendant Property ...............................................................................................9

      C.    The Government Cannot Strike the Claims Simply because Claimants are Victims of Crime ...............................................................................14

      D.    BCCI Holdings Does Not Require Striking the Claims.......................18

      E.    Reliance on the Petition Process is Not Relevant Here........................22

V.    CONCLUSION ..................................................................................................25

## TABLE OF AUTHORITIES

### CASES

*Bell v. United States*,
   462 U.S. 356 (1983) ..................................................................................................10

*Degen v. United States,*
   517 U.S. 820 (1996) ...................................................................................................6

*Dowling v. United States*,
   473 U.S. 207 (1985) ..................................................................................................13

*Great Am. Indem. Co. v. Yoder,*
   131 A.2d 401 (D.C.1957) ..........................................................................................13

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,*
   530 U.S. 238 (2000) ..................................................................................................20

*Lee v. United States*,
   570 F. Supp. 2d 142 (D.D.C. 2008) ...........................................................................21

*Levin v. United States*,
   338 F.2d 265 (D.C. Cir. 1964) ...................................................................................13

*S.E.C. v. Paige*,
   1985 WL 2335 (D.D.C. July 30, 1985) ......................................................................12

*United States v. $133,420*,
   672 F.3d 629 (9th Cir. 2012) .......................................................................................7

*United States v. $9,781,900.00 of Funds in Name of Falcon Strategic Sols.*,
   813 F. Supp. 3d 29 (D.D.C. 2025) .............................................................................10

*United States v. 8 Gilcrease Lane, Quincy Fla. 32351*,
   641 F. Supp. 2d 1 (D.D.C. 2009) ...............................................................................16

*United States v. 92 Buena Vista Ave.*,
   507 U.S. 111 (1993) ....................................................................................................9

*United States v. All Assets Held at Bank Julius Baer & Co.,*
   2023 WL 5000213 (D.D.C. Aug. 4, 2023) ...................................................................6

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*,
   228 F. Supp. 3d 118 (D.D.C. 2017) ..........................................................................6, 8

*United States v. All Assets Held in the Inv. Portfolio of Blue Holding (1) Pte. Ltd. on Behalf of*
   *Traceable to Ridley Grp. Ltd.,*
   712 F. App'x 13 (D.C. Cir. 2018) ................................................................................6

*United States v. BCCI Holdings (Luxembourg),*
   *S.A.*, 46 F.3d 1185 (D.C. Cir. 1995) .............................................................2, 18, 19

*United States v. Emor*,
   785 F.3d 671 (D.C. Cir. 2015) ..........................................................................passim

*United States v. Monzon,*

2009 WL 361095 (S.D. Fla. Feb. 9, 2009) ................................................................11

*United States v. Salti,*
579 F.3d 656 (6th Cir.2009) ....................................................................................22

*United States v. Seventeen Thousand Nine Hundred Dollars ($17,900.00) in United States Currency,*
859 F.3d 1085 (D.C. Cir. 2017) ..............................................................................6

*United States v. Sum of $70,990,605,*
234 F. Supp. 3d 212 (D.D.C. 2017) .........................................................................9

*United States v. Trafigura AG,*
2008 WL 4057907 (S.D. Tex. Aug. 26, 2008) ........................................................11

*Willis Mgmt. (Vermont), Ltd. v. United States*,
652 F.3d 236 (2d Cir. 2011) ...................................................................................21

## STATUTES

18 U.S.C. § 983 .......................................................................................................14

21 U.S.C. § 853 .......................................................................................................12

## RULES

Supplemental Rule G ..........................................................................................passim

## TREATISES

Stefan Cassella, *Asset Forfeiture Law In the United States*, 2d. ...........................8, 12

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Claimants are more than one hundred victims of cybercrime. They include teachers, health care providers, delivery workers, and retired professionals who collectively lost millions of dollars to scams the government's Complaint describes as theft. To date, they have recovered none of the assets stolen from them, but through diligent investigation and forensic tracing, Claimants have identified their stolen property in the same wallet network the Complaint identifies and from which the approximately 225,364,961 USDT at issue (the "Defendant Property") was seized. Claimants have alleged in their verified Claims that they owned such property when it was stolen from them, they never voluntarily transferred or abandoned title to it, and they continue to hold an ownership interest in it. *See* ECF No. 14 ¶¶ 1-5. All they are seeking through this proceeding is to have their stolen property returned.

The government now asks the Court to strike those Claims based on an assumption that is nowhere in the record: that the thieves who stole Claimants' assets somehow obtained title to this stolen property, leaving Claimants with only personal debts against these wrongdoers. It is axiomatic that a thief never takes good title to stolen property, but more importantly, this is simply not a Rule G(8)(c) pleading-stage argument. It is a question of fact, and it contradicts the Claims, the Complaint, and the posture the government chose for this Motion.

The Motion should be denied for three core reasons. First, it is restricted to the pleadings, yet it barely engages with the Claims and asks the Court to draw movant-favorable inferences – which the Court cannot do. Second, the D.C. Circuit's decision in *United States v. Emor*, 785 F.3d 671 (D.C. Cir. 2015)*,* directly undercuts the government's Motion, holding that a theft victim who can prove their property was stolen may establish legal title or a superior legal interest in forfeiture

proceedings; and at this stage, Claimants need only plead that theory. Third, *United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185 (D.C. Cir. 1995), does not change that result. That decision, which preceded *Emor* by two decades, addressed constructive-trust claims by failed-bank depositors in a criminal RICO forfeiture, not verified Rule G claims by theft victims who have pleaded continued ownership of specific, traced stolen property.

This is a critical crypto-victim standing case. Victims of cryptocurrency theft rarely have the chance to stand up for themselves in forfeiture proceedings before this court; here, more than one hundred have done so through their verified Claims. The government's response is to assume it is right on standing without engaging with the Claims, the Complaint's theft allegations, or the limits of the Rule G(8)(c) motion it chose. It relies instead on decades-old, distinguishable precedent whose reasoning has been called into question by later authority. A close look at the pleadings and governing law shows that the government's standing argument overreaches: the Motion is premature, unsupported by the Claims or the Complaint, and has no basis at this stage.

The Court should deny the Motion.

## II.     BACKGROUND

On June 18, 2025, the United States of America field a Verified Complaint for Forfeiture of the Defendant Assets in this action. *See* ECF No. 1 (the "Complaint").

In brief, the Complaint alleges that the Defendant Property in this case consists of approximately 225,364,961 USDT digital currency which are alleged to be criminal proceeds. *See* Compl. ¶ 15. As alleged by the government, "criminals abroad, along with their associates and conspirators, stole funds from over 430 suspected victims" and "[a]fter stealing those funds, the criminal actors laundered them through a convoluted web of cryptocurrency accounts and

addresses to evade detection and to hide the fact that the funds came from victims." Compl. ¶ 1.

Specifically, the Complaint alleges that the underlying scheme(s) operated roughly as follows: Victims were identified by criminals located abroad through cold contacts via text, social media, or some other communication platform, often pretending to have contacted the wrong number but continuing to communicate in order to establish a relationship with the victim over days, weeks, or months, eventually concocting a narrative to induce the victim to send them a series of purported investments, often in the form of cryptocurrency. Compl. ¶ 31. These criminals then convinced victims to download "what appear to be legitimate mobile banking or investment apps to track their cryptocurrency investments." but "[i]n reality, they are not connected to any real account or legitimate financial institution. Instead, the apps are created and controlled by the perpetrators, who are able to create the facade of balances and transactions that are otherwise non-existent." Compl. ¶ 40.

A widely used cryptocurrency exchange "contacted law enforcement officers regarding a large network of virtual currency accounts (the "144 OKX Accounts") they analyzed and believed were involved in receiving and transferring vast amounts of cryptocurrency scam proceeds—all controlled by a coordinated group of overseas actors." Compl. ¶ 45. The government then "identified approximately 93 addresses to which victims deposited their virtual currency while under the belief that they were sending funds to legitimate exchange platforms." Compl. ¶ 46. Government agents were able to interview approximately 60 confirmed victims who deposited funds in the 144 OKX Accounts which were then stolen, but many others were not identified or could not be contacted. *See* Compl. ¶ 71.

In summary, the Defendant Property is alleged in the Complaint to be proceeds of schemes where victims were tricked into believing they were depositing their assets into their own

investment or exchange accounts, but which were in fact controlled by criminals who then stole these assets.

On October 3, 2025, Claimants filed verified claims opposing forfeiture in this action (the "Claims"). *See* ECF Nos. 14, 15. The Claims stated, in relevant part:

> Claimants each have such an interest in the Defendant Property. Each Claimant held a lawful ownership interest in the Defendant Property at the time it was stolen from them. No Claimant has ever voluntarily transferred, assigned, or abandoned their lawful ownership interest in the Defendant Property, and each Claimant continues to hold their lawful ownership interest in the Defendant Property.
>
> Each Claimant was a victim of the criminal offenses underlying the forfeiture of the Defendant Property. Specifically, each Claimant fell victim to the scheme the Complaint describes. This sort of scheme is unfortunately common and, on information and belief, results in the theft of hundreds of millions of dollars in virtual currency annually. Perpetrators convinced Claimants to download and use what appeared to be legitimate mobile banking or investment applications meant for cryptocurrency trading. These apps, in reality, were not connected to any legitimate developer, financial institution, or other organization. Malicious perpetrators created and controlled the apps and presented a façade of fake balances and transactions that appeared real. Claimants each deposited their virtual currency at the perpetrators' direction under the belief that they were sending funds to a legitimate exchange platform. Claimants believed, based on the perpetrators' misrepresentations, that they would maintain custody and control of their virtual currency funds. (See, e.g., ECF No. 1, at 40, ¶¶ 46.) Instead, however, the perpetrators stole Claimants' funds.

Claims, ¶ 4-5.

On October 17, 2025, Claimants moved this Court pursuant to 28 U.S.C.§§ 1404, 1406 to transfer this action to the United States District Court for the Northern District of California, on the grounds that the underlying investigation, relevant witnesses, and sources of proof were located in that district, and that the United States had not adequately alleged facts supporting venue in this District. *See* ECF No. 29 (the "Transfer Motion"). In the Transfer Motion, Claimants asked the Court to resolve that threshold, non-merits venue issue first, *see* ECF No. 65 at 3, 10; ECF No. 70 at 3, because as detailed below, the government's Motion touches on merits issues such as

4

ownership, tracing, and allocation in a forum that Claimants contend is not the proper one.

On December 5, 2025, the government served Special Interrogatories on Claimants through counsel. Claimants responded to these interrogatories on February 2, 2026, producing detailed responses and objections, including thousands of pages of supporting documents which detailed the circumstances of their victimization, including forensic tracing material and analysis linking their stolen assets to the government's seizure.[1] Claimants also produced a detailed appendix of the amounts traced to the defendant assets from each Claimant's losses thus far.[2] To date, the government has not disputed Claimants' interrogatory responses or supporting materials.

On February 20, 2026, the government moved to strike Claimants from this action under Rule G(8)(c) of the Supplemental Rules. The Motion did not attach any evidence or declaration, and did not request a hearing. The Motion did not attach a statement of material facts or otherwise follow the Local Rule 7(h) governing motions for summary judgment.

## III.    RELEVANT LAW

Forfeiture actions *in rem* are governed by Supplemental Rule G of the Federal Rules of Civil Procedure, and by the remaining Supplemental Rules and Federal Rules so long as not inconsistent with Rule G. *See* Supp. Rules G(1); A(2); *United States v. All Assets Held in the Inv. Portfolio of Blue Holding (1) Pte. Ltd. on Behalf of Traceable to Ridley Grp. Ltd.,* 712 F. App'x 13, 14 (D.C. Cir. 2018).

---

[1] As detailed herein, *infra* IV.A, the government's Motion is necessarily limited to the pleadings because the Government has not requested a hearing or complied with Local Rule 7(h). Thus, Claimants are not attaching these interrogatories or Claimants' responses as part of the record for this Motion. Claimants provide this summary only as background to the Court.

[2] As Claimants made clear in their interrogatory responses, their traced loss amounts are based only on information currently available to them, which is largely limited to public blockchain records and information disclosed in the Complaint. Claimants expect that should discovery proceed, their traced loss amounts may increase as counsel obtain missing information to conduct further tracing.

"In an ordinary case a citizen has a right to a hearing to contest the forfeiture of his property, a right secured by the Due Process Clause." *Degen v. United States,* 517 U.S. 820, 822 (1996). Nonetheless, a claimant has the burden to establish their standing to oppose forfeiture, and standing in a civil forfeiture action has two aspects: Article III standing and so-called statutory standing. *See United States v. Seventeen Thousand Nine Hundred Dollars ($17,900.00) in United States Currency,* 859 F.3d 1085, 1089 (D.C. Cir. 2017).

The D.C. Circuit has described the requirements for a claimant to demonstrate constitutional standing to challenge a forfeiture as "very forgiving," and "in general, any colorable claim on the property suffices, if the claim of injury is redressable, at least in part, by a return of the property." *United States v. Emor,* 785 F.3d 671, 676 (D.C. Cir. 2015). "Article III's standing requirement is thereby satisfied because an owner or possessor of property that has been seized necessarily suffers an injury that can be redressed at least in part by the return of the seized property." *$17,900.00,* 859 F.3d at 1090 *(citing United States v. $515,060.42*, 152 F.3d 491, 497 (6th Cir. 1998)). "The term 'statutory standing' relates to a claimant's ability to show that he has satisfied whatever statutory requirements Congress has imposed for contesting a civil forfeiture action in federal court." *United States v. All Assets Held at Bank Julius Baer & Co.,* 2023 WL 5000213, at *7 (D.D.C. Aug. 4, 2023). "In order to demonstrate statutory standing in an *in rem* forfeiture proceeding, a claimant must have 'assert[ed] [their] interest in the property in the manner set forth in the Supplemental Rules.'" *Id.* at *8 (quoting *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 228 F. Supp. 3d 118, 122 (D.D.C. 2017) (*Julius Baer II*)).

A claimant's burden to show standing is evaluated on a sliding scale where a claimant must offer more proof at successive stages of litigation. *See United States v. $133,420*, 672 F.3d 629, 634 (9th Cir. 2012). "At the pleading stage, a claimant need only *allege* a colorable interest

6

in the property." *$17,900.00,* 859 F.3d at 1090 (citing *$133,420*, 672 F.3d at 638)

Once a claim is filed, the government can then challenge a claimant's putative standing in a civil forfeiture action through a motion under Rule G(8)(c), which states as follows:

(i) At any time before trial, the government may move to strike a claim or answer:

(A) for failing to comply with Rule G(5) or (6)[3], or

(B) because the claimant lacks standing.

(ii) The motion:

(A) must be decided before any motion by the claimant to dismiss the action; and

(B) may be presented as a motion for judgment on the pleadings or as a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence.

## IV. ARGUMENT

As explained above, a motion to strike can challenge either a claimant's Article III standing or statutory standing. Here the government's Motion is less than clear as to which elements of standing the government is actually contesting, but there is no serious argument that Claimants have met the procedural requirements for filing a claim stated in Rule G(5) – the Claims are verified, were served on the government via the ECF filing system, and state the basis of the Claimants' interest in the defendant *res*. The core of the Motion is an attack on Claimants' Article III standing, and more specifically, an argument that Claimants are supposedly no longer owners of the assets stolen from them, or alternatively, that Claimants lack statutory standing for the same reason. Both theories are incorrect, and have been flatly rejected by binding circuit precedent.

---

[3] Rule G(6) concerns special interrogatories. As noted above, there is no contention from the government that Claimants' interrogatory responses were deficient, so this provision does not apply here.

### A.  The Motion is Limited to the Pleadings

The government's Motion stumbles right out of the gate by failing to identify or address the applicable standard of review here. As stated in Rule G(8)(C)(ii)(B), a motion to strike can be "presented as a motion for judgment on the pleadings or as a motion to determine after a hearing or by summary judgment." Here, the government has not requested a hearing, and the Motion does not comply with the local rules for summary judgment, so it necessarily must be treated as a motion for judgment on the pleadings. And where the government moves to strike a claim on the pleadings, the familiar standards of Fed. R. Civ. P. 12 apply – that is to say, the Motion must take the allegations of the Claims as true and cannot rely on matters outside the pleadings without being converted into one for summary judgment. *See Julius Baer II*, 772 F. Supp. 2d at 197 ("As with a motion to dismiss, the Court generally may not rely on facts 'outside' the pleadings in deciding a motion for judgment on the pleadings"); *see also* Stefan Cassella, *Asset Forfeiture Law In the United States*, 2d., ("*Cassella*") 9-3(b) ("The first of the three options for challenging standing under Rule G(8)(c)(ii)(B) is to file a motion for judgment on the pleadings. In essence, the motion asserts that even if all of the allegations in the claim are assumed to be true, the claimant lacks a sufficient interest in the property to establish Article III standing").

Put another way, the government's Motion here is limited to the pleadings – and in particular, the Claims. This matters because the Motion is aimed at the Claims but barely engages with them – indeed the Motion never cites or quotes the Claims. For example, the Claims allege that each Claimant held a lawful ownership interest in the Defendant Property when it was stolen, that no Claimant voluntarily transferred, assigned, or abandoned that interest, and that each Claimant continues to hold it. ECF No. 14 ¶ 4. The Motion does the opposite of what Rule 12 requires: it recasts the Claims in the light most favorable to the government, the movant, asserting

(without citation) that Claimants "divest[ed] themselves of legal title" to their property, Mot. ¶ 12, even though Claimants allege that they did no such thing. At the very least, the government is asking the Court to draw inferences in its favor (as the movant), which the Court cannot do. *See United States v. Sum of $70,990,605*, 234 F. Supp. 3d 212, 223 (D.D.C. 2017) (court must "accept as true all of the factual allegations contained in the claim, construe the claim liberally in the claimants' favor, and grant the claimants the benefit of all inferences that can be derived from the facts alleged")(cleaned up).

The government is confined to the pleadings, and on the pleadings it cannot prevail by assuming that title to Claimants' assets had already passed to the criminals. That is contested, Claimants allege the opposite, and the Court must take those allegations as true. *See Sum of $70,990,605*, 234 F. Supp. 3d at 223. Because the Motion disputes and exceeds the bounds of the pleadings circumscribed by Rule 12(d), the Motion should be denied for that reason alone, without prejudice to be renewed at the close of discovery.[4]

**B. Claimants Have Sufficiently Pled an Ownership Interest in the Defendant Property**

The Circuit has made clear that the requirements for a claimant to demonstrate standing to challenge a forfeiture are "very forgiving." *Emor*, 785 F.3d at 676. "[F]or civil forfeitures, constitutional standing 'turns upon whether the claimant has a sufficient interest in the property to

---

[4] Nor does Section 981(f)'s relation-back rule help the government on this point, because relation back is not self-executing before judgment. *See United States v. 92 Buena Vista Ave.*, 507 U.S. 111, 125-26 (1993) (plurality opinion) (explaining that, until the government wins a forfeiture judgment, "someone else owns the property" and may invoke available defenses). That is the very authority the government invokes for its relation-back theory. *See* Mot. ¶ 15 & n.23 (citing *92 Buena Vista*, 507 U.S. at 125-26). The government's own cited authority thus confirms that relation back does not vest title in the United States before a forfeiture judgment; until then, "someone else owns the property" and may raise every available defense.

create a case or controversy…. In general, any colorable claim on the property suffices, if the claim of injury is 'redressable, at least in part, by a return of the property.'" *United States v. $9,781,900.00 of Funds in Name of Falcon Strategic Sols.*, 813 F. Supp. 3d 29, 38 (D.D.C. 2025) (quoting *Emor*, 785 F.3d at 676). "At the pleading stage, a claimant need only *allege* a colorable interest in the property." *Id.* at 34.

Claimants have done so here. As alleged, Claimants' assets were "stolen" – to use the Complaint's own terms – by criminals who tricked Claimants into thinking their assets were being deposited into accounts they owned and controlled. *See* ECF No. 14 ¶ 5; Compl. ¶ 1. As alleged, Claimants never gave up ownership of their property, and at all relevant times believed that their assets were held in their own accounts. *See, e.g.*, Claims, ¶ 5. Put simply, Claimants allege that their property was stolen, then seized by the government, and they are seeking its return.

It is well settled that taking of possession of property by deceit, without an intent to transfer ownership, is theft – and specifically, larceny by trick. *See Bell v. United States*, 462 U.S. 356, 359–60 (1983) ("The theoretical distinction between false pretenses and larceny by trick may be stated simply. If a thief, through his trickery, acquired *title* to the property from the owner, he has obtained property by false pretenses; but if he merely acquired *possession* from the owner, he has committed larceny by trick."). This is consistent with the allegations of the Complaint, including as that "[c]riminals abroad, along with their associates and conspirators, _stole_ funds." (Compl. ¶ 1) (emphasis added); *see also id.* ("After _stealing_ those funds, the criminal actors laundered them through a convoluted web of cryptocurrency accounts and addresses to evade detection…") (emphasis added); Compl. ¶ 57 ("[T]he 144 OKX Accounts often transacted with the same intermediary addresses used to launder _stolen funds_.") (emphasis added). The government has repeated this characterization in its public statements, with the U.S. Attorney stating: "Under my

10

leadership … the U.S. Attorney's Office for the District of Columbia is taking a leading role in the fight against crypto-confidence scams, partnering with law enforcement throughout the country *to seize and forfeit stolen funds* and rip them from the hands of foreign criminals") (emphasis added).[5] In sum, both the Claims and the Complaint are in agreement on this point: the defendant *res* consists of stolen property.

Courts have routinely held that victims seeking the return of stolen property have standing to contest forfeiture of their property. *See, e.g., United States v. Trafigura AG*, 2008 WL 4057907, at *3 (S.D. Tex. Aug. 26, 2008) ("The Petitioner alleges essentially that this oil was stolen. While the Court will not comment on the merits of Petitioner's claim, the Court is satisfied that the allegations made by the Petitioner, if proven, may show that its interest was superior"); *United States v. Monzon*, 2009 WL 361095, at *2 (S.D. Fla. Feb. 9, 2009) ("[T]he United States advises that certain funds stolen from Brink's and specifically listed in its Response are currently in its possession. The United States acknowledges that Brink's has superior right, title, and interest in those stolen funds. Accordingly, the United States indicates its willingness to return those funds to Brink's pursuant to court order"). And as one of the leading treatises on civil forfeiture explains, although generally "no person could ever assert an interest as a pre-existing owner in criminal proceeds," nonetheless, "[a]n exception to this rule is necessary, however, in cases involving stolen property, where the victim's legal interest in the property did in fact 'precede the crime,' and the victim never intended to transfer title to the property to the thief." *See Cassella*, § 12-4. This is consistent with the long-settled principle that a thief never takes good title to stolen property. *See, e.g., Id.* §15-3(f)("A thief has no interest in stolen

---

[5] *See* Department of Justice Press Release, June 18, 2025, *available at* https://www.justice.gov/opa/pr/united-states-files-civil-forfeiture-complaint-against-225m-funds-involved-cryptocurrency.

property; a smuggler has no interest in smuggled contraband; a drug dealer has no interest in the proceeds of a drug sale; a poacher has no interest in illegally taken wildlife; and a money launderer has no interest in money that he launders for a third party"); *see also S.E.C. v. Paige*, 1985 WL 2335, at \*5 (D.D.C. July 30, 1985), *aff'd*, 810 F.2d 307 (D.C. Cir. 1987)("Both Florida and federal legal precedent are clear that a thief obtains no title to the stolen property and holds such property and the proceeds thereof in trust for the victim").

*Emor* applies that rule in this Circuit. There, the D.C. Circuit reversed an order striking a crime victim's claim to forfeited property where the victim alleged that the defendant stole or embezzled funds from it. 785 F.3d at 674-79. In *Emor*, the court considered the government's attempt to forfeit roughly $2,000,000 following the criminal conviction of the defendant (Emor). There, Emor had stolen – and specifically, embezzled – funds from a charter school network he had founded (Sunrise Academy), and as part of his plea deal, agreed to forfeit certain of these assets. *Emor*, 785 F.3d at 674. The school sought to oppose forfeiture, arguing that it had never authorized Emor to embezzle funds from the school, and thus the property "at all times remained the property of SunRise Academy." *Id*. at 678.[6] The government moved to strike the school's claim, much like here, arguing that the school had no ownership interest in the embezzled assets, and thus lacked both Article III and statutory standing. *Id*. at 675. The Circuit disagreed, holding

---

[6] The Circuit in *Emor* considered this issue in the context of a forfeiture under the criminal forfeiture statutes, but standing requirements under the civil and criminal forfeiture statutes are largely coextensive. Indeed, the government itself cites *Emor* in its Motion, although failing to address this key point. If anything, the criminal forfeiture statute considered in *Emor* (21 U.S.C. § 853(n)) is more demanding at the pleadings stage than Rule G, as it requires a party opposing forfeiture's pleadings to "set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought." 21 U.S.C. § 853(n)(3). For civil forfeitures, a claim merely must "identify the claimant and state the claimant's interest in the property." *See* Rule G(5)(a)(i)(B). If the Claims meet the standard applied in *Emor* – and they do – then they certainly clear the lower bar of Rule G.

12

as follows:

> SunRise claimed Emor stole the funds. Under District of Columbia law, theft covers not merely larceny, but 'larceny by trick, larceny by trust, *embezzlement,* and false pretenses.' D.C. Code § 22–3211(a). So if SunRise proves Emor stole or embezzled the funds … SunRise could establish possession of legal title or a superior legal interest.

*Emor,* 785 F.3d at 678 (citing *Great Am. Indem. Co. v. Yoder,* 131 A.2d 401, 403 (D.C.1957) (where one transfers possession of property to another who converts it to his own use, the taking is a larceny)). *See also Levin v. United States*, 338 F.2d 265, 268 (D.C. Cir. 1964) (defining larceny as "an offense against the possession rather than the ownership of property").[7]

Indeed, the Circuit went on to posit a hypothetical which maps almost exactly on to the facts here:

> Say an employee convinced the Metropolitan Museum of Art to take part in an art transfer with another museum. But instead of shipping the painting to the other museum, the employee ships it to his home for his personal use, committing mail fraud in the process. If the act is labeled a fraud, the Museum's vested interest prior to the fraud should mean it retains a superior interest sufficient to defeat forfeiture. Arguably, though, a fraud victim could be relegated to the ranks of general creditors and, lacking the ability to claim a constructive trust, have a more difficult time regaining its property. *See BCCI Holdings,* 46 F.3d at 1191–92. In contrast, if the act is characterized as larceny by trick or embezzlement, the Museum can argue its title was never relinquished.

*Emor,* 785 F.3d at 679. This hypothetical – in which the Circuit agrees that a theft victim would have standing – tracks the allegations here; Claimants were informed they were moving their property to accounts they owned and controlled, and as alleged, never contemplated giving up title to this property. Unbeknownst to them, the criminals diverted Claimants' property for the

---

[7] While *Emor* specifically applied District of Columbia law regarding theft, larceny by trick is widely accepted across jurisdictions. *See Dowling v. United States*, 473 U.S. 207, 219 n.12 (1985) ("This Court has explained: "By 1919, the law of most States against local theft had developed so as to include not only common-law larceny but embezzlement, false pretenses, larceny by trick, and other types of wrongful taking." (*quoting United States v. Turley*, 352 U.S. 407, 413 (1957))).

criminals' own use. And as the Circuit held in *Emor*, whether the Claimants can prove theft (in this case, larceny by trick), is a question of fact. *Id.* at 679 ("If SunRise can prove embezzlement upon remand, then SunRise at all times possessed vested legal title or a superior legal interest over the money and Emor did not, which means the government never had a valid legal interest. … Suffice it to say, SunRise may be able to establish a vested legal interest in the $2 million dollars, thus stating a valid claim").

Applying *Emor* to the facts here, Claimants have plainly pled both Article III standing and statutory standing. With respect to Article III standing, just like in *Emor*, the return of Claimants' property would redress their harm. *See Emor,* 785 F.3d at 676 ("[I]t is sufficient, for constitutional purposes, that SunRise alleged its property was taken by the government through forfeiture; it would have reacquired its property had the property not been forfeited to the government"). And as to statutory standing, Claimants have alleged their property was stolen from them, and they did not transfer ownership, thus stating a valid claim. *Id.*, 785 F.3d 671, 678 ("SunRise must state a valid claim of relief in order to obtain a hearing. SunRise stated such a claim when it alleged, 'the Forfeited Property at all times remained the property of SunRise Academy.'"). Accordingly, Claimants have alleged an ownership interest sufficient to establish standing at this stage.[8]

## C. The Government Cannot Strike the Claims Simply because Claimants are Victims of Crime

The government's arguments against Claimants' ownership interests are largely limited to

---

[8] Section 983(d)(6) confirms as much. Under that section, an "owner" includes a person with "an ownership interest in the specific property sought to be forfeited," and excludes only a person with "a general unsecured interest in, or claim against, the property or estate of another." 18 U.S.C. § 983(d)(6)(A), (B)(i). Claimants fall on the ownership side of that line: they are not asserting a general claim against a wrongdoer's estate. Rather, they allege that they retained ownership of specific stolen USDT traced to the Defendant Property. That tracing is the difference the statute draws, and at this stage Claimants need only plead it.

14

two brief paragraphs of the Motion. *See* Mot. ¶ 11-12.

At the outset, numerous arguments in the government's Motion on this point have no citation, are unsupported, or apparently contradict the Claims, but the core defect in the Motion is that it assumes the answer to the title question before that question has been adjudicated. Most prominently, the government asserts that "Claimants here explicitly and voluntarily authorized and delivered the relevant cryptocurrency transfers via private key and on-chain confirmation, divesting themselves of legal title upon receipt by the recipient." Mot. ¶ 12. The government does not offer any citation to the Claims, or even to its own Complaint (or anything at all), explaining how or why title purportedly transferred here.[9] Nor does the government explain how, on a motion on the pleadings, this assertion does not contradict the Claims. *See* Claims, ¶ 4 ("No Claimant has ever voluntarily transferred, assigned, or abandoned their lawful ownership interest in the Defendant Property…"). There is also nothing in the pleadings about Claimants' private keys or the legal effect of on-chain confirmation. Mot. ¶ 12. The government cannot convert its title-transfer assumption into a standing defect by stating it as a conclusion. Put simply, nothing in the factual record – pleadings or otherwise – supports the core of the government's argument on this point. So it must be denied.

Setting aside the lack of any identified well-pled allegations or factual support, the

---

[9] To the extent that the government is arguing that any transfer of cryptocurrency is necessarily a transfer of ownership (*i.e.* that cryptocurrency is akin to a bearer bond and belongs to whoever holds it), (1) the government offers no legal support for this novel argument, and (2) this is a factual issue that cannot be resolved on the pleadings. For example, the gravamen of the government's Motion is that "victims voluntarily deposited their virtual currency while under the belief that they were sending funds to legitimate exchange platforms." Mot. ¶ 4. But it is common practice in the cryptocurrency exchange industry that an exchange *does not* own a user's cryptocurrency. *See e.g.* Coinbase User Agreement, Coinbase, § 2.7.1, https://www.coinbase.com/legal/user_agreement/united_states (last visited June 23, 2026)("Title to Supported Digital Assets shall at all times remain with you and s*hall not transfer to Coinbase*")(emphasis added); Global Terms of Service, Kraken, https://www.kraken.com/legal/global-terms (last visited June 23, 2026)("You own and control the Digital Assets in your account:). This kind of fact issue is not appropriate to resolve on the pleadings—and certainly not in the movant's favor.

government's argument is essentially that a transfer of possession necessarily transfers ownership and title, or as the government argues, "fraud victims who voluntarily transfer their property to their wrongdoers do not retain a legal interest in their property; instead, such victims acquire a debt against their wrongdoers." Mot. ¶ 11. The government is incorrect for multiple reasons.

First, the government's argument is inconsistent with the government's own Complaint, which repeatedly refers to the Defendant Property as "stolen." *See, e.g.,* Compl. ¶ 1 ("Criminals abroad, along with their associates and conspirators, stole funds from over 430 suspected victims."). It similarly alleges that victims deposited virtual currency under the belief that they were sending funds to legitimate exchange platforms, Compl. ¶ 46, and describes fake apps used to make victims believe they still had balances and transactions in legitimate accounts. Compl. ¶ 40. The government's own allegations suggest that victims never intentionally gave up title, only possession – indeed, as the government alleges, this distinction is what makes pig-butchering scams so effective; victims don't believe they have actually given up their money and think they remain in control of it. *See* Compl. ¶ 40-41. The government cannot plead theft in the Complaint and then, in a motion on the pleadings, ask the Court to deem the victims ordinary unsecured creditors.

Second, the government's cited authority is distinguishable because it turns on voluntary transfer, generalized debt, or failure to identify the specific property. In *United States v. 8 Gilcrease Lane*, Quincy Fla. 32351, 641 F. Supp. 2d 1, 5 (D.D.C. 2009), putative intervenors in a Ponzi-scheme forfeiture asserted innocent-owner theories but did not show an ownership interest in the specific defendant property.  That court's voluntary-transfer rule does not decide this case, because Claimants allege they never voluntarily transferred or abandoned title and that the res includes their stolen property.  ECF No. 14 ¶¶ 1-5. Nor do *Agnello* or *$3,000 in Cash* help the

16

government. *Agnello* was a criminal RICO ancillary proceeding, and it confirms that the relevant question is whether the claimant has an interest "in a particular, specific asset, as opposed to a general interest in an entire forfeited estate." *United States v. Agnello*, 344 F. Supp. 2d 360, 372 (E.D.N.Y. 2004). Claimants allege that specific interest here. And *$3,000 in Cash* turned on facts not present here: consensual delivery, unclean hands, commingling, and the claimant's failure to show an ownership interest in the specific property to be forfeited. *United States v. $3,000 in Cash*, 906 F. Supp. 1061, 1065-70 (E.D. Va. 1995). Claimants allege the opposite: larceny by trick, no voluntary transfer of title, and tracing to the specific res. The government's cases describe the claimants those rules exclude. Claimants are not those claimants.

More importantly, the conclusion the government draws from on *Gilcrease*—a District Court decision that predating *Emor*—contradicts *Emor's* holding that a transfer of property does not by itself divest ownership, and which explicitly recognized that larceny by trick is theft. *Emor,* 785 F.3d at 678. The government largely fails to address *Emor* at all, only confusingly citing the case for the proposition that "[n]or do [subjective expectations of maintaining custody and control] negate intent or delivery." Mot. ¶ 12. The government does not include a pincite or quote for this statement, so it's difficult to discern what in *Emor* the government suggests supports this proposition, but the government's conclusion is simply wrong: *Emor* plainly held that a transfer of control without intent *does not* change ownership. Indeed, the Circuit's hypothetical explicitly stated the opposite: "if the act is characterized as larceny by trick or embezzlement, the Museum can argue its title was never relinquished." *Emor*, 785 F.3d at 679.

In sum, the Motion's vague, unsupported, and exceedingly brief attempts to dismiss Claimants' continued ownership interests cannot be reconciled with *Emor*. The government may test Claimants' ownership and tracing evidence through discovery and, if appropriate, through a

17

Rule G(8)(c) motion after a factual record exists. What it cannot do is strike the Claims now by disputing pleaded facts and simply assuming that wrongdoers somehow obtained good title to stolen property.

### D. BCCI Holdings Does Not Require Striking the Claims

Separate from the Claimants' ownership interests, Claimants have also asserted an interest as beneficiaries of a constructive trust. Claimants recognize that the D.C. Circuit has previously rejected this theory of standing in *United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185 (D.C. Cir. 1995), but submit that *BCCI's* facts are plainly distinguishable, and its broad holding on this issue is no longer sustainable based on subsequent Supreme Court precedent. To the extent that the Court finds that *BCCI* remains reconcilable with Supreme Court precedent, Claimants respectfully preserve this issue to be addressed on appeal, as the Circuit itself has recognized that *BCCI* is an outlier decision.

At the outset, *BCCI* only addresses a constructive trust theory, and cannot dispose of the Claims in their entirety. As addressed below, the case rejected a constructive trust theory of standing in forfeiture actions in this district – but *BCCI* says nothing about Claimants' ownership interests. This was made clear in *Emor*, where the Circuit endorsed the ownership theory discussed above, while simultaneously recognizing that *BCCI* remained controlling law on the constructive trust question. In other words, *Emor* makes clear that *BCCI* is no bar to a victim of theft pursuing a claim based on a theory of ownership, only constructive trust.

*BCCI* is also distinguishable on its own facts:

First, the *BCCI* petitions were hard to pin down. The district court described the petitioners' "chameleon-like characterizations" of their claims and had difficulty identifying the legal right, title, or interest they sought to recover. *United States v. BCCI Holdings (Luxembourg), S.A.*, 833

18

F. Supp. 9, 13-14 (D.D.C. 1993), *aff'd*, 46 F.3d 1185 (D.C. Cir. 1995).  Here, Claimants' theory is straightforward: they allege that they retained ownership in stolen USDT traced to the seized *res*.

Second, *BCCI* involved serious practical concerns about who was before the court.  *See id.* at 11, 13-14. Here, Claimants are identified through their verified Claims and supporting records.

Third, *BCCI* involved a worldwide bank liquidation and approximately one million depositors. *Id.* at 14. The court was concerned that imposing a constructive trust would create "gargantuan disruption" of global liquidation proceedings and harm other creditors. *Id.* This case is the opposite. It involves a bounded group of victim-claimants, a defined *res*, and verifiable blockchain tracing to particular wallets.

Fourth, the *BCCI* claimants were treated as general creditors of a failed bank. 46 F.3d at 1191-92. Claimants are not bank depositors asking to reorder a creditor pool. They allege that they are theft victims who never transferred title, and that the government seized property in which they retain an ownership interest.

Those distinctions allow this Court deny the Motion without even reaching the Circuit's decision in *BCCI*, which remains a constructive-trust case about a failed bank, global liquidation, and general-creditor claims. This case is about verified Rule G claims to specific stolen cryptocurrency that Claimants allege they owned before, during, and after the theft. Treating Claimants as if they were *BCCI* depositors would erase the central fact of this case: the government seized a traceable cryptocurrency pool that both sides have described as property stolen from victims.

With respect to constructive trust standing, *BCCI's* primary holding on the issue has also been called into question by subsequent case law. In *BCCI*, the Circuit held (without citation) that "[a] constructive trust is a *remedy* that a court devises after litigation. It is, as we have noted, a

fictional trust—not a real one. It could not have been shown to exist at the time the acts were committed." *BCCI*, 46 F.3d at 1190–91. Based on this reasoning the Circuit held that a constructive trust thus "would be inconsistent with the statutory remedial scheme." *Id*. As noted in *Emor*, and discussed below, this reasoning has been roundly criticized, but more importantly, it has been called into question by subsequent Supreme Court precedent and thus must be reconsidered.

Since *BCCI* was decided, the Supreme Court has considered constructive trust law in numerous instances, each time indicating that such a trust arises with the inequitable conduct, not as a later-created judicial remedy. For example, in *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* the Supreme Court stated that "[w]henever the legal title to property is obtained through means or under circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, *equity impresses a constructive trust on the property* thus acquired in favor of the one who is truly and equitably entitled to the same." 530 U.S. 238, 250–51 (2000)(citing *Moore v. Crawford*, 130 U.S. 122, 128 (1889))(emphasis added). And in *Great-W. Life & Annuity Ins. Co. v. Knudson*, the Supreme Court explained that the role of a court sitting in equity was to "order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien)" but that "where the property sought to be recovered or its proceeds have been dissipated so that no product remains, the plaintiff's claim is only that of a general creditor, and the plaintiff cannot enforce a constructive trust." 534 U.S. 204, 213-14 (2002). This holding – that a court enforces a constructive trust, but cannot do so if the trust was previously dissipated – cannot be squared with the *BCCI* court's reasoning that a constructive trust is only created by the court later in time. Finally, in *Ortiz v. Fibreboard Corp.,* the Supreme Court held that "[e]quity, of course, recognized the same necessity to bind absent claimants to a limited fund when no formal imposition of a constructive trust was entailed." 527

20

U.S. 815, 836 (1999). Again, this holding cannot be reconciled with the reasoning of *BCCI*, and thus must be reevaluated.[10] *See Lee v. United States*, 570 F. Supp. 2d 142, 149–50 (D.D.C. 2008) ("This Court will attempt to reconcile all of the judgments binding upon it if possible, but when holdings of the Supreme Court and the D.C. Circuit are irreconcilable, the Supreme Court's decision will trump every time.")(internal citations omitted).

Third and finally, should the Court find *BCCI* nonetheless applicable to the Claims, Claimants respectfully submit that *BCCI* was wrongly decided and preserve this argument for appeal. As the Circuit recognized in *Emor*, "[e]very circuit to consider the constructive trust question in the context of criminal forfeiture has rejected the analysis in *BCCI.*" *Emor,* 785 F.3d at 682. For example, in *United States v. Shefton,* the Eleventh Circuit carefully examined *BCCI*, and found its holding seriously flawed, explaining "[w]e are unpersuaded by the reasoning in *BCCI*. First, one of its premises is incorrect. Although a constructive trust is a judicially recognized remedy, it arises when the underlying equities exist, not when it is announced." 548 F.3d 1360, 1366 (11th Cir. 2008)(internal citation omitted). *See also Willis Mgmt. (Vermont), Ltd. v. United States*, 652 F.3d 236, 245 (2d Cir. 2011) ("In declining to follow *BCCI Holdings,* we join several of our sister Courts of Appeals that have noted criticism of that decision."); *United States v. Salti,* 579 F.3d 656, 670 & n. 18 (6th Cir.2009)(same). Nonetheless Claimants recognize that if the Court determines that *BCCI* remains binding on this Court (and thus can be reconciled with subsequent Supreme Court precedent), then as the Circuit noted in *Emor*, it can only be revised through an *Irons* footnote or *en banc* review. *Emor,* 785 F.3d at 682. Accordingly, Claimants

---

[10] Additionally, in various cases the Supreme Court has relied on the *Restatement (First) of Restitution § 160* (1937), which states that a "constructive trust arises where a transfer of the title to land or a chattel or a chose in action is obtained by fraud, yet where by fraud a person is induced to render services, no constructive trust arise." *See also id.* ("The constructive trust arises apart from the insolvency of the constructive trustee, although a court of equity may refuse to enforce it…"); *see, e.g., Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002)(citing Restatement).

respectfully preserve this argument so they may seek an *Irons* footnote or *en banc* review on appeal if necessary.

### E.  Reliance on the Petition Process is Not Relevant Here

Finally, the government devotes a substantial portion of the Motion to explaining the petition for remission process – apparently in an attempt to calm any concerns the Court may have that these victims of crime may be left with nothing if their claims are struck. *See* Mot., ¶¶ 7, 9, 17-19. The Court should not be reassured. The Motion gives no enforceable commitment to the Claimants, no timeline, no standard the Court can apply, no disclosure, and no right to judicial review.

The government's stated policy of remunerating victims of crime is commendable, but nothing in the Motion provides any assurance that any petitions submitted by Claimants will be granted in whole or part, or even actually be considered. As the government acknowledges, the forfeiture laws "authorize victim compensation but do not mandate it." Mot., ¶ 17. Put another way, the remission process is entirely discretionary, and Claimants' ownership rights would be extinguished, with no way to seek recovery beyond simply hoping the government might listen to them at some point. Claimants would have no right to judicial review, no entitlement to an explanation for when or how their claims would be considered (if at all), and no ability to obtain information held by the government which would support or strengthen their claims. In substance, many of the Claimants would have their life savings hanging in the balance, with no rights at all.

Furthermore, the petition process has no time horizon other than the government's own sense of urgency, and is often outsourced to third party contractors. As one example, in April 2026, the government announced that it was opening the remission process for victims of the notorious OneCoin scam, nine years after the cases were opened in *2017*. The remission process there, tasked

with distributing approximately $40 million (or less than one-fifth of the assets in controversy here) was similarly outsourced to a third party remission administrator.[11] And the government has aggressively taken the position that courts have no ability whatsoever to guarantee that the petition process is operated transparently or effectively. For example, in July of 2025 the government announced a remission process for victims trafficked through the Backpage.com website following a civil settlement forfeiting hundreds of millions of dollars.[12] When a group of victims recently sought modest extensions of time to file their petitions from the court which approved the settlement, the government took the position that "[b]ecause all aspects of the consideration of petitions for remission fall solely within the discretion of the Attorney General (or the Attorney General's designee), this Court lacks jurisdiction to extend the time for movants to file such petitions, thus making any ruling regarding the timing of filing petitions void for lack of jurisdiction" – and successfully denied the victims the requested additional time. *See U.S. v. $1,546,076.35 in Bank Funds Seized From Republic Bank of Arizona Account '1889*,No. 2:18-cv-8420, ECF No. 342, at 4 (C.D. Cal. Apr. 2, 2026).

To be clear, the government's focus on the remission process is understandable, and the delays in that process are inevitable in many cases, but an unreviewable administrative process is no substitute for Claimants' having their day in court. Much like in *Emor*, there is no doubt that it would be administratively easier for the government to simply forfeit the Defendant Property and

---

[11] Press Release, U.S. Dep't of Justice, Justice Department Announces Compensation Process for OneCoin Fraud Victims with Funds Recovered Through Asset Forfeiture (Apr. 13, 2026), https://www.justice.gov/opa/pr/justice-department-announces-compensation-process-onecoin-fraud-victims-funds-recovered.

[12] Press Release, U.S. Dep't of Justice, U.S. Department of Justice Announces Compensation Process for Victims Trafficked Through Backpage.com (July 31, 2025), https://www.justice.gov/opa/pr/us-department-justice-announces-compensation-process-victims-trafficked-through-backpagecom.

23

then outsource any return of funds to victims to a third-party administrator on its own timeline and without the Court's involvement. But as the *Emor* court also held, "Congress designed criminal forfeiture to punish criminal defendants, not crime victims." *Emor*, 785 F.3d at 678. So too here. Whatever may be easiest for the government cannot extinguish the ownership rights of crime victims.

Finally, this Court is more than able to manage this litigation in a fashion that proceeds efficiently while preserving the rights of all victims – Claimants and those who have filed petitions instead of claims – while ensuring meaningful judicial review and respecting the dignity of crime victims. If transfer is granted, the transferee court can tailor procedures for victim proof, tracing, and claim administration. If the case remains here, this Court has tools to manage complex claims, including staged discovery, and, if warranted, appointment of a special master for matters that cannot be addressed effectively and timely by the Court alone. *See* Fed. R. Civ. P. 53(a)(1)(C). If anything, ensuring court oversight over this process is likely to speed recovery for victims and encourage victims of similar cybercrimes to come forward seeking recovery in the future. What the Court should not do is solve a case-management concern by striking verified Claims.

//

//

## V.  CONCLUSION

The Motion should be denied. Claimants are victims of a scheme the Complaint itself describes as theft, and they have waited years for a meaningful path to recover their stolen property. They now face a second injury: after being victimized by criminals, the government asks to exclude them from a court proceeding ostensibly filed to help them, stretching inapplicable authority to assert that they have no standing at all. That position is wrong. It has no basis in the pleadings, no basis in the law, and no place on a Rule G(8)(c) motion for judgment on the pleadings. The Court should deny the Motion.

Dated: June 23, 2026                    Respectfully submitted,

By:    */s/ Dan G. Boyle*

**THE CRYPTO LAWYERS PLLC**
Rafael Yakobi (CA Bar No. 312421)
(Admitted *pro hac vice*)
11035 Lavender Hill Dr, Ste. 160-220
Las Vegas, NV 89135
Telephone: 619.317.0722
rafael@thecryptolawyers.com

**THE CRYPTO LAWYERS PLLC**
Agustin M. Barbara (FL Bar No. 1002677)
(Admitted *pro hac vice*)
848 Brickell Avenue, Penthouse 5
Miami, Florida 33131
Telephone: 619.317.0722
agustin@thecryptolawyers.com

**GREENBERG TRAURIG, LLP**
Michael Burshteyn (CA Bar No. 295320)
(Admitted *pro hac vice*)
Marcelo Barros (CA Bar No. 339069)
(Admitted *pro hac vice*)
101 Second Street, Suite 2200
San Francisco, California 94105
Telephone: 415.655.1300

25

Facsimile: 415.707.2010
Michael.Burshteyn@gtlaw.com
Marcelo.Barros@gtlaw.com

**GREENBERG TRAURIG, LLP**
Nathan J. Muyskens (DC Bar No. 45821)
(Admitted *pro hac vice*)
Michael A. Pusateri (DC Bar No. 1005463)
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
Telephone: 202.533.2354
pusaterim@gtlaw.com
Nathan.Muyskens@gtlaw.com

**BOIES SCHILLER FLEXNER LLP**
Dan G. Boyle (CA Bar No. 332518)
(Admitted *pro hac vice*)
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
Telephone: 213.629.9040
dboyle@bsfllp.com

*Attorneys for Claimants 1-118*

26

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 23, 2026, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF No. system, which will send notification of such filing to all counsel of record.

*/s/ Dan G. Boyle*