-1-

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

      Plaintiff,

    v.

APPROXIMATELY 225,364,961 USDT

      Defendant, *in rem*.

Civil Action No. 25-cv-1907-AHA

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CLAIMANT**

**NIVEDITA KAUL'S MOTION FOR EMERGENCY PRELIMINARY INJUNCTION;**

**TO BIFURCATE ACTION AND ADVANCE TRIAL ON THE MERITS; AND IN THE**

**ALTERNATIVE FOR DISMISSAL OF THE FORFEITURE AS TO WALLET 0X82E**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................................4

I. INTRODUCTION AND PROCEDURAL POSTURE ...............................................6

II. STATEMENT OF FACTS ........................................................................................8

    A. The Admitted Unified Enterprise and the Desk-Based Investigation ..................8

    B. Claimant's Origination of the Turkish Prosecution ..............................................9

    C. The Turkish Judicial Seizure of August 11, 2023 and the Custody Gap ............11

    D. The Congressional Threat and the Secondary Freeze Protocol .........................13

    E. The Credit-Laundering Enterprise and the False "Proactive Discovery" Narrative...........15

    F. The OKX Guilty Plea and the Cooperation Discount .........................................17

    G. The Absence of an Independent United States Predicate; the Burn and Reissue ...............17

    H. The Enterprise Connection, Conflicted Counsel, and Forum Fragmentation.....................18

    I. Claimant's Verified Claim and Wallet 0x82e's Position in the Res......................20

    J. The DDG Recovery Framework, the Identified Victim Cohort, and the UK Framework...21

    K. Present Posture: Threatened Strike, Infiniweb Settlement, and Imminent Dissipation ......23

III. STANDING, RELIEF SOUGHT, AND STANDARDS OF REVIEW .................................24

    A. Claimant Has Statutory and Article III Standing ...............................................24

    B. Relief Sought ........................................................................................................25

    C. Security Under Rule 65(c)....................................................................................25

IV. LEAD ARGUMENT: TURKEY'S PRIOR EXCLUSIVE JURISDICTION OVER WALLET 0X82E .................................................................................................26

    A. The Governing Doctrine .......................................................................................26

    B. Turkish Judicial Taking of Custody, Established by the Seizure Order and the Statute.....27

    C. The Date Comparison Is Dispositive ..................................................................28

    D. Sections 1355(b)(2) and 2467 Do Not Displace the Prior-Custody Bar............28

    E. The United States Never Acquired Lawful Control Over the Res .......................29

    F. The Turkish Victim-Restitution Framework Confirms the Priority and Its Character.......30

V. SECOND ARGUMENT: THE BURN AND REISSUE WAS SPOLIATION OF EVIDENCE, AND ITS CONSEQUENCES FALL ON THE GOVERNMENT ...............................................31

    A. The Government Destroyed Evidence Held Under Foreign Judicial Custody ...................32

    B. The Burden the Government Must Carry............................................................................32

    C. Spoliation Shifts the Burden; the Government Cannot Prove What It Destroyed ..............33

    D. The Later Warrant Does Not Cure the Antecedent Destruction .........................................33

    E. An Independent Basis for Relief .......................................................................................34

VI. THIRD ARGUMENT: THE COURT SHOULD NOT ALLOW A SECOND THEFT THROUGH A CRIMINAL PROXY AND CONFLICTED COUNSEL ....................................34

    A. Infiniweb Is a Proxy for the Criminal Enterprise..............................................................34

    B. The Settlement Is Brokered Through Conflicted Counsel .................................................35

    C. The Government's Own Conduct Forfeits Equitable Deference .........................................35

    D. The Court's Equitable Authority to Withhold Its Process..................................................35

VII. REMAINING ARGUMENTS ...........................................................................................36

    A. The November 2023 Freeze Was Warrantless, and Its Fruits Should Be Suppressed........36

    B. Additional Independent Merits Defects ............................................................................37

    C. The Preliminary Injunction Factors Are Satisfied.............................................................38

    D. Bifurcation, Advancement, and Partial Final Judgment Are Warranted ............................40

    E. The Court Should Deny or Defer Any Motion to Strike and Permit Discovery .................41

VIII. CONCLUSION AND RELIEF REQUESTED ...................................................................42

**TABLE OF AUTHORITIES**

**Cases**

Abitron Austria GmbH v. Hetronic Int'l, Inc., 600 U.S. 412 (2023)

Austin v. U.S., 509 U.S. 602 (1993)

Blum v. Yaretsky, 457 U.S. 991 (1982)

Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151 (1st Cir. 2004)

Farris v. Rice, 453 F. Supp. 2d 76 (D.D.C. 2006)

In re McGaughey, 24 F.3d 904 (7th Cir. 1994)

Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982)

Morris v. District of Columbia, 38 F. Supp. 3d 57 (D.D.C. 2014)

Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247 (2010)

One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 696-702 (1965)

Princess Lida of Thurn and Taxis v. Thompson, 305 U.S. 456 (1939)

Republic Nat'l Bank of Miami v. U.S., 506 U.S. 80 (1992)

RJR Nabisco, Inc. v. European Community, 579 U.S. 325 (2016)

SEC v. Banner Fund Int'l, 211 F.3d 602 (D.C. Cir. 2000)

Segura v. U.S., 468 U.S. 796 (1984)

Simms v. District of Columbia, 872 F. Supp. 2d 90 (D.D.C. 2012)

Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602 (1989)

Timbs v. Indiana, 586 U.S. 146 (2019)

U.S. v. 8 Gilcrease Lane, 638 F.3d 297 (D.C. Cir. 2011)

U.S. v. All Funds in Account Nos. 747.034/278, 295 F.3d 23 (D.C. Cir. 2002)

U.S. v. Bajakajian, 524 U.S. 321 (1998)

U.S. v. Caceres, 440 U.S. 741 (1979)

U.S. v. Cosme, 796 F.3d 226 (2d Cir. 2015)

U.S. v. Dawkins, 17 F.3d 399 (D.C. Cir. 1994)

U.S. v. DeFries, 129 F.3d 1293 (D.C. Cir. 1997)

U.S. v. Dubose, 146 F.3d 1141 (9th Cir. 1998)

U.S. v. E-Gold, Ltd., 521 F.3d 411 (D.C. Cir. 2008)

U.S. v. James Daniel Good Real Property, 510 U.S. 43 (1993)

U.S. v. Schifferli, 895 F.2d 987 (4th Cir. 1990)

U.S. v. Timley, 443 F.3d 615, 627–628 (8th Cir. 2006)

U.S. v. Western Electric Co., 46 F.3d 1198 (D.C. Cir. 1995)

U.S. v. $6,999,925.00 of Funds Associated with Velmur Mgmt. Pte Ltd., 368 F. Supp. 3d 10
    (D.D.C. 2019)

U.S. v. $493,850.00 in U.S. Currency, 518 F.3d 1159 (9th Cir. 2008)

Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008)

Wong Sun v. U.S., 371 U.S. 471 (1963)

**Constitutional Provisions and Statutes**

U.S. Const. amend. IV

U.S. Const. amend. V

U.S. Const. amend. VIII

18 U.S.C. § 983(c), (d)

18 U.S.C. § 3771 (Crime Victims' Rights Act)

28 U.S.C. § 1355

28 U.S.C. § 2467

**Rules**

Fed. R. Civ. P. 12(b)(1)

Fed. R. Civ. P. 42(b)

Fed. R. Civ. P. 44.1

Fed. R. Civ. P. 54(b)

Fed. R. Civ. P. 65(a), (a)(2), (c)

Fed. R. Evid. 801(d)(2)

Supp. R. Adm. & Mar. Cl. G(2), G(5)(a), G(8)(b)

LCvR 65.1

**Foreign Statutes**

Turkish Code of Criminal Procedure (CMK) arts. 127, 128, 131(2), 158, 234

Turkish Penal Code (TCK) art. 55(1)

Turkish Code of Obligations (Law No. 6098)

**Foreign Cases**

D'Aloia v Persons Unknown [2024] EWHC 2342 (Ch).

**Other Authorities**

U.S. Dep't of Justice, Asset Forfeiture Policy Manual (2025), Chaps. 3, 9

## I. INTRODUCTION AND PROCEDURAL POSTURE

This is a dispute over superior title to a specific, traceable res, and the United States is the junior claimant. The dispositive question is narrow and requires no blockchain analysis: which court took custody of Wallet 0x82e first. The answer is established by two official records twenty-two months apart, and the constitutional and equitable defects addressed later in this Memorandum all flow from the government's decision to override that prior custody rather than respect it.

The in rem defendant is Approximately 225,364,961 USDT. Claimant Nivedita Kaul, appearing pro se, confines her Verified Claim and Answer, filed under Supplemental Rule G(5)(a), and the scope of this Motion, to a single identified subset of that pool: Wallet 0x82e1d4ddd636857ebcf6a0e74b9b0929c158d7fb ("Wallet 0x82e"), holding approximately 87,464,642 USDT and identified in the Verified Complaint as USDT Token Group G. Claimant's prior counsel withdrew and the Court ordered that she proceed pro se.

Civil forfeiture is a punitive mechanism designed to strip criminals of their proceeds, not to compound the injuries of innocent victims. Austin v. U.S., 509 U.S. 602, 609-10 (1993). Here, that doctrinal boundary has been inverted: the government is using forfeiture machinery to settle assets with a criminal proxy, while stripping the verified victim who located and preserved the res through years of independent effort at substantial personal risk.

On August 11, 2023, the Ankara West 1st Criminal Judgeship of Peace entered Decision No. 2023/5986, ordering the criminal judicial seizure of Wallet 0x82e and determined the wallet content "themselves in the nature of items of the offence" and "of evidential value," at the request of the Ankara West Chief Public Prosecutor's Office. Tether Limited, the USDT issuer and custodian, has been engaged in the same investigation since Feb 2023 and finally complied, confirming in writing to Turkish authorities on October 11, 2023, that Wallet 0x82e was frozen

(Ticket #263780). The U.S. did not obtain its Warrant for Arrest In Rem until on or about May 1, 2025, and did not file its Verified Complaint until June 18, 2025: more than twenty-two months after Turkish judicial custody attached to this res.

Under the prior exclusive jurisdiction doctrine, the court that first assumes jurisdiction over property may exercise that jurisdiction to the exclusion of any later-filed proceeding seeking control of the same res. Princess Lida of Thurn and Taxis v. Thompson, 305 U.S. 456, 466 (1939). Turkey's judicial seizure is the earlier proceeding; the federal complaint is the later one. The question is a date comparison, not a tracing contest, and Turkey comes first.

The government compounded the jurisdictional defect through a "burn and reissue." After directing Tether to take control of the wallet notwithstanding the Turkish custody, U.S. authorities caused Tether to destroy the original USDT tokens in Wallet 0x82e, tokens a foreign criminal court had seized as evidence, and to issue newly minted replacements into United States Marshals Service (USMS) custody, without notice to Claimant or the Turkish court. That act of spoliation destroyed evidence held under foreign judicial custody, including the on-chain record the government itself needs to carry its statutory burden.

Claimant is a verified victim of the underlying criminal network who holds advanced legal degrees, and has invested her savings and legal training in a victim-led recovery architecture spanning three continents through Digital Defenders Group ("DDG"), the 501(c)(3) nonprofit she founded to locate the assets, the verified victim cohort, and recover the res, at substantial personal risk, while the agencies now holding the res took no comparable action. U.S. law enforcement told Claimant recovery was not possible as the funds had gone overseas beyond their reach, then later appropriated her successful recovery and work product. The burn expropriated the architecture of a multi-year international recovery and exposed Claimant's identity; the government now proposes

to settle assets Claimant seized through her independent efforts with a criminal proxy. These facts do not merely establish personal hardship; they establish the government's unclean hands, equitable estoppel, and the irreparable harm that warrants preliminary injunctive relief.

The Motion requests three tiers of relief: (1) an emergency preliminary injunction under Rule 65(a) and LCvR 65.1 restraining any disposition or alteration of the res pending adjudication of priority of title; (2) bifurcation of Claimant's claim and advancement of trial on the merits under Rules 42(b) and 65(a)(2), with partial final judgment under Rule 54(b); and (3) in the alternative, dismissal as to Wallet 0x82e under Rule 12(b)(1) and Supplemental Rule G(8)(b), conditioned on appointment of a preservation receiver. The Memorandum leads with prior exclusive jurisdiction because comparing two official dates requires no further factual development; if the bar is upheld, the forfeiture as to Wallet 0x82e is dismissed without reaching the injunction factors or merits.

## II. STATEMENT OF FACTS

The following facts are drawn from the government's Verified Complaint ("Compl. ¶ __"), the case record, and the accompanying Declaration of Nivedita Kaul, which authenticates the exhibits cited.

### A. The Admitted Unified Enterprise and the Desk-Based Investigation

The government admits that criminals abroad stole funds from more than 430 suspected victims through a cryptocurrency confidence scam network, laundering approximately $2.9 billion through 144 OKX accounts. Compl. ¶¶ 1, 45-48, 50, 65; that the network operated through forced labor compounds in the Philippines, using Vietnamese identity documents and Philippine IP addresses, and that a planned raid was halted on-site before law enforcement entered the call center, Compl. ¶¶ 34, 55, 169; and the 144 accounts shared common IP addresses, email-naming conventions, KYC photographs taken in the same facility, and transaction counterparties indicating

a single point of control, Compl. ¶¶ 53-64. The government pleads the defendant pool as a single, unified money-laundering enterprise controlled by common owners. Compl. ¶¶ 47, 52, 195.

The Complaint reveals a wholly desk-based U.S. investigation. It admits the investigation was initiated after USSS San Francisco received a report from Tether and OKX, Compl. ¶ 1, 50, and the only "techniques" it describes are approximately 60 victim interviews, IP tracing, KYC photograph analysis, open-source job-posting research, and FATF red-flag pattern matching. It mentions no arrests, no search warrants, and no grand jury testimony.

Its causal theory linking the aborted Philippine raid to the November 15, 2023 fund movement is speculative: the Complaint itself uses "it appears" and "Likely" (¶ 170), the raid never made contact with the operators (¶ 169), and the theory rests on temporal proximity alone. That is speculation, not causation; the additional pleading defects are addressed in Section VII.B.

**B. Claimant's Origination of the Turkish Prosecution**

Over more than three years, Claimant has identified the perpetrators, mapped the network, and traced the proceeds to Wallet 0x82e and its connected wallets. Claimant's February 2023 criminal complaint and forensic work established the predicate for Criminal Investigation No. 2023/6371, the criminal judicial seizure of Wallet 0x82e, and the prosecution of the criminal network operators. The government's own Complaint depicts the same wallet identifiers, including Wallet 0x82e, that Claimant had reported to Turkish authorities.

The government's knowledge of Wallet 0x82e predates November 2023. On January 18, 2023, Claimant contacted Erin West, a Deputy District Attorney and REACT Task Force coordinator, who referred her to USSS Special Agent Andrew Frey; on January 19, 2023, Agent Frey solicited Claimant's evidence, promising "secrecy is in our name." On January 27, 2023, USSS SAC Shawn Bradstreet received analytics explicitly identifying Wallet 0x82e and its

$101,000,000 balance; his office declined to take preservation action. By February 22, 2023, Agent Frey stated his office had "exhausted preliminary recovery efforts"; in April 2023, after Claimant provided findings to the FBI, he maintained there was "no ongoing work specific to your loss."

Starting in February 2023, Tether, Binance, and other exchanges were provided with evidence establishing the criminal predicate for the network of Wallet 0x82e and associated addresses, linking it to a transnational fraud and human trafficking syndicate; the analysis tying the wallet to the KYC-verified criminal enterprise operators was supplied solely by Claimant. On February 11, 2023, she initiated a private criminal complaint as Complainant under Article 158 of the Turkish Code of Criminal Procedure ("CMK") with the Ankara West Chief Public Prosecutor's Office initiating Investigation No. 2023/6371, Ex. A. In March 2023, she identified a key network node and provided this intelligence to Turkish judicial authorities, which revealed the network operators' identities. Acting upon Claimant's intelligence, Turkish authorities established the investigative predicate for the Turkish Republic's ongoing criminal prosecution (2023/6371), which verified her findings and produced judicial proceedings against the network's controllers.

The Turkish investigation yielded over 100 arrests in the Claimant's private prosecution case and in parallel sovereign actions; raids seizing computers, notebooks, cell phones, and other physical evidence; and sworn testimony taken. The U.S. desk-based reconstruction underlying this forfeiture produced no arrests, no physical evidence, and no charged defendants.

Claimant's civil enforcement title also reaches the organization's assets. Her February 2023 Payment Order names Ling Sun Dylon and Kai Li Kelly as debtors, and file 2023/6371 records evidence that they acted as managers and agents of the criminal organization. Ex. B. Under the Turkish Code of Obligations (Law No. 6098), a principal is civilly liable for acts of its agents

Case 1:25-cv-01907-AHA    Document 79-1    Filed 07/23/26    Page 11 of 45

within the scope of their authority, without the requirement of indictment or conviction. Ling Sun Dylon and Kai Li Kelly are fugitives, and file 2023/6371 remains open for further enforcement.

**C. The Turkish Judicial Seizure of August 11, 2023 and the Custody Gap**

On August 11, 2023, the Ankara West 1st Criminal Judgeship of Peace issued two synchronized judicial seizure orders under Investigation No. 2023/6371, both pursuant to CMK Articles 127 and 128. Decision No. 2023/5986, issued by Judge Muhammed Kerem Comez, was addressed to the res in Wallet 0x82e "upon examination of the request" and directed that the property be held by that court; its operative language grants the prosecutor's request "seizing evidence of the offence," finds the listed wallets "themselves in the nature of items of the offence," and orders "THEIR SEIZURE." Ex. C. Decision No. 2023/5985, issued the same day by the same judge under the same investigation, covered Binance wallets connected to the same enterprise. The synchronized orders evidence a coordinated, Turkey-driven compliance wave, not an independent OKX "discovery" three months later.

Under CMK Article 128, a criminal seizure order restricts the right of possession and transfers that restricted right to the issuing judicial authority: the owner retains title but loses the power to transfer or dispose, and the power to vacate the blockage or order return vests exclusively in the Turkish court. This is a judicial transfer of custodial authority.

On August 18, 2023, seven days later, Aux Cayes FinTech Co. Ltd. ("OKX") filed a reactive Suspicious Transaction Report with the Seychelles Financial Intelligence Unit, as documented in the Turkish Indictment (pages 309–10), in which the prosecutor records OKX's response describing the wallets as "patates cuzdan" ("potato wallets") created with falsified identities. That reactive report directly contradicts the government's claim that the investigation began with a "proactive" OKX report in November 2023. Compl. ¶ 50.

Following the August 11, 2023 Turkish criminal judicial seizure order, Tether finally confirmed the freeze in writing on October 11, 2023, informing the Ankara West Prosecutor's Office that Wallet 0x82e was frozen. Ex. D, E. In the 60 days between the issuance of the Turkish criminal judicial seizure order and Tether's written confirmation, approximately $13,500,000 left Wallet 0x82e -- losses attributable to Tether's delayed compliance with the Turkish judicial seizure order, not to any deficiency in the order itself.

On November 8, 2023, twelve days before Tether and OKX reported Wallet 0x82e to the USSS, Claimant appeared before the Ankara West Chief Prosecutor, gave a sworn statement, and was examined on her forensic methodology; she was participating in the Turkish prosecution when Tether transferred custodial allegiance of her asset to the U.S..

Decision No. 2023/5986 has never been vacated, modified, or superseded, and the U.S. never sought relief from it through any lawful process; it knowingly bypassed the order through a private burn and reissue. On March 14, 2025, roughly three months before this action was filed, Claimant appeared as lead prosecution witness before the Ankara 23rd Heavy Criminal Court: the defendants had challenged her existence as a real person; she testified under oath for approximately three hours and the court confirmed her participation rights under CMK Article 234. The Claimant's criminal case from which the seizure order originated was actively being prosecuted when this forfeiture was initiated.

Claimant's return-of-asset request under CMK Article 131(2) remains pending before the Istanbul 19th Heavy Criminal Court; the prosecutor has already requested return of proceeds to victims. The Turkish victim-restitution framework is analyzed in Section IV.F. The U.S.' burn and reissue, and attempt to remit the res during that delay, would complete the defendants' objective: permanent destruction of the specific asset and the evidence it contains.

**D. The Congressional Threat and the Secondary Freeze Protocol**

Tether had previously defied U.S. seizure warrants[1], making its sudden compliance on November 20, 2023 attributable to the congressional pressure that followed.

On October 26, 2023, Senator Cynthia Lummis and Representative French Hill wrote to Attorney General Garland[2] regarding the "Illicit Finance Activities of Binance and Tether," demanding a criminal investigation of both. Binance, like Tether, had already been compelled to comply with Turkish judicial orders freezing assets tied to the same scheme, and neither disclosed that compliance to Congress.

Tether's staged responses reveal its conversion into a *de facto agent of the state*. Its first congressional letter[3], dated November 16, 2023, omitted Wallet 0x82e and its approximately $87 million, then subject to no U.S. demand and exclusively within the Turkish judicial seizure confirmed on October 11, 2023; the letter referenced a "large investigation" with the USSS and reported only 68 prior US requests totaling roughly 70 million USDT frozen. On or about November 20, 2023, U.S. agencies directed Tether to take control of Wallet 0x82e notwithstanding the existing Turkish custodia legis. Tether had frozen the wallet six weeks earlier under Turkish criminal judicial seizure orders; the act was a cosmetic re-labeling of the same asset to manufacture a U.S. jurisdictional hook and strip the Turkish priority.

---

[1]U.S. Prosecutors Call Huge Cryptocurrency Fraud Seizure a "Game Changer" https://www.newsweek.com/us-prosecutors-crypto-fraud-seizure-tether-binance-scams-currency-pig-butchering-1849885

[2] October 26, 2023 Senator Cynthia Lummis and Representative French Hill Letter https://www.lummis.senate.gov/wp-content/uploads/Letter-to-AG-Garland-Final.pdf

[3]November 16, 2023 Tether Letter to Senate https://assets.ctfassets.net/vyse88cgwfbl/6zq3ex2c9odGTXUC5rs8hp/34d4db8ef2060d3eac80e5256dc2ae08/For_the_Attn_Sen_Lummis___Rep_French_Hill.pdf

On December 1, 2023, Tether implemented a new wallet-freezing policy aligned with the OFAC SDN list and extended to the secondary market: a programmatic override permitting freezes at the direction of U.S. agencies without judicial process, mutual legal assistance (MLAT), or verification of court orders. Its December 15, 2023 second letter[4] disclosed approximately 435 million USDT frozen across approximately 326 wallets, more than six times the figure reported four weeks earlier and now encompassing the omitted $87 million and disclosed that Tether had "onboarded the United States Secret Service into our platform," with FBI onboarding in process.[5]

This sequence constitutes a Secondary Freeze Protocol: a system override reattributing assets already in perfected foreign judicial custody to U.S. control. Dispositive timeline follows.

| Date | Event |
|---|---|
| August 11, 2023 | Ankara West 1st Criminal Judgeship of Peace issues Decisions Nos. 2023/5985 and 2023/5986 under CMK Arts. 127-128, seizing Wallet 0x82e and companion wallets as evidence of the offense. |
| August 18, 2023 | OKX files a reactive Suspicious Transaction Report with the Seychelles FIU in response to Turkish prosecution (Turkish Indictment 309-310). |
| October 11, 2023 | Tether confirms in writing and freezes Wallet 0x82e (Ticket #263780). |
| August 11 to October 11, 2023 | Approximately $13.5 million in USDT exits Wallet 0x82e during the compliance gap. |
| October 26, 2023 | The Lummis-Hill letter demands a criminal investigation of Binance and Tether. |
| November 8, 2023 | Claimant gives a sworn statement before the Ankara West Chief Prosecutor and is examined on her tracing methodology. |
| November 16, 2023 | Tether's first congressional response omits Wallet 0x82e; reports approximately 70 million USDT frozen for the U.S. across approximately 188 addresses. |

---

[4]December 15, 2023 Tether Letter to Senate
https://assets.ctfassets.net/vyse88cgwfbl/6KDtp7U4IcH03zPWnpG11n/1b052835c72f2c7be0bb5ec5bd5a89fc/Tether_Lummis_Hill_Follow_up_Letter.pdf
[5]Tether: We've onboarded FBI, Secret Service to our platform
https://www.theblock.co/post/267973/tether-weve-onboarded-fbi-secret-service-to-our-platform

| Date | Event |
|---|---|
| November 20, 2023 | U.S. agencies direct Tether to take control of Wallet 0x82e; OKX publicly announces a "record breaking" $225 million freeze. Compl. ¶ 172 |
| December 1, 2023 | Tether implements a new SDN-aligned, secondary-market freezing policy permitting agency-directed freezes without judicial process. |
| December 15, 2023 | Tether's second congressional response reports approximately 435 million USDT frozen across approximately 326 wallets and discloses USSS onboarding, with FBI onboarding in process. |
| May 1, 2025 | The United States obtains its Warrant for Arrest In Rem. |
| June 18, 2025 | The United States files its Verified Complaint for Forfeiture In Rem. |

**E. The Credit-Laundering Enterprise and the False "Proactive Discovery" Narrative**

On November 20, 2023, the day of the USSS freeze request, Blake Cohen, Senior Investigator at OKX posted[6]: "Our investigation team at @okx froze $225 Million," thanking Tether, Chainalysis, and ZachXBT for a "record breaking achievement." The statement was false: the assets had been under Turkish criminal judicial seizure since August 11, 2023, and OKX was part of Investigation No. 2023/6371. OKX, Tether, Chainalysis, TRM Labs, and ZachXBT extracted value from Claimant's work product and legal action while excluding her from credit and damaging her standing and recovery by manufacturing a narrative of independent U.S. discovery.[7] OKX's posture in September 2022 was the opposite, with records indicating its senior investigator was threatened with demotion for freezing scam-linked accounts and that accounts were to be released back to the operators. Ex. N, O.

---

[6]November 20, 2023 Blake Cohen X post
https://x.com/BlakeCohen_/status/1726735834697859214
[7]November 20, 2023 OKX X post https://x.com/okx/status/1726606510770508004

Erin West, on the REACT Task Force with the same USSS agents, publicly credited Agent Frey[8] as the "genius" who "devised a clever plan" and "figured out how to do a burn and reissue with Tether." West has dismissed the prior Turkish custody[9] outright: "whatever Turkey says doesn't have any bearing on US Secret Service," an admission that federal agents knowingly disregarded the Turkish court's prior custody. SAC Bradstreet also took and gave credit[10] for the seizure. Ex. P, Q.

In a December 7, 2023 Newsweek[1] interview, SAC Bradstreet described the investigation as still "spider webbing all over the place," weeks after the November 20 freeze: a party-opponent admission under Fed. R. Evid. 801(d)(2) that the investigation was unfinished when the freeze occurred, leaving the Turkish trail the only completed one. The Complaint's version and the Cohen post are each contradicted by Tether's October 11, 2023 compliance with the Turkish criminal judicial seizure order, forty days earlier, and by OKX's reactive August 18, 2023 STR documented by the Turkish authorities.

## F. The OKX Guilty Plea and the Cooperation Discount

On February 24, 2025, OKX pleaded guilty to operating an unlicensed money transmitting business, paying $504 million: approximately $420 million in criminal forfeiture and an $84

---

[8]June 2025 Erin West Linkedin video crediting SAC Bradstreet and Agent Frey for the seizure https://www.linkedin.com/posts/erinnordbywest_pigbutchering-whatifwecould-activity-7341825454254768129-0mCd
[9]Compliance Corylated: "New claim disputes facts of US landmark crypto seizure" https://www.compliancecorylated.com/news/new-claim-disputes-facts-of-us-landmark-crypto-seizure/
[10]June 2025 SAC Bradstreet Linkedin video taking and giving credit for the seizure https://www.linkedin.com/posts/shawn-bradstreet_the-seizure-of-225-million-was-an-amazing-share-7342986183179718656-eevH/

million fine that the plea agreement states "reflects a 25 percent discount off the bottom of the applicable Sentencing Guidelines fine range" for cooperation and remediation.[11]

OKX monetized its compliance with the Turkish prosecution that originated in Claimant's work and private legal action; the victims' assets at OKX served as leverage for a "proactive" cooperation discount. The DOJ's primary source for the forfeiture (Compl. ¶ 50) was an entity that was simultaneously under criminal investigation and later pleaded guilty: a co-conspirator, not an independent whistleblower.

## G. The Absence of an Independent United States Predicate; the Burn and Reissue

The government obtained no criminal indictment, executed no MLAT process with Turkey, and did not obtain its own warrant until on or about May 1, 2025, more than twenty months after the Turkish seizure; it admits reliance on a questionable last-in, first-out ("LIFO") accounting method rather than any criminal adjudication. Compl. ¶¶ 46, 48, 67;

The $225 million was not within OKX's exchange infrastructure; it sat in cold wallets, subject to Tether's control over USDT, a British Virgin Islands entity. The U.S. "seizure" was a private, voluntary burn and reissue, not a U.S. warrant valid overseas: rather than transferring the original tokens frozen under Decision No. 2023/5986 and held in Turkish judicial custody since August 11, 2023, Tether destroyed them and issued newly minted replacements into USMS custody, without notice to Claimant or the Turkish court. The government admits the tokens have been or will be burned and reissued. Compl. ¶¶ 209, 213, 216, 220, 224, 227, 230;.

---

[11]OKX Pleads Guilty https://www.justice.gov/usao-sdny/pr/okx-pleads-guilty-violating-us-anti-money-laundering-laws-and-agrees-pay-penalties

TRM Labs confirmed that token reissue[12] "is not currently codified in law" and depends on the architecture, the legal process, and the issuer's policies: a private administrative mechanism at the issuer's discretion, not a law-enforcement power.

The Complaint describes tracing $263,000 through 42 intermediary wallets across 17 wallet addresses to 22 suspect accounts, Compl. ¶¶ 46, 67; across millions of transactions, (Compl. ¶ 49) such tracing yields only a hypothesis, not criminality, and cannot replace the actual criminal investigation that produced over 100 arrests and prosecutions through Turkish authorities at Claimant's instance.

LIFO is a victim-exclusion mechanism: victims' data locates the funds, then accounting fiction excludes those victims from recovery. In 2022, a victim group provided structured intelligence of more than 2,000 victims to the government, leading to seizures (Operation Guard Dog) but no recovery-and instead, disqualification for the reporting victims. This is the structural feature that makes the forfeiture fund self-sustaining: victim data goes in, claims come out as "untraceable," and net proceeds are absorbed by the Treasury.

**H. The Enterprise Connection, Conflicted Counsel, and Forum Fragmentation**

Claimant's forensic architecture traces identical wallet clusters across multiple district proceedings including this action (D.D.C. No. 1:25-cv-01907, $225 million USDT); E.D.N.Y. No. 25-cv-05745 (127,271 BTC); D. Colo. No. 1:23-cv-02549; and E.D. Mich. No. 25-cv-12945 ($163 million). The government has artificially compartmentalized these proceedings, preventing claimants from establishing the enterprise's full scope and their traceable loss. Ex. L.

---

[12]TRM Labs: "Seize, Burn, Block, Reissue…" https://www.trmlabs.com/resources/blog/seize-burn-block-reissue-understanding-the-legal-tools-behind-crypto-asset-recovery

The representation of Claimants 1-118 is structurally compromised. Mr. Boyle, formerly the government's High Intensity Financial Crimes Area Coordinator in the Central District of California, was the affiant on the seizure warrant (22-MJ-04906, C.D. Cal.) that initiated the E.D. Mich. proceeding concerning the same network. The conflict is documented in Exhibits L and M and is non-waivable under any construction of the applicable rules. Greenberg Traurig LLP, also counsel to Claimants 1-118, simultaneously appears for Daren Li[13], convicted of money laundering arising from the same Prince Group ecosystem. Claim filings submitted through counsel simultaneously engaged by the criminal principals of the same enterprise cannot be treated as reliable representations of the victims' interests.

Infiniweb Technology, Inc., listed on PAGCOR's "List of Cancelled Offshore Gaming Licensees" dated January 15, 2024, was permitted to file a claim despite no evidence of lawful source. The government admits its own open-source research revealed Infiniweb's close links with Xionwei Technologies, accused of kidnapping and human trafficking in a 120-page report to the Nineteenth Congress of the Republic of the Philippines. Compl. ¶ 240. The government did not strike Infiniweb and remained in settlement talks for months. Ex. M, J, K.

In 2023, Claimant presented evidence of the criminal network to the USSS and the FBI; they dismissed her claims, while she independently secured the Turkish seizure. Claimant was twice registered in the Victim Notification System (VNS); FBI Special Agent Daniel Heether later attested under oath, in D. Colo. 1:23-cv-02549, accepting her tracing methodology for its forfeiture while erasing her VNS registration. Ex. F.

---

[13]Man Sentenced to 20 Years in Prison for Role in $73 Million Global Cryptocurrency Investment Scam: https://www.justice.gov/opa/pr/man-sentenced-20-years-prison-role-73-million-global-cryptocurrency-investment-scam

On May 11, 2026 Claimant submitted a whistleblower complaint to the DOJ, followed by a June 17, 2026, direct conflict notice to the government's attorneys, AUSA Blaylock and AUSA Aftab, which was ignored. Ex. G, H. On July 9, 2026, she sent a 14-page Public-Source Memorandum tracing Infiniweb verifier Zeng Youzong to the Prince Group ecosystem. Ex. I, J, K. The government ignored its substance: AUSA Blaylock threatened to strike Claimant's claim, asserted that her funds are "not traceable to this case" while admitting that a parallel Colorado case is traceable to her loss, and directed her to withdraw and seek remission with Tonya Andrews, Colorado Asset Forfeiture Chief. The directive to a non-judicial channel, alongside the stripped VNS registrations and installation of conflicted counsel, evidences forum fragmentation suppressing the enterprise connection.

Claimant's relationship with the government was collaborative: in 2023, she voluntarily provided intelligence to the USSS and FBI; on three occasions thereafter, she provided the DOJ with documented evidence of the Infiniweb-Prince Group identity and the non-waivable conflicts, instead the government took no action, and continued negotiating with the conflicted parties.

## I. Claimant's Verified Claim and Wallet 0x82e's Position in the Res

Wallet 0x82e is an unhosted wallet, and the largest of the seven wallets encompassed by the Complaint: it held approximately $101 million at the time of the Turkish criminal judicial seizure order No. 2023/5986 and now accounts for approximately $87.5 million of the approximately $225 million at issue, the plurality of the res, independently subject to the Turkish court's prior custody.

Claimant's Verified Claim and Answer assert a cognizable legal interest specifically in Wallet 0x82e, including that at the government's alleged seizure the wallet was already frozen under the Turkish criminal judicial seizure order supporting an ongoing organized-crime

prosecution, and that the seizure history bears directly on this Court's jurisdiction. Under Turkish procedural law, Claimant holds the roles of Musteki (complainant) and Mudahil (intervening party), the functional equivalent of a private prosecutor and an intervening creditor with a judicially recognized interest in the seized assets. The verified filings placed the temporal priority of the Turkish seizure squarely before this Court.

**J. The DDG Recovery Framework, the Identified Victim Cohort, and the UK Framework**

After securing Wallet 0x82e through the Turkish criminal judicial seizure, Claimant has performed more than three years of continuing custodial and investigative work in relation to the res. That work comprises: (i) maintaining and advancing the Turkish criminal prosecution as Musteki and Mudahil; (ii) forensic mapping of the Prince Group network across the proceedings identified in Section II.H; (iii) locating, intake, and verification of individual victims against the Turkish investigative record; and (iv) retaining and funding counsel in the United Kingdom to prepare civil proprietary recovery proceedings for the identified victim cohort, in tandem with the Turkish criminal process. The English High Court has held that USDT is property under English law, capable of being traced and of being held on constructive trust. D'Aloia v Persons Unknown [2024] EWHC 2342 (Ch). The UK framework is accordingly built on recognized proprietary doctrine, not a novel theory: victims whose specific assets are traceable assert equitable ownership interests in those assets, rather than unsecured claims against a general fund. The legal architecture, victim-identification protocols, and forensic tracing are complete, and the proceedings are in active preparation.

The Complaint represented to this Court that the victims of the fraud could not be identified. Compl. ¶ 60. The Complaint itself quantifies that failure: of approximately 434 suspected victims, law enforcement successfully contacted only 60, and "received no response or

was unable to reach the remaining victims." Compl. ¶¶ 68, 71. Of the more than $62 million received by the 93 Initial Deposit Addresses, only approximately $19 million was traced to the 60 identified victims, leaving the majority of victim funds unattributed. Compl. ¶ 70. IC3 and FTC complaints referenced approximately $68 million in additional victim funds beyond those addresses, and the government concedes these totals "represent just a portion of the true magnitude of the scheme." Compl. ¶¶ 82, 98-100. DDG's work refutes that representation on the record: approximately 200 victims have been verified through documented intake cross-referenced against the Turkish investigative file and on-chain tracing, and approximately 3,000 potential claimants have been identified. Each verified victim is a person directly and proximately harmed by the offenses alleged in the Complaint, and is accordingly a "crime victim" within the meaning of 18 U.S.C. § 3771(e).

The case for preserving the res for adjudicated victim claims rather than a general remission pool rests on three structural differences. First, conflict-free representation: Claimants 1-118 are represented by counsel who simultaneously represent the criminal principals and sanctioned entities of the same network (Section II.H), while DDG operates under a victim-first mandate with no such conflicts. Second, asset-specific tracing: the available forensic evidence connects funds in Wallet 0x82e to identified victims through DDG's tracing work, and the res was placed under judicial seizure at Claimant's instance before this forfeiture was filed. Administrative remission, by contrast, operates on the terms described in the government's own Asset Forfeiture Policy Manual: a discretionary determination, made after final forfeiture, distributing net proceeds after deduction of costs of administration, in which victims hold no adjudicated interest in any specific asset. See Section IV.F. The difference is not one of degree; it is the difference between an ownership claim in identified property and a petition for a residue. Third, readiness: the recovery

framework is funded, staffed, and in active preparation, built over three years without government funding. No comparable mechanism for these victims exists within the remission process, which the Complaint's own inability to identify them confirms.

Settlement, remission, or other disposition of Wallet 0x82e before adjudication of priority would extinguish the identified victims' proprietary claims at the moment they are ready to be asserted. The Turkish criminal court has already been asked by the prosecutor to return proceeds to victims. Section IV.F. Disposition of the res in this proceeding would render both the Turkish restitution mechanism and the UK proprietary proceedings incapable of performance as to these victims: the specific property in which their claims subsist would cease to exist in cognizable form. That harm is not compensable later and falls on approximately 200 verified victims who are strangers to the conduct alleged in the Complaint.

**K. Present Posture: Threatened Strike, Infiniweb Settlement, and Imminent Dissipation**

The government has informed Claimant that it intends to strike her claim and has directed her to withdraw it in favor of a discretionary administrative remission process, while representing that it is reaching imminent settlement with Infiniweb. Claimant was excluded from settlement negotiations in which other claimants were included, and the government now leverages that process as a basis for striking her verified claim. She was afforded no notice of or role in negotiations concerning the res in which she asserts a prior secured perfected foreign judicial interest, in violation of the Crime Victims' Rights Act, 18 U.S.C. § 3771, which guarantees victims the rights to be heard, to fairness, and to confer with the government's attorney.

This forfeiture is the government's attempt to transfer property already in the custody of a court to a criminal proxy: a "Second Theft," completing what the criminals started. And the false public-seizure narrative in the Complaint and the publicity campaign has exposed Claimant to

retaliatory risks arising from her role in investigating a transnational criminal network and directly prosecuting its members; no later payment can undo that exposure.

### III. STANDING, RELIEF SOUGHT, AND STANDARDS OF REVIEW

### A. Claimant Has Statutory and Article III Standing

To contest a civil forfeiture, a claimant must establish Article III standing and statutory standing under the Supplemental Rules; the latter is satisfied by filing a verified claim placing the claimant in an adversarial posture with respect to the res. U.S. v. 8 Gilcrease Lane, 638 F.3d 297, 300-01 (D.C. Cir. 2011). Both are met.

Claimant filed her Verified Claim and Answer asserting her interest in Wallet 0x82e; those filings confer statutory standing. 8 Gilcrease Lane, 638 F.3d at 300. She has not withdrawn her claim, and that is dispositive: the standing analysis in 8 Gilcrease Lane turned on claimants' voluntary release of their interests. The government's stated intent to move to strike does not alter this; a motion to strike is for the Court, not a determination effectuated by executive demand.

Nor is Claimant's interest diffuse. Her Verified Claim identifies a single, discrete blockchain address: not a pro rata share of the $225 million pool but ownership and priority in the specific USDT in one determinable wallet whose judicial seizure she personally initiated and continues to pursue in Turkey as private prosecutor and secured creditor.

Claimant's interest also satisfies the statutory definition of an "owner" under 18 U.S.C. § 983(d)(6)(A), which includes "a person with an ownership interest in the specific property sought to be forfeited, including . . . a lien, . . . recorded security interest, or valid assignment of an ownership interest." The Turkish criminal court's seizure of Wallet 0x82e in aid of victim restitution, the prosecutor's request for return of proceeds to victims, and the assignment of claim authorization over the seized wallets to victims under CMK Article 131(2) (Section IV.F;) together

-24-

constitute a judicially recognized security interest in, and assignment of, the specific res. Claimant is not a general creditor of a wrongdoer; she holds a court-conferred interest in identified property, perfected before this action was filed.

## B. Relief Sought

The Motion requests: (1) an emergency preliminary injunction under Rule 65(a) and LCvR 65.1 restraining any settlement, transfer, remission, burning, reissuing, alteration, or other dissipation of the res attributable to Wallet 0x82e, including any reissued substitute, pending adjudication of priority of title; (2) bifurcation of Claimant's claim and advancement of trial on the merits under Rules 42(b) and 65(a)(2), with partial final judgment under Rule 54(b); and (3) in the alternative, dismissal as to Wallet 0x82e under Rule 12(b)(1) and Supplemental Rule G(8)(b), conditioned on appointment of a neutral receiver limited to custodial preservation pending resolution of Claimant and DDG victim cohort's Turkish and United Kingdom recovery process. Claimant additionally requests spoliation sanctions, suppression of the warrantless freeze fruits, denial or deferral of any motion to strike or transfer venue, a CVRA violation finding, conflict disclosure, and ancillary procedural relief as set forth in full in Section VIII.

## C. Security Under Rule 65(c)

Rule 65(c) conditions an injunction on security in an amount the Court considers proper; the amount rests in the Court's discretion, which may set a nominal bond or none where the injunction poses little or no risk of monetary loss. No security is appropriate here. The relief is preservation only: it keeps the res in the form in which the government already holds it, imposing no cognizable monetary cost on a party that cannot lawfully dissipate the property pending adjudication. Claimant, a pro se victim asserting a prior secured perfected judicially recognized interest and without income for over three years, respectfully requests waiver of security.

## IV. LEAD ARGUMENT: TURKEY'S PRIOR EXCLUSIVE JURISDICTION OVER

## 0X82E

### A. The Governing Doctrine

Where a suit is in rem or quasi in rem and the court must control the property to grant relief, the court that first assumes jurisdiction over the property may exercise it to the exclusion of any other court. Princess Lida of Thurn and Taxis v. Thompson, 305 U.S. 456, 466 (1939). The doctrine is jurisdictional, not discretionary.

Nor is the doctrine confined to domestic proceedings: the D.C. Circuit has recognized its application to federal cases with cognate proceedings in another country's courts. SEC v. Banner Fund Int'l, 211 F.3d 602 (D.C. Cir. 2000). It is a comity rule governing whenever a res is under the custodial control of any court, domestic or foreign, with jurisdiction to resolve claims to it.

The Department of Justice's policy recognizes the principle. The 2025 Asset Forfeiture Policy Manual,[14] Chap. 3 (citing U.S. v. Timley, 443 F.3d 615, 627–628 (8th Cir. 2006)). instructs that federal prosecutors may not initiate a in rem forfeiture against property seized by state, local, or tribal law enforcement while it remains subject to a state court's in rem jurisdiction, because "[t]he court first assuming in rem jurisdiction over the property retains jurisdiction to the exclusion of all others." If first-court exclusivity binds domestically, it applies with no less force internationally, where principles of international comity govern the same res.

### B. Turkish Judicial Taking of Custody, Established by the Seizure Order and the Statute

As set forth in Section II.C, the Ankara West 1st Criminal Judgeship of Peace issued Decisions Nos. 2023/5985 and 2023/5986 on August 11, 2023 under CMK Articles 127 and 128,

---

[14] Asset Forfeiture Policy Manual (2025) https://www.justice.gov/usdoj-media/criminal/media/1140236/dl?inline

judicially determining the wallet contents to be "themselves in the nature of items of the offence" and "of evidential value," and ordering their seizure. The Turkish court thereby exercised in rem jurisdiction over the corpus delicti itself.

Under CMK Article 128, a criminal seizure order restricts the right of possession and transfers that restricted right to the issuing judicial authority; the owner retains bare title, and only the Turkish court may vacate the blockage or order return. When Tether confirmed compliance in writing on October 11, 2023, the right of possession passed to the Turkish judicial authority and Wallet 0x82e came into the actual or constructive possession of a foreign court; a later order of another sovereign is not merely junior but without legal effect against a res under Turkish custodia legis. A criminal court's directive taking property into its own custody in an active prosecution triggers Princess Lida, 305 U.S. at 466. Decision No. 2023/5986 has never been vacated, modified, or superseded. Claimant's return-of-asset application under CMK Article 131(2) remains pending before the Istanbul 19th Heavy Criminal Court.

That approximately $13.5 million exited Wallet 0x82e between the August 11, 2023 order and Tether's October 11, 2023 written confirmation (Section II.C) does not defeat custody; it fixes the date custody was perfected. Constructive possession of an intangible asset is effected through the custodian's compliance, and from October 11, 2023, when Tether confirmed the freeze in writing to the Ankara West Prosecutor's Office, no further funds left the wallet. Even taking October 11, 2023 as the operative date, Turkish custody preceded the government's warrant by more than eighteen months and its complaint by more than twenty months. The date comparison is unaffected.

## C. The Date Comparison Is Dispositive

Application of the doctrine requires comparing two official records: the August 11, 2023 seizure order, confirmed by the custodian's October 11, 2023 written compliance, and the Warrant for Arrest In Rem of on or about May 1, 2025 with the Verified Complaint of June 18, 2025. Compl. ¶ 48. The interval between the Turkish order and the federal complaint is more than twenty-two months. Throughout, Wallet 0x82e remained frozen under the standing Turkish order. Because the Turkish court acted first and its custody has never lapsed, the doctrine bars competing in rem jurisdiction. Princess Lida, 305 U.S. at 466. Rule G(2)(b) requires the complaint to plead a valid basis for in rem jurisdiction over the defendant property, and a claimant with statutory standing may move to dismiss under Rule G(8)(b) on Rule 12(b) standards; dismissal as to Wallet 0x82e under Rule 12(b)(1) is required, subject to the receiver condition in Sections VI.D and VIII.

## D. Sections 1355(b)(2) and 2467 Do Not Displace the Prior-Custody Bar

Section 1355 supplies jurisdiction over forfeiture proceedings but not in rem jurisdiction over particular property. The government may respond that § 1355(b)(2) reaches property located in, or seized by, a foreign country. That conflates the statutory authority to entertain a forfeiture reaching property abroad with the question of whether a foreign sovereign's prior judicial seizure bars a competing exercise of jurisdiction. The D.C. Circuit treats Section 1355(b)(2) and its companions as jurisdiction- and venue-granting mechanisms for reaching foreign-located property in the first instance, U.S. v. All Funds in Account Nos. 747.034/278, 295 F.3d 23, 27 (D.C. Cir. 2002); nothing in that scheme overrides the comity principle governing a res a foreign court has already seized and held for nearly two years.

Nor can the government invoke 28 U.S.C. § 2467, which governs domestic enforcement of a foreign forfeiture judgment: a mechanism for giving effect to foreign judgments, not authority

to disregard a foreign court's prior custody. And the government has not invoked, and the record does not reflect, any MLAT request or other formal mechanism through which the U.S. sought to coordinate with or displace Turkey's prior custody before filing. Absent such invocation, a unilateral, later-filed complaint cannot supersede the Turkish court's earlier and continuing custodial jurisdiction over the same asset.

### E. The United States Never Acquired Lawful Control Over the Res

In rem jurisdiction turns on the court's relationship to the property, Republic Nat'l Bank of Miami v. U.S., 506 U.S. 80, 84 (1992); due process requires control or constructive control, and a purported exercise of in rem jurisdiction over property abroad, over which the U.S. has no lawful possession or control, cannot stand. Republic Nat'l Bank of Miami v. U.S., 506 U.S. 80, 87 (1992). The constructive-control avenue recognized in that authority - a foreign sovereign acting as a U.S. agent - is unavailable here: Turkey's court exercised independent jurisdiction for its own identified victims. Whatever control the U.S. now asserts was obtained by overriding that prior custody through the compelled freeze and a private burn and reissue that is, by the industry's own account, "not currently codified in law," not the lawful control due process requires. Reissuing tokens changed form without vesting title or supplying the missing control. Substitute property created by destruction of judicially held property takes the burdens of the original, including prior custody

The acquisition also violated multiple safeguards in the 2025 Asset Forfeiture Policy Manual, Chap. 9, requiring OIA coordination, pre-seizure probable-cause findings, and formal treaty process before overseas seizure -- safeguards the government bypassed entirely.

The government made no request to Turkey, obtained no pre-seizure probable-cause finding before the November 20, 2023 freeze, gave no indication OIA was consulted, and accomplished administratively what its manual recognizes it cannot do abroad. That the Manual

creates no privately enforceable rights, see id., Foreword (citing U.S. v. Caceres, 440 U.S. 741 (1979)), is no answer; wholesale departure from every safeguard evidences that the government knew its acquisition was unlawful.

Supplemental Rule G(2)(b) requires the complaint to plead a valid basis for in rem jurisdiction, and the control principle of Republic National Bank is what that pleading must satisfy. Because the Complaint does not plead lawful control over a res under prior foreign judicial custody, it fails to establish in rem jurisdiction over Wallet 0x82e, and the forfeiture as to that res should be dismissed.

**F. The Turkish Victim-Restitution Framework Confirms the Priority and Its Character**

Under Article 55(1) of the Turkish Penal Code ("TCK"), state confiscation of criminal proceeds is permitted only if reimbursement to the aggrieved party is out of the question; because Claimant is an identified victim, the assets are traceable, and the funds are under Turkish judicial seizure, the Turkish state itself is statutorily barred from confiscating them; the U.S. cannot invoke a derivative power the primary sovereign lacks. Separately, under CMK Article 131(2), Claimant holds a statutory right to return of the seized assets without waiting for the end of the criminal case; the prosecutor has already requested return of proceeds to victims in the Indictment, effectuated by the criminal court assigning claim authorization over the seized wallets to the victims. The victim's claim rests on pre-crime ownership, not a post-seizure creditor claim, so any suggestion that the federal warrant supersedes the Turkish seizure fails under Princess Lida. The contrast with the U.S. discretionary remission framework is stark, and it matters to the character of what the government proposes to destroy:

| Element | Turkish Law (CMK / TCK) | U.S. Asset Forfeiture Manual (2025) |
|---|---|---|
| Trigger for return | Mandatory when victim ownership is apparent "without hesitation" (CMK 131(2)) | Discretionary administrative remission after deducting "costs of administration" |
| Timing | Immediate; the victim need not wait for the end of the criminal case (CMK 131(2)) | Only after final forfeiture judgment and administrative petition |
| Nature of relief | Return of the specific asset or its derivative, not compensation | Residual cash distribution from net proceeds |
| State confiscation | Prohibited if victim reimbursement is possible (TCK 55(1)) | Permitted; victims are residual claimants |

Claimant's interest, perfected no later than August 11, 2023, is secured in character. Administrative remission would demote a secured foreign-court entitlement into an unsecured, discretionary petition for a residue net of administration costs: precisely the harm the doctrine exists to prevent. The Istanbul court has deferred, not denied, Claimant's return application amid obstructions funded by the criminal enterprise; the U.S. cannot exploit that delay to destroy the asset before the Turkish court can rule. To permit it would allow the U.S. to accomplish what the Turkish criminal defendants could not.

Claimant intends to provide an expert opinion on the character of Turkish victim restitution law pursuant to Fed. R. Civ. P. 44.1; however, the text of the TCK and CMK already establishes the priority and secured interest of the victim's claim on the face of the statute.

### V. SECOND ARGUMENT: THE BURN AND REISSUE WAS SPOLIATION OF EVIDENCE, AND ITS CONSEQUENCES FALL ON THE GOVERNMENT

#### A. The Government Destroyed Evidence Held Under Foreign Judicial Custody

As detailed in Section II.G, the government caused Tether to execute a burn and reissue, destroying the original tokens -- which a foreign criminal court had seized as evidence -- and issuing newly minted replacements into USMS custody, without notice to Claimant or the Turkish

court. Compl. ¶¶ 209, 213, 230; The original tokens carried the complete on-chain record of their transaction history linking them to the criminal proceeds identified in the Turkish investigation: the corpus delicti of the Claimant's private prosecution and the foreign sovereign's criminal case. The government destroyed that evidence to manufacture a domestic jurisdictional hook.

## B. The Burden the Government Must Carry

Under CAFRA, the government bears the burden of establishing by a preponderance that the property is subject to forfeiture, 18 U.S.C. § 983(c)(1), and where the theory is that the property was involved in or traceable to an offense, it must establish a substantial connection between the property and the offense, id. § 983(c)(3); U.S. v. Schifferli, 895 F.2d 987 (4th Cir. 1990). That nexus must be carried by particularized tracing to specific transactions, not by generalization. U.S. v. DeFries, 129 F.3d 1293 (D.C. Cir. 1997); U.S. v. $6,999,925.00 of Funds Associated with Velmur Mgmt. Pte Ltd., 368 F. Supp. 3d 10 (D.D.C. 2019). The government has admitted it cannot perform that tracing. The Complaint concedes that "tracing a single victim deposit all the way through … is incredibly time consuming for even a team of investigators," and that it is "difficult to determine which outgoing transaction involves each specific input of fraud victim funds." Compl. ¶¶ 83-84. These are party-opponent admissions, Fed. R. Evid. 801(d)(2), that the particularized nexus § 983(c)(3) requires was beyond the government's capability before it destroyed the res.

## C. Spoliation Shifts the Burden; the Government Cannot Prove What It Destroyed

The consequence of the burn is not the loss of the public ledger, which persists, but the destruction of the res itself as a continuous, identifiable object of judicial custody. The specific tokens the Turkish court seized as "items of the offence" no longer exist; what sits in USMS custody is substitute property the government caused to be created. The government cannot have

it both ways: if the substitutes are the same property, they remain impressed with the Turkish court's prior custody and this Court's jurisdiction fails under Section IV; if they are different property, the government destroyed the seized res of a foreign criminal proceeding without any lawful process and cannot found in rem jurisdiction on property of its own manufacture. In either case, equity follows the asset: substitute property created by the wrongful destruction of judicially held property stands in the place of the original and takes its burdens, including the prior custody. The evidentiary consequence is independent: the government elected to extinguish the original tokens before any court adjudicated their status, and having done so, it cannot resist an adverse inference on the nexus and priority questions its own conduct placed beyond direct proof.

## D. The Later Warrant Does Not Cure the Antecedent Destruction

The derivative-evidence doctrine reinforces the conclusion by analogy. The test asks whether the challenged evidence was come at by exploitation of the primary illegality or by means sufficiently distinguishable to be purged of the taint. Wong Sun v. U.S., 371 U.S. 471, 488 (1963); Segura v. U.S., 468 U.S. 796, 804 (1984). The government's direction to burn tokens under Turkish judicial custody, without U.S. judicial authorization, produced the substitute tokens now before the Court; there is no independent source and no attenuation. U.S. v. Dawkins, 17 F.3d 399, 407-08 (D.C. Cir. 1994) (suppressing evidence found the next day under a warrant after an initial illegal sweep). The argument here is evidentiary, not a suppression claim (Section VII.A): a warrant obtained after the destruction cannot supply the evidentiary continuity the government's burden requires.

## E. An Independent Basis for Relief

This argument operates independently of the Section IV jurisdictional bar: the government destroyed evidence under foreign judicial custody, evidence it needed to carry its own statutory

burden, with knowledge of and by displacing that custody. Together, the arguments support dismissal as to Wallet 0x82e under Rule 12(b)(1) and Rule G(8)(b), conditioned on the receiver-preservation term set out in Section VIII, or, short of dismissal, a preservation order coupled with burden-shifting and preclusion at trial of the government's nexus case.

## VI. THIRD ARGUMENT: THE COURT SHOULD NOT ALLOW A SECOND THEFT THROUGH A CRIMINAL PROXY AND CONFLICTED COUNSEL

### A. Infiniweb Is a Proxy for the Criminal Enterprise

As set forth in Section II.H, Infiniweb Technology, Inc. was listed on PAGCOR's cancelled licensee list, has demonstrated no lawful source, and Claimant's July 9, 2026 Public-Source Memorandum demonstrates it is a proxy within the Prince Group ecosystem. The Complaint itself forecloses any lawful-source showing: the government pleads that actors laundering proceeds of such schemes "do not typically commingle clean funds with stolen funds outside of the purpose of further laundering." Compl. ¶ 77. On the government's own pleading, there are no clean funds in this pool for Infiniweb to claim. A settlement transferring the res to such an entity would constitute a second theft, completed through the machinery of this Court.

### B. The Settlement Is Brokered Through Conflicted Counsel

As detailed in Section II.H, counsel for Claimants 1-118 have a non-waivable conflict, and Claimant's June 17, 2026 conflict notice was ignored. The Court should require the government to respond and disclose what action, if any, it has taken; the knowing toleration of non-waivable conflicts raises due process concerns this Court has inherent authority to address.

### C. The Government's Own Conduct Forfeits Equitable Deference

As detailed in Sections II.H and II.K, the government solicited Claimant's intelligence, benefited from the Turkish seizure she originated, and accepted her tracing methodology through

its own agent's sworn attestation in D. Colo. No. 1:23-cv-02549, before excluding her from settlement negotiations and threatening to strike her claim. The government's declared purpose in this action is "to recover assets that may be used to compensate victims." Compl. ¶ 2. Its conduct is measured against its own benchmark: striking the verified victim who located the res, while settling with a cancelled offshore gaming licensee the Complaint links to trafficking. The Court need not resolve whether that conduct satisfies estoppel. It is enough that a court of equity, asked to lend its process to the disposition of the res, may weigh the government's inconsistency in deciding whether to withhold that process pending adjudication of priority. Unclean hands is measured against the transaction before the court: here, the disposition of an asset the government acquired by overriding a foreign court's custody and now proposes to settle with a proxy for the enterprise.

### D. The Court's Equitable Authority to Withhold Its Process

A court of equity need not lend its process to a disposition that would transfer judicially seized victim property to a proxy for the perpetrators, negotiated around the victim who originated the recovery, through conflicted counsel. The Court has inherent equitable power to preserve property over which its jurisdiction is contested and to appoint a receiver where there is danger that property will be lost, removed, or materially injured. In re McGaughey, 24 F.3d 904, 907 (7th Cir. 1994). The danger is acute: the government has already burned the original res once, has declared its intent to strike the only judicially verified claim, and is negotiating with a criminal proxy. The proportionate exercise is to preserve the res, withhold approval of any distribution pending adjudication of priority, and, if dismissal or bifurcation is ordered, place the reissued substitute with a neutral receiver limited to custodial preservation pending orderly restoration to Claimant and DDG victim cohort's recovery frameworks.

## VII. REMAINING ARGUMENTS

### A. The November 2023 Freeze Was Warrantless, and Its Fruits Should Be Suppressed

The freeze on which the government's control of the res depends was state action, warrantless, and its fruits should be suppressed. Private conduct is attributable to the government when the deprivation is caused by the exercise of a right or privilege created by the state, Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982); where the government has exercised coercive power or provided significant encouragement, Blum v. Yaretsky, 457 U.S. 991, 1004 (1982); and where government compulsion, authorization, and encouragement of an otherwise private seizure supplies the nexus, Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 615-16 (1989).

First, Tether's November 20, 2023 action was not an exercise of private contractual rights: Wallet 0x82e had already been frozen on October 11, 2023 under Turkish criminal process, and Tether had no independent interest in refreezing already restrained property. Second, the record establishes compulsion: the Section II.D timeline shows the congressional demand (October 26, 2023), the U.S. directive to seize control (November 20, 2023), the SDN-aligned system override authorizing agency-directed freezes without judicial process (December 1, 2023), and Tether's disclosure that it had "onboarded the U.S. Secret Service into our platform." The settlement pattern -- Binance's $4.3 billion, OKX's $504 million[15], and Tether's provision of platform access and $225 million in USDT, including roughly $87 million already in Turkish custody -- confirms that the asset was the currency of Tether's settlement. Lugar, 457 U.S. at 937. The freeze is subject to the Fourth Amendment.

---

[15]Binance and CEO Plead Guilty to Federal Charges in $4B Resolution: https://www.justice.gov/archives/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution

Because the freeze is attributable to the government, Compl. ¶ 172, and no warrant was issued until on or about May 1, 2025, Compl. ¶ 48, the seizure was warrantless, and any exigency expired long before then. Compl. ¶ 48. U.S. v. Cosme, 796 F.3d 226, 235 (2d Cir. 2015). The exclusionary rule applies in civil forfeiture. One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 696-702 (1965). While an unlawful seizure does not itself immunize property from forfeiture, it requires exclusion of the evidence obtained by exploitation of the illegality. Segura v. U.S., 468 U.S. 796, 804 (1984); Wong Sun v. U.S., 371 U.S. 471, 488 (1963); U.S. v. Dawkins, 17 F.3d 399, 407 (D.C. Cir. 1994). Here that includes the November 20, 2023 control records, the custody chain of the reissued substitutes, and all tracing work product derived from the government's warrantless control of the wallet. Stripped of that evidence, and with the spoliation consequences of Section V applied, the government cannot plead or prove the substantial connection § 983(c)(3) requires as to Wallet 0x82e.

**B. Additional Independent Merits Defects**

Extraterritoriality: The wire-fraud and money-laundering statutes underlying the forfeiture are presumed to apply only domestically, and where the presumption is not rebutted, the permissible application turns on the location of conduct relevant to the statute's focus, not the location of injury. Compl. ¶ 1. RJR Nabisco, Inc. v. European Community, 579 U.S. 325, 337 (2016); Abitron Austria GmbH v. Hetronic Int'l, Inc., 600 U.S. 412, 422 (2023); Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 266-67 (2010). By the government's own account, the criminal enterprise, its perpetrators, its compounds, and the bulk of the conduct were abroad; victim residency cannot substitute for domestic focus-relevant conduct.

Excessive Fines: Civil forfeiture is punishment subject to the Eighth Amendment. Austin v. U.S., 509 U.S. 602, 621-22 (1993); Timbs v. Indiana, 586 U.S. 146, 150 (2019). The proportionality test

asks whether the forfeiture is grossly disproportional to the defendant's offense. U.S. v. Bajakajian, 524 U.S. 321, 337 (1998). But Claimant is not a defendant; she committed no offense, and no offense is charged against her. The proportionality denominator is zero. The proportionality inquiry measures the forfeiture against the offense of the person whose property is taken; where that person is innocent, the gravity of someone else's crime cannot supply the missing denominator. Any forfeiture of property from a verified innocent victim who holds a prior secured, perfected foreign judicial interest is definitionally excessive because there is no gravamen to which the punishment can be proportioned. This is not a restitution order calibrated to victim loss, cf. U.S. v. Dubose, 146 F.3d 1141 (9th Cir. 1998) (proportionality inherent in criminal restitution); it is a punitive forfeiture applied to the wronged party, settling the res with a criminal proxy while stripping the victim who secured it. The innocent-owner defense, 18 U.S.C. section 983(d), reflects the same principle statutorily; the constitutional floor is higher.

## C. The Preliminary Injunction Factors Are Satisfied

A preliminary injunction requires likelihood of success on the merits, likely irreparable harm, a favorable balance of equities, and the public interest; harm must be likely, not merely possible. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 22 (2008); Simms v. District of Columbia, 872 F. Supp. 2d 90 (D.D.C. 2012) (applying Winter in the forfeiture due-process context); Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 161 (1st Cir. 2004) (prejudgment preservation orders are preliminary injunctions); U.S. v. E-Gold, Ltd., 521 F.3d 411, 415 (D.C. Cir. 2008) (restraint on digital assets is an injunction for all purposes).

Likelihood of Success: Standing is established in Section III.A; success rests on independently sufficient grounds incorporated here: prior exclusive jurisdiction (Section IV), lack of lawful control (Section IV.E), spoliation (Section V), the equitable bar (Section VI), suppression (Section

VII.A), and the merits defects (Section VII.B). The jurisdictional defect alone demonstrates a substantial likelihood of success.

Relief Preserves the Status Quo: Claimant asks only that the res remain in its current form until her priority is adjudicated. The injunction is prohibitory, not mandatory: it prevents alteration of existing property. Farris v. Rice, 453 F. Supp. 2d 76 (D.D.C. 2006); U.S. v. Western Electric Co., 46 F.3d 1198 (D.C. Cir. 1995). That it runs against the U.S. informs the equitable factors but does not exempt the request from the four-factor test.

Irreparable Harm: Due process requires notice and a meaningful opportunity to be heard before the government seizes property subject to civil forfeiture. U.S. v. James Daniel Good Real Property, 510 U.S. 43, 62 (1993); E-Gold, 521 F.3d at 415; Simms, 872 F. Supp. 2d at 92. The government has already altered the res once without adversary hearing (Section II.G); a property once dissipated cannot be reconstituted. U.S. v. $493,850.00 in U.S. Currency, 518 F.3d 1159, 1170 (9th Cir. 2008). Dissipation would extinguish the Turkish remedy: a CMK Article 131(2) return order cannot be effectuated once the res is burned again, remitted, or settled away. The false seizure narrative has exposed Claimant to retaliatory risk, and loss of the res would destroy DDG's framework and the recovery rights of approximately 200 verified victims and 3,000 potential claimants.

Balance of Equities: The Court balances competing claims of injury and effect of granting or withholding relief. Winter, 555 U.S. at 24. Relief keeps the res in the frozen form the government already holds; the government suffers no cognizable hardship from a restraint on dissipating property it already restrains, while denial could be permanent: once the res is again altered, settled, or remitted, it may cease to exist in cognizable form. The equities of conduct reinforce the balance: Claimant initiated the investigation and legal action that made the res seizable, while the proposed

alternative is a process that prioritizes third-party vendors who shared no risk in the recovery, yet are compensated from the same victims' funds and the fruits of Claimant's labor.

Public Interest: Preservation favors the public: correct adjudication of title before disposition; comity toward a foreign sovereign's active criminal process that took custody first and operates a mandatory victim-restitution framework; refusal to reward the criminal; and protection of the integrity of the government's representations. The victims are international; this Court was told they could not be identified, yet DDG identified them. It is always in the public interest to prevent the violation of a party's constitutional rights. Simms, 872 F. Supp. 2d at 106.

**D. Bifurcation, Advancement, and Partial Final Judgment Are Warranted**

Claimant's claim to Wallet 0x82e presents a discrete, dispositive, and largely legal question: whether Turkey's prior judicial seizure bars this forfeiture as to that wallet, independent of the tracing and valuation disputes on the remainder of the res. The wallet's procedural footprint is separate. The factual predicates are documented; the controlling issues are legal.

Rule 42(b) authorizes separate trial of claims or issues "for convenience, to avoid prejudice, or to expedite and economize"; no binding authority directly addresses severing a single claimant's interest from a multi-claimant in rem forfeiture, and the request rests on the rule's text. Severing and advancing that question serves each of Rule 42(b)'s grounds. It expedites and economizes: the jurisdictional question can be decided without the tracing and multi-claimant discovery track the remainder requires, and if Claimant prevails, the largest of the seven wallets leaves the case. It avoids prejudice: the government has already caused one burn and reissue and is pursuing a settlement course that will render the claim illusory if adjudication is delayed. Claimant's defense shares no evidentiary record with the other tracing disputes, so bifurcation adds no discovery burden.

Advancement under Rule 65(a)(2) will not prejudice either party: the record underlying the injunction and the jurisdictional defense is the same and before the Court, no further discovery is required, and the government has had notice since the Verified Claim was filed. Morris v. District of Columbia, 38 F. Supp. 3d 57 (D.D.C. 2014). Upon a favorable merits ruling, Rule 54(b) partial final judgment, available on fewer than all claims upon an express determination of no just reason for delay, is appropriate: Claimant's claim rests on a distinct theory no co-claimant shares, partial judgment would not risk inconsistent adjudication, and withholding it would leave Claimant party to a multi-year proceeding over property the Court lacks jurisdiction to forfeit.

**E. The Court Should Deny or Defer Any Motion to Strike and Permit Discovery**

A verified claim under the Supplemental Rules confers statutory standing, and a claimant who has filed one is entitled to contest the forfeiture. 8 Gilcrease Lane, 638 F.3d at 300-01. Striking Claimant's claim would be improper for three reasons. First, the Complaint's own admissions, reliance on a penalized exchange, the absence of any charged defendant, and the entertainment of a criminal proxy create genuine factual disputes on priority and lawfulness that cannot be resolved on a motion to strike. Second, the government entertained Infiniweb's claim despite admitted trafficking links and no demonstrated lawful source, Compl. ¶ 240, while threatening to strike the only claim supported by a prior judicial record. The pattern extends further: the Complaint records that the first law-firm claimant, appearing in June 2024, failed to provide basic ownership information, and the representation ended after six months. Compl. ¶ 239. The government tolerated deficient and tainted claims for months while reserving its strike threat for the verified victim. Third, a victim panel is represented by counsel with non-waivable conflicts the government has knowingly permitted to persist; striking the only conflict-free, judicially verified claim would

compound the due-process violation. The Court should deny or defer any motion to strike, and Infiniweb's motion to dismiss, pending the hearing on this Motion.

The Court should likewise defer any motion to transfer venue. Transfer would sever Claimant's jurisdictional defense from the Turkish judicial seizure record central to it, frustrate the preliminary injunction by removing the res from this Court's supervisory reach, and permit dissipation before priority can be adjudicated. The jurisdictional question turns on dates and foreign court orders already before this Court; no purpose is served by transfer that outweighs the risk of prejudice.

### VIII. CONCLUSION AND RELIEF REQUESTED

The dispositive issue is one of official dates, not blockchain tracing. Turkey's courts assumed custodial jurisdiction over Wallet 0x82e more than twenty-two months before the U.S. initiated its forfeiture process, and the custodian acknowledged that custody in writing. Under Princess Lida, that prior seizure operates as a jurisdictional veto; the burn and reissue cannot retroactively vest in rem jurisdiction another sovereign had already exercised; and the proposed disposition would deliver Claimant's secured property to a proxy for the criminal enterprise that has harmed her and scores of other victims.

For the foregoing reasons, Claimant Nivedita Kaul respectfully requests that the Court enter an Order:

1. Granting an emergency preliminary injunction pursuant to Rule 65(a) and LCvR 65.1, restraining the U.S., and all persons acting in concert with them from settling, disposing of, transferring, converting, remitting, burning, reissuing, or otherwise altering the res attributable to Wallet 0x82e, including any substitute or reissued assets held in replacement of the assets formerly held in Wallet 0x82e, and from commencing or continuing any discretionary administrative

remission, equitable sharing, transfer to any general victim fund or government-administered distribution mechanism, or other disposition of that res, pending final adjudication of Claimant's priority, with security waived under Rule 65(c);

2. Bifurcating Claimant's claim to Wallet 0x82e from the balance of this action pursuant to Rule 42(b) and advancing trial on the merits as to Wallet 0x82e with the preliminary-injunction hearing pursuant to Rule 65(a)(2), and entering partial final judgment pursuant to Rule 54(b) upon adjudication of Claimant's claim and a determination that there is no just reason for delay;

3. In the alternative, dismissing the forfeiture as to Wallet 0x82e pursuant to Rule 12(b)(1) and Supplemental Rule G(8)(b) for want of jurisdiction over the res, conditioned upon the appointment of a neutral receiver with authority strictly limited to custodial preservation of the reissued substitute assets pending resolution of the Claimant's Turkish proceedings and the parallel United Kingdom recovery proceedings, with no authority to adjudicate victim claims, process remission applications, distribute the res, or transfer or commingle the res with any general victim fund, government-administered remission pool, equitable sharing program, or other asset-forfeiture distribution mechanism;

4. In the further alternative, should the Court grant bifurcation and advancement, appointing a neutral receiver to hold the res pendente lite with the same custodial-preservation limitations set forth in paragraph 3 above, so that the res is preserved for Claimant and the DDG victim cohort who originated the seizure rather than left to the unilateral control of the agencies or the conflicted parties currently seeking its disposition;

5. Should the Court decline to dismiss or bifurcate, applying spoliation sanctions against the government pursuant to Section V, including an adverse inference on the nexus and priority questions to which the destroyed on-chain evidence went, and preclusion of the government's

tracing theories dependent on the destroyed original tokens, such that the government cannot meet its statutory burden under 18 U.S.C. section 983(c) as to Wallet 0x82e;

6. Suppressing the fruits of the warrantless November 2023 freeze pursuant to Section VII.A, including the reissued substitute tokens and any evidence derived therefrom, on the ground that the freeze constituted state action subject to the Fourth Amendment and was executed without judicial authorization until on or about May 1, 2025;

7. Denying or deferring any motion to strike Claimant's Verified Claim, should the government file one, pending the hearing on this Motion and resolution of the jurisdictional question, on the grounds set forth in Section VII.E;

8. Granting Claimant leave to take limited discovery pursuant to Supplemental Rule G(8)(c)(ii)(B) and Federal Rules of Civil Procedure 26 and 34, confined to the custody, control, and chain of custody of Wallet 0x82e and the reissued substitute res, the communications between the government and Tether Limited concerning the October 11, 2023 compliance confirmation, the November 20, 2023 freeze, and the burn and reissue of the original tokens, and the government's knowledge of Decision No. 2023/5986 prior to that burn and reissue, with adjudication of any motion to strike deferred pending completion of that discovery;

9. Denying or deferring any motion to transfer venue, including any motion to transfer to the Central District of California or any other district, pending the hearing on this Motion, on the ground that transfer would frustrate the preliminary injunction, permit dissipation of the res, and sever the claim from the Turkish judicial seizure record central to the jurisdictional defense;

10. Requiring the government to respond to Claimant's June 17, 2026 conflict notice and to disclose whether it has investigated the non-waivable conflicts of counsel for Claimants 1-118 detailed in Section II.H;

-45-

11. Finding that the government's exclusion of Claimant from settlement negotiations concerning the res in which she asserts a prior secured judicially recognized interest violated the Crime Victims' Rights Act, 18 U.S.C. section 3771, and ordering that Claimant be afforded the rights to confer with the government's attorney, to be heard, and to participate in any further proceedings concerning the disposition of Wallet 0x82e;

12. Deferring ruling on Infiniweb's motion to dismiss pending the hearing on this Motion;

13. Granting Claimant leave to supplement the record with expert legal opinions on the laws of Türkiye and the United Kingdom pursuant to Fed. R. Civ. P. 44.1, and to file supplemental translated records from the Turkish judicial proceedings, within 21 days of the filing of this Motion; and

14. Granting such other and further relief as the Court deems just and proper.

Dated: July 23, 2026

Respectfully submitted,

/s/ Nivedita Kaul

Nivedita Kaul, Claimant, Pro Se
5001 Ramon Road, Building 3 #1005
Palm Springs, CA 92264
Tel: +1 724 413 8167
nivie@digitaldefendersgroup.org