**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

APPROXIMATELY 225,364,961 USDT

Defendant, *in rem*.

Civil Action No. 25-cv-1907-AHA

**DECLARATION OF NIVEDITA KAUL IN SUPPORT OF CLAIMANT'S MOTION**

**FOR EMERGENCY PRELIMINARY INJUNCTION; TO BIFURCATE ACTION AND**

**ADVANCE TRIAL ON THE MERITS; AND IN THE ALTERNATIVE FOR DISMISSAL**

**OF THE FORFEITURE AS TO WALLET 0X82E**

I, Nivedita Kaul, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

### I.  INTRODUCTION, IDENTITY, AND BASIS OF KNOWLEDGE

1. I am the Claimant in this action, appearing pro se. On March 17, 2026, I filed a Verified Claim and thereafter an Answer, under Supplemental Rule G(5)(a), confined to a single identified subset of the defendant res: Wallet 0x82e1d4ddd636857ebcf6a0e74b9b0929c158d7fb ("Wallet 0x82e"), identified in the Verified Complaint as USDT Token Group G and holding approximately 87,464,642 USDT. I submit this Declaration in support of my Motion for Emergency Preliminary Injunction; to Bifurcate Action and Advance Trial on the Merits; and in the Alternative for Dismissal of the Forfeiture as to Wallet 0x82e, and the accompanying Memorandum of Points and Authorities.

2. Except where expressly stated to be on information and belief, I make this Declaration on personal knowledge, based on my direct participation in the events described, my own investigative and forensic work over more than three years, my status as a party to the Turkish criminal proceedings described below, and my review of the records identified herein. If called as a witness, I could and would testify competently to the matters stated. Where I describe the contents of a document, my description is based on my review of the document itself.

3. Attached to this Declaration as Exhibits A through Q are true and correct copies of the documents identified in the Exhibit Index at the end of this Declaration. The Turkish judicial and prosecutorial records (Exhibits A through D) are notarized certified English translations of records of the Ankara West Chief Public Prosecutor's Office Investigation No. 2023/6371, which I obtained in my capacity as a party with standing to receive them. Under Turkish law, criminal investigative files are not public records; access is restricted to parties and their counsel, and disclosure to non-parties is prohibited where it would jeopardize an ongoing investigation. The redactions in these exhibits protect personal identifying information and the integrity of an active Turkish criminal prosecution; I am bound by Turkish law to limit further disclosure, and production of unredacted originals would violate that obligation. The email and message exhibits are true and correct copies of communications I sent, received, or exported from my own accounts and devices. The captures of public web pages and social-media posts are true and correct copies of those pages as they appeared when I preserved them, and the source addresses appear on their faces.

4. I hold advanced degrees in law as a multi-degree LLM. I am a victim of the transnational fraud network described in the Verified Complaint.

5. I am the founder of Digital Defenders Group ("DDG"), a 501(c)(3) nonprofit organization I established to locate the assets stolen from victims of this network, to identify and verify those victims, and to recover the assets for them. DDG operates under a victim-first mandate. Neither I nor DDG represents, accepts funding from, or shares personnel with any exchange, token issuer, blockchain-analytics vendor, or any person or entity associated with the criminal enterprise described in the Complaint, and neither of us has any conflict of the kind described in Part VII below.

## II.  MY INVESTIGATION AND THE ORIGINATION OF THE TURKISH PROSECUTION

6. Beginning in 2022, I undertook a sustained forensic investigation of the network that stole my funds. Over more than three years, at substantial personal risk and expense, I identified perpetrators, mapped the network's corporate and wallet architecture, and traced the proceeds of its frauds to a cluster of blockchain wallets, including Wallet 0x82e and its connected wallets.

7. My tracing established that Wallet 0x82e was a central aggregation point for proceeds of the network's frauds. By January 2023, my analysis showed that Wallet 0x82e held approximately $101,000,000 in USDT.

8. My analysis connected Wallet 0x82e and its associated addresses to the KYC-verified operators of the criminal enterprise. That attribution analysis was later corroborated by the Turkish investigative file and, as described in ¶ 15 below, by the government's own Verified Complaint.

9. Before any Turkish seizure was issued, evidence of the criminal conspiracy was brought to United States law enforcement:

(a) On January 18, 2023, I contacted Erin West, then a Deputy District Attorney and REACT Task Force coordinator, who referred me to United States Secret Service ("USSS") Special Agent Andrew Frey.

(b) On January 19, 2023, Agent Frey solicited my evidence, writing that "secrecy is in our name."

(c) On January 27, 2023, USSS Special Agent in Charge ("SAC") Shawn Bradstreet received analytics identifying Wallet 0x82e and its approximately $101,000,000 balance. His office declined to take preservation action.

(d) On February 22, 2023, Agent Frey stated that his office had "exhausted preliminary recovery efforts."

(e) In April 2023, after I provided my findings to the FBI, Agent Frey maintained that there was "no ongoing work specific to your loss." U.S. law enforcement told me that recovery was not possible because the funds had gone overseas, beyond their reach.

10. On February 11, 2023, I initiated a private criminal complaint as Complainant under Article 158 of the Turkish Code of Criminal Procedure ("CMK") with the Ankara West Chief Public Prosecutor's Office. My complaint and forensic work established the predicate for Criminal Investigation No. 2023/6371. A true and correct copy (redacted; notarized certified English translation) is attached as Exhibit A.

11. In February 2023, I obtained a Payment Order naming Ling Sun Dylon and Kai Li Kelly as debtors, and file 2023/6371 records evidence that they acted as managers and agents of the criminal organization. Ling Sun Dylon and Kai Li Kelly are fugitives, and file 2023/6371 remains open for further enforcement. On March 7, 2023, the Ankara West Chief Public Prosecutor's Office requested that Tether block specified wallets, under Tether Ticket #365109; a

true and correct notarized certified English translation of that request is attached as Exhibit B. Tether was accordingly engaged in the same Turkish investigation since February 2023.

12. Starting in February 2023, Tether, Binance, and other exchanges were provided with evidence establishing the criminal predicate for the network of Wallet 0x82e and associated addresses, linking it to a transnational fraud and human-trafficking syndicate.

13. In March 2023, I identified a key node of the network and provided that intelligence to the Turkish judicial authorities; it revealed the identities of the network's operators. Acting on my intelligence, the Turkish authorities established the investigative predicate for my ongoing criminal prosecution under Investigation No. 2023/6371, which verified my findings and produced judicial proceedings against the network's controllers.

14. The Turkish investigation has yielded more than 100 arrests in my private-prosecution case and in parallel sovereign actions; raids seizing computers, notebooks, cell phones, and other physical evidence; and sworn testimony. I know these results as a party in the proceedings and from the investigative file, to which I have access as a party.

15. The government's Verified Complaint in this action depicts the same wallet identifiers, including Wallet 0x82e, that I had reported to the Turkish authorities beginning in February 2023.

### III.  THE TURKISH JUDICIAL SEIZURE OF WALLET 0X82E

16. On August 11, 2023, the Ankara West 1st Criminal Judgeship of Peace, Judge Muhammed Kerem Çömez presiding, issued Decision No. 2023/5986 under Investigation No. 2023/6371, pursuant to CMK Articles 127 and 128, at the request of the Ankara West Chief Public Prosecutor's Office. The Decision recites that it issued "upon examination of the request"; grants the prosecutor's request "seizing evidence of the offence"; finds the listed wallets, including Wallet 0x82e, "themselves in the nature of items of the offence" and "of evidential value"; and

orders "THEIR SEIZURE." Under CMK Article 128, a criminal seizure order restricts the right of possession and transfers that restricted right to the issuing judicial authority: the owner retains bare title but loses the power to transfer or dispose, and the power to vacate the blockage or to order return vests exclusively in the Turkish court. A true and correct copy of Decision No. 2023/5986 (redacted; notarized certified English translation) is attached as Exhibit C.

17. On the same day, the same Judgeship issued Decision No. 2023/5985 under the same investigation, covering Binance-hosted wallets connected to the same enterprise.

18. On August 18, 2023, seven days after the seizure orders, Aux Cayes FinTech Co. Ltd. ("OKX") filed a Suspicious Transaction Report with the Seychelles Financial Intelligence Unit. That report is documented at pages 309–310 of the Turkish Indictment in file 2023/6371, where the prosecutor records OKX's response describing the wallets as "patates cüzdan" ("potato wallets") created with falsified identities. I have reviewed those pages of the Indictment in the file to which I have party access.

19. On October 11, 2023, the Ankara West Chief Public Prosecutor's Office sent Tether an urgent letter directing it to block the wallets pursuant to the court's seizure order; a true and correct copy (notarized certified English translation) is attached as Exhibit D. The same day, Tether confirmed in writing to the Turkish authorities, under Tether Ticket #263780, that Wallet 0x82e was frozen; a true and correct copy of Tether's written confirmation is attached as Exhibit E.

20. In the approximately 60 days between the August 11, 2023 seizure order and Tether's October 11, 2023 written confirmation, approximately $13,500,000 in USDT left Wallet 0x82e.

21. On November 8, 2023, I appeared before the Ankara West Chief Prosecutor, gave a sworn statement, and was examined on my forensic methodology.

22. Decision No. 2023/5986 has never been vacated, modified, or superseded. Based on the Turkish file to which I have party access and my participation in those proceedings, the United States has never sought relief from the Turkish court, and no mutual legal assistance (MLAT) request or other formal United States process concerning Wallet 0x82e appears in the file.

23. On March 14, 2025, I appeared as lead prosecution witness before the Ankara 23rd Heavy Criminal Court. The defendants had challenged my existence as a real person; I testified under oath for approximately three hours, and the court confirmed my party rights under CMK Article 234. I hold the procedural roles of Müşteki (complainant) and Müdahil (intervening party) in the Turkish proceedings.

24. My return-of-asset application under CMK Article 131(2) remains pending before the Istanbul 19th Heavy Criminal Court; the court has deferred, not denied, the application. The prosecutor has already requested, in the Indictment, the return of proceeds to victims, effectuated by the criminal court assigning claim authorization over the seized wallets to the victims.

## IV.  THE NOVEMBER–DECEMBER 2023 REATTRIBUTION OF THE RES

25. I have reviewed records that Tether had previously defied U.S. seizure warrants and had never before returned funds. Its sudden compliance with U.S. direction on November 20, 2023 followed the congressional pressure described in ¶ 26.

26. On October 26, 2023, Senator Cynthia Lummis and Representative French Hill wrote to Attorney General Garland regarding the "Illicit Finance Activities of Binance and Tether," demanding a criminal investigation of both. By that date, Binance, like Tether, had already been compelled to comply with Turkish judicial orders freezing assets tied to the same scheme (Decision No. 2023/5985). To my knowledge, neither company disclosed that compliance to Congress.

27. Tether's first response letter to Congress, dated November 16, 2023, referenced a "large investigation" with the USSS and reported only 68 prior U.S. requests totaling roughly 70 million USDT frozen. The letter omitted Wallet 0x82e and its approximately $87 million, which was then subject to no U.S. demand and was exclusively within the Turkish judicial seizure that Tether itself had confirmed in writing on October 11, 2023 (Exhibit E).

28. On or about November 20, 2023, U.S. agencies directed Tether to take control of Wallet 0x82e notwithstanding the existing Turkish judicial custody. Tether had frozen the wallet six weeks earlier under the Turkish criminal judicial seizure order. Based on the sequence set out in this Declaration, the November 20 act re-labeled an already-frozen asset; it did not effect any new freeze.

29. On December 1, 2023, Tether announced a new wallet-freezing policy aligned with the OFAC SDN list and extended to the secondary market, permitting freezes at the direction of U.S. agencies without judicial process, mutual legal assistance, or verification of court orders. Tether's second letter to Congress, dated December 15, 2023, disclosed approximately 435 million USDT frozen across approximately 326 wallets, more than six times the figure reported four weeks earlier, and now encompassing the previously omitted approximately $87 million, and disclosed that Tether had "onboarded the United States Secret Service into our platform," with FBI onboarding in process.

30. I was twice registered in the Department of Justice Victim Notification System ("VNS") in connection with this network; once in Los Angeles and later in Denver. In September 2023, FBI Agent Majors informed me that my case had been moved to the FBI Denver Office. On October 4, 2023, she further informed me that my case was being handled by FBI Special Agent Daniel Heether, as shown in the message export attached as Exhibit F. Agent Heether later attested

under oath in the District of Colorado forfeiture action, No. 1:23-cv-02549, in a manner accepting my tracing methodology for that forfeiture, while my VNS registration was erased.

## V.  THE FALSE "PROACTIVE DISCOVERY" NARRATIVE

31. On November 20, 2023, the day of the USSS freeze request, Blake Cohen, Senior Investigator at OKX, posted on X: "Our investigation team at @okx froze $225 Million," thanking Tether, Chainalysis, and ZachXBT for a "record breaking achievement." A true and correct copy of the post as I preserved it is attached as Exhibit O. In fact, the assets had been under Turkish criminal judicial seizure since August 11, 2023, and OKX had been engaged with Investigation No. 2023/6371 since at least its August 18, 2023 Suspicious Transaction Report. By contrast, internal chat logs of the Global Anti-Scam Organization ("GASO") from September 2022, a true and correct copy of which is attached as Exhibit N, record that OKX penalized Mr. Cohen for freezing scam-linked accounts, that frozen accounts were to be released back to the operators, and that the FBI expected no cooperation from OKX.

32. In June 2025, Erin West, who served on the REACT Task Force with the same USSS agents, publicly credited Agent Frey on LinkedIn as the "genius" who "devised a clever plan" and "figured out how to do a burn and reissue with Tether." A true and correct capture of that post is attached as Exhibit P. Ms. West has separately dismissed the prior Turkish custody outright, stating: "whatever Turkey says doesn't have any bearing on US Secret Service." SAC Bradstreet likewise took and gave credit for the seizure on LinkedIn; a true and correct capture is attached as Exhibit Q.

33. In a December 7, 2023 Newsweek interview, SAC Bradstreet described the investigation as still "spider webbing all over the place", weeks after the November 20, 2023 freeze.

## VI.  THE BURN AND REISSUE AND THE ABSENCE OF U.S. PROCESS

34. Rather than protect the original tokens seized under Decision No. 2023/5986 and held under Turkish judicial custody since August 11, 2023, Tether destroyed ("burned") the original USDT tokens in Wallet 0x82e and issued newly minted replacements into United States Marshals Service custody. I received no notice, and based on the Turkish file to which I have party access, neither did the Turkish court. The government's Verified Complaint admits the tokens have been or will be burned and reissued. Compl. ¶¶ 209, 213, 216, 220, 224, 227, 230.

35. TRM Labs, in a June 23, 2025 publication cited in the Memorandum, confirmed that token reissue "is not currently codified in law" and depends on the token's architecture, the legal process, and the issuer's policies.

36. Based on my review of the docket in this action, the Turkish investigative file, and the public record: the government has obtained no criminal indictment of the network's operators; has executed no MLAT process with Türkiye concerning Wallet 0x82e; and did not obtain its warrant until on or about May 1, 2025, more than twenty months after the Turkish seizure. The Complaint relies on a last-in, first-out ("LIFO") accounting method rather than any criminal adjudication. Compl. ¶¶ 46, 67.

37. On February 24, 2025, OKX pleaded guilty to operating an unlicensed money-transmitting business, paying $504 million: approximately $420 million in criminal forfeiture and an $84 million fine that the plea agreement states "reflects a 25 percent discount off the bottom of the applicable Sentencing Guidelines fine range" for cooperation and remediation. I have reviewed the plea agreement as published by the Department of Justice.

38. The government's account that this investigation began with a "proactive" report from OKX and Tether in November 2023 (Compl. ¶ 50) is contradicted by the records described above:

Tether complied in writing with the Turkish criminal judicial seizure order on October 11, 2023, forty days earlier (Exhibits D, E), and OKX filed its reactive Suspicious Transaction Report on August 18, 2023, as recorded in the Turkish Indictment (¶ 18).

## VII.  CONFLICTED COUNSEL, INFINIWEB, AND FORUM FRAGMENTATION

39. Dan G. Boyle, counsel of record for Claimants 1–118 in this action, formerly served as the government's High Intensity Financial Crimes Area Coordinator in the Central District of California and was the affiant on the seizure warrant in No. 22-mj-04906 (C.D. Cal.) that initiated the E.D. Mich. proceeding concerning the same network. These relationships are mapped in the DDG diagrams attached as Exhibits L and M.

40. Greenberg Traurig LLP, also counsel to Claimants 1–118 in this action, simultaneously appeared for Daren Li, convicted of money laundering arising from the same Prince Group ecosystem, in No. 24-cr-00311 (C.D. Cal.) and on his Ninth Circuit appeal (No. 26-959). I verified Greenberg Traurig's appearances on the public dockets of those cases.

41. Infiniweb Technology, Inc., which filed a Verified Claim asserting an interest in the entire defendant res, approximately 225,364,961 USDT, appears at entry #31 on the Philippine Amusement and Gaming Corporation's ("PAGCOR") List of Cancelled Offshore Gaming Licensees, revised January 15, 2024. The government's Complaint admits that its own open-source research revealed Infiniweb's close links with Xionwei Technologies, accused of kidnapping and human trafficking in a 120-page report to the Nineteenth Congress of the Republic of the Philippines. Compl. ¶ 240. A certification from the Philippines Securities and Exchange Commission dated April 17, 2026, confirming that Infiniweb is not registered with the SEC, is attached as Exhibit K, and DDG's corporate-network diagram mapping Infiniweb into the Prince Group ecosystem is attached as Exhibit M and provided for reference only. Notwithstanding these

facts, the government did not move to strike Infiniweb's claim and, as described in ¶¶ 48 and 50 below, has remained in settlement discussions concerning the res for months.

42. In 2022, a victim group provided structured intelligence identifying more than 2,000 victims to the government, leading to seizures (Operation Guard Dog) but no recovery for the reporting victims, who were instead disqualified from recovery. This is confirmed by personal knowledge from DDG participation.

43. My forensic analysis traces identical wallet clusters across multiple district proceedings: this action D.D.C. No. 1:25-cv-01907 (approximately $225 million USDT); E.D.N.Y. No. 25-cv-05745 (127,271 BTC); D. Colo. No. 1:23-cv-02549; and E.D. Mich. No. 25-cv-12945 (approximately $163 million). DDG's conflict-of-interest and cross-forfeiture enterprise diagram, attached as Exhibit L, maps these connections and is provided for reference only.

44. Across the proceedings identified in ¶ 43, I have observed the same structure: victims' data locates the funds; a LIFO accounting method then excludes those same victims from recovery as "untraceable"; and net proceeds are absorbed by the Treasury after deduction of costs of administration, on the terms described in the government's Asset Forfeiture Policy Manual (2025).

### VIII.  MY DISCLOSURES TO THE GOVERNMENT AND ITS RESPONSE

45. On May 11, 2026, I submitted a whistleblower complaint to the Department of Justice concerning the matters described in this Declaration. A true and correct copy of the DOJ Corporate Whistleblower Awards Pilot Program acknowledgment is attached as Exhibit G.

46. On June 17, 2026, I sent a direct conflict-of-interest notice to the government's attorneys, AUSA Rick Blaylock, Jr. and AUSA Jafer Aftab, disclosing the conflicts described in ¶¶ 39–41. A true and correct copy is attached as Exhibit H. I received no substantive response.

47. On July 9, 2026, I sent the government a 14-page Public-Source Memorandum tracing Infiniweb verifier Zeng Youzong (Dkt. 23) to the Prince Group ecosystem. A true and correct copy of that Memorandum is attached as Exhibit J; the SEC certification cited in it is attached as Exhibit K.

48. The government ignored the substance of those disclosures. In a July 21, 2026 email following conferral, AUSA Blaylock stated the government's opposition; a true and correct copy is attached as Exhibit I. AUSA Blaylock has threatened to strike my claim; has asserted that my funds are "not traceable to this case," while admitting that a parallel Colorado case is traceable to my loss; and has directed me to withdraw my claim and to seek discretionary administrative remission with Tonya Andrews, Colorado Asset Forfeiture Chief.

49. My relationship with the government began collaboratively: in 2023, I voluntarily provided intelligence to the USSS and the FBI, and they dismissed my claims while I independently secured the Turkish judicial seizure of Wallet 0x82e. On three occasions thereafter, I provided the DOJ with documented evidence of the Infiniweb–Prince Group identity and of the non-waivable conflicts described above. The government took no action on those disclosures and continued negotiating with the conflicted parties.

50. I was excluded from settlement negotiations concerning the res in which other claimants were included, and I was afforded no notice of, or role in, negotiations concerning Wallet 0x82e, in which I assert a prior, secured, judicially recognized interest. The government has represented that it is reaching imminent settlement with Infiniweb while stating that it intends to strike my claim.

## IX.  THE DDG RECOVERY FRAMEWORK AND THE IDENTIFIED VICTIM COHORT

51. Through documented intake cross-referenced against the Turkish investigative file and on-chain tracing, DDG has verified approximately 200 individual victims of the network and has identified approximately 3,000 potential claimants. DDG maintains the verification records.

52. Since securing Wallet 0x82e through the Turkish criminal judicial seizure, I have performed more than three years of continuing custodial and investigative work in relation to the res, comprising: (i) maintaining and advancing the Turkish criminal prosecution as Müşteki (complainant) and Müdahil (intervening party); (ii) forensic mapping of the Prince Group network across the proceedings identified in ¶ 43; (iii) locating, intake, and verification of individual victims against the Turkish investigative record; and (iv) retaining and funding counsel in the United Kingdom to prepare civil proprietary recovery proceedings for the identified victim cohort, in tandem with the Turkish criminal process. The legal architecture, victim-identification protocols, and forensic tracing are complete; the United Kingdom proceedings are funded, staffed, and in active preparation; and this framework was built over three years without government funding.

53. The available forensic evidence connects funds in Wallet 0x82e to identified victims through DDG's forensic work, and the res was placed under judicial seizure at my instance before this forfeiture action was filed.

## X.  IRREPARABLE HARM AND FINANCIAL CIRCUMSTANCES

54. The false public-seizure narrative in the Complaint and the accompanying publicity campaign have exposed my identity and my role in investigating a transnational criminal network and directly prosecuting its members, and the burn and reissue expropriated and exposed the architecture of a multi-year international recovery. The Turkish defendants have already challenged my existence as a real person, and the Istanbul court's consideration of my return

application has been met with obstruction funded by the criminal enterprise. No later payment can undo that exposure. Disposition of the res would extinguish the recovery rights of the approximately 200 verified victims and approximately 3,000 potential claimants described in ¶ 51 and would render both the Turkish restitution mechanism and the United Kingdom proprietary proceedings incapable of performance as to Wallet 0x82e.

55. I have had no income for more than three years. I have funded my investigation, the Turkish proceedings, and DDG's work from my own savings. The relief I seek is preservation: it keeps the res in the form in which the government already holds. I respectfully request that the Court waive security under Rule 65(c); a bond requirement in any substantial amount would deny me, and the victim cohort, the ability to seek relief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 23, 2026, at Palm Springs, California.

/s/ Nivedita Kaul

Nivedita Kaul, Claimant, Pro Se
5001 Ramon Road, Building 3 #1005
Palm Springs, CA 92264
Tel: +1 724 413 8167
nivie@digitaldefendersgroup.org

-15-

**EXHIBIT INDEX**

| Exhibit | Date | Description |
|---|---|---|
| A | Feb. 11, 2023 | Claimant's private criminal complaint to the Ankara West (Ankara Batı) Chief Public Prosecutor's Office under CMK Article 158, initiating Investigation No. 2023/6371 (redacted; notarized certified English translation) |
| B | Mar. 7, 2023 | Turkish prosecutor's formal request to Tether to block specified wallets, Tether Ticket #365109 (redacted; notarized certified English translation) |
| C | Aug. 11, 2023 | Seizure order of the Ankara West 1st Criminal Judgeship of Peace, Decision No. 2023/5986, Investigation No. 2023/6371 (redacted; notarized certified English translation) |
| D | Oct. 11, 2023 | Turkish prosecutor's urgent post-order letter directing Tether to block the wallets pursuant to the court seizure order (notarized certified English translation) |
| E | Oct. 11, 2023 | Tether compliance email confirming Wallet 0x82e frozen, Tether Ticket #263780 |
| F | Oct. 4, 2023 | SMS/iMessage export: FBI Agent Majors providing details of FBI Special Agent Daniel Heether (dheether@fbi.gov) |
| G | May 11, 2026 | DOJ Corporate Whistleblower Awards Pilot Program acknowledgment of Claimant's whistleblower submission |
| H | June 17, 2026 | Claimant's conflict-of-interest disclosure email to DOJ counsel (25-cv-1907) |
| I | July 21, 2026 | Email from AUSA Rick Blaylock, Jr. stating the government's opposition following conferral. Including July 9 submission of Public-Source Memorandum regarding the Infiniweb with AUSA responding with intent to strike Claimant if she doesn't withdraw. |

| Exhibit | Date | Description |
|---------|------|-------------|
| J | July 9, 2026 | Claimant's 14-page Public-Source Memorandum regarding the Infiniweb claim |
| K | Apr. 17, 2026 | SEC certification of no registration for Infiniweb Technology, Inc. |
| L | July 2026 | DDG conflict-of-interest and cross-forfeiture enterprise diagram (references 25-cv-1907; 25-cv-05745; 25-cv-12945; 24-cr-00311; Turkish Investigation 2023/6371) |
| M | July 2026 | DDG corporate-network diagram: Infiniweb–Prince Group and related entities |
| N | Sept. 2022 | GASO (Global Anti-Scam Organization) "Bruce" chat logs: OKX penalized its investigator for freezing scam-linked wallets; FBI expected no OKX cooperation (redacted) |
| O | Nov. 20, 2023 | Blake Cohen (OKX) X post: "Our investigation team at @okx froze $225 Million" |
| P | June 2025 | Erin West LinkedIn post crediting the "burn and reissue" plan (screenshot capture) |
| Q | June 18, 2025 | Shawn Bradstreet LinkedIn post taking and giving credit for the $225 million seizure (screenshot capture) |