**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,
Plaintiff,
v.
APPROXIMATELY 225,364,961 USDT
Defendant, *in rem*.

Civil Action No. 25-cv-1907-AHA

**CLAIMANT'S MOTION TO DEFER RULING ON THE GOVERNMENT'S MOTION TO STRIKE [DOC. 91], TO COMPEL SERVICE OF SEALED FILINGS [DOCS. 92 AND 93], TO STRIKE OR DISREGARD SPECIFIED EXHIBITS, FOR AN EXTENSION OF TIME, AND FOR PROTECTIVE RELIEF**

## TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ..... 3
II. FACTUAL BACKGROUND ..... 3
A. The August 7 Stay and the Government's Filing During It ..... 3
B. No Conferral and Surprise Filing ..... 4
C. The Government Filed Docs. 92 and 93 Under Seal Without Complying with the Protective Order or the Court's Explicit Sealing Instructions ..... 4
D. CM/ECF Access ..... 6
E. The Government's Unequal Treatment ..... 6
F. No Other Claimant Has Proven Its Claim on the Public Docket as Claimant Has ..... 7
G. What Doc. 91 Published and the Safety Risks It Created ..... 8
H. The Government Had Actual Notice of Claimant's Victim Status ..... 10
I. The Government's Conflict and the Public Victory Lap ..... 11
J. Claimant Asserts a Specific, Secured Property Interest, Not a General Victim Claim ..... 13
K. Claimant's Monetary Claim Is Quantified; Her Security Is Not Divisible ..... 15
L. Claimant's Verified Claim and the Need to Amend ..... 17
M. Exhibit 91-1 Proves the Government's Failure - Not Claimant's - and There Was No U.S. Judicial Mechanism to Compel a Tether Freeze in 2023 ..... 18
III. LEGAL ARGUMENT ..... 21
A. The Court Should Defer Ruling on Doc. 91 ..... 21
B. Claimant Intends to Seek Leave to Amend ..... 26
C. Claimant Is Entitled to an Extension of Time ..... 27
D. The Court Should Strike, Disregard, or Defer Consideration of Specified Doc. 91 Exhibits ..... 28
E. Protective Relief Is Necessary ..... 38
F. The Government's Defective Notice Violates Due Process and Rule G(4)(b) ..... 40
G. The Government's Theory Depends on Its Own Investigative Failure ..... 41
H. The Government's Waiver Theory is Disputed ..... 41
IV. CONCLUSION AND PRAYER FOR RELIEF ..... 42

## I. PRELIMINARY STATEMENT

Claimant Nivedita Kaul, appearing pro se, respectfully moves this Court to: (1) defer ruling on the Government's Motion to Strike [Doc. 91]; (2) compel the Government to serve Claimant with the sealed filings [Docs. 92 and 93]; (3) strike or disregard the specified exhibits attached to Doc. 91; (4) grant Claimant an extension of time to respond to Doc. 91; and (5) enter protective relief for victim-identifying information and the victim's communication, written during a period of acute distress, published by the Government without Claimant's consent.

This is an interim motion. It is not Claimant's substantive opposition to Doc. 91. That opposition will follow once the Government serves the sealed filings, the scope of the August 7 stay is clarified, and Claimant has adequate time to prepare declarations from herself, her mother, and representative Digital Defenders Group ("DDG") victims. This motion addresses the procedural prerequisites to a fair response: time, access, and protection. Nothing in this motion waives or narrows any ground; Claimant's amended pleadings and substantive opposition will expand, not limit, her asserted positions. Claimant's Declaration (Exhibit A) and Exhibits are attached in support of this motion.

## II. FACTUAL BACKGROUND

### A. The August 7 Stay and the Government's Filing During It

On August 7, 2026, this Court entered a Minute Order providing: "This case is stayed pending further order of the court. The parties shall file a joint status report by September 4, 2026, and every 30 days thereafter until the stay is lifted." The Minute Order was issued in response to the Joint Status Report [Doc. 85] that stated that Plaintiff, Infiniweb, and Claimants 1-118 and 119-266 had "reached agreement in principle on settlement, subject to ongoing diligence and final approval and execution."

On August 14, 2026 - one week into the stay - the Government filed Doc. 91, a dispositive Motion to Strike Claimant's Verified Claim [Doc. 53], Answer [Doc. 54], and Emergency Motion [Doc. 79]. The Government did not seek leave of Court to file during the stay. The Government did not confer with Claimant before filing. Claimant's pending motions - including her Emergency Motion for Preliminary Injunction, Motion to Bifurcate, Motion to Appoint Receiver, Motion for Discovery, and Alternative Motion to Dismiss [Doc. 79] - remain frozen under the stay. No briefing schedule has been set for Doc. 79.

This creates a "stay asymmetry": the Government uses the stay as a shield to freeze Claimant's motions while simultaneously using it as a sword to advance its own. If the stay suspends motion practice, Doc. 91 was filed without authorization and should be held in abeyance. If the stay does not suspend motion practice, then Claimant's Doc. 79 - including her motion to dismiss under Rule 12(b)(1) and Supplemental Rule G(8)(b) - must be briefed on equal footing. The Court's clarification is needed.

**B. No Conferral and Surprise Filing**

As noted above, the Government filed a dispositive motion during a stay without notice, without conferral, and without leave of Court. Claimant learned of Doc. 91 by monitoring the docket.

**C. The Government Filed Docs. 92 and 93 Under Seal Without Complying with the Protective Order or the Court's Explicit Sealing Instructions**

On August 7, 2026, this Court entered a Protective Order [Doc. 88] governing the confidentiality of all documents in this Action. The docket entry for Doc. 88 contains a specific instruction from the Court: "Notwithstanding any language in the attached document, the parties are reminded that Local Civil Rule 5.1(h)(1) requires any party that wishes to file a document under seal to file an

accompanying motion to seal." This instruction was signed by Judge Amir H. Ali and entered on August 7, 2026. In addition, Section 15 of the Protective Order itself states: "this Order does not, by itself, authorize the filing of any document under seal. Any party wishing to file Confidential Information in connection with a motion, brief, or other submission to the court must comply with the sealing requirements in the Local Rules of the U.S. District Court for the District of Columbia" (Doc. 88, Section 15). The Government violated both the Court's docket-entry reminder and the Protective Order's own text.

On August 14, 2026 - seven days after the Protective Order was entered and the Court explicitly reminded all parties of the sealing requirements - the Government filed Docs. 92 and 93 under seal. Doc. 93 contains 11 exhibits. The Government did not file an accompanying motion to seal. The Government did not comply with the Court's explicit instruction.

The Government's Certificate of Service in Doc. 91 states that it served Doc. 91 on Claimant by email. The Government did not serve Docs. 92 or 93 on Claimant. Claimant cannot access the sealed documents. She cannot determine what evidence the Government is presenting to this Court in support of its Motion to Strike. She cannot effectively oppose a motion when the supporting evidence is hidden from her.

The Government cannot file sealed documents without complying with the sealing requirements, then ask the Court to rely on those sealed documents while denying the opposing party access to them. This is a due process violation: the Government is asking this Court to rely on evidence the claimant cannot see, cannot review, and cannot oppose.

Doc. 91 itself references a sealed Exhibit 13, stating it is attached "for the sole purpose of proving DDG's assertion about the settlement false." The Government is asking this Court to rely on a

sealed settlement document to disprove Claimant's public statements - while simultaneously denying Claimant access to that same document and excluding her from the settlement negotiations.

**D. CM/ECF Access**

Claimant's CM/ECF e-filing access, granted by the Court's Minute Order of May 28, 2026 [Doc. 63], was removed after August 3, 2026 and on August 6, 2026, Claimant could not file electronically. She transmitted her status report to the Clerk's Office by email, which was initially rejected for a signature-format issue [Doc. 90]. Claimant's CM/ECF access is now restored.

**E. The Government's Unequal Treatment**

In the August 6, 2026 Joint Status Report [Doc. 85], the Government and settling parties referred to Claimant as a "putative claimant." Claimant is not a "putative claimant." She is a verified claimant of record who filed Doc. 53 on March 17, 2026, and Doc. 54 on April 7, 2026. As this Court observed at the July 23 hearing, Claimant "would have equal right as any of the claimants to participate in that process" (Tr. 46:4-7), has "one claim that I think has been filed here that's outside of the scope of the settlement" (Tr. 53:22-24), and is "at least one claimant who I think has a filed claim here that's not been stricken" (Tr. 54:3-5).

The Government's characterization of Claimant as "putative" while simultaneously negotiating with and protecting other claimants demonstrates unequal treatment. Claimants 1-118 and 119-266 are sealed, protected, and included in settlement negotiations. This Court granted pseudonymity to 266 claimants. Claimant - the only unconflicted claimant with a verified claim on the public docket - is labeled "putative," excluded from settlement, and publicly exposed.

The Government has also treated a criminal proxy more favorably than a victim. The Government filed a non-opposition [Doc. 86] to Infiniweb's Motion for a Protective Order [Doc. 37], which would shield Infiniweb's discovery responses concerning its ownership structure, criminal history, and wallet control. Meanwhile, the Government published Claimant's private victim cooperation emails, private email addresses, and her non-party mother's identity on the public docket in Doc. 91. Infiniweb - an entity the Government's own complaint links to forced scamming and human trafficking - receives protective treatment. Claimant - a VNS registered federal crime victim who cooperated with law enforcement - receives public exposure.

The Government's public filing has done more than embarrass a pro se litigant. It has transformed a private victim - previously known only to a confined circle - into a publicly identified witness against a transnational organized crime syndicate. Every motion the Government forces Claimant to file in response, and every public exhibit the Government publishes, incrementally strips away the anonymity that is her only protection. The Government litigates from behind the security of the United States Attorney's Office; Claimant has no protection, no security detail, and no institutional shield. The Government's choice to file a dispositive public motion during a stay - rather than seek confidential resolution or protective handling - exposes a victim to lethal risk that the Government itself does not bear.

**F. No Other Claimant Has Proven Its Claim on the Public Docket as Claimant Has**

Claimant filed her Verified Claim [Doc. 53] and Answer [Doc. 54] through counsel, her Emergency Motion for Preliminary Injunction, Motion to Bifurcate, Motion to Appoint Receiver, Motion for Discovery, and Alternative Motion to Dismiss [Doc. 79] pro se, and on August 11, 2026, filed a verified Status Report [Doc. 89] with a complete on-chain transaction map and appendix (Exhibits A and A-Appendix) tracing the defendant property from the burn/reissue of the

seven token groups on June 18, 2025, through Bitfinex, a Government-controlled intermediary address, Coinbase Prime custody addresses (preserving the per-wallet segregation), and into the United States Marshals Service address on February 4-5, 2026. Every transaction hash is listed and independently verifiable. No other claimant has filed comparable blockchain evidence on the public docket. The Government has not disputed this evidence.

**G. What Doc. 91 Published and the Safety Risks It Created**

Doc. 91 published the following on the public docket that was not previously there:

1. Claimant's private contact channels - her personal Gmail address;

2. Claimant's private law enforcement cooperation emails (Exhibits 2-7), containing intimate details of her financial devastation, her mother's retirement savings, her psychological state, and her efforts to convince dismissive authorities to act;

3. Claimant's mother - her existence, household, the fact her retirement savings are gone, her identity as a victim of fraud, and her financial circumstances - even though she is not a claimant, not a party, and has not consented to public disclosure of her identity or financial information;

4. The specific fraud websites, wallet addresses, and a YouTube video of the Claimant's investigation - information that creates a risk of reverse engineering of her specific case and is not needed to prove any legal issue;

5. Claimant's June 6, 2023 email (Exhibit 6 of Doc. 91), a two-page outreach from a crime victim seeking to be taken seriously by the USSS, written while Claimant was in acute distress, from which the Government extracted a single sentence to accuse her of unauthorized practice of law.

This is not a theoretical or emotional concern. The criminal organization that defrauded Claimant and her household is a structured syndicate that has a documented history of using violence against witnesses and rivals. Prior to this litigation, Claimant's identity was contained to a limited

operational circle. The Government's public motion, its refusal to redact victim identifiers, and its insistence on public briefing over sealed protective procedures have broadcast her status as a cooperating witness and the person who investigated the syndicate, froze the proceeds and is prosecuting them overseas. The risk is concrete, immediate, and asymmetrical: the Government has the security apparatus of the federal forfeiture unit; Claimant has only the anonymity the Government has now destroyed.

The Government omitted the January 19, 2023 email in which Analyst Frey assured Claimant: "Secrecy is in our name - we'll treat your information with the utmost care." This email is quoted in the very claim the Government moves to strike (Doc. 53, para 16). It was sent the same day as the Government's Exhibit 3 (Doc. 91-3). The Government filed five fragments of the correspondence and omitted the email that answers them. The omitted email is attached as Exhibit B, with personal identifiers redacted.

In the same filing, the Government redacted the email of Erin West - a public servant who was, at the time, a Santa Clara County Deputy District Attorney acting in her official capacity. The Government redacted the public servants' names, emails, and phone numbers throughout the exhibit set, while leaving the victim's identifiers exposed. The Government protected the public servant while publishing the victim's private cooperation communications.

The safety risk extends beyond the original criminal network. Doc. 91 broadcast to the world that Claimant is a two-person household that lost millions, that she is the investigative originator of the file, and that she is the sole obstacle between a settlement and roughly nine figures in seized assets. Other claimants who may perceive her as the barrier to their recovery now have her personal contact channel, her mother's identity, and the specific details of her household finances. A

transnational criminal enterprise already being prosecuted in Turkey on Claimant's complaint now has her identifying information, her cooperation history, and the specific wallet addresses and platforms she was investigating - all published by the Government that solicited her cooperation.

Individuals connected to this matter have contacted Claimant's associate, demonstrating that parties associated with the fraud network are monitoring this litigation and acting on it. The Government's public exposure of Claimant's identity, cooperation history, and role has escalated the risk of retaliation.

The asymmetry is the legal handle. The Government redacted its own people throughout the exhibit set - analysts' names, emails, phone numbers - and left the victim's identifiers exposed. And this in a case where the Court has already held that victim identity deserves protection: it granted 266 claimants pseudonymity. Claimant asks for far less than they got: not anonymity, just parity.

**H. The Government Had Actual Notice of Claimant's Victim Status**

Under Supplemental Rule G(4)(b), the Government "must send notice of the action and a copy of the complaint to any person who reasonably appears to be a potential claimant on the facts known to the Government." The Advisory Committee Note confirms that "For the first time, Rule G expressly recognizes the due process obligation to send notice to any person who reasonably appears to be a potential claimant." The Government had actual, documented knowledge of Claimant's victim status before it filed the forfeiture complaint:

1. USSS engagement (the Government's own Exhibits 3-7 to Doc. 91);

2. FBI Victim Notification System (VNS) registration of June 24, 2023 (FBI Los Angeles), number on file and available to the Court on request;

3. FBI VNS registration of October 13, 2023 (FBI Denver), number on file and available to the Court on request;

4. Claimant's mother's VNS registration.

The Government filed its forfeiture complaint on June 18, 2025. Claimant was a registered victim in the Government's own victim notification database. The Government sent nothing. Under Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950), notice must be "reasonably calculated, under all the circumstances, to apprise interested parties." Where the Government knows of an interested party, published notice is insufficient.

**I. The Government's Conflict and the Public Victory Lap**

The Government's Motion to Strike was filed by AUSA Rick Blaylock. On June 18, 2025, USSS Special Agent in Charge Shawn Bradstreet published a LinkedIn post celebrating the $225 million seizure and naming AUSA Blaylock as a member of the seizure team. Bradstreet stated the seizure was carried out "with the sole purpose of returning these stolen funds to the rightful victims." Doc. 79-19 Ex. Q. That stated purpose sits uneasily beside a motion to strike the most documented victim's claim. The settlement offers no guaranteed recovery and no defined timeline. It is not an adequate substitute for adjudicating a verified claim supported by a foreign judicial order.

Analyst Andrew Frey, whose induced cooperation emails the Government published as Exhibits 4-7 to Doc. 91, was publicly celebrated as a core architect of the seizure. Former Santa Clara Deputy District Attorney Erin West publicly credited Analyst Frey as the "genius" who "devised a clever plan" and "figured out how to do a burn and reissue with Tether." Doc. 79-18 Ex. P. West also publicly dismissed the Turkish custody order: "whatever Turkey says doesn't have any bearing on US Secret Service." See https://www.compliancecorylated.com/news/new-claim-disputes-facts-of-us-landmark-crypto-seizure/. OKX Senior Investigator Blake Cohen publicly posted that

"Our investigation team at @okx froze $225 Million." Doc. 79-17 Ex. O. That statement was false. The assets had been under Turkish criminal judicial seizure since August 11, 2023.

West further publicly stated that approximately $2 million was "taken back" for scam victims. Doc. 79-18 Ex. P. If $2 million is the anticipated victim recovery from a $225 million seizure, the settlement returns less than one percent to victims. That is not an alternative to adjudicating Claimant's secured property interest; it is a statistical indication that the proposed settlement framework does not guarantee meaningful recovery.

The Government's public celebration of the seizure, combined with its simultaneous motion to strike the most documented victim's claim, reveals a pattern of appropriation and erasure. The Government and its partners publicly credited themselves for a seizure that was built on Claimant's investigative origin and foreign judicial preservation. Not one public attribution - from the DOJ press release, to SAC Bradstreet's LinkedIn post, to TRM Labs' case study, to Erin West's LinkedIn video, to OKX's public claim - credited Claimant or DDG. The Government is appropriating the product of years of Claimant's labor, sacrifice, and risk while simultaneously moving to erase her from the docket through Doc. 91. The Government has provided no proof concerning Wallet 0x82e, identified as "USDT Token Group G" in the Government's Verified Complaint. A blockchain query is a search, not an investigation. The investigation was Claimant's: years of work included tracing, a foreign criminal complaint, a judicial seizure order, a Tether freeze confirmation, and a chain of custody that the Government later benefited from.

The Government's motion to strike is not merely procedural. It is the erasure of the investigative originator from the record of her own case, so that the Government can claim priority over assets it could not and did not independently secure. This is relevant to the Court's assessment of the

Government's credibility, the adequacy of the settlement alternative, the need for a reciprocal schedule, and the discovery Claimant seeks concerning the actual genesis of the Government's investigation and preservation of Wallet 0x82e.

**J. Claimant Asserts a Specific, Secured Property Interest, Not a General Victim Claim**

On August 11, 2023, the Ankara West 1st Criminal Judgeship of Peace issued Decision No. 2023/5986 under CMK Articles 127 and 128, placing Wallet 0x82e in Turkish judicial custody. The court determined the wallet contents to be "themselves in the nature of items of the offence" and "of evidential value," and ordered their seizure. Doc. 79-5 (certified translation of Decision No. 2023/5986). Under CMK Article 128, a criminal seizure order restricts the right of possession and transfers that restricted right to the issuing judicial authority: the owner retains title but loses the power to transfer or dispose, and the power to vacate the blockage or order return vests exclusively in the Turkish court. That order was not a preliminary or inchoate step; it was a final judicial act restricting possession and transferring custodial authority, and independent of the outcome of the ongoing prosecution. Decision No. 2023/5986 has never been vacated, modified, or superseded and is the basis of Claimant's asserted property interest.

Claimant asserts an interest in Wallet 0x82e as a secured, specific-property claim based on a foreign final judicial order that attached her civil enforcement title to identified, traceable assets. Claimant does not deny that she was defrauded and reported the loss to law enforcement. That status is relevant to the Government's notice obligations under Supplemental Rule G(4)(b), to the privacy and safety concerns raised by the Government's public filing of her cooperation materials, and to the interpretation of her communications as those of a victim seeking assistance rather than a lawyer soliciting clients. The Government's motion repeatedly treats Claimant's victim status as a reason to dismiss her claim and redirect her to remission. That characterization treats a judicially

asserted property interest as equivalent to a general victim claim for administrative relief. The two are not the same. A person with a court-recognized, specific-property interest is not a general unsecured claimant seeking discretionary restitution.

The nature of the interest is defined by the law of the jurisdiction where it arose. United States v. Fifty-Three Virtual Currency Accounts, 2025 WL 2732705 (D.D.C. Sept. 25, 2025) ("The nature of a claimant's property interest is defined by the law of the jurisdiction, state or nation, where the interest arose."). Under *In re Petition of Chawla (United States v. BCCI Holdings)*, 46 F.3d 1185, 1190-91 (D.C. Cir. 1995), general unsecured creditors lack standing in forfeiture proceedings. The D.C. Circuit's distinction between general unsecured interests and specific property interests informs the analysis here. The Government characterizes the Turkish order as "inchoate" without analyzing Turkish law. It characterizes Claimant as a "general or unsecured creditor" under 18 U.S.C. § 983(d)(6)(B)(i) while ignoring subsection (A), which includes as an "owner" a person with a "lien, mortgage, recorded security interest, or valid assignment of an ownership interest." The Government's briefing spends one adjective on the Turkish order and asks the Court to strike a verified claim on that basis. That is not a legal analysis of a judicial order; it is a dismissal of a property interest without examining the source law that created it.

If the Turkish order establishes a property-based restraint on Wallet 0x82e, that restraint should be analyzed through the burn, reissue, and custody chain rather than treated as extinguished merely because token identifiers changed. The Court should distinguish a lien, judicial custody, seizure, judgment, restitution interest, and general unsecured debt. Claimant does not ask the Court to accept those legal consequences without the underlying Turkish order and a competent legal showing. But the Court should not strike the claim before the Government has identified the legal basis for calling the order "inchoate" or analyzed the Turkish statute under which it was issued.

The Government's proposed alternative - strike the claim and leave Claimant to seek remission - would change a judicially asserted property claim into a discretionary administrative application. Dismissal of the judicial claim would materially alter Claimant's procedural position and could moot the specific-property issue before it is adjudicated. The Court should protect Claimant's secured interest and permit amendment or focused discovery rather than force Claimant into an alternative process as a substitute for deciding her asserted interest.

**K. Claimant's Monetary Claim Is Quantified; Her Security Is Not Divisible**

Claimant's claim and her security in the res are distinct, and both are already pleaded in Doc. 53.

1. The claim is a quantified amount. Doc. 53 asserts "not less than $25,461,000," comprising the $8.7 million principal, approximately $14.4 million in accrued commercial default interest through the date of filing, and approximately $2.35 million in Turkish legal fees and costs (Doc. 53, para 4). Doc. 53 expressly reserves "consequential and other damages as may be awarded by the Turkish criminal court" and "the right to supplement this claim with a detailed interest schedule as the default period continues" (Doc. 53, para 4). Under Turkish Commercial Code Article 1530, the judgment earns interest at the Central Bank of Turkey's highest published rate - 53.25% per annum simple interest. The claim grows by approximately $400,000 per month. By the time this case resolves, the claim may equal or exceed the wallet's value. This is not speculation; it is arithmetic under a statutory rate already pleaded.

2. The security is the whole of Wallet 0x82e. Doc. 53, paragraph 7, states that the Turkish criminal judicial seizure order "attached Ms. Kaul's civil enforcement title to the specific assets of Wallet 0x82e." Doc. 53, paragraph 28, describes Claimant as "a judgment creditor and the investigative originator whose interest is secured by a prior perfected judicial lien on the assets of Wallet 0x82e."

The Turkish court seized the entire wallet - not a fraction of it. A security-holder's interest runs to the whole of the encumbered res even though recovery is capped by the debt. The everyday analogy: a $250,000 mortgagee is secured by the whole house. When the house is threatened, the mortgagee gets a receiver over the whole house - not over one bedroom - and no one calls that overreach, because recovery stays capped at the debt. The unit of the custody conflict is the wallet, because the wallet is what the Turkish court seized. Claimant asks the Court to protect her secured interest and the prior foreign judicial custody from being mooted by disposition.

3. The statutory framework supports this framing. As set forth in Section II.J, the entire standing fight is which side of the line in 18 U.S.C. § 983(d)(6) the Turkish judicial seizure falls. The Government has not analyzed the Turkish statute and offers only the adjective "inchoate." Claimant is not a general creditor; she holds a court-conferred, specific, perfected interest in identified property.

4. The victims-first distribution rule supports whole-unit protection. Under Turkish Criminal Code (TCK) Article 55(1), seized funds must be distributed to victims first, with only the remainder going to the State Treasury. This is evidence that the Turkish process has a genuine statutory destination for the whole corpus - a reason not to let a U.S. settlement moot it. Claimant invokes it as a party to the Turkish proceeding. The Turkish court is aware of DDG's victim-verification work; at the March 2025 hearing, the judge inquired about it when the defendants raised the issue. DDG has verified approximately 200 victims through documented intake cross-referenced with the Turkish investigative file (Doc. 79-1). Claimant notes that the protection of Wallet 0x82e keeps every lawful avenue - judicial and administrative, in this Court and abroad - open for the Claimant and other DDG verified victims, and that the Court retains full equitable latitude to frame any preservation or distribution remedy so that no avenue is extinguished before it can be heard.

5. As set forth in paragraph 1 above, the claim grows by approximately $400,000 per month. The gap between Claimant's claim and the wallet shrinks every month, which itself supports whole-unit protection pending quantification. Under 28 U.S.C. § 2465(b), Claimant also preserves the right to seek attorneys' fees, post-judgment interest, and imputed interest. The Government's own actions - seizing property already under foreign judicial custody, failing to provide notice, and filing a dispositive motion during a stay - have prolonged the proceedings and increased Claimant's costs and accruing interest. The longer the Government litigates, the larger the claim becomes.

**L. Claimant's Verified Claim and the Need to Amend**

On March 17, 2026, Claimant filed her Verified Claim [Doc. 53] through counsel, asserting her interest in Wallet 0x82e. The Verified Claim is grounded in the Turkish Payment Order for Proceedings without Judgment, dated February 6, 2023, and in the Turkish criminal judicial seizure order in Decision No. 2023/5986, issued August 11, 2023, which "attached Ms. Kaul's civil enforcement title to the specific assets of Wallet 0x82e." The Verified Claim asserts a total interest of not less than $25,461,000 as of March 17, 2026.

On April 7, 2026, Claimant filed her Answer [Doc. 54] through counsel. The Answer includes five affirmative defenses, including innocent ownership under 18 U.S.C. § 983(d), abstention based on prior Turkish jurisdiction, forum non conveniens, and due process/notice under Rule G(4)(b). The Answer also includes a Rule 44.1 Notice regarding Turkish law, referencing CMK Articles 128 and 131 and Turkish Criminal Code Article 55.

Since filing Docs. 53 and 54, Claimant has developed additional grounds supporting her interest in Wallet 0x82e. The Government's own evidence, the Turkish judicial record, the evolving legal theory based on the Government's filings, and the burn/reissue of tokens on June 18, 2025, support

a broader and more specifically pleaded claim. The proper cure for any perceived pleading defect is amendment, not striking the claim entirely.

**M. Exhibit 91-1 Proves the Government's Failure - Not Claimant's - and There Was No U.S. Judicial Mechanism to Compel a Tether Freeze in 2023**

The Government's Exhibit 1 to Doc. 91 is a USSS document - not a document from Claimant. It is a January 9, 2023 email from USSS Financial Analyst Andrew Frey to Tether requesting a voluntary freeze. Tether declined the next day. This is the Government's own evidence, and it proves the opposite of what the Government claims. The Government's theory depends on its own inability to trace or preserve the assets in 2023, its abandonment of Claimant's case, and its refusal to acknowledge that the Turkish judicial order - not the United States - preserved Wallet 0x82e.

**1. The January 2023 Voluntary Freeze Request Failed and Did Not Concern Wallet 0x82e**

The USSS's voluntary freeze request to Tether was declined. The USSS had no legal mechanism to compel Tether. As Newsweek reported, "Tether, which is based in the British Virgin Islands, and not subject to U.S. jurisdiction, 'voluntarily complied' with the court orders." SAC Bradstreet further confirmed that Tether had "never returned funds before in response to U.S. law enforcement request." Newsweek, U.S. Prosecutors Call Huge Crypto Fraud Seizure a "Game Changer" (Dec. 7, 2023), https://www.newsweek.com/us-prosecutors-crypto-fraud-seizure-tether-binance-scams-currency-pig-butchering-1849885; Doc. 79-1 at 13 & n.1. The visible wallet in Exhibit 1 is Token Group A - not Wallet 0x82e. The second address is redacted, and the Government has not identified it. The Complaint identifies seven USDT Token Groups, designated A through G, each held in its own wallet (Compl. para 15). Contacting Tether about one wallet group does not create investigative priority over the other six. If the USSS had a pre-existing, enforceable claim to Wallet 0x82e, Tether would have recognized it. It did not. Tether complied

with the Turkish court order instead. Even when the United States later obtained a federal seizure warrant, "the transfer only completed almost a year later." Bradstreet stated that Tether "were very receptive, but it took time. It took a lot of back and forth." In January 2023, the USSS had no warrant, no judicial order; it had a request, and Tether declined. The Government did not obtain one until May 2025 - over two years later.

**2. The USSS Abandoned the Investigation and Admitted Tracing Was Impossible**

On February 22, 2023, the USSS told Claimant that recovery was "not possible here" - meaning not possible with the USSS San Francisco Field Office's preliminary methods. The Government's own complaint admits that tracing was too difficult, that tracing a single victim deposit is "incredibly time consuming" even for a team of investigators, and that the Government could contact only 60 of approximately 434 suspected victims (Compl. paras 45-46, 51). The USSS's inability to trace means the USSS could not do it; it does not mean the funds were untraceable. Claimant did trace them, and the Turkish court did freeze them. On April 20, 2023, the USSS told Claimant there was "no ongoing work specific to your loss." The United States abandoned work on Claimant's specific case.

**3. There Was No U.S. Legal Mechanism to Compel a Freeze on Tether in 2023**

Seizure warrants are Government-only tools, and no private restraining order could bind Tether - an offshore issuer that, as Newsweek reported, is "not subject to U.S. jurisdiction." The Government's own exhibit - Exhibit 91-1 - proves this. Doc. 79-1 at 13 & n.1 already established it on the record. Where no legal remedy exists in the U.S., a victim has the right to pursue recovery through available foreign judicial process. The Government's motion seeks to penalize Claimant for using the only available legal remedy.

**4. The Turkish Judicial Action Succeeded Where the U.S. Approach Failed**

Claimant, acting alone and without U.S. Government assistance, pursued recovery through the Turkish criminal justice system. The Turkish Criminal Court seized Wallet 0x82e on August 11, 2023. Tether confirmed the freeze on October 11, 2023. The United States did not obtain its seizure warrant until May 2025 - over two years after their January 2023 voluntary freeze request failed, and more than twenty months after the Turkish judicial seizure of Wallet 0x82e. Pre-complaint seizure was available under 18 U.S.C. § 981(b) throughout 2023, and a U.S.-Turkey MLAT has existed since 1981. The Government used none of these tools. No U.S. restraining order compelled Tether, a British Virgin Islands entity not subject to U.S. jurisdiction; even the Government's May 2025 federal seizure warrant was executed only through Tether's voluntary cooperation. On October 26, 2023, Senator Cynthia Lummis and Representative French Hill wrote to Attorney General Garland demanding a criminal investigation of Binance and Tether, creating the congressional pressure that preceded Tether's sudden compliance. Doc. 79-1 at 13 & n.2.

**5. The Government's Own Filings Conflict and Contradict its "Inchoate" Characterization**

The Government now claims the Turkish order is "inchoate," Claimant's funds were "dissipated," and the United States - not the victim - was the "genesis" of the investigation. But the Government's own filings conflict on when the investigation began. The Complaint states that "[i]n November 2023, the USSS San Francisco Field Office initiated an investigation" (Compl. para 50). Doc. 91 now asserts the investigation began on January 9, 2023 (Doc. 91 at 2). Both cannot be accurate. The Government told Claimant her funds were gone, abandoned her specific case, and now characterizes her foreign judicial success as "inchoate" while claiming ownership of the same assets it previously reported as dissipated. The Government cannot use its own investigative failure as a basis to strike a verified claim to property that Claimant preserved through a foreign court.

**6. The Government Has Not Identified the Wallet it Claims Priority Over**

The Government's Exhibit 1 concerns Token Group A. The Government has not identified the second redacted wallet address in Exhibit 1 or provided any evidence regarding Wallet 0x82e (Token Group G). It claims investigative priority over a wallet it has not identified, while dismissing the Turkish judicial order that actually secured it. If the Government's "accepted accounting methods" could not identify the funds, and the Turkish court's judicial order did identify and freeze them, the Turkish order is not "inchoate." It is the only judicial authority that actually secured the asset. The Government seeks to strike the claim of a party who used the only available legal remedy when the U.S. system offered none.

**7. The Government's Refusal to Acknowledge its Own Evidence is an Appropriation of the Victim's Work Dressed as Priority**

The Government will not acknowledge what its own evidence establishes: there was no legal mechanism in the United States to compel a freeze at Tether in 2023; Tether is not subject to U.S. jurisdiction; the USSS voluntary request was declined; no U.S. court order could bind Tether; and the Government did not obtain a seizure warrant until May 2025. The Turkish judicial order - not the U.S. Government - preserved Wallet 0x82e. The Government is bending the facts to claim priority it did not earn over assets it could not secure.

**III. LEGAL ARGUMENT**

**A. The Court Should Defer Ruling on Doc. 91**

**1. The Stay Asymmetry**

The Government cannot have it both ways. It represented that the August 7 stay was necessary to facilitate settlement. It represented that the stay would not address Claimant's pending motions. And then it filed a dispositive motion during the stay. If the stay suspends motion practice, Doc.

91 was filed without authorization and should be held in abeyance. If the stay does not suspend motion practice, then Claimant's Doc. 79 - including her motion to dismiss under Rule 12(b)(1) and Supplemental Rule G(8)(b) - must be briefed on equal footing. Claimant does not argue that the Government cannot file during the stay; she argues that the Government cannot use the stay as a weapon - freezing Claimant's motions while advancing its own, excluding Claimant from settlement while striking her claim, and then invoking the stay to prevent her from responding. Each of the Government's actions leads to the same conclusion: the Government is using the stay as a one-way ratchet that operates only against the victim. The Court need not characterize the Government's purpose; the asymmetry itself is reason to restore equal procedural treatment. The Court should defer ruling on Doc. 91 until the scope of the stay is clarified and Claimant's motions are afforded equal procedural treatment.

**2. The Government's Own Standing Framework Supports Claimant**

At the July 23 hearing, the Court discussed United States v. Emor, 785 F.3d 671, 679 (D.C. Cir. 2015), and framed the standing question as whether victims were "tricked to do something while maintaining their own ownership, putting it somewhere while they think they still own it" (Tr. 33:8-12). The Government's counsel agreed that "when they hack into somebody's computer and actually take something, in that case, the victim still has standing because they didn't authorize any transfer, they didn't willingly give anything over" (Tr. 31:14-20). Claimant's position is stronger than the Government's own concession: she was defrauded into transferring funds through a fake trading platform, and she additionally holds a judicial order attaching her title to Wallet 0x82e.

The Court also stated at the hearing that it was "inclined to deny the Government's motion to strike" the other claimants' claims because, taking the pleadings as true, "they have got standing to be in front of me at this stage" (Tr. 42:9-15). The Government responded that in that situation it "would

need to do more discovery on standing, and so specifically special interrogatories" (Tr. 34:20-22) - discovery, not assertion. The Government cannot now seek to strike Claimant's claim - supported by the Turkish judicial order, the Tether freeze confirmation, and on-chain tracing - through a motion that eschews the discovery process the Government itself identified as the proper path.

The Government also conceded at the hearing that the settlement "is not agreeing to compensate any specific victim any specific amount of money" (Tr. 40:14-16) and that remission "typically in cases, in all cases it starts at the end of the case, so once the settlement is reached, once there is an order of forfeiture, that's when remission begins" (Tr. 55:15-19). The Government's proposed alternative - strike the claim and redirect Claimant to remission - thus offers no guaranteed recovery, no defined timeline, and no adjudication of Claimant's secured interest. It is not an adequate substitute for adjudicating a verified claim supported by a foreign judicial order.

**3. The Government Violated the Protective Order and the Court's Explicit Sealing Instructions**

The Protective Order [Doc. 88] - both Section 15 ("this Order does not, by itself, authorize the filing of any document under seal") and the Court's docket-entry reminder - explicitly require an accompanying motion to seal. The Government filed Docs. 92 and 93 under seal seven days later without complying. The Government's failure to comply with the Protective Order and the Court's explicit sealing instructions is an independent basis for deferring ruling on Doc. 91. The Government cannot ask the Court to rely on documents filed in violation of the Court's own rules. If the Court requires the Government to file a compliant motion to seal for Docs. 92 and 93, Claimant will have an opportunity to respond to that motion before the sealed materials are considered in connection with Doc. 91. Mathews v. Eldridge, 424 U.S. 319, 333 (1976); Armstrong v. Manzo, 380 U.S. 545, 552 (1965).

**4. Non-Service of Sealed Documents**

Claimant has not been served with Docs. 92 or 93. The Government's Certificate of Service in Doc. 91 states that it served Doc. 91 on Claimant by email. The Government did not serve Docs. 92 or 93 on Claimant. Claimant cannot access the sealed documents. She cannot determine what evidence the Government is presenting to this Court in support of its Motion to Strike. She cannot effectively oppose a motion when the supporting evidence is hidden from her.

Due process requires an opportunity to be heard "at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976); Armstrong v. Manzo, 380 U.S. 545, 552 (1965). The risk of error is substantial where the Government seeks dispositive relief based on disputed facts and materials Claimant cannot review. The least restrictive cure is to defer consideration of Doc. 91 until the Government serves the materials, the Court resolves their sealing status, and Claimant has a reasonable opportunity to respond.

The Government also failed to file a motion to seal Docs. 92 and 93, as required by Local Civil Rule 5.1(h)(1), which provides: "Absent statutory authority, no case or document may be sealed without an order from the Court. A document filed with the intention of it being sealed in an otherwise public case ... shall be accompanied by a motion to seal. The document will be treated as sealed, pending the outcome of the ruling on the motion. Failure to file a motion to seal will result in the document being placed on the public record." The Government lodged sealed documents without complying with the procedural requirements. This Court's own Protective Order (Doc. 88) establishes a consistent structural pattern that procedural defects affecting confidentiality status must be cured within seven calendar days or protection is deemed lifted. See Doc. 88 § 12; § 14(c). The Government filed Docs. 92 and 93 on August 14, 2026. Fourteen days have elapsed. The Government has taken no action to cure its sealing defect, has not notified

Claimant, and has not sought leave. Under the combined effect of the Local Rule's mandatory public-record consequence and the Order's own structural cure-period principle, these documents should be treated as having lost their sealed status.

**5. The Evidentiary Route Election**

By electing to file email exhibits with Doc. 91, the Government chose the evidentiary route. A motion under Rule 12(f) requires no exhibits. The Government's election to attach exhibits opened the door to reciprocal discovery and factual dispute. Having put Claimant's cooperation emails at issue, the Government cannot shield its own evidence behind a seal and a stay.

Two limits on the Government's framing bear noting. First, Claimant brings no "private prosecution," no counterclaim, and no private cause of action; she is a verified claimant defending her asserted interest in the res as the Supplemental Rules provide. Second, Supplemental Rule G(8)(c)(ii)(A) sequences decision of the Government's standing motion before "any motion by the claimant to dismiss the action" - it does not suspend the Government's service obligations, nor bar the Court from acting to preserve the res or to protect a claimant while the standing motion is pending. Courts in this District read the sequencing provision as "a simple rule of efficiency," not a disability imposed on the claimant. United States v. All Assets Held at Bank Julius Baer & Co., 228 F. Supp. 3d 118, 123 (D.D.C. 2017) (quoting United States v. $2,051,660.00 in U.S. Currency, 2008 WL 8723566, at *2 (D. Kan. Sept. 29, 2008)).

**6. Claimant Needs Time to Prepare Declarations**

Claimant intends to submit declarations from herself, her mother, and a limited number of representative DDG victims. The Government's UPL theory implicates Claimant and DDG's work with victims, making DDG victim declarations relevant to refuting the accusation that Claimant

was practicing law. These declarations will establish facts about Claimant's appearance pro se and her representation; that DDG is a victim advocacy organization, not a law firm; that Claimant and her mother are a family unit with intertwined finances; that DDG's materials contain disclaimers; that DDG did not promise recovery or charge fees; that DDG victims keep their evidence in their own Google Drive folders and do not send it to DDG; that DDG provides support and education, not legal advice; and that DDG's recovery work is conducted through licensed counsel. Claimant needs adequate time to prepare and obtain these declarations, particularly from victims who may need protective measures before speaking on the record.

**7. The Government's Filing is Inconsistent with its Duty of Justice**

Under Berger v. United States, 295 U.S. 78, 88 (1935), the United States Attorney "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." The defendant property was preserved through the victim's cooperation and the Turkish judicial order. Filing a dispositive motion against the most documented claimant during a stay, while protecting a criminal proxy and 266 pseudonymous claimants, is inconsistent with that duty. The Court should defer ruling on Doc. 91 and require the Government to address the procedural and evidentiary defects identified in this motion before seeking a merits ruling.

**B. Claimant Intends to Seek Leave to Amend**

Claimant gives notice that she intends to seek leave to amend her Verified Claim [Doc. 53] and Answer [Doc. 54] under Federal Rule of Civil Procedure 15(a)(2) and Local Civil Rule 7(i), and will lodge the proposed amended pleadings with that motion. Amendment is freely given when justice requires. Foman v. Davis, 371 U.S. 178, 182 (1962). Any perceived pleading defect the Government asserts in Doc. 91 is of the kind amendment can cure. This District's practice confirms

it: in United States v. All Assets Held at Bank Julius Baer & Co., 228 F. Supp. 3d 118, 125-28 (D.D.C. 2017), the court declined to strike a claim notwithstanding a verification defect and an almost eleven-year failure to answer an amended complaint, found no prejudice to the Government, and directed the claimants to file an amended claim curing the defect - in the same litigation the Government cites here.

The Government's characterization of the Turkish order as "inchoate," its characterization of Claimant as a "general or unsecured creditor," and its argument that Claimant waived in rem jurisdiction challenges are all disputed and will be addressed in the amended pleadings. As set forth in Section II.J, the Turkish judicial seizure order is a final and operative judicial order under CMK Articles 127 and 128, not an inchoate order. It has never been vacated. The amended claim will articulate the interest as a lien under 18 U.S.C. § 983(d)(6)(A) - a quantified claim with indivisible security in the whole of Wallet 0x82e, not a general unsecured debt. Claimant respectfully submits that Doc. 91 should not be resolved without the opportunity to amend.

**C. Claimant Is Entitled to an Extension of Time**

Under D.C. Local Civil Rule 7, an opposition is due within 14 days of service. If Doc. 91 was served on August 14, 2026, the default opposition date is approximately August 28, 2026. Claimant requests an extension for the following reasons:

1. Non-service of Docs. 92 and 93;
2. The Government's violation of the Protective Order and sealing requirements;
3. The stay is unresolved;
4. Declaration preparation, including from mother and DDG victims;
5. Amendment preparation;

6. Complexity - Doc. 91 raises standing, timeliness, tracing, foreign law, in rem jurisdiction, UPL, the First Amendment, and Rule 12(f);

7. Pro se status and resource asymmetry - Claimant is the most attacked party in this case with the least amount of resources. Pro se pleadings are held to less stringent standards. Haines v. Kerner, 404 U.S. 519, 520-21 (1972).

Claimant does not concede that her time to respond to Doc. 91 has begun to run; service of its supporting materials is incomplete; and she seeks a thirty (30) day extension as a matter of caution. The extension should run from the date of complete service of Docs. 92 and 93. If the Court requires the Government to file a compliant motion to seal, Claimant will need time to respond to that motion before the sealed materials are considered.

**D. The Court Should Strike, Disregard, or Defer Consideration of Specified Doc. 91 Exhibits**

Claimant recognizes that Federal Rule of Civil Procedure 12(f) ordinarily addresses matter in a pleading and that Doc. 91 is a motion with attachments. Rule 7(a) does not list motions among the pleadings. Claimant therefore presents a layered request: apply Rule 12(f) only to the extent applicable; alternatively, disregard or exclude material that is unauthenticated, immaterial to the procedural motion, hearsay offered for its truth or offered only as character evidence; alternatively, require redaction, substitution, authentication, or discovery before relying on the material.

**1. Exhibit 1 Does Not Establish Priority Over Wallet 0x82e**

Exhibit 1 is a January 9, 2023 USSS email requesting a voluntary freeze from Tether. It may show that a USSS inquiry into Token Group A preceded Claimant's January 18 report, but it does not establish that the request succeeded, that it concerned Wallet 0x82e, or that it created a judicial or property interest superior to the August 11, 2023 Turkish criminal judicial seizure order. The

visible address concerns Token Group A, while the second address is redacted. The Government's complaint describes seven token groups, A through G, in seven wallets. The Government should identify the redacted address and explain its connection, if any, to Wallet 0x82e. A request concerning one token group cannot, by itself, establish priority over six other token groups.

The exhibit shows that the request was voluntary and Tether declined it; the document shows that the USSS did not preserve the property at that time. That is relevant context for the subsequent Turkish judicial order, not a basis for striking Claimant's claim. The Government's own evidence should not be converted into a priority finding that the document does not support.

**2. Exhibits 2 and 3: Authentication, Completeness, and Referral Origin**

The Government relies on communications involving Erin West, then a Santa Clara County Deputy District Attorney. The Government has not established what these documents are, who created or maintained them, whether the copies are complete and accurate, or the capacity in which West communicated. Federal Rule of Evidence 901 requires evidence sufficient to support a finding that the item is what the proponent claims it is. No declaration from West, no custodian or foundation witness, and no authentication evidence has been offered. The exhibits are unauthenticated and should not be considered in support of a dispositive motion.

The Government also presents fragments without surrounding context. Claimant's Verified Claim [Doc. 53] explained the full timeline of her case and her communications with law enforcement in chronological detail. Doc. 53, paras. 14-28. The Government had access to the complete record. It chose to extract portions and present them in isolation. Claimant was forthcoming: she contacted West on January 18, 2023, following West's public solicitation of victims of cryptocurrency crimes. Doc. 53, para. 15. The January 18, 2023 LinkedIn chat with Erin West is attached as

Exhibit C. The subsequent USSS engagement, the February 22, 2023 statement that recovery was "not possible here," the April 20, 2023 statement that there was "no ongoing work specific to your loss," and the Turkish judicial proceeding that followed. Doc. 53, paras. 15-22. The Government's exhibits are not new revelations; they are selective excerpts from a timeline Claimant already placed on the record. The difference is that Claimant presented the full timeline, whereas the Government presented fragments stripped of context. That origin and timeline matter. A victim responding to a public victim-intake solicitation is materially different from a lawyer soliciting a client. The Government also omitted the subsequent unannounced federal contact and Analyst Frey's statement that "Secrecy is in our name - we'll treat your information with the utmost care," quoted in Doc. 53, para. 16. The Government had this email. It chose not to include it.

Federal Rule of Evidence 106 permits an adverse party to require introduction of any other part of a writing or recorded statement that in fairness ought to be considered contemporaneously. Claimant does not ask the Court to decide admissibility conclusively on this interim motion. She asks the Court not to draw a dispositive inference from incomplete excerpts while the Government is withholding the omitted context.

**3. Exhibits 4 and 5 Show Cooperation and an Investigative Limitation, Not UPL**

The Government's exhibits show Claimant continuing to provide information after communicating with USSS. They do not identify a client, fee, appearance, legal advice, or representation of another person. Analyst Frey's statement that recovery was not possible "here" must be read as a statement about the office's methods and investigative posture at that time. It does not establish that the property did not exist, that the funds were not traceable by any method, or that Claimant's later Turkish proceeding was legally irrelevant. The Court should not convert an investigative limitation

into an adjudicated finding against Claimant. The USSS tracing analysis is set forth in Section III.D.5.

**4. Exhibit 6 Must Be Considered in Full**

Exhibit 6 is a two-page June 6, 2023 email. The Government extracts Claimant's self-description and uses it to suggest unauthorized practice. The full context, including the question of whether her own claim was "staked for restitution," shows a victim asking USSS about the status of her own loss. It does not identify a client, a fee, a representation of another person, a court appearance, or legal advice.

The Government has not made the showing required to convert a job title and a selective quotation into a UPL finding. The Court should not treat a selective quotation from a distress communication as a dispositive character finding without considering the complete writing, the recipient, the purpose of the communication, and the surrounding referral history. Claimant stated at the July 23 hearing that being in the proceeding was "extremely traumatic" (Tr. 46:14), and the Court responded that it was sorry to hear that the process had been traumatic (Tr. 48:22). Those statements do not decide the legal issue, but they underscore why a selective quotation from a distress communication requires care.

A June 2026 Gallup/Stop Scams Alliance study reported that 73% of scam victims experienced a negative effect on mental health or well-being and that 65% of household members not directly scammed reported negative mental-health impacts. See Gallup, "Scam Victims Report Billions Lost and Harm to Mental Health" (June 29, 2026), https://news.gallup.com/poll/710984/scam-victims-report-billions-lost-harm-mental-health.aspx. Claimant offers this public source as contextual evidence of a recognized harm pattern, not as proof of any individual diagnosis.

**5. Exhibit 7 Raises a Disputed Tracing Question**

The Government characterizes the funds as dissipated and refers to the USSS's accounting assessment. Claimant disputes that characterization based on the Turkish judicial record, the Tether freeze confirmation, and the on-chain materials identified in her filings. The Government's own Exhibit 7 in fact records a partial trace: it identifies a December 21, 2022 transfer of 200,000 USDT that "included 55,988.74 USDT in proceeds traceable to your fraud," and expressly limits its conclusion to the "current balance in this wallet address." An exhibit documenting traced proceeds and a scope-limited accounting is not evidence that nothing traces; it is evidence that tracing was possible and incomplete. The Court need not resolve that tracing dispute on a motion aimed at striking pleadings.

The Government's own technology partner, TRM Labs, publicly documented that the USSS San Francisco Field Office - the same office that communicated with Claimant - could not seize cryptocurrency from unhosted wallets and was required to wait for funds to move to a centralized exchange before obtaining a seizure warrant. In a case study published on TRM Labs' website and promoted by TRM Labs spokesperson Stephanie Ashford, TRM Labs described how USSS San Francisco tracked stolen funds to "multiple unhosted wallets where the funds sat dormant for months," and only secured a seizure warrant "when the funds finally started to move again - this time to a centralized exchange." See Stephanie Ashford, LinkedIn post (Dec. 2023) (Exhibit D); TRM Labs, USSS Pig Butchering Investigation Leads to $5M+ Seizure of Victim Funds (case study) (Exhibit E), https://www.trmlabs.com/resources/case-studies/usss. The case study confirms that USSS's methodology was limited to centralized-exchange seizures; it could not seize funds directly from unhosted wallets. That is precisely the limitation Analyst Frey described when he

told Claimant recovery was "not possible here." The Turkish judicial order, not USSS methodology, preserved the funds in Wallet 0x82e.

The Government's own complaint acknowledges the difficulty of tracing victim deposits and the limited number of victims it could contact (Compl. paras. 45-46, 51). The USSS's January 2023 voluntary freeze request failed. These facts establish an investigative limitation, not a legal conclusion about the status of the funds. The Court should not treat the Government's earlier inability to trace as an adjudicated finding that the funds were unavailable, particularly where the Government later obtained or controlled property it had characterized as dissipated. A Government office's inability to trace or seize a particular asset through its available methods is not proof that the asset was gone or that another judicial process could not preserve it. The USSS's preliminary methods did not identify the funds; the Turkish judicial order did.

**6. Exhibit 8 Concerns Notice, Not a Concession**

Exhibit 8 references a District of Colorado forfeiture that the Government itself disclosed to Claimant in AUSA Blaylock's July 9, 2026 email. Doc. 79-11. Claimant's responsive reference in her filing is evidence of communication, not a concession that she lacks an interest in this action or that the Government satisfied Rule G(4)(b) notice requirements here. The Government cannot use its own disclosure to Claimant as a weapon against her.

**7. Exhibits 9-11: Public Advocacy and the Tao Liao Misattribution**

The Government relies on public statements and reposts involving DDG victims who are also victim advocates. Public criticism of Government conduct and organized efforts to help people assert legal rights raise First Amendment concerns. See NAACP v. Button, 371 U.S. 415 (1963); Organization for a Better Austin v. Keefe, 402 U.S. 415 (1971). Those authorities do not immunize

independently unlawful conduct, but they do require the Government to identify the specific conduct it contends is unlawful rather than treating criticism as proof of wrongdoing.

Doc. 91's own Introduction settles the exclusion question. It states that, "[b]ased on scandalous misrepresentations by Ms. Kaul to this Court and the public, that door is now closed" - the "door" being Claimant's inclusion in the tentative agreement (Doc. 91 at 1). That sentence concedes both facts Claimant reported in Doc. 89: the settlement was negotiated without her, and she is now excluded from it. It states openly that the exclusion is a response to Claimant's statements to this Court and the public - that is, to her petitions and her speech. A DDG member's public claim about the settlement's terms is not Claimant's participation in its negotiation, and the Government's brief nowhere asserts that Claimant was included in it.

Government's Exhibit 10 is labeled as a statement by Jan Santiago, DDG. The underlying statement is by Tao Liao, not Jan Santiago. That material misattribution is directly relevant to reliability and authentication. The Government has not identified the source, custodian, capture method, or chain of custody for the public-post exhibits. Without that foundation, the exhibits cannot support a dispositive characterization and should be disregarded.

The Government further implies that Claimant had non-public knowledge of settlement terms. Claimant was excluded from the settlement framework identified in Doc. 85. Public arithmetic based on publicly stated recovery figures does not prove access to a sealed agreement. If the Government relies on a sealed settlement document, Claimant must be served with it and afforded a meaningful opportunity to respond.

**8. The DDG Disclaimer is Material Context, and the Government Has Not Identified Any Act Constituting Legal Practice**

Doc. 79-11 includes the disclaimer: “The information contained in this email is intended solely for informational purposes and does not constitute legal advice. No attorney-client relationship is formed by the sending, receipt, or review of this email. Recipients should consult with their own legal counsel for advice regarding any specific legal matter. The transmission of this email does not imply or create an attorney-client relationship between the sender and the recipient.” This disclaimer pertains to notice, intent, and the nature of the relationship. The Government has not identified any act constituting legal practice, so the disclaimer stands unrebutted. Doc. 91 does not identify a client represented by Claimant, a fee or contingency arrangement, a court appearance on another's behalf, individualized legal advice, or a specific injury caused by the alleged conduct. These are elements the Government must establish and has not. The Government's motion fails for lack of factual support. The Court should not strike a verified claim based solely on a job title and a sentence from a distress email. These facts should be established through declarations and records, not inferred from a title or a single sentence in a victim's email.

DDG's asserted access-to-justice function includes victim education, evidence preservation, referral to licensed counsel where required, and victims’ right to public advocacy. Claimant maintains that DDG does not charge fees, promise recovery, appear as counsel for other persons, or provide individualized legal advice.

**9. Pattern of Misattribution and Selective Presentation**

Taken together, the identified defects warrant caution: selective quotation of the West/Frey correspondence; failure to present the full context of Exhibit 6; a disputed "dissipated" characterization; misattribution of Tao Liao's statement to Jan Santiago; reliance on a cited Exhibit 13 that Claimant cannot locate in the public record; and omission of the Doc. 79-11 disclaimer from the Government's theory. Claimant describes this as a pattern requiring adversarial testing.

Claimant does not request that the Court make findings on the Government's intent on this interim motion. The identified defects require adversarial testing before any such question is reached. A table compiling contradictory statements in Doc. 91 is attached as Exhibit F.

The appropriate relief is to strike or disregard material only if the Court finds the governing standard satisfied; otherwise, require authentication, complete service, redaction, declarations, targeted discovery, or defer consideration until the full opposition is filed.

**10. The Government's "Scandalous" Characterization Misapplies Rule 12(F) and Confuses Protected Advocacy with Pleading Defects**

Rule 12(f) permits a court to strike "redundant, immaterial, impertinent, or scandalous matter" from a pleading. Fed. R. Civ. P. 12(f). The rule applies to allegations in a pleading, not to a claimant's public advocacy, not to a motion for protective relief, and not to criticism of Government conduct. The Government's motion to strike [Doc. 53] Claimant's Verified Claim, [Doc. 54] her Answer, and [Doc. 79] her Emergency Motion relies on public posts, LinkedIn advocacy, and DDG communications that are not part of any pleading. The Government attaches them as exhibits and then labels them - and by extension the pleadings to which they are attached - "scandalous."

The Government's proposed order confirms the overreach. Doc. 91-12 does not identify which filings are struck, under which rule, or on which ground; it states only that "the documents filed by Nivedita Kaul are hereby struck from the record." That language would sweep in Claimant's verified Status Report [Doc. 89] - a filing this Court itself ordered on July 24, 2026 - along with every procedural filing she has made. A motion to strike that encompasses a court-ordered

compliance filing is not pleading cleanup; it is the erasure of a litigant from the docket. Relief of that breadth is not tailored to Supplemental Rule G(8)(c) or to Rule 12(f).

This is a category error. Doc. 53 is a verified claim asserting a property interest in Wallet 0x82e, grounded in a final Turkish judicial order. Doc. 54 is an answer that includes standard affirmative defenses, such as innocent ownership, abstention, and due process. Doc. 79 is an emergency motion seeking protective relief, preservation, and discovery. These are ordinary procedural filings. None contain "scandalous matter" within the Rule 12(f) sense of "allegations that are unnecessarily prejudicial, constitute abusive language, or are otherwise plainly improper." See 5C Wright & Miller, Fed. Prac. & Proc. Civ. § 1382 (3d ed.). Criticism of Government conduct, public advocacy for victim rights, and factual allegations about institutional conflicts are not "scandalous" matters in a pleading. They may be disputed; they are not subject to a Rule 12(f) strike.

The Government's real objection is not to the form of the pleadings but to their content and to Claimant's public voice. Its theory treats advocacy as a defect rather than as the core function of an adversarial system. The Government cites Claimant's public statements about the seizure, her advocacy for victims, and her criticism of the settlement framework as evidence that her pleadings are "scandalous." But public criticism of Government conduct and organized advocacy for victims are protected speech under the First Amendment. See NAACP v. Button, 371 U.S. 415 (1963); Organization for a Better Austin v. Keefe, 402 U.S. 415 (1971). The Government cannot use Rule 12(f) to strike a claimant's pleadings simply because it dislikes her public advocacy. Rule 12(f) does not sanitize public petitioning, and it does not authorize the Court to strike pleadings based on the claimant's extrajudicial speech. The Government's confusion between protected advocacy and scandalous matter is itself the scandal - it suggests that a victim who speaks publicly about institutional misconduct forfeits her right to be heard in court.

The Government and its partners publicly celebrated the seizure while treating Claimant's verified claim as "scandalous," as set forth in Section II.I. The public celebration extended beyond the USSS: the Department of Justice issued a press release; the U.S. Attorney appeared on television; TRM Labs, Chainalysis, Coinbase, OKX, and Tether each issued public statements claiming credit; and not one credited Claimant or DDG. Doc. 79-17 Ex. O; Doc. 79-18 Ex. P; Doc. 79-19 Ex. Q.

If any filing in this case could be characterized as prejudicial self-promotion, it is the Government's public campaign to credit its partners and itself for a seizure built on Claimant's investigative origin and foreign judicial preservation. Yet the Government does not strike its own press releases, its U.S. Attorney's television appearances, or its contractors' LinkedIn celebrations. It seeks to strike Claimant's verified claim instead. Rule 12(f) is not a tool for erasing a claimant whose public advocacy contradicts the Government's preferred narrative.

The Court should reject the "scandalous" characterization as a misapplication of Rule 12(f) and as an attempt to use protected advocacy as character evidence to dismiss a verified property claim.

**E. Protective Relief Is Necessary**

Claimant does not seek blanket sealing. She identifies each category and the specific protective measure requested:

| Material | Requested relief | Reason |
|---|---|---|
| Private email addresses | Redact or substitute with "email on file" | Targeting; harassment |
| Law enforcement cooperation emails (Ex. 2-7) | Seal or substitute with redacted summary | Victim cooperation privacy; CVRA dignity |

| | | |
|---|---|---|
| Mother's identity and finances | Redact or seal | Safety; privacy; non-party; no consent |
| Reported websites/platforms/wallets | Redact | Enables TCO cross-referencing; reverse engineering |
| June 6, 2023 victim email written during acute distress (Ex. 6) | Seal; preserve for Court | Psychological safety; selective quotation |

Claimant's mother is not a claimant in this U.S. case. She is a non-party who has not consented to public disclosure. The Government's publication of her identity as a victim and her financial circumstances, without notice or opportunity to object, is an additional basis for protective relief. She is a private citizen who never chose to be part of this litigation.

The concern extends beyond Claimant and her household. When the Government publishes a cooperating victim's identifying information and cooperation history on the public docket - and then uses that cooperation as a basis to strike the victim's claim - the consequence is a chilling effect on victim reporting. A victim who sees that cooperation may be republished three years later and weaponized against her has every reason to remain silent. This is victim shaming and blaming dressed in procedural language: the Government took the victim's cooperation, used it to build its case, and now uses the same cooperation as evidence that the victim's claim is "scandalous." Under the Crime Victims' Rights Act, 18 U.S.C. § 3771(a)(8), victims have the right to "be treated with fairness and with respect for the victim's dignity and privacy." Moreover, 18 U.S.C. § 3771(c)(1) requires officers and employees of the Department of Justice engaged in the detection, investigation, or prosecution of crime to “make their best efforts to see that crime victims are notified of, and accorded,” those rights. The Government's officers were engaged in the investigation of the underlying crime when Claimant reported in January 2023, when they traced

the funds, and when they built this forfeiture action. They had a statutory duty to accord her fairness, dignity, and privacy. Doc. 91 does the opposite: it weaponizes three years of victim cooperation, publishes her private communications and household details, and uses them to argue that her verified claim is “scandalous.” The Government's conduct in Doc. 91 honors none of these statutory obligations.

Claimant places the Government on actual notice of specific, foreseeable safety risks created or aggravated by the public filing of Doc. 91. The Government's litigation choices have transformed a previously confined victim into a publicly identified witness against a transnational organized crime syndicate that has a documented history of violence against witnesses. Claimant preserves all available claims, defenses, and remedies arising from this exposure, including but not limited to claims under the Crime Victims' Rights Act, 18 U.S.C. § 3771; the Federal Tort Claims Act; and constitutional and equitable doctrines of state-created danger and deliberate indifference. Nothing in this filing asks the Court to adjudicate liability prematurely.

**F. The Government's Defective Notice Violates Due Process and Rule G(4)(b)**

Under Supplemental Rule G(4)(b), the Government "must send notice of the action and a copy of the complaint to any person who reasonably appears to be a potential claimant on the facts known to the Government." The Government had actual knowledge through USSS engagement, two FBI VNS registrations, and Claimant's mother's VNS registration. The Government sent nothing. Under Mullane, 339 U.S. at 314, where the Government knows of an interested party, published notice is insufficient. The Government cannot benefit from its own constitutional violation.

The Government cites United States v. Three Sums Totaling $612,168.23, 2021 WL 2255310 at *6 (D.D.C. June 3, 2021), for the proposition that an untimely claim deprives a claimant of

procedural statutory standing. That case addressed a claim filed a year late where the Government had provided proper notice. Here, the Government provided no direct notice to a registered victim in its own database. The delay the Government now weaponizes was caused by the Government's own failure to notify. The Court observed at the July 23 hearing that "there have been a number of blown deadlines in this case, not exclusive to one party" and that "the Government has missed a number of deadlines" (Tr. 7:9-22). The Government's own missed deadlines undermine its equity argument. The Government cannot benefit from a delay it caused by failing to provide the notice that Rule G(4)(b) and the Due Process Clause require.

**G. The Government's Theory Depends on Its Own Investigative Failure**

As set forth in Section II.M, the Government's theory depends on its own inability to trace or preserve the assets in 2023. The USSS's voluntary freeze request was declined. The USSS told Claimant recovery was "not possible here" and that there was "no ongoing work specific to your loss." The United States abandoned work on Claimant's specific case. Claimant succeeded through the Turkish judicial system, which seized Wallet 0x82e on August 11, 2023. The Government did not obtain a seizure warrant until May 2025.

The Government now characterizes the Turkish order as "inchoate" and Claimant's funds as "dissipated" while claiming investigative priority over assets it could not and did not independently secure. The Government cannot use its own failure as a basis to strike a verified claim to property that a foreign court preserved. The Government's Exhibit 1 concerns Token Group A and an unidentified redacted address. The Government is claiming priority over a wallet it has not identified, while dismissing the foreign judicial order that actually secured Wallet 0x82e.

**H. The Government's Waiver Theory is Disputed**

The Government argues in footnote 4 to Doc. 91 that Claimant waived any challenge to in rem jurisdiction by filing an Answer instead of a motion to dismiss. Claimant disputes this characterization. The Answer included affirmative defenses asserting that this Court must abstain from exercising jurisdiction over Wallet 0x82e under principles of international comity and prior-jurisdiction doctrine, and that forum non conveniens bars this action. These objections were stated in the Answer and are therefore preserved under Supplemental Rule G(5)(b). The Advisory Committee Notes confirm that failure to present an objection to in rem jurisdiction or to venue "by timely motion or answer waives the objection" - meaning the objection is preserved if it is stated. More importantly, Claimant's subsequent pro se filing, Doc. 79, expressly moved to dismiss the forfeiture as to Wallet 0x82e under Rule 12(b)(1) for lack of subject-matter jurisdiction. Under Rule 12(h)(3), a challenge to subject-matter jurisdiction may be raised at any time and is never waived. The Advisory Committee Notes do not address subject-matter jurisdiction; they cannot override Rule 12(h)(3). The Government's waiver theory fails as to this fundamental defect.

**IV. CONCLUSION AND PRAYER FOR RELIEF**

For the foregoing reasons, Claimant respectfully requests that this Court enter an Order:

1. Holding in abeyance ruling on the Government's Motion to Strike [Doc. 91] pending (a) service of Docs. 92 and 93 on Claimant; (b) resolution of the Government's compliance with the Protective Order [Doc. 88] and Local Civil Rule 5.1(h)(1); (c) clarification on the scope of the August 7, 2026 stay; and (d) adequate time for Claimant to respond after complete service;

2. Granting Claimant an extension of time to respond to Doc. 91, running for thirty (30) days from the date of complete service of Docs. 92 and 93 and resolution of the Government's sealing compliance under Local Civil Rule 5.1(h)(1);

3. Clarifying the scope of the August 7, 2026 stay, and if the stay does not suspend motion practice, setting a reciprocal briefing schedule for Claimant's pending motions in Doc. 79, including her motion to dismiss under Rule 12(b)(1) and Supplemental Rule G(8)(b), on equal footing with the Government's motion practice;

4. Preserving Claimant's right to seek leave to amend her Verified Claim [Doc. 53] and Answer [Doc. 54] under Federal Rule of Civil Procedure 15(a)(2) and Local Civil Rule 7(i), with the proposed amended pleadings to be lodged with that motion;

5. Striking or disregarding specified exhibits attached to Doc. 91 as set forth in Section III.D;

6. Directing the Government to serve Claimant with Docs. 92 and 93, and with the exhibit c

ited at Doc. 91 page 14 as "Ex. 13," within five (5) days of this Order, and to identify by docket entry and attachment number where "Ex. 13" was filed, or state under oath that it was not filed;

7. Directing the Government to identify the second, redacted wallet address in Exhibit 1 to Doc. 91, and to explain its connection, if any, to Wallet 0x82e;

8. Ordering the Government to file a compliant motion to seal for Docs. 92 and 93, or show cause why it has not done so, within five (5) days of this Order;

9. Directing the Government to show cause why its public filing in Doc. 91 of Claimant's private victim identifiers, law enforcement cooperation correspondence written during a period of acute distress, operational details, and non-party mother-identifying information was not an unreasonable exposure of a cooperating witness to retaliation by a transnational organized crime syndicate; directing the Clerk to restrict public access to Claimant's private email addresses, law enforcement cooperation emails (Exhibits 2-7), Claimant's mother's identifying and financial information, and fraud website addresses and wallet addresses pending further order; and Claimant preserves all claims and remedies arising from this exposure for appropriate adjudication;

10. Protecting Claimant's non-party mother from further public exposure in any filing by any party, and requiring that any future filing by any party referencing Claimant's household redact her mother's identifying information or substitute "non-party family member" unless otherwise ordered;

11. Preserving Wallet 0x82e pending adjudication of Claimant's pending motion for emergency preliminary injunction and bifurcation [Doc. 79]; restraining the Government, any settling claimant, and any party with potential control over the defendant property from moving, distributing, settling, or otherwise disposing of Wallet 0x82e or the assets traced thereto absent further order; and reserving jurisdiction to appoint a receiver under Rule 66 or to bifurcate Wallet 0x82e from any settlement disposition upon application;

12. Directing the Government to file a status report addressing its compliance with the directives in paragraphs 6, 7, 8, and 9 above within ten (10) days of this Order;

13. Preserving all of Claimant's objections, defenses, and claims; and

14. Granting such other and further relief as the Court deems just and proper.

Dated: August 28, 2026

Respectfully submitted,

/s/ Nivedita Kaul

Nivedita Kaul, Claimant, Pro Se
5001 Ramon Road, Building 3 #1005
Palm Springs, CA 92264
Tel: +1 724 413 8167
nivie@digitaldefendersgroup.org

**CERTIFICATE OF CONFERENCE PURSUANT TO LCvR 7(m)**

Pursuant to Local Civil Rule LCvR 7(m), the Claimant certifies that she conferred with counsel for the United States, AUSA Rick Blaylock, U.S. Attorney's Office for the District of Columbia, regarding the relief sought in Claimant's Motion To Defer Ruling On The Government's Motion To Strike [Doc. 91], To Compel Service Of Sealed Filings [Docs. 92 And 93], To Strike Or Disregard Specified Exhibits, For An Extension Of Time, And For Protective Relief. On August 28, 2026, AUSA Blaylock informed Claimant in writing that the Government OPPOSES the relief sought in the Motion.

Dated: August 28, 2026

Respectfully submitted,

/s/ Nivedita Kaul
Nivedita Kaul, Claimant, Pro Se
5001 Ramon Road, Building 3 #1005
Palm Springs, CA 92264
Tel: +1 724 413 8167
nivie@digitaldefendersgroup.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was electronically filed with the Clerk of Court on this 28th day of August 2026 by using the CM/ECF system, which will send a notice of electronic filing to the following CM/ECF participant(s): All Counsel and Parties of Record.

/s/ Nivedita Kaul
Nivedita Kaul, Claimant, Pro Se
5001 Ramon Road, Building 3 #1005
Palm Springs, CA 92264
Tel: +1 724 413 8167
nivie@digitaldefendersgroup.org