# EXHIBIT A

**Exhibit A - Financial Times Video Report Concerning Infiniweb Technology Inc.**

On September 8, 2023, the Financial Times published a video report, "Premier League betting sponsors: closed doors and companies within companies," reported by James Sandy and Taro Yokosawa. It is available at https://www.ft.com/video/4bf67319-ce1e-4d13-a49d-120e12cc7d3d.

**-Transcript Begin-**

You can enable subtitles (captions) in the video player

You see it very, very often, especially in football, betting patches here or there.

Gambling companies not just on the front of shirts, on the side of shirts, the pitch-side hoardings.

You see those strange messages in Thai, Vietnamese, and Chinese, and nobody understands what is going on here.

I don't think the football clubs really realise the provenance of the company that is actually sponsoring their shirt.

Who do the Premier League clubs actually deal with? Are they dealing with the brand?

These companies, they're using shell companies to hide their ownership structure, so the whole thing is a dodge.

I'm a football fan, and like all fans I used to recognise the sponsor on my club's shirt. Nowadays, not so much. The Premier League has the biggest players, the best teams, the widest TV audience. But have clubs been taking money from betting brands who operate in countries where

gambling is illegal? To find out, I teamed up with my colleague Taro from Nikkei in Japan and worked with FT journalists and experts from across Europe.

Illegal gambling is probably today the biggest criminal operation in the world.

This explosion of illegal betting in Asia, the number of illegal betting operators - some of the money being invested in sponsorship in sports clubs could be the proceeds of crime.

Let's start with some context. In China all gambling is illegal except the national lottery and some casinos in a few select jurisdictions. You can't even advertise gambling products, and that's where football comes in. China boasted over 200mn football fans in 2022. That's a lot of eyeballs, making football the perfect platform for overseas advertising aimed at Chinese customers within China.

If one was to run an online... particularly an illegal online operator, and you would like to get yourself or your brand or brands noticed in China, one of the most popular ways or common ways is to advertise on European soccer channels or soccer events.

It's watching that TV coverage, seeing the sponsorship of a betting company, and then that drives people to go online immediately and bet through that betting operator.

So we are putting ourselves in a position where this advertising in a foreign country is facilitating very often illegal activity. Our Premier League is being used as the billboard. It's got to stop.

Just to be clear, we're not saying that every Premier League betting brand targeting Chinese customers is illegal. Advertising gambling products is perfectly legal in the UK, and there are Chinese diaspora communities all across Europe and beyond. But we wanted to know whether it

was these communities that were being marketed to, or whether the money paying for sponsorship deals could ultimately be coming from illegal sources within mainland China.

We also wanted to know how much Premier League clubs - our clubs - really know about the brands they help to advertise. The Premier League doesn't impose its own standards on clubs when it comes to vetting potential sponsors. It's up to each club individually, and none of the clubs we approached were willing to tell us how they go about due diligence in any detail, so we looked into the betting brands themselves and who owns them. What we found was a tangled web of closed doors, dead ends, and companies within companies.

138 was one of the very first brands to try to experiment with a globalisation of that Asian market. People talked about them because they sponsored Watford, for example.

138.com is a new gaming brand. We were looking for a football club to become the shirt sponsor of, that was a club with a plan, going somewhere a little bit different.

The man you just heard from is called Garth Kimber. He was the public face of 138.com when it signed sponsorship deals with Watford FC and Newcastle United in 2013, but he wasn't the owner of that brand. It's not quite that simple. 138.com is just a name. It needs a company behind it to get its gaming licence, file trademarks, register websites, and so on.

In this case, that company was called Fesuge Limited, and the company behind that was Xela Holdings. Garth Kimber was the director of Xela Holdings, but getting at who ultimately owned Xela Holdings - that was our first dead end.

Now, we have to make a distinction between the owner on paper and the actual owner or the actual beneficiary. It could be a company that offers the service of being the public-facing owner, but it is actually held for someone else, or it could be that it is the vehicle that does the administrative work for the ultimate owner of the brand.

We're talking here people who know the system absolutely inside out. They know the people to contact, they know what kind of hurdles you've got to overcome. Believe me, it's actually more complicated than you think.

In 2013, Xela Holdings was described in a trade magazine as the online arm of one of Macau's leading VIP junket operators, Suncity.

Suncity Group has been variously linked to triad groups, has been accused of being a front for money laundering, and its former CEO in January, Alvin Chau, was jailed for 18 years.

He was charged with fraud, involvement in illegal gambling, as well as involvement in organised crime. When we're talking about their online illegal betting in the mainland, Suncity was handling bets worth 1 trillion RMB a year, which exceeded the bets that went through China's national lottery. The rewards are just so huge.

But whether Xela was, in fact, part of Suncity and ran the brand 138.com on its behalf is extremely difficult to prove, and that's because of where it's based. It's on the Isle of Man, a small island in the Irish Sea that has access to the UK market, but with its own government and its own laws.

The Isle of Man has an Act which basically allows you, if you feel uncomfortable revealing your ownership of something, you can nominate a shareholder in your place. So you end up with shell companies. You end up with shell companies that go nowhere because you cannot find out definitively who the owners are.

Everything is like one of those Russian dolls where countless companies are used as screens, companies which are almost always based in tax havens, with the British Virgin Islands being a prime candidate for that.

The British Virgin Islands will afford an extra level of... they won't like me saying this, but secrecy. And if you don't have law enforcement powers it will be much harder to find the information.

So where does this leave us? We knew Xela Holdings was based on the Isle of Man, so we pulled company documents from there. All that told us is that Xela Holdings was owned by another company called Xela (BVI). Where was that company registered? The British Virgin Islands. That means that without a court order we can't access who owned that company or ultimately the people behind Xela and the 138.com brand.

We asked Garth Kimber whether Xela Holdings was ultimately owned by Suncity as the trade magazine from 2013 had claimed. He didn't answer the question directly, but categorically denied any involvement in illegal betting activities and said he had consistently abided by the laws and regulations of all jurisdictions in which he operated. But we found evidence of links between Xela Holdings and a number of Suncity subsidiaries.

There was a dispute with regards to a domain name called sunbet.com, and that really gave us some very interesting insights, more puzzle pieces as to how these companies all fit together. In that dispute Xela Holdings is described as the corporate and regulatory arm of Sun Ventures Development.

This seemingly insignificant line in a 2014 panel decision by the World Intellectual Property Organisation set us on a trail. By looking at Sun Ventures Development Limited, we were introduced to a whole new cast of companies within Suncity's orbit.

There was a whole other universe of Suncity-affiliated companies, and some of these had the word 'Sun' in their name or would use something quite similar to the Suncity logo.

There was a contractor to Sun Ventures Development which filed some corporate filings in the Philippines, and what's interesting there is when you actually looked at the logo that was displayed on the paperwork, it was the same logo, the same sun image that Suncity the Casino group, was using.

Cheuk Wah was the Philippines' licence holder for three Suncity websites from 2008, and when you look at the shareholders of Cheuk Wah one of those shareholders was also on the board of Sun International, which is another Suncity affiliate company.

All of these connections suggest Sun Ventures Development Limited may have been a subsidiary of Suncity which could provide another potential link between Xela Holdings and Suncity itself. We found the LinkedIn profile of the person who represented Sun Ventures Development Limited in the domain name dispute. It suggested that he worked for Suncity at the time, but we couldn't get hold of him. There was no number or email address for him, no response on

LinkedIn. We even tried reaching him through colleagues at his current workplace. Nothing. And again, because of where Sun Ventures Development was registered, we weren't able to get hold of its owners.

Sun Ventures was registered in the British Virgin Islands.

We don't have the shareholders, but we have some names of directors which would suggest that they're probably Asian, but that's where the trail ends.

So we have these connections from Suncity to Sun Ventures Development, from Sun Ventures to Xela Holdings, from Xela to 138.com. We asked Garth Kimber, Watford FC, and Newcastle United about these links. None were willing to comment on them specifically. We did get a statement from Watford which said, 'the club employs a rigorous process of due diligence involving both its internal legal team and external legal advice to ensure absolute transparency where commercial partners are concerned.'

But we still had questions. If there was even the suggestion that these brands could be connected to illegal gambling operations in the Far East, how could they be allowed to advertise in Great Britain? How did they even get their licences? It turns out most of today's Asian-facing betting sponsors gain licences to advertise in the UK through something called a white label.

At its essence, a white label provider applies for and gets a Gambling Commission licence to provide services in the UK market, then it sells its services on to gambling brands that may be based anywhere in the world. And with that, all the due diligence that the Gambling Commission, the regulator, would do into these brands immediately just falls and drops a level.

So the Gambling Commission, just to use this UK example, has made it incumbent upon those white label licence holders to check the sublicenses. But unfortunately, the white labelling system enables the primary licence holder to take responsibility but not actually exercise that responsibility. This is clearly exposed by earlier this year TGP Europe, which is the biggest white labelling operator for most of the betting partners in the Premier League, is hit with a £300,000-plus fine by the Gambling Commission in part because it didn't do enough due diligence on these companies.

With the gambling industry and the way that the white labels operate, it is murky. They are not adequately scrutinised, and I don't think the public know anything about that.

In a compliance and enforcement report, from 2020, the Gambling Commission itself admits there is a concern that unlicensed operators who would potentially not pass the Commission's initial licencing suitability checks are looking to use the white label model to provide gambling services in Great Britain.

Therefore, the Commission insists, it is essential that UKGC licence holders conduct appropriate due diligence checks on their prospective white label partners before entering into a business relationship, but, that ultimately, responsibility for compliance will always sit with the licence holder. So in effect, the Gambling Commission only looks into the white label provider itself and not the partners that provider then deals with.

In this case, that white label provider is TGP Europe. And when we tried to find out who was behind TGP Europe we found a very interesting press release from one of its contractors.

It was announcing a partnership with TGP, and they said part of TGP Holdings which itself is part of the Suncity Group. And when you find that, it's like a eureka moment.

Those allegations that had been floating around in the media for a while I put to both Garth Kimber and to Steve Templeman, who on Companies House, on publicly accessible records is one of the directors of TGP Europe. Both of them categorically denied any links to Suncity or Alvin Chau, but there's very little ways of verifying that because there's not a huge amount that's clear about exactly how their ownership structure works.

Back about a decade ago, 2013/2014, there was a company called TGP Holdings that half-owned TGP Europe whose owners, the real ultimate owners, we didn't quite know. To begin with, it was held in multiple-use shell companies. Then that got changed and the assets were put into trust. The assets have been reassigned as it were, and now it's been dissolved. So we don't really know who the owner of that company, TGP Holdings, was.

The trusts that were used to dissolve TGP Holdings might have stopped us getting to the company's ultimate owners, but they also gave us a clue. They were the same trusts used to dissolve Xela (BVI), the shell company behind Xela Holdings and 138.com. Could the same people be behind both sets of companies, and could that be Suncity?

We found a statement from the Gambling Commission in 2017 in which the regulator called TGP Europe and Fesuge Limited, the company that ran 138.com under Xela Holdings, 'part of a single group of companies'. But when we asked the Gambling Commission what it meant by this, it contradicted the original statement, saying 'they were owned by separate companies that were owned by some of the same owners'.

Then, when I lodged a Freedom of Information request to reveal the names of the companies and owners in question, the Commission decided to withhold that information. Among the reasons it gave, the following really jumped out at me. 'The public trusts that the Commission has robust processes in place to assess operators so that when they use the services provided by an operator, they are confident that there has been sufficient scrutiny of that operator to ensure that they are protected. If this information were released it would undermine that confidence. We consider that the public interest is better served by withholding this information.'

I'm not going to lie. I was pretty stunned by this response. The UK's regulator refused to reveal what it knew about 138.com and TGP Europe's owners, under a Freedom of Information request, because it felt that it would undermine public trust in its ability to do its job. And yeah, after all the effort we'd gone to, it was frustrating to be denied this basic information.

Beyond that, this whole episode raised an even bigger question. If we can't find out who ultimately owned these brands, or even the company behind their licences, then can the clubs really know who they're dealing with? There was evidence from another Asian betting brand that threw this into doubt.

They love having signing ceremonies, and I noticed that there was a couple of guys who were appearing there... chief executive, chief marketing this, chief operating officer, blah, blah, blah, blah, blah... and one of them was particularly present, one Dean Hawkes. He was a male model.

Dean Hawkes didn't respond to our requests for comment, but we could see from his social media that he's modelled for some of the world's leading brands and featured in several Chinese-language campaigns. In 2019, he also featured in promotional videos for major football clubs

across Europe, each time standing in for a genuine CEO or representative of a betting brand called Yabo.

Suddenly, they were everywhere, I mean absolutely everywhere. In terms of the partnerships, the portfolio was unbelievable.

But did the clubs think they were dealing with Yabo, or with somebody else?

One clue was in the Manchester United 2020 Annual Report which describes one of its global sponsors as Tianyu (Yabo). One of the other important documents was the announcement of a prize draw using Yabo as the trade name, but actually behind it is Tianyu Technology. And this was ahead of the 2019-2020 Premier League season.

We don't know how much money Manchester United received in sponsorship funding from Tianyu, and some estimates have put it around about the £3mn mark. So therefore, we would expect there to be quite a lot of money in Tianyu in order to be able to sponsor Premiership clubs, and that wasn't the case. In its first year it made the equivalent of around about £35,000 in revenue. And the following year it was around about the £130,000 mark. That then made us question, is it actually their money that is paying for the sponsorship?

In response to our questions, Manchester United said that the agreement with Yabo, which later rebranded to HTH, complied with UK law, and that before any partnership agreement is completed the club undertakes a thorough internal and external due diligence process. The spokesperson made no mention of Tianyu though, nor any other company behind the brand. So where was the money coming from?

We knew from records found in the Philippines that Tianyu was based in Manila. We also knew the company had placed several job adverts asking for Chinese speakers and lodged alien work permits enabling Chinese citizens to work out of its offices. Why? Could it be that Tianyu's employees were doing something in the Philippines that was illegal in China, and could that be proxy betting?

Because betting in most Asian countries is largely not legal or has very limited legal betting opportunities, people would bet with someone they know, which is an agent, and that agent might handle three customers or five customers or 20 customers. They don't only meet people in bars and pubs to take bets. They open accounts for their customers online. So it was a local business when it's physical, but then suddenly you can have customers across Asia.

So if there's not any casinos in China, or any legal casinos, people are instead using technology to bet via proxy in casinos abroad. It's definitely been something that has been a massive thing in China, and extremely popular, but more and more difficult to control.

One of the easiest ways of operating that they found is also for geographical reasons... is to go to the Philippines. You can acquire a licence there. Then what you do, you take some office space and you move Chinese-speaking personnel into those offices so they can actually interact with the customers.

And then from there, your personal telemarketer, for want of a better term - your personal relationship - they would guide you through the process of accessing the actual gaming platform. They're usually Chinese youths in their mid-20s to early 30s, and that basically reflects the target market segment that they're going for.

Proxy betting is seen as a way for Chinese operators to take bets from customers in mainland China while basing themselves abroad. Or, to put it another way, to break Chinese law while evading the country's authorities. But is this what employees of Tianyu were doing when they traded as Yabo and sponsored Manchester United?

Taro and I contacted as many Tianyu representatives as we could find. Those who were willing to talk to us said they couldn't remember or couldn't provide any details about the company's clients or dealings, but we did find evidence of another gambling operator, also called Yabo, which was dismantled by the Chinese authorities in 2021 for running a cross-border gambling syndicate.

With this Yabo, what the authorities alleged against them was that they had employed senior staff and based them overseas, and that they had also recruited Chinese-speaking staff within China separately to work on some of these operations that were based overseas.

The Chinese authorities were able to identify 80,000 agents working in mainland China - 80,000 - and these agents have themselves affiliates. So it's a pyramidal system, so it becomes incredibly difficult to find out who is doing what.

When they were at their height, in 2019, almost 60 per cent of people working in Philippines Offshore Gaming Operators, or POGOs, were from China, and almost half of all bets placed through them were in Chinese Yuan. Since then, serious crimes attributed to POGOs have quadrupled, including human trafficking and kidnapping.

All of that said, we can't be certain the Yabo brand, which was handled by Tianyu Technology in the Philippines, and which sponsored Manchester United, was in any way connected to the cross-

border gambling Yabo based in China. In fact, the only connection we could find between Tianyu and China at all was a trademark application.

A Chinese company tried to register a Yabo trademark in China and was rejected, but Tianyu managed to register the same trademark in the same year in the Philippines. That didn't help us much, but looking at trademarks gave us much more - more Tianyu brands to investigate and a whole new line of inquiry.

Looking at the trademarks that Tianyu Technology owned, it became apparent that they didn't just own Yabo, but had also registered a whole number of other brands that had sponsored football clubs. It was quite interesting once you started looking at it because the brand ownership would shift.

On the 1st of August, 2022, HTH and Leyu's trademarks passed directly from Tianyu to another Philippines-based company called BOE United Technology. And, just a day later, yet another Manila company applied for the Yabo trademarks previously held by Tianyu.

Now, it doesn't mean that this company is the real company. No, they're just the holder of the licences and the trademarks, but they're owned by somebody else, which is owned by somebody else, which is owned by somebody else, up till the moment where, as per usual, you hit the wall and you can't go further than that. But at least we have a proof that those companies are related.

As we continued to look into this, one of the curious things that we found out was that in fact, Tianyu and the other owners or the registrants of the various brands, weren't in fact gambling operators. They were service providers for gambling operators, which again leads us to the

question, well, if they're only providing services, whose money are they actually using? And in this case, we found that it was another company sitting on top called Infiniweb.

Infiniweb Technology, Inc. seemed like a ghost. The Manila address they gave to the Philippines gaming regulator turned out to be false. Their website could only be accessed with the help of an agent. We did find several Facebook posts where Infiniweb representatives could be seen donating money and supplies to police stations across the Philippines, but none of those receiving the donations were able to offer any contact information for the company itself.

Then there were the company documents. We couldn't find them for Infiniweb Technology, Inc. anywhere in the Philippines, but we did find them somewhere. You can probably guess. The British Virgin Islands. Throughout this entire investigation, the BVI has been the end of the line in our various searches for brand owners.

So at the end of it all, we still don't know who's behind Xela and 138.com, Tianyu and Yabo, or Infiniweb and a host of brands still operating under BOE United Technology. We don't even know the full involvement, if any, of Suncity. And for the clubs, the licence providers, and the regulators who have to deal with these brands, that's a problem.

The fact that it's difficult to uncover who owns these entities, how they are run, how much profit they're making, are they paying taxes, where are they paying their taxes... I mean, clearly, this is something that needs to be looked into a lot more.

Telling us just the brand is one thing. Unless we really know who are the companies that are providing money, who are behind those companies, and whose money or where is this money

coming from, how do we know for sure that the money is clean? How do we know for sure that the due diligence has been done?

For me, any company which hasn't got a transparent chain from operator to owner... it's not right. It's definitely not right.

It is a way for these companies to operate in the British market, but completely outside of British corporate regulation.

These can become international operations far beyond the reach of a gambling regulator or a law enforcement organisation. The problem for enforcement against illegal betting is one simple question - where does the crime take place?

To get proof we would have to, I think, probably invade the British Virgin Islands, seize all the computers, and ask a team of specialists to go through every single company that is registered there to find out the names of who actually owns the thing.

We've gone into a lot of detail in this film - brands, shell companies, licence providers, trademark holders. But why does any of that matter? Because for 10 years now these tools have been used to conceal the true identities of some of football's most visible sponsors. Not just in the Premier League, but in leagues across Europe. We see the name, the brand, but we don't know who's behind it or how it's being paid for. From a legal and transparency perspective, that should be concerning for all of us, but there's another simpler reason why this information should be in the public domain. Fans everywhere deserve to know.

**-Transcript End-**