# EXHIBIT 2

**EXHIBIT 2**

Redline Comparison: Amended Verified Claim (Ex. 1) against Verified Claim (ECF 53, filed March 17, 2026)

Inserted text: blue double underline. Deleted text: ~~red strikethrough~~.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>APPROXIMATELY 225,364,961 USDT<br>Defendant, *in rem*. | Civil Action No. 25-cv-01907-AHA |

**AMENDED VERIFIED CLAIM OF NIVEDITA KAUL**

Claimant Nivedita Kaul submits this Amended Verified Claim pursuant to Supplemental Rule G(5)(a), Federal Rule of Civil Procedure 15, and the Court's September 30, 2026 Minute Order directing her to file a motion for leave to amend by October 14, 2026. Claimant asserts her ownership interest in USDT Token Group G and its substitutes ("Group G" or "Wallet 0x82e," as defined in ¶ 10), protected by the Turkish court's perfected judicial custody and pleaded in ECF 53 as secured by a prior perfected judicial lien; her interests in identified Network Proceeds (as defined in ¶ 12) within the unified Defendant Property; and the interests assigned to her, on the grounds set forth below. This amendment restates and supplements Claimant's original Verified Claim, ECF 53, with the Turkish judicial and prosecution record and the foreign-law analysis of Av. Sami Yavuz described in ¶ 19 (the "Grand Bazaar Network Analysis"). It arises out of the conduct, transactions and property set out in ECF 53 and relates back to the date of that filing.

Fed. R. Civ. P. 15(c)(1)(B). Each ground of interest pleaded below is independent and sufficient on its own, and the grounds are pleaded in the alternative where necessary. Fed. R. Civ. P. 8(d)(2)-(3).

Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions to intervene and assert her interest in Wallet 0x82e1d4ddd636857ebcf6a0e74b9b0929c158d7fb ("Wallet 0x82e"), identified as 'USDT Token Group G' in the Verified Complaint filed by the Plaintiff against Approximately 225,364,961 USDT (the "Defendant Property").

In support, Ms. Kaul states as follows:

1. Ms. Kaul is a United States citizen, a judgment creditor, and a victim of a criminal conspiracy perpetrated between April and December 2022, through which her assets were stolen by members of the enterprise identified in the Government's Verified Complaint in connection with Wallet 0x82e.

2. In January 2023, Ms. Kaul initiated civil debt enforcement proceedings under Turkish law to enforce the debt owed to her by members of this enterprise.

3. As a result of the civil debt enforcement proceedings, Ms. Kaul obtained a Payment Order for Proceedings without Judgment from the Republic of Turkey Azdavay Execution Office on February 6, 2023, against Ling Sun Dylon and Kai Li Kelly, named parties to the Turkish enforcement proceedings, in the amount of 164,096,484.48 Turkish Lira, representing the $8.7 million principal debt also documented in Ms. Kaul's criminal complaint on February 11, 2023. This debt amount is independently confirmed and judicially acknowledged in the indictment filed under Investigation No. 2023/6371. The Payment Order is final and binding, carrying the

legal force of a money judgment under Turkish Enforcement and Bankruptcy Law, entitling Ms. Kaul to proceed directly to attachment and enforcement without further judicial proceedings.

4. Ms. Kaul's total claim is not less than $25,461,000, representing the principal debt, approximately $14.4 million in accrued commercial default interest from February 6, 2023, through the date of this filing, and approximately $2.35 million in legal fees and costs incurred in Turkish proceedings. Per Turkish Commercial Code Article 1530, Ms. Kaul's judgment earns interest at the highest published rate of the Central Bank of Turkey for the period the debt remains unpaid; the highest such rate since the date of default is 53.25% per annum, simple interest. This amount reflects Ms. Kaul's civil debt claim and does not include consequential and other damages as may be awarded by the Turkish criminal court in ongoing criminal proceedings in which Wallet 0x82e is at issue, among others. Ms. Kaul reserves the right to supplement this claim with a detailed interest schedule as the default period continues.

5. Ms. Kaul commenced criminal proceedings in Turkey on February 11, 2023, five days after issuance of the Payment Order, as the statutorily prescribed escalation under Turkish Enforcement and Bankruptcy Law when the enforcement process was frustrated. Tether, in communications to Ms. Kaul's Turkish counsel, had declined to comply with civil enforcement orders on the ground that it would only freeze assets subject to a criminal investigation. Those communications and Tether's refusal to act on civil orders caused the Turkish prosecutor's office to open Investigation No. 2023/6371.

6. Ms. Kaul developed her forensic blockchain analytical capabilities and proprietary methodology independently and identified a key network node through which her assets had been channeled. In March 2023, Ms. Kaul provided this intelligence to Turkish judicial authorities. Acting upon Ms. Kaul's intelligence, Turkish authorities established the foundational

investigative predicate for the Turkish Republic's ongoing criminal prosecution (2023/6371), which verified Ms. Kaul's findings and produced judicial proceedings against the network's controllers. Her intelligence directly produced the August 11, 2023, criminal judicial seizure and preservation of the seized assets, including Wallet 0x82e, the single largest asset among the seven USDT Token Groups now claimed by the U.S. Government. Ms. Kaul's intelligence has led to approximately 70 arrests to date. Ms. Kaul serves as the witness, complainant, party, and investigative originator of the intelligence that led to the identification and preservation of the Defendant Property, establishing her role in this prosecution approximately 9 months before the U.S. investigation began in November 2023.

7. On August 11, 2023, on account of the criminal complaint made by Ms. Kaul, the Ankara West 1st Criminal Judgeship of Peace issued two simultaneous criminal judicial seizure orders arising from Investigation No. 2023/6371. Decision 2023/5985 directed the criminal judicial seizure of assets held at the Binance cryptocurrency exchange. Decision 2023/5986 directed the criminal judicial seizure of Wallet 0x82e through Tether Limited, the issuer and custodian of the USDT held in that wallet, which contained over $101,000,000 in USDT at the time. The criminal judicial seizure order (Decision 2023/5986) attached Ms. Kaul's civil enforcement title to the specific assets of Wallet 0x82e to preserve them against dissipation pending enforcement.

8. Tether confirmed in writing to the Turkish prosecutor on October 11, 2023, pursuant to the criminal judicial seizure order, that Wallet 0x82e is "now frozen."

9. In the 60 days between the issuance of the Turkish criminal judicial seizure order on August 11, 2023, and Tether's written confirmation of compliance on October 11, 2023, approximately $13,500,000 left Wallet 0x82e. Tether's failure to timely comply with a criminal judicial seizure order allowed those funds to be dispersed from Wallet 0x82e.

~~10. Wallet 0x82e contained approximately $87,465,000 in USDT when this forfeiture action was filed, representing 39% of the total Defendant Property. The Government's Verified Complaint alleges that the Defendant Property constitutes~~

## I. PRELIMINARY ALLEGATIONS: THE OWNER'S PROPERTY, PRESERVED THROUGH HER TURKISH PROCEEDING AFTER THE UNITED STATES ABANDONED HER CASE

1. Claimant is the original innocent owner of assets taken from her by the organized fraud whose proceeds are now before this Court, and she is a victim of that fraud. Group G, the largest component of the Defendant Property, exists for forfeiture because of her. After United States authorities abandoned her case, Claimant launched the Turkish proceeding that identified, seized and preserved Group G: the Turkish court seized it by Decision No. 2023/5986 on August 11, 2023, and Tether, the issuer of USDT, confirmed to the Turkish prosecutor on October 11, 2023 that the wallet was "now frozen." The United States obtained no judicial restraint of Group G until its seizure warrant of approximately May 1, 2025, more than twenty months later. ECF 53, ¶¶ 7-8, 25 and 28; ECF 79-5 to 79-7; ECF 1, ¶ 48; ¶¶ 14 and 64-74 below.

2. The United States abandoned the case before Claimant acted and did not tell her why. On the Government's own account, the United States Secret Service ("Secret Service") asked Tether on January 9, 2023 to freeze cryptocurrency subject to its investigation, and "[a] day later, Tether declined." ECF 91 at 5. As reported by Department of Justice attorneys, Tether "initially declined a request to freeze the USDT held in two suspicious wallets," and only "[b]y November" 2023 "told the government it was ready to help." ECF 102-5 at 4. Nine days after Tether's refusal, the Secret Service solicited Claimant's evidence, promising that "secrecy is in our name." On January 27, 2023, Shawn Bradstreet, Special Agent in Charge

of the San Francisco Field Office, received forensic analytics reports explicitly identifying Wallet 0x82e and its $101,000,000 balance; despite being in possession of the specific wallet address that constitutes the largest single asset in this forfeiture action, his office declined to take preservation action. On February 22, 2023, the office told her it had "exhausted preliminary recovery efforts." At no point did it disclose to her that Tether had refused its freeze request or that it had no pathway to recover her funds. Claimant therefore undertook the identification and preservation work herself, and Tether froze Group G on the order of the Turkish court in October 2023, a month before it told the United States it was ready to help. Claimant's personal knowledge; ECF 53, ¶¶ 14-18; ¶¶ 22-27 and 69 below.

3. Türkiye treated Claimant with the dignity owed to a victim and the credit owed to the person who brought the case. Its prosecutor recorded her as complainant and victim, took her formal statement and inspected the outflow evidence she supplied; its indictment of January 10, 2024, Indictment No. 2024/72 in Investigation No. 2023/6371 (the "Indictment"), devotes a tracing section to her, records her loss and charges the organization's fraud "against Complainant NIVEDITA KAUL"; its court examined her through a sworn interpreter with counsel present and admitted her as an intervening party; and its prosecutor has asked the trial court to order that the victims be paid from Group G before any confiscation. The United States, which received the Claimant's work first, sent her no notice of this action although she was a registered victim, placed her private cooperation correspondence and her mother's loss information on the public docket, moved to strike her claim, and told the Court that the door to its settlement "is now closed" to her. Grand Bazaar Network Analysis, sections 7-8, at 14-20, section 10, at 25, and sections 13-14, at 29 (citing

Indictment at 1, 130, 135, 188, 380 and 389); ECF 79-2, ¶ 30; ECF 91 at 4; ¶¶ 30-31, 78-84, 105 and 136 below.

4. The Turkish State has identified Group G as a criminal wallet. Its court seized Group G as property constituting the offense itself. Its prosecutor instructed the Financial Crimes Investigation Board ("MASAK"), Türkiye's financial intelligence unit, to assess the expert report on Group G, and the Indictment, which relies on MASAK's analyses, records Group G as a cold wallet holding "balances subject to the offense, in the nature of proceeds obtained from crime," "used by the criminal organization within the scope of its acts," in which "no clue or evidence was found that the legal and factual connection had been severed." That is the property that Claimant Infiniweb Technology Inc. ("Infiniweb") claims as revenue from gaming and wagering. Claimant is also not the only victim of the Turkish proceeding before this Court: a co-victim identified in the Indictment has assigned that victim's interest to Claimant. ECF 79-5 at 2; Grand Bazaar Network Analysis, section 3, at 6, section 4, at 9, and section 5, at 10 (citing Indictment at 309 and 389); ¶¶ 9, 64-66 and 129 below; Schedule A.

5. The Government now proposes to take the value Claimant preserved and pay part of it to the competing business claimant. It represented that "the government will send Infiniweb back a certain amount of those funds," while stating that "the government and parties are not agreeing to compensate any specific victim any specific amount of money." Transcript of July 23, 2026 Motion Hearing, ECF 84 ("Tr."), at 39:22-40:16. That is a second theft of the recovery and the state-created crisis to which this claim and the assignments respond. Claimant's cooperation was not an assignment of her ownership, an abandonment of her Turkish-law interests, or consent to the appropriation of her work. The Government cannot

appropriate the benefit of a cooperating victim's work, substitute its own recovery process for the judicial process that work produced, and then use her effort to protect the preserved property as a ground for excluding her. The owners' and victims' interests must be adjudicated before any settlement consumes the recovery pool. ECF 53, ¶¶ 18-28; ECF 79-2, ¶¶ 9 and 22-24; ECF 91; ECF 91-5.

6. Claimant's standing rests first on the two interests in Group G pleaded in ECF 53: her ownership interest as the original innocent owner, and her interest in the specific assets of Wallet 0x82e under the Turkish court's perfected judicial custody, which ECF 53 pleaded as a prior perfected judicial lien securing her enforcement title. As the investigative originator of the network-wide Turkish proceeding, Claimant also holds interests in identified Network Proceeds within the Defendant Property, reinforced by the network-wide Turkish restraints and the statutory victim-return priority, together with the property interests assigned to her. Each is an interest in specific, identified property, not a general unsecured claim against the property or estate of another, and each independently supports her standing. At the pleading stage, a claimant need only allege a colorable interest in the property. United States v. $17,900.00 in U.S. Currency, 859 F.3d 1085, 1090 (D.C. Cir. 2017). Group G is the largest identified component of those Network Proceeds now before this Court and the subject of her direct claim. Claimant's investigative origination explains how those interests were acquired and preserved; the operative property allegations follow. ECF 53, ¶¶ 10, 25 and 28.

**II. CLAIMANT, DEFENDANT PROPERTY, AND NATURE OF THE INTERESTS ASSERTED**

7. Claimant Nivedita Kaul is a United States citizen; the original innocent owner of assets taken from her through the organized fraud committed between April and December 2022, and a named victim of that fraud in the Turkish prosecution; the holder of the Turkish

enforcement title described in ¶ 15; and the investigative originator of the network-wide Turkish proceeding. The Indictment lists her as a complainant, devotes a tracing section to her, and charges qualified fraud committed "against Complainant NIVEDITA KAUL." ECF 53, ¶¶ 1, 6, 25 and 28; Grand Bazaar Network Analysis, sections 7-8, at 18-19, and sections 13-14, at 29 (citing Indictment at 1, 188 and 380).

8. Claimant appears in her individual capacity. She asserts her own interests and the interests conveyed directly to her through executed assignments. She does not appear as legal counsel for the assignors or as counsel for Digital Defenders Group ("DDG").

9. The assignors reside throughout the world, not only in the United States, consistent with the international network the Turkish prosecution charges. One assignor is a European citizen and, like Claimant, a victim identified in the Indictment; that victim's interest is before this Court through this claim. Schedule A summarizes the assigned interests: the number of assignors, their aggregate reported loss and its distribution by loss band, and the countries in which they reside. Each assignor's identity, contact details and individual loss amount are withheld from the public record for the assignors' safety. They are recorded in Claimant's complete assignment register, which Claimant will submit to the Court under seal, with a motion under Local Civil Rule 5.1(h)(1), within 30 days after the Court grants leave, or at such other time as the Court directs.

10. The defendant property identified in the Verified Complaint, ECF 1 (the "Defendant Property"), consists of approximately 225,364,961 USDT organized into seven identified token groups constituting the unified Defendant Property, or res, in this action. The seven-group description identifies components of that unified res; it does not define seven unrelated recovery estates. The Government's own complaint pleads the Defendant Property

as the proceeds of a single, unified money-laundering enterprise controlled by common owners. ECF 1, ¶¶ 1, 47, 52 and 195; ECF 53, ¶ 10. Claimant specifically identifies USDT Token Group G as 87,464,642.259005 USDT attributable to Ethereum address 0x82e1d4ddd636857ebcf6a0e74b9b0929c158d7fb ("Wallet 0x82e" or "Group G"). ECF 1, ¶¶ 15, 230.

~~owners (Verified Complaint, paras. 1, 47, 52, and 195). Ms. Kaul reserves all rights to assert her interest in the full pool of proceeds.~~

~~11. Under Turkish law, Investigation No. 2023/6371 is a private prosecution initiated by Ms. Kaul. As a matter of due process, the Defendants have exercised their right to confront Ms. Kaul directly, thereby requiring her continued presence and participation in the proceedings. On November 8, 2023, twelve days before Tether and OKX reported the seized assets to the U.S. Secret Service, Ms. Kaul appeared in person before the Ankara Chief Prosecutor and provided her sworn statement. In her statement, she detailed the incident that led to her investigation, her documented losses, and the basis of her identification of the individuals in Turkey. Ms. Kaul testified not only as the complainant and claimant but was further examined by the Prosecutor on her proprietary forensic blockchain tracing methodology she had developed and applied to identify the critical wallets and connections.~~

~~12. Upon information and belief, Tether retained Turkish counsel who reviewed the criminal proceedings before confirming, in writing, compliance with the Turkish criminal judicial seizure order on October 11, 2023. Forty days later, on November 20, 2023, Tether and OKX reported these same assets to the U.S. Secret Service San Francisco Field Office (Verified Complaint, para. 50). The following day, the Department of Justice announced its~~

~~$4.3 billion resolution with Binance, an exchange already subject to a three-month-old Turkish criminal judicial seizure order.~~

~~13. Tether reported the assets to U.S. law enforcement without notifying Ms. Kaul, without notifying the Turkish court, and without seeking relief from the order it had acknowledged in writing. The U.S. Government's own complaint confirms that "USSS requested that Tether voluntarily freeze" the assets (Verified Complaint, para. 172). To Ms. Kaul's knowledge, the Turkish criminal judicial seizure order remained in force throughout.~~

~~14. Ms. Kaul is the reason the Department of Justice knows about the wallets that are the subject of this forfeiture action. Before Ms. Kaul initiated any action in Turkey, she sought assistance from the U.S. Secret Service, which told her that recovery efforts were not possible.~~

~~15. On January 18, 2023, Ms. Kaul contacted Erin West, Deputy District Attorney, Santa Clara County, CA,~~

11. Within that unified res, Claimant's direct claim is to Group G: she asserts her ownership interest, protected by the Turkish perfected judicial custody and, as pleaded in ECF 53, secured by a prior perfected judicial lien, in Group G, the replacement tokens issued for its value, identifiable proceeds of that property, and the earnings attributable to it. Those interests attach to Group G as a whole, the entire restrained content of the wallet, not to particular units traceable to a particular deposit. The original units and the replacement units represent the same identified value, as the Government explained at the July 23 hearing. Tr. 12:11-19, 13:18-20.

12. Claimant also asserts her interests in the identified proceeds of the charged network, in whatever asset form they are held, including the remaining token groups of the unified res,

their substitutes, and network assets located elsewhere ("Network Proceeds"). Her interests within the unified res include the interests assigned to her described in Schedule A. Claimant is the investigative originator of the network-wide Turkish proceeding, not of a single wallet: the February 28, 2023 order restrained the network's addresses before Group G was placed in custody, and the Turkish proceeding continues against the network's assets in whatever form they are held. The property relationship is established through network topology: on-chain transactions, exchange-account attribution, organizational control, bank and payment records, off-chain movements, common collection and conversion infrastructure, and identifiable proceeds and substitutes. A single blockchain address or selected transaction path is not the boundary of the offense or of the interests asserted. Claimant's direct claim in this action is to Group G; her interests in the remaining Network Proceeds within the unified res, and in further identified proceeds of the same network wherever located, are asserted and reserved, as pleaded in ECF 53, ¶ 10.

13. The Government itself relies on network relationships rather than an unchanged token path: its complaint describes common controllers, shared IP addresses, transaction counterparties, pass-through exchange accounts, circular movements and layers of intermediaries. It states that many accounts did not receive funds directly traceable by LIFO in the same manner, but received them through other accounts in the group. It further alleges that the intermediary groups and the subject addresses moved hundreds of millions of dollars "back and forth between each other in a manner that appears consistent with the repeated efforts to conceal the nature, location, source, ownership, and control of crime proceeds, and frustrate law enforcement's tracing efforts." It also acknowledges that the network's consolidation and intermediary addresses "redirect the LIFO order" on which its own tracing relies, and

that funds reached Group G through two such consolidation addresses. A claimant cannot be held to a single-path tracing standard that the Government itself pleads the network was built to defeat. Claimant invokes the same structural evidence together with the Turkish on-chain and off-chain record. ECF 1, ¶¶ 49, 51-57, 64-66, 73-84, 176, 196, 229 and footnote 14.

14. Claimant holds two independent interests in Group G, each pleaded in ECF 53 and each sufficient on its own. (a) Ownership: Claimant is the original innocent owner of the assets taken from her through the charged fraud and of their identified proceeds, and has had, and continues to have, an ownership interest in the assets of Wallet 0x82e. (b) Perfected judicial custody and judicial lien: Decision No. 2023/5986 D.Is., issued August 11, 2023 in the proceeding opened on her complaint, placed Group G under perfected judicial custody more than twenty months before any United States seizure warrant. Under Turkish law, that custody is a final determination of the custody question requiring no further perfection step. ECF 53 pleaded the same position as a prior perfected judicial lien on the specific assets of Wallet 0x82e securing Claimant's enforcement title; to the extent the Court classifies the custody-protected interest in the categories of United States law, Claimant pleads in the alternative that it is such a lien, an interest that 18 U.S.C. Section 983(d)(6)(A) expressly includes. Both interests are reinforced by the Turkish judicial restraints issued in Investigation No. 2023/6371 beginning February 28, 2023, and by the statutory victim-return priority governing the restrained property under Article 131 of the Turkish Code of Criminal Procedure ("CMK") and Article 55(1) of the Turkish Penal Code ("TCK"). The Turkish proceedings are the foundation of this claim: the network-wide orders remain in

force and were not limited to a single wallet, and Group G is the identified component of that continuing network custody that is now before this Court. ECF 53, ¶¶ 7, 25 and 28.

15. Claimant's loss is also liquidated in the Payment Order for Proceedings without Judgment issued by the Republic of Turkiye Azdavay Execution Office on February 6, 2023, No. 2023/9 Esas (the "Payment Order"), for TRY 164,096,484.48, representing the USD 8,700,000 principal debt also documented in Claimant's February 11, 2023 criminal complaint, acknowledged in the Indictment, and reported as her loss throughout the Turkish proceedings. As pleaded in ECF 53, the Payment Order is final and binding and carries the legal force of a money judgment under the Turkish Enforcement and Bankruptcy Law, entitling Claimant to proceed directly to attachment and enforcement, and Claimant's claim is not less than USD 25,461,000, comprising the principal debt, accrued commercial default interest from February 6, 2023 at the highest published rate of the Central Bank of the Republic of Turkiye under Turkish Commercial Code Article 1530, and legal fees and costs incurred in the Turkish proceedings; that interest continues to accrue while the debt remains unpaid. Claimant's claim is the USD 8.7 million principal together with every other head of loss and recovery pleaded in ECF 53, including accrued interest, Turkish legal fees and costs, the consequential and other damages that the Turkish criminal court may award, and the fees, costs and interest recoverable under 28 U.S.C. Section 2465. Claimant reserves all losses and damages of every kind arising from the fraud and from the matters pleaded in this claim; no amount stated here caps her recovery. The Payment Order is pleaded for the amount of Claimant's loss, for her diligence in pursuing it and, in the alternative pleaded in ¶ 14(b), as the enforcement title secured by the Turkish custody. It is not the source of her

ownership interest in Group G, which rests on ¶ 14(a). ECF 53, ¶¶ 3-4, 28 and 29; Grand Bazaar Network Analysis, section 13, at 29.

16. Claimant further preserves equitable recovery and reimbursement interests arising from identification and preservation of the common property, and independent rights in her proprietary investigative product, including claims against any person or entity, public or private, for its misappropriation, unauthorized use or disclosure, or false attribution. Those interests and their distinct remedy pathways are stated in Parts XII and XIII below. The direct and assigned victim-recovery pool is separately accounted for from any personal compensation sought for Claimant's investigative work.

17. Claimant's original Verified Claim was filed through then-counsel on March 17, 2026, as ECF 53. Her Answer was filed on April 7, 2026, as ECF 54. On September 30, 2026, the Court directed: "Claimant Kaul shall file her motion for leave to amend her claim by October 14, 2026." This amendment is submitted with that court-directed motion. The Government did not move against ECF 53 for nearly five months. At the July 23, 2026 hearing, the Court described it as a filed claim "that's not been stricken," and, asked whether Claimant's claim had been objected to as untimely, Government counsel answered: "we may strike her, and the government intends to strike her." Tr. 54:3-5, 56:23-57:1. The Advisory Committee Note to Supplemental Rule G(8)(c) provides that "the court should strike a claim or answer only if satisfied that an opportunity should not be afforded to cure the defects under Rule 15."

18. Claimant maintains her objections to the exercise of in rem jurisdiction over Group G, stated in ECF 54 at 33, Affirmative Defenses 2-3, and raised by motion in ECF 79. Those objections were both stated in her Answer and made by motion and are preserved under

Supplemental Rule G(5)(b). Nothing in this amendment waives, withdraws or narrows any objection, defense, motion or request stated in ECF 53, 54, 79, 89, 94, 97, 98 or 102. Her participation and amendment do not surrender those preserved objections or consent to the Government's asserted right to dispose of the prior-restrained property. Claimant's position is that Group G remains under the prior, operative custody of the Turkish court; that the United States acquired it through the token issuer without any request to or relief from that court and without invoking 28 U.S.C. Section 2467 or mutual legal assistance; and that the Court should decline to exercise in rem jurisdiction over Group G in deference to that custody. The interests pleaded in this claim are asserted in the alternative and without waiver of that position. See ¶ 124.

19. The foreign-law source for the Turkish-law allegations is Av. Sami Yavuz, Review of Turkish Case-File Materials and Analysis of Their Legal Consequences, October 12, 2026, filed as Exhibit 3 to Claimant's motion for leave to file this Amended Verified Claim, prepared for reliance in this action by an attorney registered with the Istanbul Bar Association, Registration No. 80156. Claimant gives notice under Federal Rule of Civil Procedure 44.1 that the nature, operation, preservation and disposition of the Turkish-law interests described in this claim present issues of foreign law, which the Court determines as a question of law and on which it may consider any relevant material or source, including testimony. The analysis examines issued judicial decisions, prosecution and hearing records, exchange correspondence and MASAK findings, translates selected operative passages, and applies identified Turkish statutes to those actual records. It is a record-based analysis of existing acts and their legal consequences, not commentary on hypothetical transactions.

20. The Grand Bazaar Network Analysis identifies the underlying records and their pinpoint pages. Turkish case-file records referred to in this claim, including the Indictment, the MASAK reports of December 26, 2023 (the "December MASAK Report") and September 11, 2023 (the "September MASAK Report"), petitions, examination and hearing records, and the enforcement instruments, are not annexed; they are cited through the Grand Bazaar Network Analysis, which identifies and examines them. A citation in the form "Grand Bazaar Network Analysis, section __, at __ (citing Indictment at __)" refers to the section and page of the Grand Bazaar Network Analysis and to the page of the underlying record that it identifies. Capitalized functional descriptions of wallets and accounts, including the Common Collection Wallet, Intermediate Transfer Wallet, Member Exchange Account and Manager Exchange Account, have the meanings given to them in the Grand Bazaar Network Analysis. Decisions Nos. 2023/2001 D.Is. and 2023/5985 D.Is., each with an English translation, are annexed as Exhibits A and B. The public custody anchors are already filed as ECF 79-3 through 79-7. The analysis uses neutral functional descriptions for protected wallets, accounts and persons. The MASAK reports are marked classified GIZLI, and access is governed by Turkish law and the competent Turkish authority. If the Government seeks originals or fuller records, it should request them directly from the competent Turkish authorities through applicable official cooperation channels. Claimant cannot be required to violate Turkish restrictions on disclosure as the price of asserting her property interests, and established inability to produce foreign-protected records despite good-faith efforts does not justify dismissal under Rule 37. Societe Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197, 211-12 (1958). A protective order in this action does not itself authorize disclosure contrary to Turkish law.

Grand Bazaar Network Analysis, section 1, at 2, and section 11, at 26; CMK Articles 153, 157 and 234; Law No. 6706.

**III. ORIGINATION, UNITED STATES COOPERATION, AND THE GOVERNMENT'S PRIOR KNOWLEDGE**

21. Claimant developed her forensic blockchain analytical capabilities and investigative methodology independently after the 2022 fraud. She identified a common collection wallet and substantial outflows to a Turkish exchange and instructed Turkish counsel to pursue preservation and recovery on the basis of that analysis. ECF 53, ¶ 6; Grand Bazaar Network Analysis, section 7, at 14-18.

22. On January 18, 2023, Claimant contacted Erin West, then a Santa Clara County Deputy District Attorney and REACT Task Force coordinator, following ~~Ms.~~ West's public solicitation of ~~cryptocurrency crime victims. Ms. West referred Ms. Kaul to Agent Andrew Frey, U.S. Secret Service~~ cryptocurrency-crime victims. West referred Claimant to Andrew Frey, a Financial Analyst (Forensics) in the United States Secret Service's San Francisco Field Office, describing him as "the best in the nation." ECF 53, ¶ 15.

~~16. On January 19, 2023, Agent Frey directly solicited Ms. Kaul's evidence, promising~~

23. On January 19, 2023, Frey solicited Claimant's evidence and stated that "secrecy is in our ~~name—we'll~~ name - we'll treat your information with the utmost care." By January 30, ~~2023, Agent Frey confirmed~~ he confirmed that his office was "working on getting your transactions traced." Claimant supplied the requested evidence in reliance on that cooperation and confidentiality undertaking, for the limited purpose of recovering victims' funds. She did not license its commercial use, its public disclosure or its attribution to others. ECF 53, ¶ 16; ECF 94-2 at 2; ECF 91-4.

~~17.~~

24. On January 27, 2023, Shawn Bradstreet, Special Agent in Charge of the San Francisco Field Office, received forensic analytics reports explicitly identifying Wallet 0x82e and its $101,000,000 balance. Despite being in possession of the specific wallet address that constitutes the largest single asset in this forfeiture action, SAC Bradstreet's office declined to take preservation action. The Group G address was thus before United States law enforcement more than six months before the August Custody Decision. ECF 53, ¶ 17; ECF 79-2, ¶ 9(c); Grand Bazaar Network Analysis, section 11, at 27.

18. On January 29, 2023, Ms. Kaul alerted Ms. West that

25. On January 29, Claimant warned West that the funds needed to be frozen "before they disappear," and she was redirected back to Agent Frey. By disappear" and was redirected to Frey. On February 22, 2023, Agent Frey stated that his the office had "exhausted preliminary recovery efforts" and that "recovery... is not possible here." Even after Ms. Kaul provided forensic recovery "via more straightforward tracing and processes is not possible here." ECF 53, ¶ 18; ECF 91-5. When soliciting and receiving Claimant's evidence, the Secret Service did not disclose to her that it had no pathway to recover her funds, or that Tether had declined its January 9, 2023 request to freeze cryptocurrency subject to its investigation. Claimant's personal knowledge; ECF 91 at 5; ECF 102-5 at 4.

26. Claimant supplied additional findings and transaction records to FBI Agent Majors in March 2023 and reported that new funds were entering the wallets, Agent Frey, in April 2023, maintained funds continued to enter the wallets. In April, Frey maintained that there was "no ongoing work specific to your loss." ECF 53, ¶ 18.

19. On June 5, 2023, Ms. Kaul escalated the matter to Agent Majors, requesting that the FBI

27. On June 5, 2023, Claimant asked Agent Majors to "remedy a potential operational error by USSS" in closing the case. She reported that international recovery efforts were underway, including collaboration with three international law firms and pursuit of United Kingdom law-enforcement intervention because the network crossed multiple countries. ECF 53, ¶ 19. her case. In that communication, Ms. Kaul disclosed that she was "collaborating with 3 international law firms that have verified this evidence as actionable and are escalating U.K. law enforcement intervention overseas since the case crosses multiple countries."

20. On June 6, 2023, Ms. Kaul provided Agent Frey with forensic documentation of a frozen and blacklisted wallet traceable to the same network described in the Government's complaint and requested that her restitution claim be staked within any enforcement action that had produced the freeze. Agent Frey, copying Ms. West, responded that Ms. Kaul's funds were not recoverable from that address under the accounting methodology his office applied. No preservation action was taken on her behalf.

21. The same day, Ms. Kaul provided

28. On June 6, 2023, Claimant e-mailed Frey, under the subject "Good news - DBEX seizure," that the target account into which her funds had gone was "frozen and blacklisted"; she identified the "TARGET WALLET ADDRESS: 0x450195A34602FA0f8F1eaa82646ABeAd93641953," linked her recorded video walkthrough of her analysis, and asked that her claim be staked for restitution from those funds. The Government filed that e-mail as Exhibit 6 to its motion to strike. Frey, copying West, replied the same day that Claimant's funds were "not part of the current balance in this wallet address, according to the accepted accounting methods we utilize," while stating that the address had received "55,988.74 USDT in proceeds traceable to your fraud," which

he said were then expended in smaller outgoing transfers. That address is not one of the seven subject addresses in this action, and the reply predates by five months the investigation that the Verified Complaint says began in November 2023. ECF 91 nonetheless captions the reply "Funds Dissipated" and relies on it for the assertion that the Secret Service "advised Kaul that her property did not trace to the defendant property." The reply concerns different property and does not address Group G. ECF 91 also states that Government counsel informed Claimant that "her loss may be traceable to an action in the District of Colorado." That action is United States v. 12,324.84 USDT Seized from Binance.com User ID # 2974, et al., No. 1:23-cv-02549 (D. Colo. filed Sept. 29, 2023) (the "Colorado Action," whose verified complaint is cited as "Colo. Compl."). Less than four months after Frey's reply, FBI Special Agent Daniel Heether verified the complaint in that action, which traces victim funds through the address beginning 0x450195A3 to a seized Binance account named as a defendant. The Government cannot treat its June 6 reply as showing that Claimant's funds do not trace here after relying on a chain through the same address to forfeit network proceeds in Colorado. ECF 53, ¶ 20; ECF 91 at 13, 19; ECF 91-6; ECF 91-7; ECF 1, ¶¶ 15 and 50; ECF 79-2, ¶ 30; Colo. Compl. ¶¶ 49-50 and Verification.

29. The same day, Claimant supplied her forensic materials to Brian R. Lewin, Special Agent in Charge, U.S. Secret Service Honolulu Field Office. SAC Lewin confirmed in writing that Ms. Kaul had been sent to the wrong jurisdiction by Ms. West, "Generally, the complaint is taken where the victim resides... which falls under our Los Angeles Field Office." SAC Lewin also noted, "Andrew is probably one of our best in USSS. Andrew is who we go to when we get stuck. If Charge of the Secret Service's Honolulu Field Office. Lewin stated that the complaint ordinarily belonged where the victim resided, within the Los Angeles

Field Office's territory, and that Claimant had been directed to the wrong jurisdiction. He also wrote: "If either SF or SJ is saying they hit a dead end, that's not good." ECF 53, ¶ 21.

SAC Lewin subsequently transferred to the U.S. Secret Service Los Angeles Field Office in July 2023; no corrective action was provided.

22. Following the June 2025 seizure, SAC Bradstreet publicly stated that the funds should "be returned to their rightful owners." His office held forensic identification of Wallet 0x82e and its balance for 29 months without taking preservation action. The U.S. Secret Service San Francisco Field Office is the same office that declined to act on Ms. Kaul's intelligence in 2023 and subsequently led the investigation initiated after Tether's November 2023 report.

23. On June 24, 2023, 19 days after receiving Ms. Kaul's written disclosure of international recovery efforts, the FBI registered her in the Department of Justice Victim Notification System (VNS). Ms. Kaul was assigned a Victim Identification Number (VIN) under the Los Angeles Division. Her case was subsequently transferred to the FBI Denver Division in October 2023, with the Government providing VNS updates through July 2024.

24. The Government possessed Ms. Kaul's complete identity, Victim Identification Number, and FBI case number, yet did not notify her of this forfeiture action. Ms. Kaul believed that the Turkish court's criminal judicial seizure order on Wallet 0x82e remained in place; and, indeed, nothing in the Turkish proceedings to which she is a party indicates that such order has been vacated.

25. Ms. Kaul has had, and continues to have, an ownership

30. On June 24, 2023, the FBI registered Claimant in the Department of Justice Victim Notification System and assigned a Victim Identification Number under its Los Angeles

Division. In October 2023, she was informed that her case had been transferred to the Denver Division assigned to Heether, and she received Victim Notification System updates through July 2024. ECF 53, ¶ 23.

31. The Government consequently possessed Claimant's identity, contact information, victim-registration information and the wallet intelligence she supplied. Supplemental Rule G(4)(b)(i) required the Government to send direct notice of this action to any person who reasonably appeared to be a potential claimant on the facts known to it. On those facts, Claimant was such a person: she had supplied the network's wallet and transaction intelligence to the Secret Service and the FBI, had asked that her restitution claim be recorded in any enforcement action, and was a registered victim in the Department of Justice's own notification system. The Government sent her no direct notice of this action. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 318 (1950). Her understanding was that the Turkish custody protecting Group G remained operative, as the continuing Turkish record confirms. ECF 53, ¶ 24; ECF 79-2, ¶ 22.

32. The prior cooperation, repeated preservation requests, formal victim registration and absence of direct forfeiture notice are material to the Government's timeliness challenge and Claimant's request for consideration of the amended claim. The amendment supplies the complete property relationship in the procedural vehicle directed by the Court; it does not abandon the original notice and filing chronology. To the extent any claim deadline is held to have run, the Government's failure to send the direct notice the Rule required, its knowledge of Claimant and her interest, the absence of prejudice to it, and Claimant's continuous pursuit of the property establish good cause under Supplemental Rule G(5)(a)(ii). See United States v. $83,686.00, 498 F. Supp. 2d 21, 24-25 (D.D.C. 2007); United

States v. All Assets Held at Bank Julius Baer & Co., 664 F. Supp. 2d 97, 102 (D.D.C. 2009).

33. The assigned interests are asserted through Claimant's claim and relate back to ECF 53. To the extent required, the circumstances pleaded in ¶ 32, together with each assignor's participation in the pre-existing recovery effort, establish good cause under Supplemental Rule G(5)(a)(ii).

34. The Government's complaint dates the origin of its investigation to November 2023, describes an approximately November 20, 2023 voluntary-freeze request, and states that its seizure warrant issued on or about May 1, 2025. ECF 1, ¶¶ 48, 50, 172.

35. On the Government's pleaded chronology, the issuer report identified the pool before the later tracing exercise: Tether, working with OKX, a virtual currency exchange, reported approximately USD 250 million in USDT to the Secret Service in November 2023; the voluntary freeze request followed on or around November 20. Tether and OKX had already received and responded to requests in the Turkish proceeding opened on Claimant's complaint. Claimant's position is that the United States entered an existing preservation and information pathway, not an evidentiary vacuum. ECF 1, ¶¶ 50 and 172; Grand Bazaar Network Analysis, sections 4, 7 and 9, at 9, 15, 21-22 (citing Indictment at 309); ECF 79-4, 79-6 and 79-7.

36. ECF 91 instead invokes a January 9, 2023 voluntary-freeze request concerning two addresses linked to OKX accounts. The disclosed address is the address the complaint identifies as Token Group A; another line is redacted, and Tether declined the request. The disclosed request does not identify Group G or an earlier judicial restraint of Group G. ECF 91 at 5-6; ECF 91-1; ECF 1, ¶ 15; Grand Bazaar Network Analysis, section 11, at 27.

37. The Government's own accounts of when its investigation began conflict: its Verified Complaint states that it began "[i]n November 2023," while its motion and its counsel at the hearing date it to January 9, 2023. ECF 1, ¶ 50; ECF 91 at 5; Tr. 16:9. Whatever investigation the January 9 correspondence describes, the Government's sources identify no United States judicial custody of Group G predating the Turkish decision. The unsuccessful voluntary request does not displace the judicial preservation chain pleaded below.

## IV. THE NETWORK-WIDE TURKISH PROCEEDING AND SUCCESSIVE JUDICIAL RESTRAINTS

38. In January and February 2023, Claimant initiated Turkish civil enforcement and obtained the Payment Order described in ¶ 15. Tether declined to act on civil enforcement orders, stating that it would freeze only assets subject to a criminal investigation; the criminal complaint followed as the statutorily prescribed escalation under the Turkish Enforcement and Bankruptcy Law. ECF 53, ¶¶ 2-5.

39. On February 11, 2023, Claimant, through Turkish counsel, lodged a criminal complaint with the Ankara Bati Chief Public Prosecutor's Office requesting identification of the perpetrators and blocking of the identified assets. The complaint recorded a loss of USD 8.7 million and stated that the organization's wallets had been identified through expert work. ECF 79-3 at 2; Grand Bazaar Network Analysis, section 7, at 15 (citing December MASAK Report at 6-7 and Indictment at 135).

40. Investigation No. 2023/6371 is the public criminal investigation and prosecution opened on that complaint and evidence. Claimant is its complainant, victim, witness, investigative originator and admitted intervening party. The prosecutor exercised the statutory investigative and charging functions under CMK Articles 160 and 170. Grand Bazaar Network Analysis, sections 7-8.

41. On February 20, 2023, acting on the complainants' wallet list, the prosecutor instructed a Turkish exchange, Binance and Tether to block identified assets and provide ownership information. Tether replied on February 22 under Ticket No. 365109. These steps coincided with the Secret Service's statement that its preliminary recovery efforts were exhausted. ECF 79-4 at 2; Grand Bazaar Network Analysis, section 7, at 15 (citing Indictment at 136 and December MASAK Report at 7); ECF 91-5.

42. On February 28, 2023, the Ankara Bati Second Criminal Judgeship of Peace issued Decision No. 2023/2001 D.Is., restraining forty-four identified Ethereum wallets held at Binance. The prosecutor's request recited that the assets were obtained from the events complained of by victims' counsel, and the Judgeship granted the restraint under CMK Articles 123 and 127. Grand Bazaar Network Analysis, sections 2 and 7(3), at 3, 16; Exhibit A (Decision No. 2023/2001) at 1-2.

43. The February 28 decision established the initial judicial restraint of identified proceeds in the network. Claimant's standing theory proceeds from this network identification and preservation chain, rather than treating the later Group G decision as an isolated event disconnected from the preceding investigation.

44. On March 7, 2023, the complainants sought seizure of identified Tether wallets to remedy their victimization and prevent dissipation of the organization's benefit. The prosecutor's urgent letter warned Tether that perpetrators could rapidly transfer the assets and requested blocking as a matter of great urgency. ECF 79-4 at 2-5; Grand Bazaar Network Analysis, section 7(4), at 16 (citing December MASAK Report at 10).

45. On March 14, 2023, Decision No. 2023/2480 D.Is. restrained the Member Exchange Account and a TRON wallet. The account was linked to the Common Collection Wallet identified by

Claimant. Grand Bazaar Network Analysis, section 7(5), at 16 (citing December MASAK Report at 8 and 20 and Indictment at 147).

46. On March 18, Claimant separately reported that the defrauded funds had moved into the Manager Exchange Account and requested its blocking. The Indictment records that, on that application, the prosecutor instructed the exchange to block the account and supply ownership and transaction information; the account holder was identified on March 21. Decision No. 2023/3506 D.Is. restrained that account on April 11. As the Grand Bazaar Network Analysis records, "[t]his step was Ms. Kaul's alone." Grand Bazaar Network Analysis, section 7(6), at 16-17 (citing December MASAK Report at 8).

47. On April 12, 2023, Claimant's petition supplied transfer listings tracing her funds through intermediary wallets into the Common Collection Wallet. MASAK's December graph follows the same wallets in the same sequence and reproduces the same opening transfer totals. Grand Bazaar Network Analysis, section 7, at 17-18 (citing Claimant's April 12, 2023 petition and its annex EK-1, December MASAK Report at 55, and Indictment at 188).

48. Scientific and legal opinions obtained before the August decisions examined a transfer route through the Common Collection Wallet and concluded that its factual and legal connection had not been broken. Yavuz identifies the opinions of Associate Professor Mete Tevetoglu dated June 20, 2023, and Associate Professor Pinar Caglayan Aksoy dated July 11, 2023, with their relevant passages. Grand Bazaar Network Analysis, section 7, at 18.

49. On August 11, 2023, the Ankara Bati First Criminal Judgeship of Peace issued Decision No. 2023/5985 D.Is., restraining approximately 426 Binance wallets, including thirteen previously restrained under Decision No. 2023/2001, and Decision No. 2023/5986 D.Is., restraining twelve Tether wallets, including Group G. Each instrument has its own identified

property; together they establish the successive network-preservation record. Exhibits A and B; Grand Bazaar Network Analysis, section 2, at 3-4.

50. The Binance investigation was a separate, documented arm of the same complaint-driven network inquiry. On the February 20 wallet list, the prosecutor directed Binance to block identified assets and provide ownership information; the February 28 decision restrained forty-four Ethereum-protocol wallets held there. The August 11 companion decision expanded the Binance restraint to approximately 426 listed wallets, thirteen already covered by the February decision. Grand Bazaar Network Analysis, sections 2 and 7(2)-(3), at 3-4, 15-16; Exhibits A and B.

51. Binance's communications supplied account and investigative context. The Indictment records that Binance reported false-identity or "potato" wallets on its platform and that the same fraud events were pending investigation in three judicial units in the United States. Grand Bazaar Network Analysis, section 4, at 9.

52. MASAK's graphs connect the Common Collection Wallet and Intermediate Transfer Wallet to accounts at Binance and Turkish exchanges held by persons identified in the Indictment as managers and members of an organization. The Binance orders are therefore presented with the ownership, control and conversion evidence that explains their place in the network-preservation chain. Grand Bazaar Network Analysis, sections 5-6, at 10-11 (citing December MASAK Report at 25, 59 and 145 and Indictment at 313).

53. OKX separately reported in its August 18, 2023 letter that its Seychelles entity had filed a suspicious-transaction report with the Seychelles Financial Intelligence Unit. The Indictment also records OKX's information about false-identity wallets on its platform. Grand Bazaar Network Analysis, section 4, at 9.

54. The Turkish proceeding prosecutes the organization and its proceeds system. For purposes of this claim, "Network Proceeds" means identified assets attributable to that organized fraud-and-laundering system and their identifiable converted forms, economic gains and substitutes. TCK Article 55(1) reaches economic gains resulting from investment or conversion of criminal benefits. Grand Bazaar Network Analysis, sections 4-6, 12 and 14.

55. The proceeds system is asset-form agnostic: the Indictment and MASAK analyses describe cryptocurrency converted into lira, cash, gold and physical United States dollars. The source analysis follows the connected accounts, management and conversion infrastructure, not merely the original medium transferred by a victim. Grand Bazaar Network Analysis, sections 4-6, at 7-14.

56. The charged network is international. The Turkish prosecution records proceeds from fraud "both abroad and in Turkiye," and organizational capacity to commit fraud and laundering domestically and internationally. Claimant's worldwide cohort corresponds to that cross-border proceeds system. The Court's adjudication of identified property interests must address that actual network and the scheduled holders, not reduce the victim class to United States residents. Grand Bazaar Network Analysis, section 4, at 9, and section 6, at 11 (citing Indictment at 377); Schedule A.

57. The December MASAK analysis records approximately USD 22 million moving from the Common Collection Wallet to the Intermediate Transfer Wallet between January 13 and April 28, 2023, and approximately USD 5.77 million moving onward into the Manager Exchange Account. The Indictment's earlier expert analysis covers a different period on the same route. Grand Bazaar Network Analysis, sections 5 and 7, at 10-11, 17 (citing December MASAK Report at 25 and Indictment at 147-148).

58. MASAK expressly explains that only one of the many addresses to which Claimant made transfers was drawn at page 55 to simplify the graph. Other diagrams follow additional manager, member, exchange and conversion paths. A simplified illustration is not a finding that the underlying fraud or Claimant's property relationship traveled through only one address. Grand Bazaar Network Analysis, section 6, at 11, and section 7, at 17 (citing December MASAK Report at 55 and n. 3, 59, 77, 116 and 145).

59. The Indictment records the expert finding that the factual and legal connection between the relevant wallets and the defrauding of the victims "was at no stage broken." MASAK confirms the management-level route and identifies the common conversion node. Grand Bazaar Network Analysis, sections 5-7, at 10-11, 17 (quoting Indictment at 152).

60. The December report records approximately TRY 6.3 billion transferred into a gold company within the alleged leader's group. The September MASAK report identifies intensive one-directional transfers into the same group's currency-and-gold infrastructure and records the M80-coded internal tracking system. Grand Bazaar Network Analysis, section 6, at 11-14 (citing the December MASAK Report and the September MASAK Report).

61. Those primary-record leadership, company, conversion-node and accounting-system links connect Claimant's route to the wider Grand Bazaar laundering infrastructure. The July 2026 public reporting described in ECF 102 and the Grand Bazaar Network Analysis concerns an expanded investigation and Indictment involving that infrastructure. ECF 102, ¶¶ 20-23; Grand Bazaar Network Analysis, sections 6 and 14.

62. Claimant preserves supplementation as further Network Proceeds are identified and subjected to judicial restraint or recovery. The estate of identified proceeds continues to develop through the prosecution and financial analysis; the additional identification of assets does

not erase the earlier judicial preservation or the victim-return interest in the proceeds already identified.

63. Claimant seeks a focused evidentiary examination of the competing reconstruction methods, including completeness of transaction inputs, multiple-path treatment, account ownership and organizational attribution, exchange-internal transfers, bank and cash conversion, commingling assumptions, period selection and reproducibility. The Government's chosen accounting method must be tested against the combined record, rather than used to exclude the off-chain and organizational evidence that identifies the proceeds system. Under the Turkish law governing the custody, neither the CMK nor the TCK prescribes an accounting convention, such as last-in, first-out, for attributing crypto-assets to an offense; attribution is a matter of evidence. ECF 1, ¶¶ 73-84; ECF 79; Grand Bazaar Network Analysis, sections 5-7 and 10, at 23; CMK Article 217(1)-(2).

## V. GROUP G: PERFECTED JUDICIAL CUSTODY, EXECUTION, AND CONTINUING PROTECTION

64. Decision No. 2023/5986 D.Is. was issued on August 11, 2023, after the Judgeship examined the prosecutor's request and investigation file. The request concerned organized criminal activity, qualified fraud and theft through information systems, and laundering under TCK Article 282. ECF 79-5 at 2-5; Grand Bazaar Network Analysis, section 2, at 3-4.

65. The decision records that organization members held the virtual assets obtained from the events complained of by victims' counsel and used those wallets in their acts. It granted the prosecutor's request under CMK and ordered seizure of twelve identified wallets "for the purpose of identifying and seizing evidence of the offence" and because they were "bizatihi suc esyasi" – property constituting the offence itself. Group G is the tenth identified wallet. Each ground on its own supports the restraint, and the victim-return outcome does not

depend on which ground is read into the grant. ECF 79-5 at 2, 4-5; Grand Bazaar Network Analysis, section 9, at 20-21.

66. The certified translation states the operative judicial disposition: "the wallets set out below being themselves in the nature of items of the offence, THEIR SEIZURE IS ORDERED." The order concerns identified property and its entire restrained content. ECF 79-5 at 2; Grand Bazaar Network Analysis, section 10, at 23-25.

67. The custody question was judicially determined by the competent Judgeship. The decision is issued, operative and executed judicial custody, described in the Grand Bazaar Network Analysis as "perfected judicial custody." Turkish law prescribes no additional creditor-law perfection step for this judge-ordered measure. Grand Bazaar Network Analysis, sections 3, 9 and 10, at 5-6, 20-26.

68. The legal existence and operation of that custody do not depend on a later conviction. A judge-ordered restraint is distinct from an urgent nonjudicial seizure that lapses without timely judicial approval. The latter approval rule does not apply to the August Custody Decision. Grand Bazaar Network Analysis, sections 9-10, at 20, 23-24.

69. On October 11, 2023, the prosecutor sent Tether an urgent follow-up execution request identifying Decision No. 2023/5986 and the use of Group G within the organization's acts. Tether's Compliance Department replied under Ticket No. 263780: "We can now confirm that [Wallet 0x82e] is now frozen." ECF 79-6 at 2-3; ECF 79-7 at 2.

70. The Indictment records that the prosecutor contacted Tether for execution of the decision, that the asset was frozen through the Cybercrime Department of the General Directorate of Security, and that the balance "still stands blocked." Grand Bazaar Network Analysis, section 9, at 21-22, and section 10, at 23-24 (quoting Indictment at 309).

71. Execution through the issuer is legally significant. CMK Article 128 permits restraint of qualifying property in third-party possession and provides for institutional implementation of restraints on accounts, rights and receivables. The court's custody is exercised through the binding direction; possession of a private key by the court is not a prerequisite to that custody. Grand Bazaar Network Analysis, section 9, at 20-22.

72. A competent Turkish prosecutor, judge or court must decide release or return under the applicable CMK mechanisms. No objection, postponement, lifting or return decision concerning Group G appears in the records examined by Yavuz. Claimant's Turkish counsel has attested that Decision No. 2023/5986 has never been vacated, modified or superseded. ECF 79-2, ¶ 22; Grand Bazaar Network Analysis, sections 9-11.

73. The issuer's burn or reissue, an exchange transaction, and a foreign seizure request are not Turkish decisions releasing custody, and Turkish law contains no provision by which a foreign seizure or forfeiture order, or an issuer's technical act, discharges a Turkish judicial seizure. The original restraint predates the Government's approximately May 1, 2025 warrant by approximately twenty months: Türkiye was the first to restrain Group G by judicial order, and no judicial restraint over Group G other than the Turkish seizure is shown before May 2025. ECF 1, ¶ 48; Grand Bazaar Network Analysis, sections 5, 9 and 11, at 11, 22, 26-27; Law No. 6706.

74. ECF 53 recorded a balance exceeding USD 101 million at the August decision and approximately USD 13.5 million leaving before Tether's October 11, 2023 execution confirmation of the freeze. That confirmation followed the earlier preservation demands and the August judicial decision; it is not the beginning of the issuer-notice chronology. Execution concerns enforcement, not existence: under Turkish law a decision does not

become incomplete because the holder implements it later. Grand Bazaar Network Analysis, section 9, at 22. Claimant preserves the recovery and accountability rights associated with that interval, including the supporting transaction history and issuer-notice chronology. Those rights concern the dissipated value separately from the balance now designated Group G. ECF 53, ¶¶ 7-9.

75. Claimant's specific-property interest is therefore grounded in an issued judicial act directed at this wallet, documented execution, continuing custody, the charged offense against her, and the statutory disposition rules pleaded below. It is not a request to collect a personal debt from the offender's assets at large. Under Turkish law, that issued and executed custody is perfected judicial custody requiring no further perfection step. In the property categories of United States law, the interest it protects is the victim-owner's interest in the specific restrained property and, in the alternative pleaded in ECF 53, ¶ 28, a prior perfected judicial lien on the specific assets of Wallet 0x82e securing Claimant's enforcement title. Either way, it is an interest in specific property within 18 U.S.C. Section 983(d)(6)(A), and not the general unsecured interest excluded by Section 983(d)(6)(B)(i).

0x82e. Not only is Ms. Kaul an innocent owner under 18 U.S.C. § 983(d), she is the original innocent owner. She provided timely notice to multiple U.S. law enforcement agencies and, upon their refusal to act, obtained a criminal judicial seizure through Turkish courts that preserved those assets.

26. On March 14, 2025, approximately three months before the United States filed this forfeiture action, Ms. Kaul appeared as the lead prosecution witness at a hearing before the Ankara 23rd Heavy Criminal Court. The defendants had challenged Ms. Kaul's existence as a real person, exercising their confrontation rights directly against Ms. Kaul. She appeared in

~~person before the accused to answer that challenge. She testified under oath for approximately three hours, subject to direct questioning by the court, the defendants, and defense counsel. Multiple indicted defendants were present who directly examined her on her forensic analysis and blockchain tracing methodology, which served as the foundational investigative predicate for the prosecution. The court confirmed Ms. Kaul's procedural rights under the Turkish Code of Criminal Procedure Article 234, including the right to participate in the prosecution and to appeal decisions arising from those proceedings. The criminal case in which Ms. Kaul is the complainant, from which the criminal judicial seizure order on Wallet 0x82e originates, was actively being prosecuted when this forfeiture was initiated, and such proceedings continue today.~~

27. ~~The Turkish criminal proceedings arose directly from Ms. Kaul's civil debt enforcement and constituted the statutorily mandated next step under the Turkish Enforcement and Bankruptcy law, initiated because civil process alone was insufficient to reach assets held by non-compliant third parties. The indictment filed under Investigation No. 2023/6371 explicitly incorporates Ms. Kaul's documented loss, as recorded in her statement before the prosecutor, referencing her February 11, 2023, criminal complaint and naming the specific perpetrators, Kai Li Kelly and Ling Sun Dylon, thereby establishing a judicially acknowledged minimum floor of the victim restitution obligation. Turkish Penal Code Article 55(1) mandates that this principal floor, together with accrued commercial default interest thereon, be satisfied in full before any state confiscation of the criminal proceeds can occur.~~

28. ~~Ms. Kaul is thus a judgment creditor and the investigative originator whose interest is secured by a prior perfected judicial lien on the assets of Wallet 0x82e, established through~~

~~the Turkish criminal judicial seizure order (Decision 2023/5986), which placed the Defendant Property under Turkish judicial custody more than 20 months before any U.S. seizure warrant was issued. Without Ms. Kaul's intelligence and the Turkish proceedings that she initiated, the Defendant Property would not have been identified and preserved. The Defendant Property exists for forfeiture because of Ms. Kaul. The Turkish criminal judicial seizure order on Wallet 0x82e has never been vacated.~~

~~29. In addition to her claim of $25,461,000, Ms. Kaul demands, pursuant to 28 U.S.C. § 2465(b), attorneys' fees incurred in this action, post-judgment interest, and allocable or imputed interest that has been paid or would have been paid to the United States.~~

~~30. This filing constitutes a Verified Claim asserting direct ownership, not a petition for remission. Ms. Kaul reserves all rights to seek any and all available remedies, including administrative relief, should judicial proceedings not fully resolve her claim.~~

~~I attest and~~

## VI. STATUTORY VICTIM-RETURN PRIORITY AND CLAIMANT'S FORMAL PARTICIPATION

76. CMK Article 131(2) directs return to the owner of property seized under Article 128 when it belongs to the victim injured by the offense and is no longer needed as evidence. CMK Article 131(1) provides the competent authority's return mechanism for seized property, including property of a third person. Grand Bazaar Network Analysis, sections 9 and 13, at 21, 28-29.

77. TCK Article 55(1) places victim return before State confiscation: for confiscation under that provision, the material benefit must be incapable of being returned to the victim. The return priority extends to identified proceeds and their converted economic gains. Grand Bazaar Network Analysis, sections 12-13, at 27-29.

78. The Turkish prosecutor expressly invoked that priority for Group G. Item 12 at page 389 of the Indictment requests that the determined victim balance from the wallet restrained by Decision No. 2023/5986 "BE PAID TO THE VICTIMS." Item 13 requests confiscation only of the USDT remaining "after the restitution to the victims." Grand Bazaar Network Analysis, section 10(9), at 25 (quoting Indictment at 389).

79. That requested disposition is directed at the identified wallet itself. It uses the statutory concept of return and fixes State confiscation behind victim restitution. The property relationship differs from an unsecured money claim against an estate: the return interest concerns the restrained corpus in which the prosecution has identified the organization's proceeds. Turkish criminal procedure does not treat the injured victim as a creditor of the offender's estate at large; it provides for return of seized property to its owner, and once the statutory conditions are found, "return is mandatory, not discretionary remission, and it does not await conviction." Grand Bazaar Network Analysis, sections 10(8) and 13, at 24, 28-29.

80. Claimant is a named complainant and the victim of the charged organizational fraud against her. The Indictment records her loss, identifies her investigation, her tracing route and requests application of the victim-first regime to Group G. Her statutory position is established by the charged offense and the participation record, independently of a prior conviction. Her listing as complainant is a statutory designation required by CMK Article 170(3), not a courtesy. Grand Bazaar Network Analysis, sections 2 and 8, at 3, 18-20, section 10, at 25, and sections 13-14, at 29 (citing Indictment at 1, 135, 188, 380 and 389).

81. On November 8, 2023, Claimant appeared before the Turkish prosecutor and gave her formal statement. The examination records her own blockchain analysis, identification of the Common Collection Wallet, exchange outflows, instructions to Turkish counsel and

disclosure of her analyses to the FBI and Secret Service. The prosecutor inspected the outflow evidence, and counsel credited the client's analyses as part of the complaint's foundation. Grand Bazaar Network Analysis, section 7, at 14-15 (citing Indictment at 130 and the record of Claimant's November 8, 2023 examination).

82. On March 14, 2025, Claimant appeared for the delegated examination before Ankara 23rd Assize Court in Delegated Examination No. 2025/40 for the Istanbul proceeding. Her examination was taken through a sworn interpreter with counsel present, and the hearing minute records her request to join the case. Grand Bazaar Network Analysis, section 8, at 19-20.

83. On April 30, 2025, Istanbul 19th Assize Court admitted Claimant as an intervening party, or mudahil, in File No. 2024/277 under CMK Articles 237 and 238. Claimant holds both complainant and intervening-party status in that proceeding, which is the prosecution of the Indictment in Investigation No. 2023/6371. Independently of her joinder, CMK Article 260(1) opens legal remedies to her as a person injured by the offense in such a way as to be able to acquire intervening-party status. Grand Bazaar Network Analysis, sections 2 and 8, at 3, 19; April 30, 2025 Hearing Minutes.

84. Claimant has applied for return under CMK Article 131(2). She also expressly refused consent to partial-restitution effective repentance under TCK Article 168(4), stating: "No; I want all that I have lost, and I want the perpetrator punished." ECF 79-2, ¶ 24; Hearing Transcript of March 14, 2025, at 10; Grand Bazaar Network Analysis, sections 8 and 13, at 19-20, 28-29.

85. The Turkish judicial custody, statutory return priority, property identification and formal participation supply legal interests beyond the general-creditor description advanced in ECF

91. The Government's motion describes Decision No. 2023/5986 as "an inchoate order which never matured into a judgment or a perfected lien," but cites no Turkish statute, decision or expert for that characterization and offers no material under Federal Rule of Civil Procedure 44.1. The Grand Bazaar Network Analysis supplies the foreign-law record and analysis the motion omits: the terms "inchoate," "matured" and "perfected lien" "belong to secured-credit and judgment-enforcement law, not to the categories in which Turkish law classifies a criminal-procedure seizure"; the final judgment "ends the seizure by ordering return or confiscation; it does not create it"; and the decision "is not inchoate in Turkish law." ECF 91 at 19-20; Grand Bazaar Network Analysis, sections 9, 10 and 14, at 20-26, 30.

## VII. LOSS AND DAMAGES: SEPARATE CONSEQUENCES OF THE FRAUD

86. Claimant's property loss and the damages flowing from the fraud are consequences of the fraud, separate from and in addition to her interests in the res. The February 11, 2023 criminal complaint recorded the USD 8.7 million loss, which the Indictment and MASAK analysis record. Claimant reserves her consequential losses, including borrowing and property consequences, the damages that may be awarded by the Turkish criminal court, and her claims against responsible private actors; none is surrendered by assertion of her interests in the present res. ECF 53, ¶ 4; ECF 79-3 at 2; Grand Bazaar Network Analysis, section 7, at 15, and section 8, at 19 (citing December MASAK Report at 6-7 and Indictment at 135).

## VIII. ASSIGNED INTERESTS

87. The Claimant's victim-recovery efforts through DDG predate the Government's June 2025 forfeiture action. Every assignor knew Claimant and participated in the recovery effort

before assigning. The assignments are a response to the state-created crisis produced by the Government's displacement of that recovery pathway. ECF 79-2; ECF 102-6, ¶¶ 5-8.

88. As of the date of verification, one hundred fifty-nine victims have executed assignments conveying their legal interests directly to Claimant. Each assignment conveys an ownership interest within 18 U.S.C. Section 983(d)(6)(A), and Claimant is the real party in interest as to each interest conveyed. Fed. R. Civ. P. 17(a)(1). Claimant holds those conveyed interests individually and asserts them in this action as assignee. Schedule A summarizes the assigned interests; the complete assignment register, identifying each assigned interest, its assignor and its loss amount, will be submitted under seal as stated in ¶ 9.

89. The assignments are not a DDG-to-Claimant transfer and do not place DDG before the Court as a corporation represented pro se. The legal interests pass directly from each accepted assignor to Claimant. The DDG role is evidentiary organization and forensic verification; the Claimant holds the conveyed interests.

90. Each assignor received notice of the proposed assignment and replied electing to assign. Each instrument is a present, irrevocable transfer effective on the assignor's signature and verified under 28 U.S.C. Section 1746. The assignments create no attorney-client relationship with Claimant.

91. Claimant appears personally under 28 U.S.C. Section 1654 and asserts transferred legal interests as their holder. The executed instruments effect present, irrevocable transfers of the assignors' transferable recovery rights to Claimant, effective on signature, and provide that Claimant may investigate, file verified claims, assert interests, enforce and seek distribution in her own name; an assignor's contractual right to a distribution does not defeat or condition the transfer or Claimant's standing. Title to the assigned interests vests in

Claimant as claimant, as it would were she represented by counsel. Claimant litigates her own property interests and her own stake in the recovery, which she has chosen to share with the assignors, and does not litigate as a representative of the assignors. An assignee's obligation to distribute recovered proceeds is consistent with the assignee's standing to pursue legally conveyed claims. Sprint Communications Co. v. APCC Services, Inc., 554 U.S. 269, 271, 285-87 (2008).

92. Each assignor's decision to assign was voluntary. The accepted assignors chose Claimant on the basis of the pre-existing ongoing relationship and disclosed process, not through an undertaking by Claimant to serve as their lawyer. Claimant receives no personal percentage of the net assigned-interest pool. Her own claim and separately preserved compensation rights remain distinct.

## IX. DDG, UNCOMPENSATED ORIGINATOR WORK, AND THE COST OF PRESERVATION

93. DDG is a Section 501(c)(3), entirely volunteer victim-advocacy organization founded by Claimant. It educates victims on evidence collection, helps victims organize their evidence, verifies victim records, and supports lawful investigative and recovery work. Claimant's individual Turkish interests and her personally held assignments remain distinct from DDG's organizational role. ECF 79-2, ¶¶ 1-5; ECF 102-6, ¶¶ 5-8. DDG's work is grounded in disciplined pursuit of justice: education about victims' rights and the different investigative and recovery processes, organized evidence preservation, and sustained victim-led assistance. Participation requires watching DDG's published evidence-preservation webinar, "Reclaiming Control: Recovery & Management Workshop," available on DDG's website, which covers victims' legal rights, what counts as evidence, organizing files for authorities, blockchain tracing and recovery pathways, and following DDG's

detailed evidence-saving instructions. Claimant educates participants in evidence collection and chain-of-custody practices. Victim-support volunteers, themselves victims, assisted participants in assembling and preserving their records, working day and night during the assignment effort. This recovery work is not financed by a public grant, sponsoring law firm or organized around Claimant's personal profit; it arose from victims' shared losses and their effort to solve the recovery problem.

94. ECF 79-11, at 3-4, contains DDG's express disclaimer of legal advice and of an attorney-client relationship. The disclaimer and DDG's actual conduct in the recovery work rebut the premise that DDG's victim assistance is retained legal representation. Claimant's individual assertion of assigned title does not convert the organization into counsel.

95. Roger Welte's declaration describes Claimant's honesty, analytical competence and relentless recovery work. He confirms that he has neither observed nor heard of victims being charged by Claimant or DDG, and that he serves DDG without compensation. His family's work with Claimant began in mid-2024. He describes victim education, best-practice collection of evidence and crime data, evidence-based recovery pathways, and protection against outside control or monetization of victim data. His later account describes his challenge to the public credit-taking narrative and deletion of his comments and subsequent blocking. Those observations corroborate the victim-led work and attribution dispute. His account is offered personally, not on behalf of his employer. ECF 102-6, ¶¶ 1-8, 15 and 18-21.

96. In July 2026, Claimant described approximately 200 verified victims and approximately 3,000 potential claimants, alongside the self-funded international recovery preparation. ECF 79-2, ¶¶ 51-55. The Government's own record shows how little of that work it did. Its Verified Complaint pleads that law enforcement identified approximately 434 suspected

victims, "including 60 confirmed victims," and interviewed approximately 60 of them, who collectively lost approximately USD 19 million. ECF 1, ¶¶ 45 and 51. As reported in The Wall Street Journal article filed in this action, the Secret Service convened crypto-exchange representatives in February 2024 for a two-day gathering, "one of what the Secret Service has dubbed 'sprints,'" to identify victims. Even so, the Secret Service "was able to contact around 60 victims whose cumulative $19 million in losses could be traced to the seven unhosted wallets—just a slice of the total $225 million ultimately seized by the Justice Department," and agents believed there were "some 374 other victims but were unable to either identify or contact them." ECF 102-5 at 6-7. Claimant's verified-victim work, built over approximately four years, documents the scale and duration of the evidence task and the recovery infrastructure that predates this forfeiture.

97. Claimant's tracing and preservation work dates to 2022. Over approximately four years, she developed the analytical method, identified connections, pursued foreign process, organized victim evidence and continued the recovery effort while defending her own property claim. She delayed her own recovery while bringing other victims into an effort through which they could share the fruits of that work. She continued locating victims so that the remaining preserved proceeds from Group G could be pursued for their benefit rather than confiscated after satisfaction of her own recovery. That additional work neither abandoned her individual interest nor transferred authorship or attribution of her investigation.

98. Claimant expended herself as capital: personal labor, analytical capacity, time, lost opportunity, risk to her own life, the burden of cross-border proceedings and the sustained responsibility of keeping the recovery effort alive. The resulting intelligence was a product of that expenditure. Its transmission to authorities did not render the underlying work

valueless or extinguish Claimant's rights in it. Claimant undertook the investigative identification, prevention of dissipation and overseas preservation work after reporting to law enforcement and receiving its statements that recovery efforts were exhausted. The necessity of doing that work as a victim, followed by the Government's acquisition of its preserved fruits, is part of the state-created crisis alleged here. ECF 53, ¶¶ 15-28; ECF 91-5.

99. The Government acknowledges that, because of the "sheer volume of transactions and complex web of intermediary addresses," tracing a single deposit is "incredibly time consuming for even a team of investigators." The complaint also describes a strategic tracing session involving over a dozen Secret Service personnel. Claimant performed the originating investigation and continuing topology work independently, and the Turkish State later expanded and corroborated that work through MASAK, exchange inquiries and judicial process. Two sovereigns received the fruits of an investigative undertaking the Government itself describes as difficult and resource-intensive. ECF 1, ¶¶ 73 n.24 and 84; Grand Bazaar Network Analysis, sections 5-7.

100. The federal procurement record independently confirms that specialized crypto-financial analytical capacity commands substantial public expenditure. ICE awarded TRM Labs, Inc. Contract No. 70CMSD26C00000005 on July 1, 2026 for analytical support services to the Homeland Security Task Force Cyber Disruption Center. The award is reported at USD 94,655,840, with a performance period of July 1, 2026 to June 30, 2027. This is a government procurement of analytical capacity in the same field. USAspending Award Record, Contract No. 70CMSD26C00000005; SAM.gov Award Notice, July 2026.

101. Claimant seeks an evidentiary valuation of the work actually contributed: years of specialist analysis; original source and attribution material; identification of proceeds and controllers;

judicial-preservation preparation; cross-jurisdictional coordination; continuing victim verification; proprietary products and documented external expenditures. The proper measure concerns the proven contribution, its use and its beneficiaries. Government and Turkish corroboration establish the work's investigative significance; the separate expense and provenance records establish the categories for valuation and compensation.

102. The fraud and prolonged recovery struggle caused severe distress and continuing trauma. Claimant has described those experiences in her declarations and pursued treatment. The record of her distress supplies context for the harm of renewed exposure and displacement; the Government's receipt of private cooperation communications was not permission to use those communications to attack the cooperating victim. ECF 79-2; ECF 94-1; ECF 91 and exhibits. The displacement also required Claimant to divert recovery resources into defending her recorded victimhood, investigative role and property interests before the institutions that had already received her reports. Claimant experienced that renewed burden, harassment and interference with recovery as additional trauma, distinct from the original fraud. Claimant's personal knowledge; ECF 94-1.

103. The repeated denial of Claimant's recorded role, followed by public praise for participants who had received her work, compounded the original trauma. Claimant experienced that contradiction as gaslighting: the acts she documented and the judicial process she produced were treated as inventions when she asserted the resulting rights. The resulting harm concerns distress and recovery interference, and also the credibility on which a cooperating victim-originator depends when dealing with courts, authorities, partners and other victims. Claimant's personal knowledge; ECF 53, ¶¶ 15-28; ECF 79-2; ECF 91.

104. ECF 91 escalated the credibility attack by stating that Claimant "paints herself as the genesis of this investigation, but she is not," and by publicly characterizing her papers as accusing the United States and counsel of a "widespread criminal conspiracy." The cited ECF 79-2 passages describe disclosed conflicts of interest, a proceeds-recovery pattern and the exclusionary effect of the accounting methodology; none alleges a criminal conspiracy by the United States or its counsel. The Turkish examination, Indictment and judicial chronology substantiate the originator acts the Government sought to discredit, and ECF 91's "genesis" point concerns only the Secret Service investigation, not the Turkish sequence. ECF 91 at 5, 23; ECF 79-2, ¶¶ 38-46; Grand Bazaar Network Analysis, section 7, at 17-18. Independent reporting by The Wall Street Journal describes Claimant as the victim "whose efforts kicked off a sprawling investigation in Turkey" and reports that, "[b]efore Turkey could move to distribute the money, U.S. law enforcement took custody of the wallet sought by Kaul." ECF 102, ¶ 17(a)-(b); ECF 102-5.

105. The Government also placed Claimant's private victim-cooperation emails and her mother's information on the public docket while using its representation allegations to attack her capacity. Claimant alleges foreseeable renewed distress, reputational injury and interference with the credibility of her recovery work. Those effects are stated from her experience and the filed record; her competence and persistence do not erase either the original victimization or the additional harm of exposure. ECF 91 at 6 and 14 and Exhibits 2-7; ECF 79-11; ECF 94. The exposure also implicated safety: Claimant had pursued preservation while participating in proceedings concerning the alleged network, and her declarations describe the importance of anonymity, reported contacts and continuing security concerns. Publishing her private cooperation material and identifying information exposed the

cooperating victim while she was still seeking recovery. Claimant alleges that the resulting exposure and renewed need to defend her credibility aggravated her distress and disrupted the victim-led recovery work. ECF 94-1, ¶¶ 5-10 and 18-21; ECF 94 at 8-10.

106. ECF 91 was filed on August 14, 2026, one week after the Court ordered that "[t]his case is stayed pending further order of the court." Minute Order of August 7, 2026. Claimant disputes the following features of ECF 91 and its exhibits: (a) it relies on a June 6, 2023 Secret Service reply about a different address, which is not a subject address, for the assertion that her property did not trace to the defendant property (¶ 28 above); (b) it dates the start of the investigation to January 9, 2023, contrary to the Government's Verified Complaint (¶ 37 above); (c) it invokes "the tentative settlement," placed before the Court only in sealed filings that were never served on Claimant and that the Court struck on September 30, 2026 (¶ 140 below); (d) it describes a judicial seizure decision that was issued, executed and remains in force as "inchoate," citing no Turkish authority (¶ 85 above); and (e) it placed Claimant's private victim-cooperation correspondence and her mother's loss information on the public docket (¶ 105 above). ECF 91; ECF 91-2 to 91-7.

107. Claimant reserves her request for sanctions and other relief concerning ECF 91 and its exhibits for the appropriate separate motion and procedure under Federal Rule of Civil Procedure 11(c)(2) and the Court's inherent authority. Nothing in this claim waives that request. See Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991).

108. The United States and commercial participants publicly promoted the seizure and the investigative collaboration, while the Turkish record preserves Claimant's actual originator role. Claimant alleges that the public credit-taking, subsequent attack on her claim and proposed transfer of value to the competing claimant form a continuing displacement of the

citizen whose work helped identify and preserve the property. ECF 53, ¶ 22; ECF 79 exhibits; ECF 91; Grand Bazaar Network Analysis, section 7.

109. The filed relationship diagram is ECF 79-14, Exhibit L; the custody map is ECF 89-1. The former organizes the documented contacts, participants and cross-proceeding relationships; the latter records replacement and transfer of the res. Those records place the Secret Service personnel, West referral, Tether and OKX in the same information and preservation chronology that began with Claimant's cooperation. ECF 79-2, ¶¶ 9, 29, 39 and 43; ECF 79-14; ECF 89-1 and 89-2.

110. OKX investigator Blake Cohen publicly wrote on November 20, 2023 that "Our investigation team at @okx froze $225 Million in USDT," thanking Tether, Chainalysis and ZachXBT. The same exhibit contains OKX's statement that its investigation, in collaboration with Tether and DOJ, led to the freeze. The Group G Turkish execution had already been requested and confirmed. ECF 79-17 at 2; ECF 79-6 and 79-7; ECF 53, ¶ 8; ECF 79-2, ¶ 19.

111. Bradstreet's filed public post credits Andrew Frey, an investigative analyst, the FBI, identified prosecutors, Tether and exchanges for the USD 225 million seizure, describing the purpose as return of the stolen funds to rightful victims. West's filed post praises Frey and Bradstreet. Neither account identifies Claimant's earlier investigative and judicial-preservation contribution. Their documented receipt of the reports and evidence described in ¶¶ 22-28, the Turkish attribution and the subsequent ECF 91 attack supply the record for Claimant's allegation of erasure and credit-taking. ECF 79-18 at 2; ECF 79-19 at 2; ECF 53, ¶¶ 15-22; ECF 79-2, ¶ 9.

112. Claimant's present property claim protects the recovery pool created through that effort. Her distinct rights concerning exploitation of her proprietary investigative product and the costs of preservation are separately preserved below.

## X. SUBSTITUTE PROPERTY, CUSTODY, SPOLIATION, AND THE THREATENED SECOND DEPRIVATION

113. The Government obtained its warrant on or about May 1, 2025, and filed this forfeiture complaint on June 18, 2025. Both occurred after the Turkish judicial custody and its documented execution. ECF 1, ¶ 48; ECF 79-5 through 79-7.

114. At the July 23 hearing, Government counsel explained that Tether destroys the original cryptocurrency and creates separate cryptocurrency "with the same value," a sum "representing the same exact thing as the currency that they were after." Claimant's interest reaches the identified replacement value. Tr. 12:11-19, 13:18-20.

115. The burn-and-reissue record and subsequent transfer history are addressed in ECF 89 and its transaction appendix and in ECF 102, ¶ 11(b). The Court questioned the custody path at the July 23 hearing. Those records are material to preservation of the identified value, allocation of earnings and the continuing relationship between the restrained original and its substitute. Tr. 27:10-28:15.

116. The legal custody chain requires inquiry. At the hearing the Court asked about custody when the complaint was filed and the transfer and storage details; Government counsel asserted Marshals custody at filing but could not supply the exact transfer date and requested control details. The filed map and hash appendix instead show a June 2025 government-controlled address with no identified agency, Coinbase allocations on January 6, 2026 and consolidation into the USMS-labeled address on February 4, 2026. Claimant

requests reconciliation of the hearing representation with that documented chain, supported by sworn control and custody records. Tr. 27:10-28:15; ECF 89-1 at 2; ECF 89-2 at 2-6.

117. The on-chain record identifies the movements; the Government must identify the legal authority, agency control, account ownership, contractual custody and signing authority at each stage. Claimant seeks the executed warrant and return, issuer instructions, intermediate account and agency records, custodial agreements, dates and authority for transfers, key-control information, group-allocation records, conversion and fee information, and present balance and earnings.

118. Group G remained separately identifiable after replacement. On January 6, 2026, 87,464,642.259005 USDT was allocated to its identified Coinbase Prime custody address. Its February 4 transfer comprised a 16-USDT test and a main transfer of 87,464,626.280604 USDT, totaling 87,464,642.280604 USDT. Both transfers are included in Claimant's accounting. ECF 89-2 at 4-5, Transfers 14, 15 and 20.

119. The appendix records reissue of 225,364,963.876576 USDT, 2.876576 USDT above the approximate caption amount, and receipts of 225,364,964.024175 USDT at the USMS-labeled address. The appendix identifies small third-party receipts and an unsolicited 0.016-USDT transfer for reconciliation. Claimant seeks the complete principal, allocation, fees and earnings account so that the approximate caption cannot substitute for the actual distributable balance. ECF 89-2 at 2 and 6.

120. Under the Turkish-law analysis, the technical replacement of restrained units with units of the same identified value does not extinguish the victim-return priority. TCK Article 55 follows proceeds into converted forms and economic gains; no competent Turkish release is

established by the issuer's technical act. Grand Bazaar Network Analysis, sections 9, 11 and 12, at 22, 26-28.

121. Claimant alleges that the Government's acquisition of that substitute displaced the Turkish and United Kingdom recovery work previously underway and put the preserved value under a new disposition process. The Government's subsequent motion to strike would remove the originator's judicial property claim from that process. ECF 53; ECF 79 at 2, 7; ECF 91.

122. The threatened second theft is accordingly a property deprivation with an identified mechanism: displacement of the preserved recovery interest, governmental control of the replacement value, payment to an adverse claimant and exclusion of the victim-originator in favor of discretionary remission. The pleaded judicial and statutory interests require adjudication before that mechanism defeats the recovery.

123. Decision No. 2023/5986 seized the original Group G units "for the purpose of identifying and seizing evidence of the offence" and as items constituting the offence itself, in the Turkish criminal proceeding in which Claimant is complainant and victim. Under Turkish law, the measures necessary to preserve the value of seized property must be taken; the victim is entitled to notice of the seizure and, through counsel, to examination of the seized items; release or return must be decided by a competent Turkish prosecutor, judge or court; and an issuer implementing a freeze acquires no power to decide ownership or distribution. ECF 79-5 at 2, 4-5; CMK Articles 123, 127(5), 131, 132(4) and 234(1)(a)(4); Grand Bazaar Network Analysis, sections 3, 9, 10(8), 11 and 13, at 5, 20, 24, 26, 29.

124. On June 18, 2025, the day this action was filed, the original Group G units were burned by the issuer and replacement units were issued to the Government pursuant to its seizure. No Turkish decision authorized the burn or released the restrained units, and Turkish law

contains no provision by which a foreign seizure order or an issuer's technical act discharges a Turkish judicial seizure. From the Turkish file, to which she has party access, Claimant states that the United States has never sought relief from the Turkish court and that no mutual legal assistance request or other formal United States process concerning Group G appears in it. Claimant, a registered victim known to the Government, received no notice of the burn. ECF 1, ¶ 230; ECF 89 at 8; ECF 102, ¶ 11(b); Tr. 12:11-19; ECF 79-2, ¶ 22; Grand Bazaar Network Analysis, sections 9 and 11, at 22, 26; Law No. 6706. The Government's recovery thus depended on a foreign issuer's act on property the Turkish court had already preserved. An empirical study of eighty-one federal civil forfeiture actions arising from cyber grooming scam cases found that, in nearly all successful cases, seizure "was made possible by the cooperation of either an exchange or an issuer," and that Tether "burned and reissued USDT in twenty-nine of the cases." Here, the issuer's freeze existed because Claimant's Turkish proceeding obtained it.[1]

125. On information and belief, the Government knew or should have known of the Turkish custody when the burn was carried out: the issuer that performed it had confirmed to the Turkish prosecutor that the same address was frozen, in response to the request to execute the Turkish decision, and, on the Government's own pleaded chronology, its investigation followed that issuer's November 2023 report. ECF 79-6; ECF 79-7; ECF 1, ¶¶ 50 and 172.

126. The burn destroyed the original restrained units, the specific property the Turkish Judgeship had seized as items of the offense. The Government has not disclosed its instructions to the issuer, its communications concerning the Turkish decision, or its records of the burn and

1 Yotam Berger, Note, Confronting Pig-Butchering Scams Through Civil Forfeiture, 79 Stan. L. Rev. (forthcoming 2027) (manuscript at 28, 33), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=7037759.

reissue, although Claimant has asked for them. At the July 23 hearing, Government counsel told the Court that he could "supplement" the record on when the property was transferred to this District and would "need to provide supplemental documentation" on who held its access codes; as of October 5, 2026, it had filed no such supplement. Tr. 27:19-20, 28:4-15; ECF 79-1, Part V; ECF 97, ¶ 6; ECF 102, ¶ 25.

127. The Government-directed destruction of the original restrained units cannot be used to defeat the property relationship it destroyed. Claimant seeks recognition that the replacement value carries the identified Group G property relationship; preclusion of any Government argument that depends on the absence of the original units; production and preservation of the issuer instructions, communications and custody records; and spoliation relief under the Court's inherent authority and Federal Rule of Civil Procedure 37(e). The destruction is documented in ¶¶ 124-126. Gerlich v. U.S. Department of Justice, 711 F.3d 161, 170-71 (D.C. Cir. 2013); Shepherd v. American Broadcasting Cos., 62 F.3d 1469, 1475, 1478 (D.C. Cir. 1995).

128. Claimant demands that the Government and its agencies preserve, and suspend any deletion or alteration of, all documents, communications and data concerning: (a) Claimant's reports to, and communications with, the Secret Service, the FBI and any other federal agency since January 2023; (b) Group G and the other subject addresses, including freeze requests, tracing work papers and the tracing session described in the Verified Complaint; (c) the Turkish proceeding, Decision No. 2023/5986 and the Turkish freeze, including any knowledge of them and any communication about them; (d) the burn, reissue, transfer and custody of the Defendant Property, including instructions to and communications with the issuer, exchanges and custodians, and agency custody records; (e) public statements

concerning the seizure and the attribution of the investigative work; (f) the materials underlying ECF 91 and the filings struck on September 30, 2026; and (g) any proposed disposition of the Defendant Property, including to any government reserve or stockpile. Claimant reserves all remedies for any failure to preserve.

## XI. COMPETING CLAIM, SETTLEMENT STRUCTURE, AND THE PROPERTY REMAINING FOR VICTIMS

129. Infiniweb Technology Inc. claims all seven token groups, including Group G, as revenues from gaming and wagering services. Its claim competes directly with Claimant's interests in the same identified corpus. ECF 23, ¶¶ 1-5, as quoted in ECF 102, ¶¶ 9-10. Before suit, Infiniweb's counsel claimed only five of the subject addresses; its Verified Claim, filed eight months later, claims all seven, including Group G, without explanation. ECF 1, ¶ 240; ECF 102, ¶ 10(c).

130. Per the Government's Verified Complaint, ¶ 240, open-source information about Infiniweb was minimal; cited reporting linked it to an entity accused of kidnapping and trafficking; it appeared on the Philippine regulator's list of cancelled offshore gaming licensees; and its counsel had not provided additional information showing that the subject funds came from lawful sources. Those are the Government's attributed allegations and stated evidentiary deficiency concerning its proposed settlement partner.

131. The Financial Times report filed with ECF 102 describes a false Manila address and an opaque ownership structure. Claimant's independent verification of the address appears in ECF 79-15. Those sources support examination of Infiniweb's asserted property interest; Claimant maintains her challenge to its adverse claim. ECF 102-2 at 16; ECF 102, ¶¶ 7-10.

132. The Government told the Court that it would return a negotiated amount to Infiniweb, and said that sending Infiniweb its share through the Marshals "typically takes 60 days." It

expressly committed to no specific victim amount. The Government would thus pay a negotiated share of the proceeds of a network it pleads as a single laundering enterprise to the claimant whose lawful-source showing it found wanting, while directing the victim-originator whose work identified the property to discretionary remission. Tr. 39:22-40:16, 55:5-8; ECF 1, ¶ 240.

133. The remission pool is the value the Government does not return to Infiniweb. Every payment to the competing claimant reduces the property available to satisfy the traceable victims whom the Government says have first priority. The standing and lawful-source questions concerning Infiniweb therefore bear directly on the value available for Claimant's direct and assigned interests. Under the Turkish law governing the custody of Group G, confiscation does not reach items belonging to good-faith third parties, and "an account label or intermediary holding does not by itself establish good faith." TCK Articles 54(1) and 55(3); Grand Bazaar Network Analysis, sections 10(7) and 12, at 24, 28.

134. The Government described a tiered remission process: first those who could trace loss to the defendant property or intermediary wallets, then victims of specified websites or perpetrators, then other qualifying petitioners. It also stated that anyone could petition following forfeiture. These descriptions identify a process, not satisfaction or adjudication of Claimant's existing property interests. Tr. 40:1-41:3, 57:15-18.

135. Claimant has not elected to replace her judicial claim with remission. The ability to request discretionary relief after forfeiture is not a transfer or discharge of her direct and assigned interests in the identified res. Victims with pending remission applications are excluded from Schedule A. No disposition of this claim shall be conditioned on submission to remission. Remission is no substitute for adjudication: of fifty-one concluded federal

forfeiture actions arising from cyber grooming scam cases, forty-two "resulted in the forfeiture of the entire amount seized to the U.S.," and the limitations of that path "are especially acute for foreign victims." Berger, supra note 1 (manuscript at 29, 37).

136. ECF 96 states that the settling parties were not seeking a stay of ECF 79 and 91 because those motions would not be resolved by their agreement in principle. The proposed settlement's diligence and DOJ review were continuing, as subsequently reported in ECF 101. The settling parties have three times told the Court that their agreement would not resolve Claimant's motions, and the Court stated at the hearing that it must "make sure that I'm respecting everybody's rights who is before the Court." The Government has told the Court that it had "left open the possibility to invite Ms. Kaul to the tentative agreement once approved by the Deputy Attorney General" and, citing what it called her "misrepresentations," that "that door is now closed." Those parties' negotiations do not dispose of Claimant's separately asserted interests. ECF 85 at 2; ECF 91 at 4; ECF 96 at 2; ECF 101 at 2; Tr. 59:24-60:1.

137. Roger Welte's declaration supplies a sworn, first-hand account of his September 2, 2026 exchange with United States Attorney Jeanine Ferris Pirro at the Global Anti-Scam Summit in San Francisco. He states that, when he challenged the office's victim-recovery position and contended that she would prefer seized funds to go directly to the Bitcoin Reserve, she emphatically declared "Yes!" and stated that the process should result in getting the seized funds to that reserve. Claimant incorporates that attributed sworn account, not an assertion of personal presence at the conversation. ECF 102-6, ¶¶ 9-13.

138. Welte recorded the conversation in his September 13 email to Director of External Affairs Tim Lauer, asked that it be shared with Pirro, and authenticated the email in his declaration.

At execution of the declaration, he had received no response. ECF 102-4; ECF 102-6, ¶¶ 14-15.

139. Claimant's ECF 102 status report places that account beside the victim-return protections of Executive Order 14233. The stated preference is material to the proposed destination of the property and the Government's displacement of judicial victim claims. Claimant maintains the request for lawful victim return and opposition to any disposition that defeats the pleaded interests. ECF 102, ¶¶ 15-16.

140. On September 30, 2026, the Court struck ECF 92 and 93 for failure to comply with Local Civil Rule 5.1(h)(1) and the Court's Standing Order and directed a compliant motion to seal. Claimant's service requests concerning the materials invoked against her remain maintained. The struck filings supply no basis to assume settlement terms not disclosed and served on Claimant. ECF 91 relies on that struck material, and as of October 5, 2026 the Government had not filed the motion to seal the Court directed. Minute Order of September 30, 2026; ECF 91 at 17; ECF 94, 97; ECF 102, ¶¶ 3-5.

141. Claimant maintains the non-opposition relief requested in ECF 98 and docketed as ECF 99 concerning ECF 79 and 94. Those requests remain pending for the Court's determination. The Court-directed amendment preserves the specific-property record while the separate procedural requests proceed through their appropriate vehicles.

## XII. INNOCENT OWNERSHIP, EQUITABLE INTERESTS, AND DISTINCT FINANCIAL PATHWAYS

142. Claimant asserts her status as the original innocent owner under 18 U.S.C. Section 983(d), as pleaded in ECF 53, ¶ 25, and her documented role as investigative originator, pleaded in ECF 53, ¶¶ 6 and 28. She did not consent to the fraud, the laundering, or the appropriation of her assets. Upon identifying the network and its flows, she repeatedly alerted law

enforcement, sought freezing and preservation, supplied evidence, and pursued judicial process. ECF 53, ¶¶ 14-28; ECF 79-2; Grand Bazaar Network Analysis, section 7.

143. Claimant's direct claim to Group G rests on her ownership of the identified proceeds of the offense committed against her, protected by the issued and executed Turkish perfected judicial custody and reinforced by the statutory return priority, and, in the alternative, on the prior perfected judicial lien securing her enforcement title described in ¶ 15, as pleaded in ECF 53. The claim is not the general unsecured interest excluded by Section 983(d)(6)(B)(i).

144. Claimant asserts the validly conveyed property interests described in Schedule A as their individual holder. The conveyed interests are qualifying ownership interests in specific property under Section 983(d)(6)(A), asserted by Claimant as assignee under Rule 17(a)(1). The assigned strands retain their identified property relationships and their own evidentiary bases. Each assigned interest is the assignor's own pre-existing ownership interest in property taken from that assignor by the charged fraud, and Claimant asserts it as it stood in the assignor's hands at the time of the offense.

145. Claimant preserves equitable reimbursement and cost-allocation relief for the creation, identification and preservation of the common recovery property, including documented external expenditures for tracing, translation, authentication, litigation and retained professionals. The Claimant-funded costs, organizational costs and unpaid personal labor are distinct categories of the recovery accounting. Claimant maintains an expense register, identifying payer, date, deliverable, recovery purpose and beneficiaries, and a proprietary-work register, identifying the author, creation, transmission purpose and use restrictions of each work, for presentation in the appropriate proceeding.

146. As the investigative originator of the network-wide proceeding, Claimant separately asserts and preserves her interests in, and an equitable origination and reimbursement interest concerning, identified Network Proceeds beyond Group G that were located or preserved through her investigative work, including the remaining token groups of the unified res and network assets held elsewhere, together with related unjust-enrichment and proprietary-work-product remedies. Personal compensation for the exploitation of Claimant's investigative product is separately asserted through the applicable property, equitable or compensation vehicle.

147. The res-related equitable request identifies the non-Group-G recovery benefited by Claimant's originating and preservation work, the benefiting claimants or recipients, the causal contribution and the legally allocable expenses. Claimant seeks an evidentiary determination of reimbursement, restitutionary allocation and any supported proprietary-work compensation on those identified bases.

148. Claimant's proprietary methodology, analytical design, source material and nonpublic investigative products are distinct from the seized token value and from a vendor's output. Disclosure of selected findings for cooperation did not constitute a blanket abandonment of those property rights. Claimant also holds copyright in her written analyses, reports and graphic works. Claimant preserves appropriate protection, accounting and compensation claims concerning subsequent acquisition, use, disclosure or attribution of qualifying proprietary property, against any person or entity, public or private.

149. Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1000-04 (1984), recognizes qualifying trade-secret interests as protected property. Claimant preserves a properly supported just-compensation pathway under the applicable Tucker Act jurisdiction, claims for infringement

or unauthorized use of her copyright and other intellectual property by or for the United States, including under 28 U.S.C. Section 1498(b), and contractual or other independently supported compensation rights, without merging those rights into the victim principal or surrendering them through this forfeiture claim.

150. Claimant demands the relief available upon substantially prevailing under 28 U.S.C. Section 2465, including return of the property, allowable litigation costs, qualifying incurred attorneys' fees, post-judgment interest, and actual or legally required imputed interest attributable to the property. Claimant also preserves the earliest legally supportable control or deprivation date for applicable earnings or interest, including the November 2023 freeze chronology, separately from the 2025 warrant date.

151. Recoverable principal, Turkish enforcement interest and accessories, common recovery expenses, statutory costs and earnings, independent proprietary-property compensation, claims against responsible private actors, and claims against any person or entity, public or private, for misappropriation, false attribution or unjust enrichment arising from her work remain distinct financial pathways. Claimant reserves additional remedies and unsatisfied amounts.

152. Claimant reserves supplementation as additional proceeds, valid assignments, transaction records, custody information and recoverable amounts are identified, and will seek leave under Federal Rule of Civil Procedure 15(d) to supplement Schedule A as further assignments are executed. Neither a change in the form of the proceeds nor the substitution of tokens extinguishes the interests pleaded in those proceeds or their identifiable equivalents.

## XIII. CLAIM FOR RELIEF AND PRESERVATION OF EXISTING POSITIONS

153. Claimant's direct claim is to Group G and its substitutes, with their attributable proceeds and earnings, on her ownership interest, protected by the Turkish perfected judicial custody and, in the alternative, by the judicial lien pleaded in ECF 53, and for the interests assigned to her described in Schedule A, in priority to any other claimant. Group G is to be delivered to Claimant and shared, under the disclosed terms, with the victims of her cohort. Claimant's interests in the remaining Network Proceeds within the unified res and beyond are asserted and reserved as pleaded in ¶ 12. She seeks recognition and adjudication of those interests and return of the property to satisfy them, with the applicable interest, costs and accessories.

154. Claimant seeks a court-directed transfer of Group G and its attributable earnings to Claimant, for her direct interests and for distribution to the scheduled assignors under the disclosed terms, with a final accounting by the custodian. A dismissal, severance or release concerning Group G must be accompanied by effective disposition of its identified value, not custodial limbo.

155. Claimant maintains her jurisdictional, preservation, service and accounting objections and requests in ECF 54, 79, 94, 97, 98 and 102. Claimant does not ask the Court to appoint a receiver at this time; the receivership request in ECF 79 is reserved, not withdrawn. Transfer of Group G shall not be conditioned on surrender to discretionary remission.

156. Claimant maintains her challenge to Infiniweb's adverse interest and reserves the separately sequenced standing motion and requests for evidentiary determination, protection and accounting. She also preserves source-supported conflict issues, safety protections, the spoliation relief described in ¶¶ 123-128 and the sanctions request described in ¶¶ 106-107, each for its appropriate vehicle.

157. This filing is a verified judicial claim asserting direct and assigned property interests. It is not a petition for remission, an appearance as attorney for the assignors, or consent to a settlement of Claimant's interests by other parties.

158. Claimant reserves, and does not release, waive, elect against or submit for decision in this action, all claims she holds or may hold against any person or entity, public or private, arising from the matters pleaded here, including claims for misappropriation, unauthorized use or disclosure of her investigative work product and proprietary information; false attribution of, or taking credit for, her investigative work; breach of confidentiality undertakings; unjust enrichment; spoliation; exposure of her private information; and the taking of private property for public use without just compensation. Those claims belong to their proper forums and are not merged into, or precluded by, this claim to the res.

WHEREFORE, Claimant Nivedita Kaul respectfully claims the identified Defendant Property to the extent of her direct and assigned interests, demands return and court-directed transfer of Group G and its substitutes, attributable proceeds and earnings to Claimant in satisfaction of her direct and assigned interests, seeks the costs, fees and interest authorized by 28 U.S.C. Section 2465 and other applicable law, seeks an accounting of the custody, burn, reissue and transfer of Group G and its earnings and an order requiring preservation of the materials identified in ¶ 128, and requests such further relief as the Court determines appropriate, without waiver of her preserved jurisdictional objections, pending motions, spoliation and sanctions remedies, distinct recovery and compensation rights, or the claims reserved in ¶ 158.

Dated: October 14, 2026 Respectfully submitted,

/s/ Nivedita Kaul

Nivedita Kaul, Claimant, Pro Se
5001 Ramon Road, Building 3 #1005
Palm Springs, CA 92264

Tel: +1 724 413 8167
nivie@digitaldefendersgroup.org

## VERIFICATION

I, Nivedita Kaul, declare under penalty of perjury ~~that my~~ under the laws of the United States of America that this claim is not frivolous and ~~the information provided in support of my claim is~~ that the factual statements supplied in support of it are true and correct to the best of my knowledge and belief. The statements concerning my own acts, communications, experiences and interests are based on my personal knowledge. Statements made on information and belief are identified as such and are based on the records cited with them. Statements attributed to identified records and declarations accurately describe those sources. Legal contentions and requests for relief are presented as such.

~~March __, 2026~~

~~Nivedita Kaul~~

~~Submitted by and through:~~

~~SEQUOR LAW, P.A.~~

~~s/ Tara J Plochocki~~

~~Tara J. Plochocki (D.C. Bar No. 989404)~~

~~Sequor Law, P.A.~~

~~1200 G Street, N.W.~~

~~Suite 340~~

~~Washington, D.C. 20001~~

~~tplochocki@sequorlaw.com~~

~~Tel. (202) 900-8740~~

Executed on October 14, 2026, at Palm Springs, California.

/s/ Nivedita Kaul

Nivedita Kaul, Claimant, Pro Se
5001 Ramon Road, Building 3 #1005
Palm Springs, CA 92264
Tel: +1 724 413 8167
nivie@digitaldefendersgroup.org