# EXHIBIT 3

# AV. SAMI YAVUZ

YAVUZ HUKUK BÜROSU

ADRES: NUROL TOWER
TELEFON: +90 535 677 07 90 | E-POSTA: AVSAMIYAVUZ@GMAIL.COM
BARO SICIL NO: ISTANBUL BAR ASSOCIATION - 80156


# REVIEW OF TURKISH CASE-FILE MATERIALS AND ANALYSIS OF THEIR LEGAL CONSEQUENCES

*Investigative origin, the organized-proceeds prosecution, issued and executed judicial custody, and victim-return priority*

**Matter:** United States of America v. Approximately 225,364,961 USDT, Civil Action No. 1:25-cv-01907-AHA (United States District Court for the District of Columbia), and related proceedings concerning identified network proceeds.

## 1. SCOPE, SOURCES AND PROTECTED ACCESS

This opinion examines Turkish law and the case-file record of Investigation No. 2023/6371 of the Ankara Batı Chief Public Prosecutor's Office (the "Ankara Batı investigation"; the organization it charges is referred to as the "Grand Bazaar network"). Its factual foundation is the Indictment dated 10 January 2024, Investigation No. 2023/6371, Esas No. 2024/474, Indictment No. 2024/72 (Ankara Batı Cumhuriyet Başsavcılığı, İddianame; the "Indictment"), read with the seizure decisions, the reports of the Financial Crimes Investigation Board ("MASAK") of 26 December 2023 and 11 September 2023 (the "December MASAK Report" and the "September MASAK Report") and the other records described in Section 2. It addresses the role of Nivedita Kaul ("Ms. Kaul"), a claimant in the U.S. proceeding, in the identification, blocking and seizure chain; the organized fraud-and-laundering prosecution of the Grand Bazaar network and the MASAK findings on which it rests; the Grand Bazaar conversion node and the "M80" accounting system documented in the September MASAK Report; the nature in Turkish law of the criminal judicial seizure of wallet 0x82e1d4ddd636857ebcf6a0e74b9b0929c158d7fb ("USDT Token Group G" in the U.S. proceeding; "Group G"; ECF 79-5), including the United States' description of it as "inchoate"; and the victim-

return, participation and consent rights that attach. Questions of U.S. law, including ownership and standing under 18 U.S.C. § 983, are for the U.S. court; this opinion supplies the Turkish-law attributes on which they depend. This opinion was commissioned by Ms. Nivedita Kaul. It is given by an attorney at law registered with the Istanbul Bar Association (Reg. No. 80156) and rests on the records described in Section 2, including records to which counsel for the person injured by the offense has access under CMK Articles 153 and 234.

Because the Turkish criminal proceedings are pending, this opinion names no suspect, defendant, or suspect or front company; persons are described by the role the Indictment assigns them. Except for publicly identified Group G (0x82e), wallets and accounts are identified by neutral functional designations drawn from their recorded roles: the Common Collection Wallet, Intermediate Transfer Wallet, Member Exchange Account, Manager Exchange Account, Victim-Transfer Receiving Wallet and Upstream Funding Wallet. No other wallet address or address fragment, and no Turkish exchange name, is reproduced, and no address-to-name crosswalk is published. Personal identifiers and transaction identifiers are omitted. Turkish quotations reproduce the source wording, with wallet and exchange identifiers omitted or replaced by bracketed functional descriptions; English renderings are the opinion's own translations, and certified translations filed in the U.S. proceeding are identified where used. In this opinion, "CMK" is the Code of Criminal Procedure (Ceza Muhakemesi Kanunu, Law No. 5271) and "TCK" is the Turkish Penal Code (Türk Ceza Kanunu, Law No. 5237).

Procedural acts in the investigation stage are confidential, save where the law provides otherwise and without prejudice to defense rights (CMK Article 157(1)). Counsel's access to the file is governed by CMK Article 153, whose rights extend to counsel for the person injured by the offense; once the Indictment is accepted, they include inspection of the file and copies of all records and documents (Article 153(4)-(5)), and in the prosecution stage the victim and complainant may also request copies of records and documents (Article 234(1)(b)(3)). Both MASAK reports are classified GİZLİ ("secret"). Quotation is therefore limited to the passages needed for the questions addressed. The protected records are identified and described, not annexed; access to them is governed by the competent Turkish authority in the Ankara Batı investigation, No. 2023/6371, now before the Istanbul 19th Assize Court as File No. 2024/277. This opinion is intended for filing and reliance in the U.S. proceeding, subject to any redaction or sealing; it grants no access to the Turkish files and waives no restriction on any source. Recognition, priority and remedies under another sovereign's law are for that forum.

## 2. DOCUMENTS EXAMINED AND THEIR EVIDENTIARY FUNCTION

The Indictment records the prosecution's charges, evidence assessment and requested relief, and is the principal official record of Ms. Kaul's position. It lists her as a complainant ("MÜŞTEKİ … 3-NIVEDITA KAUL", printed p. 1), an entry the Code requires, since an indictment must state the identity of the victim and of the complainant and the date of the complaint (CMK Article 170(3)(c), (f), (g)); her listing is a statutory designation, not a courtesy. The Indictment is addressed to the Ankara Batı Assize Court (p. 1), and the prosecution is pending before the Istanbul 19th Assize Court as File No. 2024/277. The Indictment is filed as a detainee case ("TUTUKLU İŞ"), devotes a tracing section to her ("Mağdur Nivedita Kaul Yönünden", "As regards Victim Nivedita Kaul", p. 188), and charges qualified fraud committed "Müşteki NIVEDITA KAUL'a karşı" ("against Complainant NIVEDITA KAUL") (p. 380); its record of her tracing and applications is set out in Section 7. Charges and requests are attributed to the prosecution; adjudication of guilt is a separate question.

The public U.S. exhibits include certified translations reproducing the Turkish originals of the following records of the prosecution file: the complaint of 11 February 2023 (ECF 79-3); the Chief Public Prosecutor's urgent letter to Tether Operations Limited of 7 March 2023 (ECF 79-4); and the urgent block request to Tether of 11 October 2023 citing Decision No. 2023/5986 (ECF 79-6). Tether's Compliance Department confirmed by e-mail that the address "is now frozen" (ECF 79-7).

The seizure decisions are separate instruments, each defined by its own operative terms. (1) Decision No. 2023/2001 D.İş of the Ankara Batı 2nd Criminal Judgeship of Peace, 28 February 2023, ordered seizure of 44 Ethereum-protocol wallets held at Binance Holdings Limited; the prosecutor sought seizure under CMK Article 128 et seq., and the Judgeship granted it under CMK Articles 123 and 127 (pp. 1-2). (2) Decision No. 2023/2480 D.İş of the same Judgeship, 14 March 2023, seized the Member Exchange Account and a TRON wallet under CMK Articles 123, 127, 128 et seq., on the prosecutor's request (December MASAK Report, p. 8). (3) Decision No. 2023/3506 D.İş of the same Judgeship, 11 April 2023, seized the Manager Exchange Account (December MASAK Report, p. 8). (4) Decision No. 2023/5985 D.İş of the Ankara Batı 1st Criminal Judgeship of Peace, 11 August 2023, ordered seizure of approximately 426 wallets held at Binance, thirteen of them wallets already seized by Decision No. 2023/2001 (pp. 1-10; compare Decision No. 2023/2001, pp. 1-2). (5) Decision No. 2023/5986 D.İş, described next.

Decision No. 2023/5986 D.İş of the Ankara Batı 1st Criminal Judgeship of Peace, 11 August 2023 (the "August Custody Decision"; ECF 79-5), was given after "talep ve beraberinde gönderilen soruşturma

dosyası incelendi" ("the request and the investigation file forwarded with it were examined"). It identifies the offenses under investigation as forming an organization to commit crime, qualified fraud and qualified theft through information systems, and laundering of crime proceeds, listing each of the acts in TCK Article 282(1): taking assets abroad, concealing their illegitimate source, and creating the impression that they were legitimately acquired. It records that it had been established from the account movements that the suspects "örgüt halindeki" ("acting as an organization") held "mağdur vekillerinin şikayetlerine konu olaylardan elde ettikleri suça konu sanal para varlıklarını" ("the virtual-currency assets subject to the offense, obtained from the events that are the subject of the complaints of the victims' counsel") in wallets held with Tether and used them "eylemlerinde" ("in their acts"). The prosecutor sought seizure "5271 Sayılı Ceza Muhakemesi Kanununun 127, 128 ve devamı maddeleri uyarınca" ("under Articles 127, 128 et seq. of CMK No. 5271"); the Judgeship found the request "usul ve yasaya uygun" ("in accordance with procedure and law") and granted it "5271 sayılı CMK uyarınca" ("pursuant to CMK No. 5271"). It ordered, "suç delillerinin tespiti ve el konulması amacıyla" ("for the purpose of identifying and seizing evidence of the offense"), the seizure of twelve wallets containing Tether-issued tokens "bizatihi suç eşyası niteliğinde olması sebebiyle" ("because they are in the nature of property constituting the offense itself"). The tenth is Group G; the U.S. exhibit shows that address and redacts the other eleven (ECF 79-5, pp. 2, 4). Objection lay within seven days to the Ankara Batı 2nd Criminal Judgeship of Peace (p. 3). The certified translation renders the operative words: "the wallets set out below being themselves in the nature of items of the offence, THEIR SEIZURE IS ORDERED" (ECF 79-5, p. 2). Decision No. 2023/5985, issued the same day by the same judge in materially identical terms, concerns Binance-held wallets and does not list Group G; it is a companion order, not a second source of Group G custody. Decisions Nos. 2023/5985 and 2023/5986 are together "the August decisions".

The Ankara Batı Chief Public Prosecutor's Office, Record of Examination of Nivedita Kaul, 8 November 2023 (İfade Tutanağı; the "Prosecutor Examination"), is signed by Ms. Kaul, the examining public prosecutor, the clerk, the interpreter and counsel. The Ankara 23rd Assize Court Hearing Minute of 14 March 2025, Delegated Examination No. 2025/40 (the "Hearing Minute"), and its SEGBİS transcription (the "Hearing Transcript") record her examination for the Istanbul trial, her participation request and her consent refusal.

MASAK, the Financial Crimes Investigation Board of the Ministry of Treasury and Finance (Mali Suçları Araştırma Kurulu Başkanlığı), prepared the December MASAK Report, a Financial Analysis

Report (Mali Analiz Raporu) of 26 December 2023, No. 2023-545-16-3961604, 185 pp., on the prosecutor's instructions of 12 June, 14 June, 3 July and 19 July 2023 in Investigation No. 2023/6371 (p. 1). The September MASAK Report is an Analysis and Assessment Report (Analiz ve Değerlendirme Raporu) of 11 September 2023, No. 2023-468/8-968/5-3717726, 473 pp., subject "Paravan Şirketler Üzerinden Suç Gelirlerinin Temini ve Aklanması Hk." ("On the Procurement and Laundering of Crime Proceeds through Front Companies"). The Indictment relies on it (Indictment, p. 314).

The payment order issued on 6 February 2023 by the Azdavay Enforcement Office (ECF 53, ¶ 3) is a separate civil enforcement instrument (Section 13). It is identified by reference and is not used to convert, replace or cap the recorded loss or other pleaded claims. ECF 53, 79 and 102, with their exhibits, are Ms. Kaul's U.S. filings cited here. U.S. page references are to the ECF header page; for ECF 91 these run three pages ahead of its printed numbering.

## 3. EXECUTIVE CONCLUSIONS

**First,** the August Custody Decision is perfected judicial custody, in the descriptive sense defined in Section 10(1): an issued, operative and executed custody decision, not an inchoate application. It was ordered by a judge, the authority whose decision is required for an Article 128 seizure and which reviews any urgent prosecutorial seizure (CMK Articles 127(1), (3) and 128(9)), on the investigation file and against identified property; it was executed through the token issuer; and on 10 January 2024 the prosecutor recorded that the balance "still stands blocked" (ECF 79-5 to 79-7; Indictment, p. 309). It can be released only by a decision of a competent Turkish authority: the public prosecutor, judge or court under CMK Article 131(1), a judge or court on application or objection (CMK Articles 127(4), 271(2)), or the trial court on final disposition. No objection was lodged against it, and no lifting, suspension or return decision appears in the materials examined. It protects the injured victims' statutory return interest in identified property; how that interest is classified under U.S. law is for the U.S. court (Sections 9-10).

**Second,** the order in which seized property is disposed of is fixed by statute. Seized property that belongs to the injured victim is returned to its owner once it is no longer needed as evidence (CMK Article 131(2) for Article 128 seizures; Article 131(1) for any seized item belonging to a third person). Proceeds may be confiscated only where they cannot be returned to the victim (TCK Article 55(1)). Conviction is not a condition of return, which the public prosecutor, judge or court may order (CMK

Article 131(1)). That outcome holds whichever head of the CMK is read into the August Custody Decision (Section 9).

**Third,** the prosecution has invoked that order for this very wallet. It asks the trial court to order that the balance determined for the victims be paid to them from the blocked Group G balance first, and to confiscate only what remains after restitution to the victims (Indictment, p. 389).

**Fourth,** Ms. Kaul is the originator and a continuing driver of the Turkish identification, blocking and seizure chain. On her account as recorded in the Indictment, her own analysis identified the Common Collection Wallet and its outflows to a Turkish exchange before she instructed Turkish counsel, and she shared her analyses with the FBI and the U.S. Secret Service (Indictment, p. 130). The complainants' applications were followed, often the same day, by blocking instructions and judicial seizures on requests reciting "the complaints of the victims' counsel"; her own application of 18 March 2023 led to the blocking, identification and seizure of an organization manager's account; and the State's own analysis independently confirmed her core finding: that the Common Collection Wallet is an organization wallet through which the victims' funds passed into Turkish exchange accounts held by the organization's members and managers (Indictment, p. 307; December MASAK Report, pp. 25, 55, 59) (Section 7).

**Fifth,** the Ankara Batı investigation has become a prosecution of a structured criminal organization for organized fraud and laundering under TCK Articles 220 and 282. The offense against Ms. Kaul is charged as committed within its activity. The Judgeship seized Group G as property constituting the offense itself (ECF 79-5); the prosecution records its balance as proceeds obtained from crime and as "used by the criminal organization within the scope of its acts", asks that the balance determined for the victims be paid to them from it first, and describes only the residue after restitution as "a material benefit of the criminal organization" (Indictment, pp. 309, 389) (Sections 2, 4, 10).

**Sixth,** MASAK, Türkiye's financial intelligence unit, holds a statutory role in laundering investigations. Its December 2023 report, commissioned by the prosecutor in this file, maps Ms. Kaul's route into the accounts and devices of the organization's managers, and MASAK was specifically instructed to assess the expert report on Group G. Its September 2023 report, on which the Indictment relies, describes the front-company system feeding the same Grand Bazaar currency-and-gold node as a "profesyonel aklama sistemi" ("professional laundering system") (Sections 5-6).

**Seventh,** the primary records tie the Grand Bazaar network to the currency-and-gold conversion infrastructure in the Grand Bazaar, at the level of the laundering system. The Indictment identifies the alleged organization leader (p. 313) and his group of companies (pp. 375, 377). The December MASAK Report records approximately TRY 6.3 billion transferred to a gold company within that group (p. 135). The September MASAK Report devotes a section to that group of currency and gold companies, records intensive, high-value and one-directional transfers from its front-company system to the same group's currency office and gold firm (p. 326), and documents the "M80"-coded tracking software inside the system (pp. 309, 461). Findings at this level describe the network and its proceeds system as a whole; the same individuals appear in both MASAK reports at that conversion node (Section 6). Public reporting placed before the U.S. court describes a 1,548-page Istanbul Grand Bazaar indictment and an internal accounting infrastructure in it, "M80", used to track funds through exchange offices and cryptocurrency accounts, and reports that Ms. Kaul's Turkish claim "sparked a probe" into what Turkish prosecutors describe as a professional money-laundering ring (ECF 102, ¶ 21; ECF 102-5, pp. 2, 8; Section 6).

**Eighth,** restraint of the whole corpus preserves it for the victim-first disposition the prosecution has requested for the victims in the file, of whom Ms. Kaul is a named complainant (Sections 10, 13).

## 4. THE CRIMINAL ORGANIZATION, ITS LAUNDERING SYSTEM AND THE CHARGES

TCK Article 220 punishes founding or managing (Article 220(1)) and membership of (Article 220(2)) an organization of at least three members formed and suited to commit offenses. Offenses committed within the organization's activity are punished in addition (Article 220(4)), and its managers are punished as perpetrators of all such offenses (Article 220(5)). The Indictment applies the Court of Cassation's settled test (at least three members; a hierarchy, even if loose; a de facto union around a criminal purpose; continuity; suitability for the intended offenses) element by element (pp. 373-378).

On the structure chart of the Cybercrime Branch Directorate of the Ankara Provincial Police, the Indictment identifies one organization leader, five organization managers and fifty-four members (p. 313), in three units: one reaching victims by telephone, a large-volume and overseas-operations unit, and a crypto-conversion unit (p. 314). Relying on the MASAK reports and police digital examinations, it finds "a sharp hierarchy" (p. 375). The Indictment states that the organization's crypto activity began in 2020 and had continued "istikrarlı bir şekilde aynı cüzdanlar üzerinden" ("steadily, through the same

wallets") (p. 377). Custody and arrest orders were executed simultaneously in eleven provinces on 13 October 2023 (p. 338).

The prosecution requests punishment of the alleged leader under TCK Articles 220(1), 220(4) and 220(5), qualified fraud under Article 158(1)(f) charged once for each victim concerned, qualified theft under Article 142(2)(e), and laundering under Articles 282(2) and 282(4), among others (p. 384). It identifies Ms. Kaul as the victim of fraud "by using information systems, banks or credit institutions as a tool" under Article 158(1)(f) (p. 380). That form of fraud carries a minimum of four years' imprisonment and a judicial fine of not less than twice the benefit obtained (Article 158(1), final sentence), doubled where committed within a criminal organization's activity (Article 158(3)). Through Article 220(4)-(5), the fraud against Ms. Kaul is charged as an offense within the organization's activity, for which its managers answer as perpetrators. Its proceeds are therefore, on the prosecution's case, proceeds of that organization. A person's status as injured by the offense is assessed on that charged footing, not on the outcome of the trial (Section 8).

Laundering under TCK Article 282(1) consists in taking abroad, or subjecting to transactions designed to conceal their illegitimate source or create the impression of legitimate acquisition, assets derived from an offense carrying a minimum of six months' imprisonment; qualified fraud is such an offense, and the penalty is doubled within an organization's activity (Article 282(4)). Among its evidence, the Indictment sets out the analysis report on the Manager Exchange Account, into which the victims' funds were routed. That report found that all the crypto-currencies in the account's transactions had been sent to the exchange by wallets belonging to the fraud network and were "in no way used for purposes such as buying and selling crypto-currency or investment", and that the account served "kara para ve suç gelirlerinin aklanması için" ("for the laundering of black money and crime proceeds") (pp. 151-152). The Indictment itself finds, of one organization manager, that the cold wallets in that manager's use received the victims' balances and that "fiili ve hukuki bağlantının bulunduğu" ("there is a factual and legal connection") (p. 322).

The Indictment describes the laundering system. Crypto-assets obtained from crime were converted rapidly into lira on exchanges, withdrawn in cash, and turned into gold and then physical U.S. dollars; the prosecution rejects the arbitrage explanation because the flows were "tek yönlü" ("one-directional") rather than circular and "arbitraj işlemleri ile uyumlu olmadığı" ("not compatible with arbitrage transactions") (p. 133). Despite five or six intermediate transfers, a victim's money reached the network's controllers on the same day, "sometimes within only five minutes" (p. 375). The Grand Bazaar was the

conversion point: noting the Central Bank's prohibition on using crypto-assets in payments, the Indictment concludes that "Kapalıçarşı'da hukuka aykırı bir kripto varlıkları konu alan yapılanma olduğu hususunda kuşku olmadığı" ("there is no doubt that there is an unlawful structure dealing in crypto-assets in the Grand Bazaar") (p. 373). Persons wishing to do crypto business there had to work in harmony with the alleged leader's group of companies (p. 375); members brought crypto-assets from fraud "both abroad and in Türkiye" to the Grand Bazaar and converted them into cash; and "at the end of the day, the conversion into cash always came out" at that group's companies (p. 377).

The scale is commensurate. On the accounts of one front company and two managers alone, USDT was cashed out one-directionally for TRY 5,276,700,726, excluding "the transactions in other wallets" (p. 332). The organization has "the technical and physical means to commit fraud and crime-proceeds laundering offenses worth billions of liras [and] dollars in our country and internationally" (p. 378). In communications with the prosecutor, Binance reported that some of the organization's wallets, and OKX reported that the organization's wallets on its platform, were "potato" wallets created with false e-mails in other persons' names. OKX's Seychelles entity filed a suspicious-transaction report with the Seychelles Financial Intelligence Unit, as OKX reported in its letter of 18 August 2023. Huobi left the prosecutor's request "without result" (pp. 309-310). Binance (referred to in the Indictment as "Binance Global") notified the prosecutor that the same fraud events were under investigation "Amerika Birleşik Devletlerinde de üç farklı yargı biriminde" ("in three different judicial units in the United States of America as well"), describing those investigations as "derdest" ("pending") (p. 378).

Group G sits inside this case. The Indictment records that 0x82e is "herhangi bir borsada kayıtlı olmayan soğuk cüzdan" ("a cold wallet not registered at any exchange") whose balance was approximately 87.5 million USDT at the time of the Indictment and in which "suçtan elde edilen gelir niteliğinde olan suça konu bakiyelerin bulunduğu" ("balances subject to the offense, in the nature of proceeds obtained from crime, are held") (p. 309). Its examination of the wallet also records that the first approximately 1,100 inbound transfers were of roughly 50,000 USDT each, "belirli bir takipten kaçmak için yapılmış olabileceği" ("possibly made to evade tracking"), and that "hukuki ve fiili bağlantının kesildiğine dair hiçbir ipucu veya delil tespit edilememiştir" ("no clue or evidence was found that the legal and factual connection had been severed") (p. 309). The Indictment describes the wallet as "suç örgütünün eylemleri kapsamında kullandığı anlaşılan" ("understood to have been used by the criminal organization within the scope of its acts") (p. 389). The balance corresponds to the approximately 87,464,642 USDT that the U.S. Verified Complaint attributes to Group G before its burn and reissue (ECF 1, ¶¶ 15, 230).



These are prosecution charges and assessments, not findings of guilt; their significance is that, within the Turkish proceedings, Group G is treated as proceeds of an organized fraud-and-laundering enterprise.

## 5. MASAK: STATUTORY STANDING AND FINDINGS

MASAK is Türkiye's financial intelligence unit. Under Law No. 5549 on the Prevention of Laundering of Crime Proceeds, laundering is the TCK Article 282 offense (Article 2(1)(g)); obliged parties report suspicious transactions to MASAK (Article 4); and public bodies and natural and legal persons must give it all requested information and records, including passwords, notwithstanding special-law secrecy (Article 7). Where there is strong suspicion of laundering, assets may be seized "5271 sayılı Ceza Muhakemesi Kanununun 128 inci maddesindeki usûle göre" ("under the procedure in Article 128 of CMK No. 5271") (Article 17(1)), and laundering indictments and Article 17 seizure decisions must be sent to MASAK (Article 18). Under the Regulation on the Examination of the Laundering Offense, a prosecutor may ask MASAK to establish the facts of laundering, under the prosecutor's coordination if required, and the report is returned to that prosecutor (Articles 5, 8 and 15(2)). MASAK's reports are official analyses of the competent State authority within the criminal file, not party submissions; their weight at trial is for the court (CMK Article 217(1)).

The December MASAK Report was commissioned by the prosecutor in June and July 2023, before the August decisions (p. 1). On 27 November 2023, the prosecutor instructed MASAK to add to its research file and assess the expert report concerning wallet 0x82e (p. 49), and MASAK's open-source research recorded a news report that Tether had blacklisted the address (p. 34). The Indictment relies on both reports in its findings on leadership, hierarchy, wallet use and capacity (pp. 307, 314, 316, 375, 378).

MASAK's analysis connects Ms. Kaul's route to the organization's management. The December MASAK Report records USD 22 million moving from the Common Collection Wallet to the Intermediate Transfer Wallet between 13 January and 28 April 2023, USD 5.77 million from the Intermediate Transfer Wallet into the Manager Exchange Account, and transfers from the Common Collection Wallet to the Member Exchange Account, which it attributes to a person the Indictment charges as an organization member (p. 25; Indictment, p. 313). MASAK's own Chainalysis analysis records 18 transfers totaling USD 4,444,187 from the Common Collection Wallet to the Member Exchange Account between 3 January and 20 February 2023 (p. 20). It maps "Nivedita KAUL'un Gönderim Yaptığı Cüzdan" ("the wallet to which Nivedita KAUL made transfers") into the Common

Collection Wallet, describing transfers collecting "birbirleri ile bağlantılı ortak cüzdanlarda" ("in interconnected common wallets") (p. 55); carries the Common Collection Wallet and the Intermediate Transfer Wallet into exchange accounts at Binance and Turkish exchanges held by persons the Indictment identifies as managers and members (pp. 59, 145; Indictment, p. 313); uses as a node the suspect deposit address in the complainants' petition of 28 March 2023 (p. 93); identifies the Intermediate Transfer Wallet in the digital-material examination report of an organization manager (pp. 77, 116); and joins the Member Exchange Account, the Common Collection Wallet, the Intermediate Transfer Wallet, the Manager Exchange Account and a node at a Turkish exchange labeled USD 71.9 million in one graph (p. 143). On the State's own analysis, the route Ms. Kaul traced ends in the accounts and devices of the organization's management.

Three consequences follow. First, the competent State authority's findings, on which the prosecution relies, confirm that Ms. Kaul's route is a channel of an organized laundering system, not a private dispute; its proceeds fall, as charged, within TCK Articles 220(4)-(5) and 282, and laundering-linked assets are seizable under the CMK Article 128 procedure by virtue of Law No. 5549, Article 17(1), in addition to the fraud and theft offenses listed in CMK Article 128(2)(a). Second, that property is subject to the victim-first order of TCK Article 55(1) and CMK Article 131(2), which the prosecution has invoked (Section 10). Third, on the record, Türkiye was the first to restrain Group G by judicial order and the first to charge the organization that, on the Indictment's case, used it (Indictment, p. 389). The sequence was: the complaint and blocking instructions in February 2023; judicial seizures from 28 February 2023; the August Custody Decision of 11 August 2023, executed through Tether on the prosecutor's request of 11 October 2023; and a detainee-case indictment against a sixty-person organization on 10 January 2024 (Section 11).

## 6. THE GRAND BAZAAR CONVERSION NODE AND THE M80 SYSTEM

The record shows one conversion node serving two laundering channels. On the 2023/6371 side, the organization's "conversion into cash always came out" at the alleged leader's group companies (Indictment, p. 377). In statements to the public prosecutor reproduced in the December MASAK Report, suspects described a lira-gold-dollar-USDT loop run through Grand Bazaar over-the-counter shops (pp. 63, 72, 107, 123). Two organization managers, one of them the holder of the Manager Exchange Account at the end of Ms. Kaul's route (p. 143), moved approximately TRY 2.2 billion received from Turkish exchanges to that group's gold firm; approximately TRY 6.3 billion was in turn

moved to the same firm from the managers' company, and approximately TRY 23 billion entering the firm's accounts was withdrawn in cash (pp. 130, 135, 137). On the other side, the September MASAK Report analyzes a front-company system in which approximately TRY 7.4 billion was transferred to 186 natural persons, 176 of whom largely transferred the incoming funds to crypto-asset service providers (p. 382). The report separately describes those persons' crypto withdrawals and onward transfers to "Organizasyon Yöneticileri" ("organization managers") (pp. 391-394), and records that approximately TRY 7.1 billion passed to currency and gold offices (pp. 1, 322), with "intensive, high-value and also one-directional transfers" to the same group's currency office and gold firm (p. 326). A statement reproduced in that report describes money pooled at the end of each day in a single "kasa" ("till") account being transferred, among other recipients, to the group's currency office (p. 22). The report reproduces Central Bank findings that the group's gold trades enabled "physical money of unknown origin, connected with crypto-asset trading, to be introduced into the banking system under the appearance of gold trading" (p. 370; the Indictment refers to the same Central Bank inspection report of 2 June 2021 through that MASAK report, at p. 316), and characterizes the whole: "Döviz bürolarının 'Sistemin' bir nevi 'tahsilat' şubesi olduğu" ("the currency exchange offices are a kind of 'collection' branch of the 'System'"); amounts were converted "genellikle USDT (Tether) isimli kripto varlığa" ("generally into the crypto-asset named USDT (Tether)"); investment-fraud and cyber-fraud proceeds were introduced into it; and it is a "profesyonel aklama sistemi" ("professional laundering system") (p. 461). The Indictment relies on that report for the alleged leader's relationship with the front companies and managers (p. 314) and for an intercepted conversation, which it draws from "the Masak report", showing that "persons in different organizations ultimately referred the problem to the top manager" (p. 376).

The same individuals appear at the node in both MASAK reports. Among those withdrawing cash from the group's gold firm, the December MASAK Report, prepared in Investigation No. 2023/6371, identifies persons it describes as "soruşturma konusu şüpheliler arasında yer alan" ("among the suspects subject to the investigation") (p. 137). Two of them are named in the September MASAK Report as suspects in connection with a Capital Markets Board inspection of unauthorized forex platforms (p. 331), and one of the two is among the recipients of the front-company system's pooled till (p. 22). The two channels therefore converted proceeds through one and the same Grand Bazaar currency-and-gold node: the node to which, on MASAK's analysis, the holder of the Manager Exchange Account at the end of the route Ms. Kaul first traced (the Common Collection Wallet, the Intermediate Transfer



Wallet, the Manager Exchange Account), with another manager, moved lira received from Turkish exchanges.

Public reports, including those placed before the U.S. court (ECF 102, ¶¶ 20-21; ECF 102-5), describe the continuing prosecution of that infrastructure. According to the Anadolu Agency, the Istanbul Chief Public Prosecutor's Office indicted 504 suspects in its Grand Bazaar (Kapalıçarşı) investigation; after a MASAK report established laundering through certain Grand Bazaar exchange offices, an earlier non-prosecution decision concerning certain exchange-office officials was lifted (as summarized at ECF 102, ¶ 20, p. 26). A Türkiye Gazetesi report of 10 July 2026 describes a 1,548-page main indictment and "an internal accounting infrastructure, the 'M80,' used to track funds assigned to persons and companies and their onward transfer through exchange offices and cryptocurrency accounts", with proceeds "converted mainly into stablecoins such as USDT" (as summarized at ECF 102, ¶ 21, p. 27). Hürriyet and Milliyet report the same indictment and its "M80" infrastructure, and Milliyet reports that the indictment describes the alleged organization leader in this case as holding a managerial and determinative position in its Grand Bazaar-centered currency, gold and crypto-asset conversion leg. The figures reported from that indictment correspond to the September MASAK Report: approximately TRY 5.55 billion sent from the front companies to the currency office of the alleged leader's group, of which only about TRY 12 million came back (pp. 322, 327; Gazete Oksijen, July 2026). The reported conversion infrastructure likewise corresponds to the September MASAK analysis relied on in this case (Indictment, p. 314). The Wall Street Journal reports that Ms. Kaul's claim in Türkiye "sparked a probe into what Turkish prosecutors have described as a professional money-laundering ring", that her "efforts kicked off a sprawling investigation in Turkey", and that "[s]ince Kaul took her legal crusade to Turkey, prosecutors there have filed a 1,548-page indictment describing a money-laundering operation they say operated out of Istanbul's Grand Bazaar" (ECF 102-5, pp. 2, 8; ECF 102, ¶¶ 20, 23). These press reports are cited only as public context; the allegations they describe remain to be tried.

The network link rests on primary records, not public reporting. The Indictment identifies the alleged organization leader and his group of companies (pp. 313-314, 375, 377); the December MASAK Report traces approximately TRY 6.3 billion to a gold company in that group (p. 135); the September MASAK Report documents the group of currency and gold companies and intensive, high-value, one-directional transfers into a currency office and a gold firm within it (p. 326), and the "M80"-coded tracking software within the system (pp. 309, 461). These primary-record findings connect the two channels at

the level of the conversion system. The alleged organization leader, his group of companies, the gold companies and M80 are the bridge between this case and the wider Grand Bazaar enforcement: the reports document the same conversion node and its internal accounting infrastructure. The public reports describe continuing and widened enforcement against that infrastructure and network proceeds since the Indictment; Group G itself remains the subject of the August Custody Decision and of the Indictment's victim-first request (p. 389). The conversion paths MASAK documents are paths along which TCK Article 55(1) follows proceeds into converted forms (Section 12).

## 7. INVESTIGATIVE ORIGIN: MS. KAUL'S TRACING AND THE COMPLAINANT-DRIVEN CHAIN

On learning "ihbar veya başka bir suretle" ("by denunciation or otherwise") of facts giving the impression of an offense, the prosecutor "hemen işin gerçeğini araştırmaya başlar" ("immediately begins investigating the truth of the matter") and must collect and secure the evidence (CMK Article 160). The victim and complainant may request the collection of evidence (CMK Article 234(1)(a)(1)). Investigation No. 2023/6371 resulted in a public prosecution brought by the prosecutor (CMK Article 170(1)). The prosecutor was bound to investigate once the complaint and evidence were before the Chief Public Prosecutor's Office (Article 160), and to bring the prosecution once the evidence gave sufficient suspicion (Article 170(2)); Ms. Kaul is a complainant whose complaint and evidence set it in motion. The complaint and tracing supplied concrete wallet and exchange leads for the prosecutor's statutory investigative duty under CMK Article 160.

Her recorded account begins with her own work: "Ben kendi blok zincir bilgimi ve analiz yeteneğimi geliştirdim. Dolandırıldığım cüzdanları takip etmeye başladım. Bu ana paraların toplandığı cüzdanlardan bir tanesinin [ortak toplama cüzdanı] olduğunu tespit ettim. Bu cüzdandan bir Türk borsası olan [...] borsasına çok yüklü miktarlarda para çıkışları olduğunu analiz ettim." ("I developed my own blockchain knowledge and analytical ability. I began tracing the wallets through which I had been defrauded. I identified one of the wallets in which these principal amounts were collected as [the Common Collection Wallet]. I analyzed very substantial outflows from that wallet to the [...] exchange, a Turkish exchange.") Her statement continues: "Bunun üzerine Türkiye'de ki avukatlarıma ulaşarak bu konuda gereken aksiyonu ve hukuki müracaatları şahsım adına yapmaları için talimat verdim. Aynı analizleri ve bu borsaya çıkışı FBI ve SECRET SERVICE ile paylaştım." ("Thereupon I reached my lawyers in Türkiye and instructed them to take the necessary action on this matter and to make the legal

applications in my name. I shared the same analyses, and the outflow to this exchange, with the FBI and the SECRET SERVICE.") She had first applied to law enforcement "hiç vakit kaybetmeden" ("without wasting any time"), but "kolluk kuvvetleri beklediğim desteği bana sunmadı" ("law enforcement did not give me the support I expected") (Indictment, p. 130, summarizing her statement of 8 November 2023 introduced at p. 127; Prosecutor Examination, p. 3). The Turkish State's charging document therefore records, in her own account, that the same tracing analysis was also given to United States agencies. The pivotal wallet is the Common Collection Wallet. The Prosecutor Examination records the prosecutor's inspection of her evidence ("Müştekinin göstermiş olduğu kripto çıkışları bulunan sayfa görüldü. Sayfada mağdurdan çıkışların bulunduğu ve [ortak toplama cüzdanının] girişleri olduğu görüldü."; "The page showing the cryptocurrency outflows presented by the complainant was viewed. Outflows from the victim and inflows to [the Common Collection Wallet] were observed.") and counsel's statement crediting "müvekkilin analizleri" ("the client's analyses") alongside the analysis firms' work as the basis of the Turkish complaint, adding that the analyses relating to her loss had already been filed with the prosecutor by petition ("Müvekkilin zararına ilişkin olarak analizleri dosyaya dilekçemizle sunmuştuk") (Prosecutor Examination, p. 3).

The record then shows the complainants invoking their rights and the State acting on them, often the same day.

**(1)** **11 February 2023.** Ms. Kaul, through counsel, lodged a written criminal complaint with the Ankara Batı Chief Public Prosecutor's Office, stating her loss of USD 8.7 million and that "[t]he organisation's crypto wallets have already been identified by us through an expert", and asking that the assets be blocked and the perpetrators identified (ECF 79-3, p. 2; December MASAK Report, pp. 6-7; Indictment, p. 135). On the record, it is the earliest dated step in the investigation.

**(2)** **20-22 February 2023.** On the complainants' wallet list of 20 February 2023, the prosecutor informed a Turkish exchange, Binance and Tether that an expert report had established that the assets subject to the offense were in the listed wallets, and instructed blocking and owner identification (Indictment, p. 136; December MASAK Report, p. 7). The prosecutor's letter to Tether is dated 20 February 2023, and Tether replied on 22 February 2023 under Ticket #365109 (ECF 79-4, p. 2). The same day, the U.S. Secret Service told Ms. Kaul that it had "exhausted preliminary recovery efforts" (e-mail of 22 February 2023, ECF 91-5).

**(3)** **28 February 2023.** The prosecutor requested seizure of the Binance wallets that day, and the complainants' petition of the same day identified accounts of the file suspects at Tether, as their application of 7 March 2023 records (December MASAK Report, p. 10). The same day, on the prosecutor's request reciting that the suspects held at Binance the assets "mağdur vekillerinin şikayetlerine konu olaylardan elde ettikleri" ("obtained from the events that are the subject of the complaints of the victims' counsel"), the Judgeship accepted the request and seized the wallets (Decision No. 2023/2001, pp. 1-2). Seventeen days after the complaint, a judge had restrained property on a request whose stated factual basis was the victims' complaints.

**(4)** **7 March 2023.** The complainants applied for seizure of identified Tether wallets "şikayetçilerin mağduriyetinin giderilmesi ve dolandırıcılık örgütünün şikayetçilerden elde ettiği menfaatin kaçırılmaması adına" ("to remedy the complainants' victimization and so that the benefit the fraud organization obtained from them is not spirited away") (December MASAK Report, p. 10). The same day the prosecutor wrote to Tether under "İVEDİ İŞ" ("urgent matter"), citing the risk that the assets "may be rapidly transferred by the perpetrators" and requesting blocking "çok ivedi olarak" ("as a matter of great urgency") (ECF 79-4, pp. 2, 4; December MASAK Report, p. 11).

**(5)** **6-14 March 2023.** The Turkish exchange's reply of 6 March 2023 identified the holder of the Member Exchange Account. The expert analysis of that wallet recited in the Indictment found that it had received a USDT transfer of USD 4,439,000 "only from" the Common Collection Wallet, the hub Ms. Kaul had identified (Indictment, p. 147). MASAK's own analysis records 18 transfers totaling USD 4,444,187 on the same leg between 3 January and 20 February 2023 (December MASAK Report, p. 20; Section 5). On 14 March 2023, on the prosecutor's request, Decision No. 2023/2480 seized that account and a TRON wallet (December MASAK Report, p. 8).

**(6)** **18 March-11 April 2023.** Ms. Kaul, through counsel, informed the prosecutor that the defrauded money had gone to the Manager Exchange Account at the same Turkish exchange and requested a block. The Indictment records: "bunun üzerine savcılık makamının talimatlarında ilgili şirkete bloke kararının iletildiği, cüzdan sahiplik bilgisi ve hesap hareketlerinin talep edildiği" ("thereupon, in the instructions of the Public Prosecutor's Office, the blocking order was conveyed to the company concerned and the wallet ownership information and account movements were requested") (p. 151). The exchange's reply of 21 March 2023 identified the

holder (p. 152), one of the five organization managers (pp. 308, 313), and Decision No. 2023/3506 seized the account on 11 April 2023 (December MASAK Report, p. 8). This step was Ms. Kaul's alone.

**(7)** **28 March 2023.** The complainants' petition identified a suspect deposit address that MASAK later used as a node of its analysis (December MASAK Report, p. 93).

**(8)** **11 August 2023.** The August decisions, including the August Custody Decision, rest on the same recital of the victims' counsel's complaints (Section 2).

Ms. Kaul's contribution was a network of wallets and routes, not an isolated address, and the official record says so. MASAK traces her transfers into the Common Collection Wallet and records that, "Mağdur Nivedita KAUL'un gönderim yaptığı çok sayıda adres olmakla birlikte" ("although there are many addresses to which Victim Nivedita KAUL made transfers"), only one is drawn, to simplify the graph (December MASAK Report, p. 55 and n. 3). The Indictment finds that the Common Collection Wallet is a cold wallet belonging to a charged organization member and turns to the wallets connected with the transfers of four named victims, Ms. Kaul among them (p. 307), and that two organization managers discussed the Intermediate Transfer Wallet in communications recovered under Decision No. 2023/9644 D.İş of the Istanbul 5th Criminal Judgeship of Peace of 13 October 2023 (p. 308). The recorded chain identifies the Upstream Funding Wallet as the source of the largest inflow into the Common Collection Wallet listed in the analysis the Indictment recites at pp. 147-148, USD 8,014,000. Under the same numbered heading that introduces her 18 March application (p. 151), the Indictment sets out the expert analysis of the Manager Exchange Account. That analysis found that the account received USD 5,467,000 in the last 41 days, all from the Intermediate Transfer Wallet, which had itself received USD 2 million from the Common Collection Wallet, and that "söz konusu kripto cüzdanları ile mağdurların dolandırılmasına konu olay arasındaki fiili ve hukuki bağlantının hiçbir aşamada kesilmediği" ("the factual and legal connection between the said crypto wallets and the incident of the defrauding of the victims was at no stage broken") (p. 152). MASAK's own analysis then recorded larger flows on the same route over a longer period: USD 22 million from the Common Collection Wallet to the Intermediate Transfer Wallet between 13 January and 28 April 2023, and USD 5.77 million from the Intermediate Transfer Wallet into the Manager Exchange Account (December MASAK Report, p. 25). The reports describe different amounts over their respective stated periods; the State's analysis independently confirmed the route Ms. Kaul's tracing had mapped. Her counsel's petition of 12 April 2023 in Investigation No. 2023/6371 was accompanied by her transfer listings (EK-1), which trace her

funds from the Victim-Transfer Receiving Wallet used as the starting point of the recorded tracing analysis (Indictment, p. 188) through intermediate wallets into the Common Collection Wallet, with transfers into the Common Collection Wallet from 22 December 2022 to 10 April 2023 (Petition of 12 April 2023, p. 1 and EK-1). The graph MASAK prepared eight months later follows the same wallets in the same sequence, with the same totals on the opening transfers: USD 418 thousand, USD 1.39 million, USD 589 thousand and USD 1.05 million (December MASAK Report, p. 55). Two law-faculty opinions obtained by the complainants' counsel before the August decisions, a scientific opinion of Assoc. Prof. Mete Tevetoğlu (Maltepe University Faculty of Law, 20 June 2023) and a legal opinion of Assoc. Prof. Pınar Çağlayan Aksoy (İhsan Doğramacı Bilkent University Faculty of Law, 11 July 2023), examined a transfer route through the Common Collection Wallet (Tevetoğlu, pp. 4-5; Çağlayan Aksoy, p. 6). Both found the factual and legal link along it unbroken. Tevetoğlu concluded that "fiili ve hukuki bağın herhangi bir suretle kesildiğine ilişkin bir bilgi veya emare bulunmamaktadır" ("there is no information or indication that the factual and legal link was in any way broken") (p. 7), and Çağlayan Aksoy reached the same conclusion (p. 6).

The record attributes specific steps to Ms. Kaul herself: her blockchain analysis, the identification of the Common Collection Wallet and its outflows to a Turkish exchange, her instruction to Turkish counsel and her 18 March application; the opening transfers MASAK graphed from the Victim-Transfer Receiving Wallet and the Indictment's trace at p. 188 concern her alone. The State's later work built outward from an investigation whose first recorded steps were the complainants' applications, and confirms rather than displaces her contribution. ECF 91 does not address that sequence: its "genesis" point concerns the U.S. Secret Service investigation (ECF 91, printed p. 2, ECF p. 5), and of the Turkish proceedings it says only that Ms. Kaul "makes reference to providing information to Turkish authorities to initiate an investigation" (printed p. 16, ECF p. 19).

## 8. FORMAL EXAMINATION, RECORDED LOSS, PARTICIPATION AND CONSENT

The Prosecutor Examination records rights advice, retained counsel and sworn interpretation, and its p. 4 records reading and signature by the examining public prosecutor, the clerk, Ms. Kaul, the interpreter and counsel. The Indictment summarizes that statement under the words "Müşteki NIVEDITA KAUL'un 08/11/2023 tarihinde Cumhuriyet Başsavcılığımızda alınan ifadesinde özetle" ("in summary, in the statement of Complainant NIVEDITA KAUL taken at our Chief Public Prosecutor's Office on 08/11/2023") (pp. 127-130). The Turkish record states her loss as USD 8.7

million in the complaint and in the official summaries of it (ECF 79-3, p. 2; December MASAK Report, p. 6; Indictment, p. 135). The Indictment records the loss as her own and charges the fraud "against Complainant NIVEDITA KAUL" (p. 380); in Turkish law, her status as the injured person rests on that charged act (see the next paragraph). The Indictment's summary of her statement also records that the fraudster pressed her daily to take out loans against her house (p. 128). Any borrowing and property consequences of the fraud are distinct loss heads; their computation is distinct from preservation and return of the identified property, and this opinion does not recalculate the claim.

Beyond the investigation-stage rights noted in Sections 7 and 10, CMK Article 234 gives the victim and complainant, in the prosecution stage, the rights to be informed of the hearing, join the prosecution, obtain copies, have witnesses summoned and, once joined, use legal remedies (Article 234(1)(b)); these rights are explained and minuted (Article 234(3)). Joinder is available until first-instance judgment (Article 237(1)), including by an oral application entered in the hearing minutes, and the court decides after hearing the prosecutor and the accused (Article 238(1), (3)). Legal remedies are open also to persons whose joinder request "karara bağlanmamış" ("has not been decided") and to those injured so as to be entitled to join (Article 260(1)). Whether a person is injured by the offense is determined "iddianamede gösterilen fiilin sabit olduğu ve suç teşkil ettiği varsayımına göre potansiyel olarak" ("potentially, on the assumption that the act shown in the indictment is proven and constitutes an offense"), not by the outcome of the trial (Criminal General Assembly, 12 April 2016, E.2014/11-830, K.2016/185, as quoted in Yargıtay 11th Criminal Chamber, E.2026/385, K.2026/5794, 1 June 2026). The Indictment identifies Ms. Kaul as the victim of the charged Article 158(1)(f) offense (p. 380). Her complainant status and statutory participation rights do not depend on a prior conviction.

The Hearing Minute of 14 March 2025 records rights advice and her response: "Davaya katılmak istiyorum" ("I wish to join the case"). Her examination was taken through a sworn interpreter with counsel present, and she confirmed her account (Hearing Minute, pp. 1-2). In its hearing minutes dated 30 April 2025, the Istanbul 19th Assize Court admitted Ms. Kaul as an intervening party in File No. 2024/277 under CMK Articles 237 and 238, recognizing her status as both müşteki (complainant) and müdahil (intervening party) (Istanbul 19th Assize Court, hearing minutes of 30 April 2025; ECF 79-2, ¶ 23). Independently of her joinder, CMK Article 260(1) opens legal remedies to her as a person injured by the offense in such a way as to be able to acquire intervening-party status. TCK Article 168 applies, among other offenses, to theft and fraud (Articles 141-142, 157-158), and Article 168(4) provides: "Kısmen geri verme veya tazmin halinde etkin pişmanlık hükümlerinin uygulanabilmesi için, ayrıca



mağdurun rızası aranır." ("In cases of partial return or compensation, application of the effective-repentance provisions additionally requires the victim's consent.") The Hearing Transcript, p. 10, records her refusal: "Hayır, ben bütün kaybettiklerimi istiyorum, suçlunun cezalandırılmasını istiyorum." ("No; I want all that I have lost, and I want the perpetrator punished.") The recorded statement explicitly withholds consent to partial-restitution effective repentance under TCK Article 168(4); no later consent is identified in the materials examined.

## 9. ISSUED, EXECUTED AND PRESENT CUSTODY

CMK Article 123(1) requires property values to be taken into safekeeping where useful as evidence and also where they "eşya veya kazanç müsaderesinin konusunu oluşturan" ("constitute the subject of confiscation of items or of proceeds"); they may be seized if not surrendered (Article 123(2)). Under Article 127(3), a seizure made without a judge's decision must be submitted for judicial approval within 24 hours, and the judge must announce the decision within 48 hours from the seizure itself, failing which it lapses automatically; that rule does not apply to a judge-ordered seizure, for which the Code sets no maximum duration. The person from whose possession the property was seized may at any time ask the judge for a decision (Article 127(4)), and the seizure "suçtan zarar gören mağdura gecikmeksizin bildirilir" ("shall be notified without delay to the victim injured by the offense") (Article 127(5)). CMK Article 128 permits seizure, on strong suspicion based on concrete evidence, for listed offenses including theft and fraud (Article 128(2)(a)), of the suspect's or accused's accounts at financial institutions, rights and receivables held with natural or legal persons, and other property values (Article 128(1)(c), (d), (h)), even where they are in the possession of a person other than the suspect or accused (Article 128(1)); Law No. 5549, Article 17(1) applies the same procedure to laundering-linked assets. Under Article 128(9), "ancak hâkim karar verebilir" ("only a judge may decide").

The 2023 measures rest on the CMK as then in force. Decision No. 2023/2001 was granted expressly under CMK Articles 123 and 127, and Decision No. 2023/2480 under Articles 123, 127 and 128 et seq. The August Custody Decision granted, "5271 sayılı CMK uyarınca", a request made under Articles 127 and 128 et seq., on two stated grounds: evidence, and property constituting the offense itself (Section 2). Those grounds are the two limbs of Article 123(1): property useful as evidence, and property constituting the subject of confiscation of items or proceeds. Each limb on its own supports the restraint, whether or not the property belongs to an identified suspect.

The victim-return outcome does not depend on which head is read into the grant. So far as the grant rests on the request made under Articles 127 and 128 et seq., Article 131(2) applies to Group G as property seized "128 inci madde hükümlerine göre" ("under the provisions of Article 128"): property so seized that belongs to the injured victim and is no longer needed as evidence "sahibine iade edilir" ("shall be returned to its owner"). Article 131(2) thus contemplates that property seized as the suspect's may prove to be the victim's. If the restraint were read as resting on Article 123 alone, the result is the same: any seized item belonging to a third person, a category that includes the victim, is returned, of the authority's own motion or on request, once it is no longer needed or will not be confiscated (Article 131(1)). In every case, proceeds may be confiscated only where they cannot be returned to the victim (TCK Article 55(1)). Article 128/A, added by Law No. 7571 of 24 December 2025, is not the source of the 2023 measures, but its paragraph (5) confirms the legislative policy: a seized benefit found to belong to the victim "soruşturma veya kovuşturma evresinde sahibine iade edilir" ("shall be returned to its owner during the investigation or prosecution stage").

A seizure of accounts, rights and receivables is executed by immediate notice to the institution or person holding them, followed by formal service (Article 128(5), (7)). For accounts, "Elkoyma kararı alındıktan sonra, hesaplar üzerinde yapılan bu kararı etkisiz kılmaya yönelik işlemler geçersizdir" ("after the seizure decision has been taken, transactions on the accounts aimed at rendering it ineffective are invalid") (Article 128(5)). That rule is written for accounts at banks and other financial institutions; it is the closest statutory guide for an issuer-controlled token balance, and its policy is that a transaction aimed at defeating the decision once made has no effect against the seizure. Article 128(8) provides: "Bu madde hükmüne göre alınan elkoyma kararının gereklerine aykırı hareket edilmesi halinde, Türk Ceza Kanununun 'Muhafaza görevini kötüye kullanma' başlıklı 289 uncu maddesi hükümleri uygulanır." ("Where the requirements of a seizure decision taken under this Article are acted against, TCK Article 289, headed 'Misuse of the duty of safekeeping', applies.") Judicial custody therefore does not require the court to hold private keys; it operates through a direction to the holder of the asset, here executed through the issuer. The Indictment itself explains that Tether can block and freeze USDT in wallets by smart contract (p. 33).

The August Custody Decision returned the file to the prosecutor for execution (ECF 79-5, pp. 3, 5). On 11 October 2023, the prosecutor wrote to Tether, marked "İVEDİ TALEPLİ" ("urgently requested"), recording that organization members had used the cold wallet in their acts and that its seizure had been ordered by Decision No. 2023/5986, and asking for an urgent block (ECF 79-6, pp. 2-

3). Tether's Compliance Department replied under Ticket #263780, which records submission of the request that day: "We can now confirm that [Group G (0x82e)] is now frozen" (ECF 79-7, p. 2; ECF 53, ¶ 8). The Indictment records that the prosecutor contacted Tether "kararın icrası için" ("for the execution of the decision"), that the asset was frozen through the Cybercrime Department of the General Directorate of Security, and that "hala bu bakiyenin blokeli şekilde bulunduğu" ("this balance still stands blocked") (p. 309). The judicial decision was issued on 11 August 2023; its execution through the issuer is documented by the request of 11 October 2023 and Tether's confirmation, and the continuing block is recorded in the January 2024 Indictment. Execution concerns enforcement, not existence: a decision does not become incomplete because the holder implements it later.

Objection lies against a judge's decision (CMK Article 267). The August Custody Decision states a seven-day period, the period in force in 2023; Law No. 7499 extended the general period in Article 268(1) to two weeks from 1 June 2024, and, under the provisional article it added to the CMK, the new period applies only to decisions given on or after that date, so decisions given in 2023 remain subject to the seven-day period (Law No. 7499, Articles 22 and 37(5)(ç)). "İtiraz, kararın yerine getirilmesinin geri bırakılması sonucunu doğurmaz" ("an objection does not have the effect of postponing the execution of the decision"), and only the issuing or reviewing authority may postpone it (Article 269); a decision on objection is final (Article 271(4)). A judge-ordered seizure ends only by a decision of a competent Turkish authority: on application (Article 127(4)), by return order of the public prosecutor, judge or court (Article 131(1)), on a successful objection (Article 271(2)), or on final disposition. No objection was lodged against Decision No. 2023/5986, and no postponement, lifting or return decision concerning Group G appears in the materials examined; Ms. Kaul, who states that she has party access to the Turkish file, attests that Decision No. 2023/5986 "has never been vacated, modified, or superseded" (ECF 79-2, ¶ 22). An issuer's burn or reissue, an exchange's internal transaction or a foreign seizure request is none of these acts.

## 10. WHY THE TURKISH MEASURES ARE NOT INCHOATE

The United States describes the Turkish measure as "an inchoate order which never matured into a judgment or a perfected lien to the defendant property", refers to "preliminary inchoate orders", and treats Ms. Kaul as a "general or unsecured creditor" (ECF 91, printed pp. 16-17; ECF pp. 19-20). It also says that she asserts an interest "without sufficient tracing to the actual property seized", relying on Secret Service tracing "using established accounting methods" (printed p. 16, ECF p. 19). It cites no

Turkish statute, decision or authority. “Inchoate”, “matured” and “perfected lien” belong to secured-credit and judgment-enforcement law, not to the categories in which Turkish law classifies a criminal-procedure seizure. Turkish law knows no separate perfection step; “perfected judicial custody” is used in this opinion only in the descriptive sense defined in point (1), and its U.S.-law classification is for the U.S. court. Measured against Turkish law, the August Custody Decision has these attributes.

**(1)** Complete as a custody decision. CMK Articles 127 and 128 distinguish an issued judicial seizure from an unconfirmed urgent measure; CMK Article 131 governs return and CMK Article 132 governs preservation. The Constitutional Court describes el koyma as “suç isnadı kapsamında uygulanan geçici bir koruma tedbiri” (“a provisional protective measure applied in connection with a criminal accusation”) and recognizes it as an interference with property (Hanife Ensaroğlu, App. No. 2014/14195, 20 September 2017, § 52). “Provisional” concerns duration and continued review, not an unformed application awaiting issuance. In this opinion, “perfected judicial custody” denotes a custody measure that has been issued by the competent judge and executed, on the prosecutor’s request, through the holder of the asset.

**(2)** A judicial act of the authority the Code designates (CMK Articles 127(1) and 128(9); Sections 2 and 9), made on the request and the investigation file. It is an adjudicated decision, not an application, prosecutorial request or private filing.

**(3)** Specific, identified property: twelve wallets identified by address, the tenth being Group G, whose whole content is restrained (ECF 79-5; Indictment, p. 309).

**(4)** A judicial characterization of the property as the offense itself (“bizatihi suç eşyası”), made on a request and investigation file reciting that the assets were obtained from the events complained of by the victims’ counsel. The reasoning uses “ihtimal” (“possibility”) in assessing the request; the Judgeship then finds the request lawful and issues an unconditional operative order. Neither the CMK nor the TCK prescribes an accounting convention, such as last-in, first-out, for attributing crypto-assets to an offense. Attribution is a matter of evidence, which “hâkimin vicdanî kanaatiyle serbestçe takdir edilir” (“is freely evaluated according to the judge’s conscientious conviction”), and the offense may be proved by “hukuka uygun bir şekilde elde edilmiş her türlü delille” (“any lawfully obtained evidence”) (CMK Article 217(1)-(2)). The request granted by the August Custody Decision was made “Dosyadaki tüm deliller bir arada değerlendirilerek” (“evaluating all the evidence in the file as a whole”), on a finding made from the account movements (ECF 79-5, pp. 2, 4), and the Indictment records that the transactions

under investigation were "designed in a highly intensive and complex way" (p. 377). Property constituting the subject of the offense ("suçun konusunu oluşturan") falls within TCK Article 55(1), and property subject to confiscation within CMK Article 123(1), the category whose disposition the victim-return rule governs.

**(5)** Operative from issue and executed through the issuer (Section 9). The seizure may be made even where the property is in the possession of a person other than the suspect (Article 128(1)), and within Türkiye acting against an Article 128 seizure attracts TCK Article 289 (Article 128(8)). Tether implemented the freeze on the prosecutor's request citing the decision (ECF 79-6, 79-7), and on the Indictment's record the freeze was maintained (p. 309). No release decision by a competent Turkish authority appears in the materials examined.

**(6)** No suspension, no lapse, release only by decision of a competent Turkish authority. CMK Article 131(1) authorizes return by the public prosecutor, judge or court, and the objection provisions supply judicial review routes (Section 9). A judge-ordered seizure has no statutory lapse; Article 127(3) applies only to seizures made without a judge. No objection was lodged against the decision, and no release or suspension decision concerning Group G is identified in the materials examined. Here the restraint preserves the property against which the victims' statutory return interests are asserted.

**(7)** Its disposition is governed by statute, so it need not have "matured into a judgment": return to the victim-owner (CMK Article 131(2)), confiscation only of what cannot be returned (TCK Article 55(1)) and only of items not belonging to good-faith third parties (TCK Article 54(1)) (Sections 12-13). The final judgment ends the seizure by ordering return or confiscation; it does not create it, and return need not await it (CMK Article 131(1)).

**(8)** Return of property, not payment of a debt. Turkish criminal procedure does not treat the injured victim as a creditor of the offender's estate at large. It speaks of "iade" (return) of seized property to its owner and gives the victim a statutory place in the seizure process: notice of it (CMK Article 127(5)) and, subject to Article 153, examination of the seized items through counsel (CMK Article 234(1)(a)(4)). From the first complaint, the Turkish file has treated the assets to be blocked as the victims' own: MASAK records that the complainants sought "mağdurlara ait malvarlıklarının bloke edilmesi" ("the blocking of the assets belonging to the victims") (December MASAK Report, p. 7; ECF 79-3, p. 2). A direction that victims be paid from a seized wallet, such as the prosecution has requested for Group G (Indictment, p. 389), is therefore not

a money judgment against the offender's estate at large; it is the disposition of identified seized property under CMK Article 131 and TCK Article 55(1), quantified by reference to what was taken from the victims.

**(9)** The prosecution has formally invoked that order for this wallet. The conclusion of an indictment must state the penalties and security measures sought (CMK Article 170(6)), confiscation under TCK Articles 54-55 being such a measure. The Indictment requests, as item 12, that from the blocked balance in the Group G cold wallet, "Ankara Batı 1.Sulh Ceza Hakimliginin 11/08/2023 gün ve 2023/5986 degisik is sayılı kararı ile el konulmasına karar verilen ve suç örgütünün eylemleri kapsamında kullandığı anlaşılan" ("the seizure of which was decided by Decision No. 2023/5986 D.İş of the Ankara Batı 1st Criminal Judgeship of Peace dated 11/08/2023, and which is understood to have been used by the criminal organization within the scope of its acts"), "… belirlenen bakiyenin … MAĞDURLARA ÖDENMESİNE" ("the balance determined [for the victims] … BE PAID TO THE VICTIMS"); and, as item 13, that only the USDT "Mağdurlara iade sonrası cüzdandaki bakiyeden kalacak olan" ("which will remain of the balance in the wallet after the restitution to the victims") be confiscated under TCK Articles 54 and 55 as "suç işlenmesiyle elde edilen ve suç örgütünün maddi menfati [sic] niteliğindeki" ("obtained through the commission of crime and in the nature of a material benefit of the criminal organization") (Indictment, p. 389). The request is directed at the seized wallet itself. It uses the statutory word "iade", and it makes State confiscation expressly conditional on prior restitution to the victims. That wording specifies the requested disposition of the residue; it does not negate the Indictment's separate characterization of the blocked corpus as criminal proceeds (p. 309).

**(10)** The measures advanced as the case matured: seizures under CMK Articles 123 and 127 for fraud and theft in February 2023; the August decisions, one again covering thirteen of those addresses and the other seizing Group G, within an organization-and-laundering investigation in August 2023; the Indictment recording Group G as still blocked and seeking payment to the victims first in January 2024; and trial, recorded as pending before the Istanbul 19th Assize Court, File No. 2024/277.

**(11)** Conclusion. A judicial decision with attributes (1) to (10) is not, in Turkish law, preliminary, unformed or awaiting maturation. Ms. Kaul's protection is the statutory victim-return priority attaching to identified property seized in the public criminal proceedings opened on the complaint lodged by Ms. Kaul and built outward from the wallets her tracing identified. That is

a statutory return priority over specific, judicially restrained property, which the prosecution has asked the trial court to apply to Group G (Indictment, p. 389); it is not, in Turkish law, the position of a general creditor looking to the offenders' assets at large. Its classification under 18 U.S.C. § 983(d)(6) is for the U.S. court.

## 11. PRESERVATION DUTIES AND INTERNATIONAL COOPERATION

TCK Article 289(1) penalizes disposing of seized property formally delivered for safekeeping otherwise than for the purpose of delivery, and Article 289(4) penalizes using property seized in an investigation or prosecution otherwise than for its purpose; CMK Article 128(8) applies these provisions to breaches of an Article 128 seizure. The measures necessary to preserve the value of seized property must be taken (CMK Article 132(4)), and the Constitutional Court has held that proving the property was preserved as received is the responsibility of the custodian administration (Ova Elektronik İletişim San. ve Tic. A.Ş., App. No. 2020/6618, 14 January 2025, § 56). Preservation is therefore an enforced legal obligation of the Turkish authorities, discharged here through the issuer's freeze; implementing a freeze gives the issuer no power to decide ownership or distribution. This opinion does not adjudicate any person's criminal liability.

Cooperation abroad is governed by Law No. 6706 on International Judicial Cooperation in Criminal Matters (Cezaî Konularda Uluslararası Adlî İş Birliği Kanunu) and the treaties it preserves (Article 1(3)); Turkish judicial authorities may request mutual legal assistance and, in urgent cases, request provisional measures to preserve evidence before submitting the assistance request (Article 7(1)(a)). The Law contains no provision by which a foreign seizure or forfeiture order, or an issuer's technical act, discharges a Turkish judicial seizure. Law No. 6706 makes a request for mutual legal assistance available; it does not condition the validity of a Turkish seizure on one. Ms. Kaul states, from the Turkish file to which she has party access, that the United States has never sought relief from the Turkish court and that no mutual legal assistance request or other formal U.S. process concerning Group G appears in the file (ECF 79-2, ¶ 22). The Turkish authorities chose to execute through the issuer: the decision was implemented through Tether (ECF 79-6, 79-7; Indictment, p. 309), and the Indictment asks that both the payment to victims and the confiscation of the residue be carried out by official letter to the Department of Combating Cyber Crime of the General Directorate of Security, the confiscation letter to be sent on to Tether (p. 389).

The U.S. filings give different investigation-start dates but identify no earlier U.S. judicial restraint over Group G. The United States' Verified Complaint, under the heading "Origin of the Investigation", dates the start of its investigation to November 2023 (ECF 1, ¶ 50). The complaint describes a request "[o]n or around November 20, 2023" that Tether "voluntarily freeze" approximately 225 million USDT at the subject addresses (¶ 172). That was not a judicial measure, and it came after the August Custody Decision and its execution request of 11 October 2023. The seizure warrant issued "[o]n or about May 1, 2025" (¶ 48). ECF 91 now asserts that the U.S. Secret Service "began this investigation on January 9, 2023" and that day asked Tether to "voluntarily freeze cryptocurrency subject to the investigation", which Tether declined the next day (ECF 91, printed p. 2, ECF p. 5). The e-mail it reproduces concerns "two wallet addresses with USDT linked to OKX accounts"; one line is redacted, and the address shown is the one the Verified Complaint defines as USDT Token Group A (ECF 91, printed p. 3, ECF p. 6; ECF 91-1; ECF 1, ¶ 15). Neither ECF 91 nor its exhibit identifies Group G. That request too was voluntary and unsuccessful. Ms. Kaul declares that on 27 January 2023, before any Turkish seizure, the Special Agent in Charge of the U.S. Secret Service San Francisco Field Office received analytics reports identifying the Group G wallet and its balance, and that his office declined to take preservation action (ECF 53, ¶ 17; ECF 79-2, ¶ 9(c)). Her declaration places the Group G address before U.S. law enforcement more than six months before Decision No. 2023/5986. On either account, no judicial restraint over Group G other than the Turkish seizure is shown before May 2025.

## 12. NETWORK PROCEEDS, TRANSFORMATION AND SUBSTITUTE PROPERTY

CMK Article 128(1) prevents third-party possession from defeating a qualifying seizure, so an intermediary address or the limited scope of an unrelated collection instrument does not answer the network-proceeds inquiry. TCK Article 55(1) covers benefits obtained through or constituting the subject of the offense "ile bunların değerlendirilmesi veya dönüştürülmesi sonucu ortaya çıkan ekonomik kazançların" ("together with the economic gains resulting from their investment or conversion"). It is not confined to the original medium taken; identified proceeds remain relevant when converted into lira, gold, cash dollars or property, the paths the Indictment and MASAK document (Sections 4-6). For Group G, the decision restraining it recites that the Tether-held wallets hold assets obtained from the events complained of by the victims' counsel (ECF 79-5), and the prosecution requests payment of the balance determined for the victims from the restrained corpus before confiscation of the residue (Indictment, p. 389). That requested allocation implements the victim-return condition in TCK Article 55(1).

The Indictment invokes both TCK Articles 54 and 55 for the residue of Group G, and both protect a non-participant owner. Article 55(2) provides for confiscation of corresponding value where the items or benefits "elkonulamadığı veya bunların merciine teslim edilmediği" ("cannot be seized or are not delivered to the competent authority"), and Article 54(2) provides for the value of items removed or consumed. Equivalent-value confiscation substitutes for property that cannot be reached; it is not a route around the victim-return condition for identified seized property. Where an issuer burns restrained units and issues replacements of the same identified value, the technical act does not extinguish the victim-return priority described in Sections 9-10. At the hearing of 23 July 2026, counsel for the United States described the burn and reissue in this case in the same terms: Tether "will destroy it and they will create separate cryptocurrency with the same value", "a sum representing the same exact thing as the currency that they were after" (ECF 84, Tr. 12:14-15, 13:18-20). Further identified proceeds may support supplementary seizure or return relief. TCK Article 55(3) protects only a subsequent acquirer who can rely on the good-faith provisions of the Turkish Civil Code No. 4721; an account label or intermediary holding does not by itself establish good faith.

## 13. VICTIM RETURN IS PRIOR TO STATE CONFISCATION OF PROCEEDS

CMK Article 131(2) provides: "128 inci madde hükümlerine göre elkonulan eşya veya diğer malvarlığı değerleri, suçtan zarar gören mağdura ait olması ve bunlara delil olarak artık ihtiyaç bulunmaması halinde, sahibine iade edilir." ("Items or other property values seized under the provisions of Article 128 shall be returned to their owner where they belong to the victim injured by the offense and are no longer needed as evidence.") Once those conditions are found, return is mandatory, not discretionary remission, and it does not await conviction. Under Article 131(1) return is decided "re'sen veya istem üzerine" ("of the authority's own motion or on request") by the "Cumhuriyet savcısı, hâkim veya mahkeme" ("the public prosecutor, the judge or the court"), and a refusal is open to objection.

TCK Article 55(1) provides: "Bu fıkra hükmüne göre müsadere kararı verilebilmesi için maddi menfaatin suçun mağduruna iade edilememesi gerekir." ("For a confiscation decision to be given under this paragraph, the material benefit must be incapable of being returned to the victim of the offense.") Proceeds confiscation is otherwise mandatory ("müsaderesine karar verilir"); the victim-return condition is what places the victim ahead of the State. The prosecution has invoked that order for Group G (Indictment, p. 389; Section 10(9)). CMK Article 131 supplies the return rule; CMK Article 132

governs the safekeeping of seized property and the preservation of its value. This opinion preserves the recorded loss and pleaded accessories without recomputing them.

Ms. Kaul is the named victim of the charged offense (Indictment, p. 380), and a complainant of record (p. 1) whose loss of USD 8.7 million is recorded in the Indictment (p. 135). Her position is a statutory victim position in a public prosecution in which identified property has been seized: she is entitled to notice of the seizure (CMK Article 127(5)) and, through counsel, to have the seized items and the evidence held in safekeeping examined (CMK Articles 153(4)-(5), 234(1)(a)(4)), and the seized property's disposition is governed by the return-first rules of CMK Article 131(2) and TCK Article 55(1). It is not that of an outside creditor with only a personal money claim. Ms. Kaul attests that her application for return under CMK Article 131(2) is pending before the trial court (ECF 79-2, ¶ 24).

The payment order is a separate instrument of enforcement without judgment (ilamsız takip) under the Execution and Bankruptcy Law (İcra ve İflas Kanunu, "İİK"). It is issued by the enforcement office (Article 60); the debtor may object within seven days of service (Article 62); and absent a timely objection, the enforcement becomes final and attachment (haciz) may be requested without a court judgment (Article 78). It records that Ms. Kaul asserted and quantified her claim in Türkiye (TRY 164,096,484.48, per ECF 53, ¶ 3) before the criminal complaint. It is identified here by reference only and is not used to measure or cap the loss recorded in the criminal file.

## 14. CONCLUSIONS FOR THE DISPUTED LEGAL RELATIONSHIPS

The Ankara Batı Indictment of 10 January 2024 brought an organized fraud-and-laundering prosecution of a sixty-person organization, the Grand Bazaar network, under TCK Articles 220 and 282, built on MASAK financial intelligence on which the prosecution relies. The offense against Ms. Kaul is charged as an organizational offense, and her route ends, on the State's own analysis, in the accounts and devices of the organization's management. The Indictment treats Group G as used by the organization within the scope of its acts (p. 389). That management converted proceeds into cash at the same Grand Bazaar currency-and-gold node that, on MASAK's September 2023 analysis, also served a front-company "professional laundering system", and the same individuals appear in both MASAK reports at that node. The September MASAK Report identifies the "M80"-coded tracking software within the system (pp. 309, 461) and a group of currency and gold companies, including a currency office and a gold firm, as the conversion node receiving intensive, one-directional transfers (p. 326); the

Indictment identifies the alleged organization leader and his group of companies (pp. 313-314, 375, 377). The Turkish proceeding is therefore a prosecution of the network and its proceeds system, not an in rem proceeding against a single asset: the organization's proceeds remain subject to identification as the proceedings continue (Section 12), successive seizures have followed across the network since February 2023 (Section 2), and each restrained asset is attributed to those proceeds by the decision restraining it, Group G by Decision No. 2023/5986; Group G is also the subject of the Indictment's return-first request (p. 389). Public reporting describes the same leadership, companies and "M80" internal accounting infrastructure in the Istanbul Grand Bazaar indictment, tracking funds through exchange offices and cryptocurrency accounts in that marketplace. The primary-record leadership, company and accounting-system links connect this case to Türkiye's widening enforcement against the Grand Bazaar conversion infrastructure.

Ms. Kaul is the originator and a continuing driver of the Turkish identification, blocking and seizure chain. She is a statutorily designated victim and complainant in the Indictment, her request to join the Istanbul trial is recorded (Hearing Minute, pp. 1-2) and she declares that she holds müdahil status (ECF 79-2, ¶ 23); her tracing analysis is recorded in the Indictment, and the State's analyses independently confirmed her core finding.

The August Custody Decision imposed Group G custody on the prosecutor's request under CMK Articles 127, 128 et seq., granted pursuant to CMK No. 5271, seizing the wallet as property constituting the offense itself, on a request reciting that the Tether-held wallets held assets obtained from the events complained of by the victims' counsel. It was executed through the issuer and recorded as still blocked when the Indictment was filed. It is complete and operative, it can be released only by a decision of a competent Turkish authority (CMK Articles 127(4), 131(1), 271(2)) or on final disposition, and no objection was lodged against it. It is not inchoate in Turkish law.

CMK Article 131 and TCK Article 55(1) place return to the victim before State confiscation, whichever head of the CMK is read into the grant; the prosecution has asked the trial court to apply that order to Group G. The recorded loss and the payment order remain distinct from final computation of other pleaded heads, and nothing here caps the pleaded claim or abandons its accessories. Ms. Kaul has explicitly refused the consent required for partial-restitution effective repentance under TCK Article 168(4) (Hearing Transcript, p. 10). This opinion identifies protected sources by title and pinpoint without annexing the private case file.

## SOURCE SCHEDULE - PROTECTED RECORDS NOT ANNEXED

Protected records are described and selectively quoted, not annexed. Printed pagination is used where present. Within quotations, ellipses mark omissions and square brackets mark editorial insertions. Wallets, persons and personal identifiers are treated as stated in Section 1.

**Indictment:** Ankara Batı Chief Public Prosecutor's Office, 10 January 2024, Investigation No. 2023/6371, Esas No. 2024/474, Indictment No. 2024/72, 390 pp. Printed pp. 1, 33, 127-130, 133, 135-136, 147-148, 151-152, 188: addressee court, complainant status, Tether's blocking capability, Ms. Kaul's statement and tracing, laundering method, complaint, blocking instructions, the Turkish exchange's replies, the recorded chain and the expert analyses recited; pp. 307-310, 313-314, 316, 322, 332, 338: wallet attributions, Group G seizure and continuing block, exchange responses, organization structure, MASAK and Central Bank basis, scale and operations; pp. 373-378, 380, 384: organization test, Grand Bazaar conversion, capacity, U.S. investigations, offense against Ms. Kaul, referral articles; p. 389: requested payment to victims from Group G before any confiscation.

**Prosecutor Examination:** İfade Tutanağı, 8 November 2023, pp. 1-4; p. 3: own analysis, the Common Collection Wallet and exchange tracing, sharing with U.S. agencies, prosecutor's inspection, counsel's confirmation and earlier petition; p. 4: signatures.

**Seizure decisions:** No. 2023/2001 D.İş, 28 February 2023, pp. 1-2; No. 2023/5985 D.İş, 11 August 2023, pp. 1-10 (neither lists Group G); Nos. 2023/2480 and 2023/3506 D.İş as recorded in the December MASAK Report, p. 8. **Public custody anchors:** ECF 79-3, p. 2 (complaint); ECF 79-4, pp. 2-5 (7 March 2023 letter: translation pp. 2-3, original pp. 4-5; wallet annex not filed); ECF 79-5, pp. 2-5 (August Custody Decision, translation and original; eleven of twelve wallets redacted); ECF 79-6, pp. 2-3 (11 October 2023 block request); ECF 79-7, p. 2 (Tether confirmation, Ticket #263780).

**December MASAK Report:** 26 December 2023, No. 2023-545-16-3961604, 185 pp., GİZLİ. Printed p. 1: commissioning; pp. 6-8, 10-11: complaint, instructions, Decisions Nos. 2023/2001, 2023/2480 and 2023/3506, 7 March 2023 application and Tether instruction; pp. 20, 25: the Common Collection Wallet, the Intermediate Transfer Wallet, the Manager Exchange Account and the Member Exchange Account flows; pp. 34, 49: Group G; pp. 55, 59, 77, 93, 116, 143, 145: network graphs, manager-device reference and exchange flows; pp. 63, 72, 107, 123: suspects' statements to the public prosecutor; pp. 130, 135, 137: transfers to, and cash withdrawals from, the group's companies. **September MASAK Report:** 11 September 2023, No. 2023-468/8-968/5-3717726, 473 pp., GİZLİ. Printed p. 1: subject and flow diagram; p. 22: statement on the pooled till; pp. 322, 327: disposal of front-company funds and transfers to the group's currency office; p. 326: the group's currency office and gold firm; p. 331: suspects connected with the forex platforms; p. 370: Central Bank findings; pp. 382, 391-394: natural-person transfers and onward crypto flows; pp. 309, 461: the M80 panel, the "System" and its tracking software. These are financial-analysis sources, distinct from the August Custody Decision.



**Hearing Minute and Hearing Transcript:** Ankara 23rd Assize Court, Delegated Examination No. 2025/40, 14 March 2025, for Istanbul 19th Assize Court File No. 2024/277; Hearing Minute pp. 1-2; Hearing Transcript p. 10. Istanbul 19th Assize Court, Hearing Minutes, File No. 2024/277 (30 April 2025) (admitting Ms. Kaul as an intervening party).

**Other materials:** petition of counsel for Ms. Kaul to the Ankara Batı Chief Public Prosecutor's Office, Investigation No. 2023/6371, 12 April 2023, p. 1, with EK-1 (transfer listings); scientific opinion (bilimsel mütalaa) of Assoc. Prof. Mete Tevetoğlu, 20 June 2023, 8 pp., pp. 4-5, 7; legal opinion (hukuki mütalaa) of Assoc. Prof. Pınar Çağlayan Aksoy, 11 July 2023, 7 pp., p. 6. The two opinions were obtained by the complainants' counsel; they are identified, not annexed.

**U.S. references:** ECF 1, ¶¶ 15, 48, 50, 172, 230; ECF 53, ¶¶ 3, 8, 17; ECF 79-2, ¶¶ 9(c), 22-24; ECF 84, Tr. 12:14-15, 13:18-20 (hearing of 23 July 2026); ECF 91, printed pp. 2-3, 16-17 (ECF pp. 5-6, 19-20); ECF 91-1; ECF 91-5; ECF 102, ¶¶ 20-21 (pp. 26-27), 23; ECF 102-5, pp. 2, 8 (The Wall Street Journal, 9 September 2026). **Public reports cited as context only, as summarized at ECF 102, ¶¶ 20-21:** Anadolu Ajansı, "'Kapalıçarşı soruşturması'nda 504 şüpheliye iddianame" (10 July 2026); Türkiye Gazetesi, "1112 iddianame, binlerce mağdur! Kapalıçarşı'da 'M80' ile 40 milyarlık para trafiği, kara para sistemi nasıl işledi?" (10 July 2026). **Further public reports cited as context:** Hürriyet, "Kara paranın 'M80' labirentini savcılık yıktı… 1548 sayfalık kapalıçarşı iddianamesi tamamlandı" (July 2026), https://www.hurriyet.com.tr/gundem/kara-paranin-m80-labirentini-savcilik-yikti-1548-sayfalik-kapalicarsi-iddianamesi-tamamlandi-43234730; Milliyet, "Kapalıçarşı iddianamesi! Kara para akışında 'M80' detayı" (July 2026), https://www.milliyet.com.tr/gundem/kapalicarsi-iddianamesi-kara-para-akisinda-m80-detayi-7621201; Milliyet, "Kapalıçarşı vurgunun iddianamesi tamamlandı! Kara paranın rotası çıkarıldı" (July 2026), https://www.milliyet.com.tr/gundem/kapalicarsi-vurgunun-iddianamesi-tamamlandi-kara-paranin-rotasi-cikarildi-7620576; Gazete Oksijen, "Kapalıçarşı'da kara para nasıl aklanmış?" (July 2026), https://gazeteoksijen.com/turkiye/kapalicarsida-kara-para-nasil-aklanmis-282507. The press reports name suspects and are not annexed.

## CASE LAW

**Anayasa Mahkemesi (Constitutional Court):** Hanife Ensaroğlu, App. No. 2014/14195, 20 September 2017, § 52; Ova Elektronik İletişim San. ve Tic. A.Ş., App. No. 2020/6618, 14 January 2025, § 56.

**Yargıtay (Court of Cassation):** 11th Criminal Chamber, E.2026/385, K.2026/5794, 1 June 2026, quoting the Criminal General Assembly, 12 April 2016, E.2014/11-830, K.2016/185.



## STATUTORY AUTHORITIES

**CMK (Law No. 5271):** Articles 123, 127, 128, 128/A (added by Law No. 7571 of 24 December 2025; context only), 131, 132, 153, 157, 160, 170, 217, 234, 237-238, 260, 267-269, 271; Law No. 7499 of 2 March 2024 (Official Gazette 12 March 2024, No. 32487), Article 37(5)(ç), amending Article 268(1) with effect from 1 June 2024 (Article 40(1)(b)), and Article 22 (provisional article on time limits, CMK Provisional Article 6(1)(c)).
https://www.mevzuat.gov.tr/mevzuat?MevzuatNo=5271&MevzuatTur=1&MevzuatTertip=5

**TCK (Law No. 5237):** Articles 54, 55, 141, 142, 157, 158, 168, 220, 282 and 289.
https://www.mevzuat.gov.tr/mevzuat?MevzuatNo=5237&MevzuatTur=1&MevzuatTertip=5

**Turkish Civil Code (Türk Medeni Kanunu, Law No. 4721):** good-faith provisions, as referred to in TCK Article 55(3).

**Law No. 5549 on the Prevention of Laundering of Crime Proceeds:** Articles 2, 4, 7, 17 and 18.
https://www.mevzuat.gov.tr/mevzuat?MevzuatNo=5549&MevzuatTur=1&MevzuatTertip=5.
**Regulation on the Examination of the Laundering Offense (Aklama Suçu İncelemesi Hakkında Yönetmelik):** Articles 5, 8 and 15.

**Law No. 6706 on International Judicial Cooperation in Criminal Matters (Cezaî Konularda Uluslararası Adlî İş Birliği Kanunu):** Articles 1 and 7.
https://www.mevzuat.gov.tr/mevzuat?MevzuatNo=6706&MevzuatTur=1&MevzuatTertip=5

**İİK (Law No. 2004, İcra ve İflas Kanunu):** Articles 60, 62 and 78.
https://www.mevzuat.gov.tr/mevzuat?MevzuatNo=2004&MevzuatTur=1&MevzuatTertip=3

Respectfully submitted for reliance in the above-captioned proceeding.

Istanbul, 12 October 2026

AV. SAMI YAVUZ
Attorney at Law
Yavuz Hukuk Bürosu
Istanbul Bar Association, Reg. No. 80156