**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

APPROXIMATELY 225,364,961 USDT,

Defendant *in rem*.

Civil Action No. 25-cv-01907-AHA

**CLAIMANT INFINIWEB TECHNOLOGY INC.'S OPPOSITION TO CLAIMANT NIVEDITA KAUL'S MOTION FOR LEAVE TO FILE AMENDED VERIFIED CLAIM**

## TABLE OF CONTENTS


BACKGROUND .......... 1

ARGUMENT .......... 3

I. Legal Standards .......... 4

II. Kaul's Proposed Amended Claim Is Futile Because She Fails to Colorably Allege a Valid Interest in the Defendant Property and Therefore Lacks Standing .......... 5

A. Kaul Fails to Plead that She Retained Title to the Defendant Property Following the Alleged Fraud .......... 6

B. Kaul Does Not Adequately Connect Kaul's Property to the Defendant Property .......... 9

C. The Turkish Proceedings Do Not Grant Kaul a Present Interest in the Contents of USDT Token Group G .......... 10

D. Kaul Is Not a Valid Assignee of Any Interest in the Defendant Property .......... 13

1. Kaul Fails to Allege the Assignors' Ownership Interests and Connections to the Defendant Property .......... 14

2. *Sprint Communications* Weighs in Favor of Dismissal Where, as Here, an Assignment Was Made in Bad Faith and in the Absence of an Ordinary Business Purpose .......... 14

3. Kaul Does Not Allege She Is a Bona Fide Purchaser for Value, as Required by the Applicable Forfeiture Statute .......... 15

E. Kaul Does Not Clearly State the Extent or Basis of Her Claimed Interest in the Defendant Property .......... 16

III. Kaul's Proposed Amended Claim Is Futile Because It Fails to Cure, and Compounds, the Original Claim's Untimeliness .......... 18

A. Kaul's Original Claim Was Untimely .......... 18

B. The Assigned Claims Are Untimely and Do Not Relate Back to the Original Claim .......... 20

CONCLUSION .......... 21

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Bell v. United States*,
462 U.S. 356 (1983)....................7

*In re: BP p.l.c. Sec. Litig.*,
No. 4:10-MD-2185, 2016 WL 29300 (S.D. Tex. Jan. 4, 2016)....................14

*Jibril v. Mayorkas*,
101 F.4th 857 (D.C. Cir. 2024)....................4

*Mayle v. Felix*,
545 U.S. 644 (2005)....................20

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
554 U.S. 269 (2008)....................14, 15

*United States v. 998 Cotton Street, Forsyth County, N.C.*,
No. 1:11-cv-356, 2013 WL 1192821 (M.D.N.C. Mar. 22, 2013)....................12

*United States v. $17,900 in U.S. Currency*,
859 F.3d 1085 (D.C. Cir. 2017)....................4, 11

*United States v. $240,100.00 in U.S. Currency*,
No. 1:14-cv-942, 2017 WL 2303985 (M.D.N.C. May 25, 2017)....................12

*United States v. $299,218.48 in U.S. Currency*,
719 F. Supp. 3d 85 (D.D.C. 2024)....................13

*United States v. $26,620.00 in U.S. Currency*,
No. 2:05-cv-50-WCO, 2006 WL 949938 (N.D. Ga. Apr. 12, 2006)....................6

*United States v. 47 10-Ounce Gold Bars*,
No. 03-cv-955-MA, 2005 WL 221259 (D. Or. Jan. 28, 2005)....................9

*United States v. 8 Gilcrease Lane, Quincy Fla. 32351*,
641 F. Supp. 2d 1 (D.D.C. 2009)....................5, 6

*United States v. 9276 Ridge Rd., Middleport, New York*,
No. 16-CV-318-A, 2018 WL 4681773 (W.D.N.Y. Sept. 28, 2018)....................6

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*,
480 F. Supp. 3d 1 (D.D.C. 2020)....................10

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*,
No. CV 04-0798 (PLF), 2020 WL 7640213 (D.D.C. Dec. 23, 2020).................... *passim*

*United States v. All Assets Held in Account No. XXXXXXXX in name of Doraville Properties Corp.*, 299 F. Supp. 3d 121 (D.D.C. 2018)....10

*United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185 (D.C. Cir. 1995)....9

*United States v. Emor*, 785 F.3d 671 (D.C. Cir. 2015)....6, 7, 8

*United States v. Hicks*, 283 F.3d 380 (D.C. Cir. 2002)....20

*United States v. Real Property Known as 7501 N.W. 210th Street*, 437 F. App'x 754 (10th Cir. 2011)....19

*Warth v. Seldin*, 422 U.S. 490 (1975)....5

**Statutes**

18 U.S.C. § 983....6

18 U.S.C. § 983(a)(4)(A)....4

18 U.S.C. § 983(d)(3)(A)....16

18 U.S.C. § 983(d)(6)....6, 13

18 U.S.C. § 983(d)(6)(A)....11, 15

28 U.S.C. § 1654....15

28 U.S.C. § 2465....17

**Other Authorities**

Fed. R. Civ. P. 12(f)....2

Fed. R. Civ. P. 15(a)(1)....4

Fed. R. Civ. P. 15(a)(2)....4

Fed. R. Civ. P. 15(c)(1)(B)....20

L. Levenson & A. Ricciardulli, *California Criminal Law* § 9:2 (2025-2026 ed.)....7

Stefan D. Cassella, *Asset Forfeiture In The United States: A Treatise On Forfeiture Law* (2006)....5

Supp. R. G(4)(b) ....................19
Supp. R. G(4)(b)(i) ....................19
Supp. R. G(5) ....................4
Supp. R. G(5)(a)(i) ....................17
Supp. R. G(6) ....................4
Supp. R. G(8)(c)(i) ....................4

Claimant Nivedita Kaul's proposed amended claim neither pleads a cognizable interest in the defendant property nor cures her original claim's untimeliness. Each of those defects defeats Kaul's standing and renders amendment futile—independent of the additional deficiencies identified earlier today in the Government's Motion for Extension of Time (ECF No. 106).

Kaul's proposed amended claim fails to establish standing in myriad ways. She does not plead that she retained title to the funds she originally transferred, explain how her property connects to the defendant property from Wallet 0x82e, or establish why the Turkish government's enforcement and seizure measures vest her with a present property interest in the defendant property. Nor do purported assignments from 159 victims fill those gaps: the amendment does not adequately identify the assignors' underlying interests or explain how the assignments satisfy the applicable statutory requirements. The amendment also fails to cure the original claim's untimeliness and adds distinct assigned interests that do not relate back to that filing. Because the proposed amendment supplies neither a cognizable property interest nor a basis for treating the claim as timely, Kaul would lack statutory, Article III, and prudential standing even if amendment were permitted. As a result, amendment would be futile, and Claimant Infiniweb Technology Inc. ("Infiniweb") respectfully requests that the Court deny Kaul's motion for leave to amend her claim ("Motion to Amend," ECF No. 104).

## BACKGROUND

The United States filed its Verified Complaint for Forfeiture In Rem (the "Complaint" or "Compl.") on June 18, 2025, seeking forfeiture of approximately 225,364,961 USDT associated with seven cryptocurrency addresses. ECF No. 1. Those assets include approximately 87,464,642 USDT designated "USDT Token Group G," associated with Wallet 0x82e. *Id.* ¶ 15. The government published notice of the action on forfeiture.gov for thirty consecutive days beginning

June 23, 2025. Its subsequently filed Declaration of Publication identified August 22, 2025, as the deadline for claims responsive to publication. ECF No. 5-1.

Approximately seven months later, on March 17, 2026, Kaul, then represented by counsel, filed a Verified Claim asserting an interest in the contents of Wallet 0x82e. ECF No. 53. The claim described Kaul as a fraud victim, an original innocent owner, and a judgment creditor whose interest was secured by a purported prior perfected judicial lien arising from Turkish proceedings. *Id.* ¶¶ 1, 25, 28. It sought recovery of at least $25,461,000, including an asserted $8.7 million principal debt, accrued interest, and Turkish legal fees and costs. *Id.* ¶¶ 3–4. Kaul filed her Answer on April 7, 2026, and the Court granted her counsel's motion to withdraw on May 18, 2026. ECF No. 54.

Proceeding *pro se*, Kaul filed a motion on July 23, 2026, seeking an emergency preliminary injunction preserving the assets attributable to Wallet 0x82e, bifurcation and advancement of trial concerning that wallet, and, alternatively, dismissal of the forfeiture as to those assets. ECF No. 79.

On August 14, 2026, the government moved to strike Kaul's Verified Claim, Answer, and preliminary-injunction filing. ECF No. 91. As relevant here, the government argued that Kaul's claim was untimely, that she had not established a sufficiently specific interest in the defendant property or adequately traced her property to it, and that the Turkish measures were "inchoate" and did not establish a judgment or perfected lien against the defendant property sufficient to distinguish her from a general unsecured creditor. *Id.* at 19–23. The government also sought to strike Kaul's preliminary injunction motion as redundant, immaterial, impertinent, and scandalous under Rule 12(f). *Id.* at 22.

On September 30, 2026, after Kaul indicated that she intended to amend her claim, the Court entered a minute order directing her to file a motion for leave to amend by October 14, 2026.

The minute order made no determination as to the timeliness of either Kaul's original claim or her expected proposed amended claim. Kaul filed her motion for leave to amend on the specified date, attaching a proposed Amended Verified Claim that expands on her original ownership and Turkish-law theories and adds interests allegedly assigned to her by 159 other victims, reporting approximately $94.5 million in aggregate losses. Motion to Amend; Proposed Amended Claim ("PAC"), ECF No. 104-1 ¶¶ 88–92 & Sched. A. Her conferral statement states that both the government and Infiniweb opposed the requested amendment. Motion to Amend at 2. The Court subsequently authorized the government and Infiniweb to submit briefs opposing Kaul's motion for leave to amend by October 22, 2026.

## ARGUMENT

Granting Kaul leave to file her proposed amended claim would be futile for several independent reasons. The proposed amended claim's allegations that Kaul has an interest in the defendant property as a crime victim and judgment creditor fail on Article III and statutory standing grounds because neither constitutes a colorable, cognizable interest in the defendant property. Her purported interest as assignee of others' property is similarly nonviable, because the prudential standing doctrine prohibits assertion of the rights of third parties, and because the assignments are inconsistent with both the applicable civil forfeiture statute and the case law. And all three of these purported interests are unavailing for two further, independent reasons. First, Kaul fails to clearly state a specific interest in the defendant property, in contravention of the clear language of Supplemental Rule G. And second, because Kaul's claim was filed severely out of time, Kaul lacks statutory standing—and Kaul's proposed amendment not only fails to cure her claim's unexcused untimeliness, but it exacerbates it by adding additional grounds, relating to assigned interests, that do not relate back to the original claim. Accordingly, the Court should deny Kaul's motion for leave to amend her claim.

## I. Legal Standards

Once amendment as of right is unavailable,[1] Rule 15 generally allows a party to amend a pleading only with the opposing parties' written consent or the court's leave. Fed. R. Civ. P. 15(a)(2). Under the rule, "[t]he court should freely give leave when justice so requires." *Id.* Determination of what "justice so requires" involves analysis of whether "the proposed claim would . . . survive a motion to dismiss." *Jibril v. Mayorkas*, 101 F.4th 857, 870 (D.C. Cir. 2024). If not, "[a] district court may deny a motion to amend . . . as futile." *Id.* (internal quotation marks omitted). Because the pleading at issue here is a claim, the applicable standards derive from 18 U.S.C. § 983(a)(4)(A), which requires that "any person claiming an interest in the seized property . . . file a claim asserting such person's interest in the property in the manner set forth in the Supplemental Rules for . . . Admiralty and Maritime Claims [and Asset Forfeiture Actions]" (the "Supplemental Rules"). Supplemental Rule G, in turn, requires (in relevant part) that a claim "identify the specific property claimed," "identify the claimant and state the claimant's interest in the property," and establish that the claimant has standing. Supp. R. G(5), (6), (8)(c)(i). A claim that does not meet these requirements may be struck. Supp. R. G(8)(c)(i).

Standing in a civil asset forfeiture case is multifaceted, encompassing Article III standing, statutory standing, and prudential standing. *United States v. $17,900 in U.S. Currency*, 859 F.3d 1085, 1089 (D.C. Cir. 2017); *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, No. CV 04-0798 (PLF), 2020 WL 7640213, at *5 & n.3, *13 (D.D.C. Dec. 23, 2020). "The term 'statutory standing' relates to a claimant's ability to show that he has satisfied whatever statutory requirements Congress has imposed for contesting a civil forfeiture action in federal court," such

[1] Kaul is not entitled to amend her claim as of right because she waited more than twenty-one days after filing her claim on March 17, 2026 (ECF No. 53) to seek leave to amend, and because a claim is not a pleading "to which a responsive pleading is required." Fed. R. Civ. P. 15(a)(1).

as the timely filing of a verified claim fulfilling the requirements of Rule G. *United States v. 8 Gilcrease Lane, Quincy Fla. 32351*, 641 F. Supp. 2d 1, 5–6 (D.D.C. 2009) (citing Stefan D. Cassella, *Asset Forfeiture In The United States: A Treatise On Forfeiture Law* § 9-4 at 326 (2006)). "'Article III standing' or 'constitutional standing' relates to the claimant's ability to show that he has a sufficient interest in the property to satisfy the case-or-controversy requirement of Article III of the Constitution." *Id.* (cleaned up). Article III standing "turns upon whether the claimant has a sufficient interest in the property to create a case or controversy," meaning "a cognizable interest in the assets potentially subject to forfeiture." *Bank Julius Baer*, 2020 WL 7640213, at *5–6 (citations omitted). And prudential standing requires that a party "generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at *13 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

## II. Kaul's Proposed Amended Claim Is Futile Because She Fails to Colorably Allege a Valid Interest in the Defendant Property and Therefore Lacks Standing

Kaul's proposed amended claim asserts three types of interest in the defendant property. First, it asserts that as a victim of fraud and the "original innocent owner" of assets whose proceeds are now defendant property, she "continues to have . . . an ownership interest in the assets of Wallet 0x82e." PAC ¶ 14. Second, Kaul's proposed amended claim asserts that Kaul is a judgment creditor who holds a cognizable interest in the defendant property due to "[p]erfected judicial custody and judicial lien." *Id.* Third, the proposed amended claim asserts that Kaul is the assignee of various interests previously held by others. *Id.* ¶ 8. None of these is adequately pleaded in the proposed amended claim. As to the fraud-victim and original innocent owner theory, Kaul fails to adequately plead that she retained title to the defendant property following the alleged fraud. As to the judicial-lien theory, Kaul fails to allege that the various Turkish legal documents to which she refers grant her a property interest in the defendant property. As a result, Kaul lacks Article III

and statutory standing with respect to each theory. *See Bank Julius Baer*, 2020 WL 7640213, at *7–8 (determining whether claimant had Article III standing by evaluating whether claimant had a "cognizable interest in the assets" under 18 U.S.C. § 983); *United States v. $26,620.00 in U.S. Currency*, No. 2:05-cv-50-WCO, 2006 WL 949938, at *6 (N.D. Ga. Apr. 12, 2006) (person who claims to be owner of defendant property but who lacked possession at the time of its seizure must satisfy definition of "owner" in § 983(d)(6) to establish Article III standing); *8 Gilcrease Ln., Quincy, Fla., 32351*, 641 F. Supp. 2d at 5 (statutory standing requires establishment of legal interest in the property that qualifies under § 983(d)(6)); *United States v. 9276 Ridge Rd., Middleport, New York*, No. 16-CV-318-A, 2018 WL 4681773, at *2 (W.D.N.Y. Sept. 28, 2018) (same). And as to the assignment theory, Kaul fails to allege that she is a bona fide purchaser for value, as required by both the forfeiture statute and by case law addressing assignment of litigation interests and prudential standing.

### A. Kaul Fails to Plead that She Retained Title to the Defendant Property Following the Alleged Fraud

Kaul claims that she holds an interest by virtue of her status as the "original innocent owner" of an $8.7 million portion of the defendant property. Yet Kaul's filings indicate that she lacks title to those funds because she was a victim of theft by false pretenses, which results in the transfer of title to the underlying property, not embezzlement or larceny by trick, which do not. Because Kaul has failed to allege retained ownership, she lacks the continued ownership interest necessary to support a claim.

An earlier round of briefing focused on *United States v. Emor*, 785 F.3d 671 (D.C. Cir. 2015), which even by Claimants 1–118's account held that "a theft victim who can prove their property was stolen may establish legal title or a superior legal interest in forfeiture proceedings." Claimants 1–118's Opposition to Plaintiff's Motion to Strike, ECF No. 72 at 6–7. As Claimants

1–118 explained, *Emor* involved funds embezzled from a charter school network by the network's founder. *Id.* at 17; *Emor*, 785 F.3d at 678. Similarly, the art-theft hypothetical discussed in the *Emor* opinion involved misappropriation of property (a painting) by someone who had lawful access to it and simply abused that right of access (an art museum employee, who wrongfully sent the painting to his own home rather than another museum, as intended). *Emor*, 785 F.3d at 679. Because each of these victims never intended to hand over title, it was retained, and on that basis each victim would be able to file a claim in an asset forfeiture proceeding. *Id.* But *Emor* conceded that, unlike a victim of larceny by trick or embezzlement, whose title was never relinquished, "a fraud victim could be relegated to the ranks of general creditors and, lacking the ability to claim a constructive trust, have a more difficult time regaining its property." *Id.* Indeed, as Claimants 1–118 further note, in *Bell v. United States*, the Supreme Court drew a similar line between larceny by trick and false pretenses, a species of fraud: "The theoretical distinction between false pretenses and larceny by trick may be stated simply. If a thief, through his trickery, acquired title to the property from the owner, he has obtained property by false pretenses; but if he merely acquired possession from the owner, he has committed larceny by trick." 462 U.S. 356, 359–60 (1983).[2]

To prevent a finding that they gave up title to their property, Claimants 1–118 argued that they "were informed they were moving their property to accounts they owned and controlled, and

[2] Kaul appears to live in California, *see* Motion to Amend at 14, and this same distinction between false pretenses, on the one hand, and larceny by trick or embezzlement, on the other, also holds under California law. *See* L. Levenson & A. Ricciardulli, *California Criminal Law* § 9:2 (2025–2026 ed.) ("[California] Penal Code § 484(a) covers not just the crime of obtaining property by false pretenses, but also the related crimes of larceny (taking of another person's property, either by trespass or by trick) and embezzlement (the appropriation of property by one to whom it has been entrusted). The three offenses are closely related. A defendant commits larceny by trick when he or she fraudulently induces the victim to part with possession of property. By contrast, the crime of obtaining property by false pretense is committed when the victim is induced by fraud to part with both possession and title." (citations omitted)).

as alleged, never contemplating giving up title to the property. Unbeknownst to them, the criminals diverted Claimants' property for the criminals' own use." ECF No. 72 at 18–19. Indeed, Claimants 1–118's claim specifies that those claimants did not invest cash but rather "deposited their virtual currency" and "believed . . . that they would maintain custody and control of their virtual currency funds." ECF No. 14 at 2. Because claimants were tricked into giving up possession, but not title, to their property, they were purportedly victims of larceny by trick, not false pretenses, meaning they can "argue [their] title was never relinquished." *Emor*, 785 F.3d at 679. This Court signaled at the July 23, 2026 hearing that it likely agrees with this analysis.

By contrast, Kaul has not pleaded that she was a victim of theft in the form of larceny by trick or embezzlement. Rather, the allegations in her proposed amended claim and other filings are consistent with a false pretenses theory of investment fraud. The proposed amended claim states that Kaul "is the original innocent owner of assets taken from her by the organized fraud whose proceeds are now before this Court, and she is a victim of that fraud." PAC ¶ 1. The attached Turkish legal opinion states, "the fraudster pressed her daily to take out loans against her house," ECF No. 104-3 at 20, and her own Turkish criminal complaint states, "Our clients invested in the crypto exchange belonging to the suspects and, as a result, their withdrawal transactions have been suspended." ECF No. 79-3 at 2. Earlier, Kaul told a local District Attorney's Office, "The scammer used a fake trading website to show that I had made millions by trading." ECF No. 91 at 7. Thus, as Kaul has pleaded the facts, she is a fraud victim who willingly "invested" funds in the expectation of receiving crypto in return, but who received nothing but a series of false representations on an app concerning a fictitious account. This is consistent with the allegations in the government's Complaint, which repeatedly uses the word "invest" to describe a scheme in which victims "invest[] . . . funds" through a fake mobile banking or investment app in exchange

for "investments into non-existent, perpetrator-controlled platforms [that] are realizing substantial gains." Compl. ¶¶ 40–44, 85. In short, the pleadings suggest that Kaul was a fraud victim who relinquished title to her funds in exchange for consideration that never materialized. That is fraud by false pretenses, and on that record, Kaul has failed to allege transaction facts necessary to invoke *Emor*'s retained-title principle.

Regardless, this is not a case involving nonprofit funding or art theft; and to deposit funds with what one believes to be a financial institution is to willingly relinquish both possession and title to those funds. For instance, "bank depositors, as general creditors, have no interest in the specific accounts to which their deposits might be traced, only in the defendant's estate as a whole—and therefore can have no interest in particular assets forfeited." *United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185, 1191 (D.C. Cir. 1995). The same is true of customers of other financial businesses; they lack standing to contest forfeiture of the funds they provide to those businesses, or other assets acquired with those funds. *United States v. 47 10-Ounce Gold Bars*, No. 03-cv-955-MA, 2005 WL 221259, at *4 (D. Or. Jan. 28, 2005) (customers who sent money to broker to buy gold and silver lacked standing to contest forfeiture of gold bars). Accordingly, Kaul is, at best, a general creditor who lacks a specific interest in the defendant property.

### B. Kaul Does Not Adequately Connect Kaul's Property to the Defendant Property

Even assuming Kaul retained ownership of the assets originally transferred, the proposed amended claim does not adequately allege the assets' connection to the forfeited balance. Kaul alleges that she has traced her funds into a "Common Collection Wallet" and through various collection and management accounts. PAC ¶¶ 46–48, 57–61. But she separately characterizes Wallet 0x82e, or Group G, as a wallet that is part of the same criminal network, without

comparably alleging a bridge between her property and Group G. *Id.* ¶ 4. Common control of the collection wallet and Group G, and laundering infrastructure connecting the two, cannot establish ownership over the contents of Wallet 0x82e by any particular victim of the network. Kaul need not plead every transaction, but her conclusory assertion of ownership, coupled with her claim to "Group G as a whole," does not explain how her property or its identifiable proceeds are tied to Group G. *See id.* ¶¶ 11, 14, 143.[3]

### C. The Turkish Proceedings Do Not Grant Kaul a Present Interest in the Contents of USDT Token Group G

Kaul alternatively pleads that she has an interest "in USDT Token Group G and its substitutes . . . protected by the Turkish court's perfected judicial custody and . . . secured by a prior perfected judicial lien." PAC at 2. This theory also fails; none of the Turkish legal documents on which Kaul relies grants her a cognizable interest in the defendant property.

With respect to an alleged property interest grounded in foreign law, while "the nature of a claimant's asserted property interest is defined by the law of the . . . nation . . . in which the interest arose . . . federal law determines the effect of that interest on the claimant's right to bring a claim." *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 480 F. Supp. 3d 1, 13 (D.D.C. 2020) (cleaned up). To plead a "colorable claim" on property, a claimant must allege a "present right" to an "ownership or possessory interest." *See United States v. All Assets Held in Account No. XXXXXXXX in name of Doraville Properties Corp.*, 299 F. Supp. 3d 121, 135, 137 (D.D.C.

---

[3] Kaul's failure to connect her assets to Wallet 0x82e's contents is unsurprising in light of the U.S. Secret Service's conclusion that her "funds are not part of the current balance in this wallet address, according to the accepted accounting methods we utilize when tracing ETH and tokens. . . . This address received . . . 55,988.74 USDT in proceeds traceable to your fraud. These funds were then expended." ECF No. 91 at 13 (email from Agent Andrew Frey to Nivedita Kaul dated June 6, 2023). As the government explains, Kaul was informed around this time that "her property did not trace to the defendant property" but "her loss may be traceable to an action in the District of Colorado." *Id.*

2018) (granting in part a motion to strike claimants who were beneficiaries of discretionary trusts because their rights were contingent on the discretion of the trustees and they lacked present rights to any specific trust property); *$17,900 in U.S. Currency*, 859 F.3d at 1090 (noting that the "colorable claim" on the property is "typically" an "ownership or possessory interest").

None of the Turkish legal documents Kaul points to alleges a present ownership or possessory interest. Kaul's proposed amended claim makes clear that it rests largely on "Decision No. 2023/5986 D.Is., issued August 11, 2023 in the proceeding opened on her complaint," which purportedly "placed Group G under perfected judicial custody." PAC ¶ 14. The various statements in papers filed by Kaul concerning Decision No. 2023/5986 D.Is. confirm that it is not "an ownership interest in the specific property sought to be forfeited," whether in the form of a "lien," a "recorded security interest," or otherwise, as required by 18 U.S.C. § 983(d)(6)(A). Rather, a translation of Decision No. 2023/5986 D.Is. reveals that the document is a seizure order, and it nowhere indicates that it grants Kaul a lien or any interest in the property. ECF No. 79-5. Kaul herself characterizes it as a "judicial seizure order," Preliminary Injunction Motion, ECF No. 79 at 1, conferring "perfected *judicial* custody," Motion to Amend at 7 (emphasis added), based on the notion that "the wallet content 'themselves in the nature of items of the offence' and 'of evidential value.'" ECF No. 79-1 at 6. As she explains, the Decision merely "directed that the property be held by the court." *Id.* at 11.

Kaul attempts to avoid the conclusion that the seizure order does not grant her a lien or other possessory or ownership interest by noting that the Turkish prosecutors have requested victim-first distribution of the property and that she has a statutory return priority once it is no longer needed for evidentiary purposes. PAC ¶¶ 76–80, 143. But even accepting these statements as true, Kaul has nothing more than an expectation; nowhere do the papers filed in connection with

her motion state that either the prosecutors' request to the Turkish court or the Turkish statutory provision governing subsequent disposition of seized property grants Kaul a lien or any other right to the property. Indeed, in *Bank Julius Baer*, the court rejected the argument that another country's "'restraining order' that freezes . . . assets" gave a claimant a cognizable interest in those assets merely on the ground that the assets could later be used to satisfy a future judgment against the claimant. 2020 WL 7640213, at *7–9 ("Even if Mr. Lazarenko could show that Ukraine has a legally enforceable interest in the Liechtenstein Accounts, he has failed to articulate how that would give him any interest in those assets under Liechtenstein law."). And courts have similarly held that an expectation is not an "ownership" interest for standing purposes. *See United States v. $240,100.00 in U.S. Currency*, No. 1:14-cv-942, 2017 WL 2303985, at *5 (M.D.N.C. May 25, 2017) (separated spouse lacked standing to claim husband's property despite expectation of equitable distribution of marital property under state law); *United States v. 998 Cotton Street, Forsyth County, N.C.*, No. 1:11-cv-356, 2013 WL 1192821, at *6–7 (M.D.N.C. Mar. 22, 2013) (same). The seizure order confers, at most, an interest in the Republic of Türkiye, which gives Kaul no cognizable property interest and which Kaul lacks standing to assert. Indeed, the seizure order covers the entirety of the funds in Wallet 0x82e, but Kaul does not explain whether, how, or why she would be entitled even under Turkish law to the full contents of that wallet, given her stated loss amount of $8.7 million, further demonstrating that Kaul is substituting the Turkish government's seizure of the property for her own interest in it.

The other Turkish legal documents Kaul cites fare no better. Kaul claims that both of her interests—her interest as an innocent owner and her interest as a purported lienholder—"are reinforced by the Turkish judicial restraints issued in Investigation No. 2023/6371." PAC ¶ 14. Specifically, Kaul states that her loss is "liquidated in the Payment Order for Proceedings without

Judgment issued by the Republic of Turkiye Azdavay Execution Office on February 6, 2023." *PAC* ¶ 15. Yet she concedes that this Payment Order "carries the legal force of a money judgment under the Turkish Enforcement and Bankruptcy Law." *Id.* A money judgment, without an accompanying attachment, perfected lien, or other property-specific right under applicable law, ordinarily establishes a personal claim against the debtor rather than an interest in a particular asset. Unsurprisingly, then, Kaul has separately acknowledged, in her preliminary injunction motion, that "February 2023 Payment Order names Ling Sun Dylon and Kai Li Kelly as debtors." ECF No. 79-1 at 10. *See also* ECF No. 79-4 (copy of payment order). Thus, it is an *in personam* money judgment—exactly the type of "general unsecured interest in, or claim against, the property or estate of another" that is excluded from the definition of "owner" in 18 U.S.C. § 983(d)(6). *See also United States v. $299,218.48 in U.S. Currency*, 719 F. Supp. 3d 85 (D.D.C. 2024) (claimant holding only an *in personam* judgment and a lien against the debtor remained a general unsecured creditor for § 983(d)(6) purposes). Simply put, even accepting as true Kaul's representations concerning the Turkish legal proceedings, those proceedings grant Kaul no cognizable interest in the defendant property.

**D. Kaul Is Not a Valid Assignee of Any Interest in the Defendant Property**

Kaul's proposed amended claim also fails to the extent that it asserts claims that were assigned to her, because she does not allege adequate facts concerning the assignors' purported interest in the defendant property, and does not allege that she is a bona fide purchaser for value, as required by both the forfeiture statute and case law governing assignment of litigation interests and addressing prudential standing.

**1. Kaul Fails to Allege the Assignors' Ownership Interests and Connections to the Defendant Property**

Kaul labels all 159 assigned interests as ownership interests, but she does not individually explain the transactions or circumstances from which each of those claims arose, or their specific connections to the defendant property. *See* Motion to Amend at 10. Indeed, her proposed amended claim expressly distinguishes reported losses from amounts traceable to defendant property. PAC at 59 (Sched. A). A valid assignment conveys only the assignor's existing interest, and Kaul can possess, at most, the interest held by each assignor. Yet here she fails to allege what those interests are or how they are connected to the defendant property. For that reason alone, she has not alleged that the assignments confer a colorable, cognizable interest, and her claim must be rejected for want of Article III and statutory standing to the extent it relies on the assignments.

**2. *Sprint Communications* Weighs in Favor of Dismissal Where, as Here, an Assignment Was Made in Bad Faith and in the Absence of an Ordinary Business Purpose**

To support her standing as an assignee, Kaul relies on *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269 (2008). But that opinion expressly notes "that in this litigation, there has been no allegation that the assignments were made in bad faith. We note, as well, that the assignments were made for ordinary business purposes. Were this not so, additional prudential questions might perhaps arise." *Id.* at 292. At least one court has thus dismissed assignee plaintiffs' complaint for lack of standing where "[assignor] claimants have struggled to articulate a business-related justification for assigning their claims." *In re: BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 29300, at *7 (S.D. Tex. Jan. 4, 2016).

Here, the assignments Kaul touts appear to have been made "in bad faith" and not "for ordinary business purposes." *Sprint*, 554 U.S. at 292. The proposed amended claim references no compensation paid by Kaul to the assignors in exchange for the assignments, and concedes that,

conversely, "Claimant [Kaul] receives no personal percentage of the net assigned-interest pool," cites to a third party's declaration that "confirms [the third party] has neither observed nor heard of victims being charged by Claimant or DDG," states that "Claimant . . . has chosen to share [her own property interests and stake in the recovery] with the assignors," and further references an "assignee's obligation to distribute recovered proceeds" and an "assignor's contractual right to a distribution." PAC ¶¶ 91, 95. The arrangement thus has no economic substance. Rather, it appears that Kaul, who stated during the July 23, 2026 motion hearing that she represents other victims but has not identified a license to practice law in the United States, may be attempting to use the mechanism of assignment to avoid a finding that she is engaged in unauthorized practice of law, in contravention of 28 U.S.C. § 1654, by acting as counsel for other purported victims. Consistent with *Sprint* and *In re BP p.l.c. Securities Litigation*, the Court should not allow a party to use a series of potential sham assignments to recover funds on behalf of others.

Moreover, because the assignments apparently lack economic substance, the practical result of allowing Kaul to press the assigned interests is that Kaul is asserting the interests of others—raising precisely the type of prudential standing concern discussed in *Bank Julius Baer*, 2020 WL 7640213, at *13 ("According to this [prudential standing] rule, a party generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." (internal quotation marks omitted)). For that independent reason, Kaul should not be permitted to add the assigned interests to her claims.

**3. Kaul Does Not Allege She Is a Bona Fide Purchaser for Value, as Required by the Applicable Forfeiture Statute**

Kaul's assignment theory also fails to allege a valid interest because she is not a bona fide purchaser for value, as required by the applicable forfeiture statute after the conduct giving rise to forfeiture has occurred. While she correctly notes that 18 U.S.C. § 983(d)(6)(A) recognizes that a

valid assignment that transfers an interest in property may form the basis for a claim, it does not exempt an assignee from § 983(d)(3)(A), which requires that post-misconduct acquisitions of an interest in property have been both (1) "for value" and (2) made when the acquiror "did not know and was reasonably without cause to believe that the property was subject to forfeiture." Neither of these requirements was met here.

First, as to acquisition for value, the proposed amended claim does not identify the consideration Kaul gave in exchange for the 159 assignments. To the contrary, as noted above, the proposed amended claim suggests that Kaul gave no compensation in exchange for the assignments, and states that she is charging the assignors no fees and both intends and is obligated to return property obtained through this proceeding back to the assignors. Second, the apparent timing of the assignments suggests that at the time they were made, Kaul was already on notice that the property was subject to forfeiture, and indeed had already filed her initial claim. The proposed amendment alleges that 159 assignments had been executed by October 14, 2026, and that each became effective upon signature, but identifies no execution date for any assignment. Kaul's Motion to Amend suggests that the assignments had not been made as of the time she filed her original claim—by which point she was necessarily on notice of this action—and states that they were all complete by October 14. Because Kaul was not, as alleged, a bona fide purchaser for value as required by 18 U.S.C. § 983(d)(3)(A), the assignments do not confer a cognizable interest on her.

**E. Kaul Does Not Clearly State the Extent or Basis of Her Claimed Interest in the Defendant Property**

Kaul fails to identify the specific property claimed. She appears to assert an interest in the entirety of "the assets of Wallet 0x82e," PAC at 2 & ¶ 11, which contained 87,464,642.259005 USDT. Compl. ¶ 15. But other statements in her proposed amended claim are in tension with this

sweepingly broad claim. As a result, the proposed amended claim fails to comply with Supplemental Rule G(5)(a)(i), which requires that the claim "identify the specific property claimed," and she accordingly lacks both statutory and Article III standing.

Kaul states that the Turkish seizure order, Decision No. 2023/5986 D.Is., "placed Group G [that is, Wallet 0x82e] under perfected judicial custody." PAC ¶ 14. This is presumably the basis for Kaul's claimed interest in the entire contents of the wallet. But as noted above, based on Kaul's submissions, the seizure order itself is just that—a Turkish government order allowing the Turkish government, not Kaul, to seize the wallet. Kaul fails to take the necessary next step and explain whether or why, under the Turkish statutory procedure for return of stolen funds for victims she invokes, she would be entitled to the wallet's full contents, as opposed to, at most, the $8.7 million she allegedly invested. And she elsewhere equates the amount of the Turkish Payment Order (which, as discussed above, is an *in personam* order that does not create standing in this proceeding), which she states is in the amount of 164,096,484.48 Turkish Lira, representing the $8.7 million, with "the amount of Claimant's loss." PAC ¶ 15. Indeed, Kaul concedes that she invested, at most, about $8.7 million in a fraudulent scheme. *Id.* To that, she adds "accrued interest, Turkish legal fees and costs, the consequential and other damages that the Turkish criminal court may award, and the fees, costs and interests recoverable under 28 U.S.C. § 2465," as well as "equitable recovery and reimbursement interests," PAC ¶¶ 15–16, none of which Kaul quantifies or ties to the defendant property. In short, Kaul does not clearly state whether she claims her $8.7 million in principal, the entire amount that was in the wallet, or some other amount.

Kaul separately asserts claims deriving from purportedly assigned interests totaling $94.5 million. PAC at 57 (Sched. A). It is unclear whether any or all of these interests pertain to property in Wallet 0x82e (which has, according to Kaul, at times held more than 87,464,642.259005 USDT,

PAC ¶ 10), nor is it clear whether the "assignment register" Kaul proposes to provide (but has not provided) contains additional relevant information, but the assignors may have had interests in other wallets (including wallets whose contents are not defendants to this litigation), and even all of the assigned interests together may not cover the entirety of Wallet 0x82e. Again, Kaul fails to identify with "specific[ity]" the property claimed.

Moreover, Kaul's representations now are inconsistent with prior statements made to law enforcement. Kaul told the U.S. Secret Service that she "was defrauded of USD 2.5 Million"; she told a local District Attorney's Office that her "[t]otal amount lost is about $2.5 million (actual principal). My mother's retirement funds are included in this amount. The scammer used a fake trading website to show that I had made millions by trading." ECF No. 91 at 7, 10–11. Taking these various statements together, it appears possible that the $8.7 million encompasses not only Kaul's purported investment in the fraudulent scheme, but also funds from her mother's retirement account, assigned funds, and/or paper crypto gains that Kaul was led to believe were accruing in her account, but were not. Kaul does not provide enough detail to reconcile her various statements or to make clear precisely what assets she is claiming and on what bases.

## III. Kaul's Proposed Amended Claim Is Futile Because It Fails to Cure, and Compounds, the Original Claim's Untimeliness

Kaul also lacks statutory standing for the independent reason that her claim was untimely, and the proposed amended claim only compounds that untimeliness.

### A. Kaul's Original Claim Was Untimely

Kaul's original claim was untimely for the simple reason that it was filed almost seven months after the deadline. The government's Complaint was filed on June 18, 2025. The government filed its Declaration of Publication on August 8, 2025, demonstrating publication of the Notice of Forfeiture on forfeiture.gov for thirty consecutive days starting on June 23, 2025 and

establishing an August 22, 2025 deadline for filing claims. ECF No. 5-1. Yet Kaul did not file a claim until March 17, 2026—almost seven months later. ECF No. 53. Kaul did not seek or obtain the government's leave to file late, and her original claim was patently untimely.

To excuse this untimeliness, Kaul argues that the government failed to provide her with direct notice of the proceeding, as required by Supplemental Rule G(4)(b). Motion to Amend at 3. But under that provision, direct notice is required only to a "person who reasonably appears to be a potential claimant on the facts known to the government." Supp. R. G(4)(b)(i). And the government's awareness of a person's broader grievance, economic injury, or relationship to the investigation does not require direct notice if the person does not claim an ownership, possessory, or security interest in the defendant property. *United States v. Real Property Known as 7501 N.W. 210th Street*, 437 F. App'x 754, 756–59 (10th Cir. 2011) (holding that putative claimant was not entitled to direct notice merely because the government knew he had claimed economic injury from the related criminal case, where he did not claim an ownership, possessory, or security interest in any defendant property). Here, the government had already analyzed Kaul's potential claim and her tracing and concluded that "her property did not trace to the defendant property." ECF No. 91 at 19. Thus, even if Kaul's losses had a nexus to the same criminal network as the defendant property in this case, absent a "showing that [her] alleged economic injury is the direct result of the forfeiture of the defendant properties, or that a successful challenge to the forfeiture and a return of the properties to their owners would redress [her] alleged injury," Kaul would not have reasonably appeared to be a potential claimant. *Real Property Known as 7501 N.W. 210th Street*, 437 F. App'x at 759. Thus, she was not entitled to direct notice, and the fact that she did not receive it does not excuse her original claim's untimeliness.

### B. The Assigned Claims Are Untimely and Do Not Relate Back to the Original Claim

Kaul's proposed amended claim expands on the original by adding the interests of 159 other victims who assigned their interests in the property to Kaul. Motion to Amend at 10. These interests were not asserted in Kaul's original claim, and they do not relate back. They are therefore untimely.

Under Federal Rule of Civil Procedure 15, an amendment to a pleading relates back to the pleading's original date when, as relevant here, "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). This provision allows for relation back only where the core operative facts are the same as those initially alleged, and does not allow a claimant to introduce a new legal theory based on a different set of facts. *United States v. Hicks*, 283 F.3d 380, 383 (D.C. Cir. 2002) (proposed amendment to motion that "raised an entirely new legal claim arising from a new set of facts" did not relate back); *Mayle v. Felix*, 545 U.S. 644, 646 (2005) ("[R]elation back depends on the existence of a common core of operative facts uniting the original and newly asserted claims.").

Here, the assigned interests were entirely unmentioned in Kaul's original claim and, indeed, appear not to have been assigned to Kaul at that time. No details concerning these interests, including the transactions giving rise to the assignors' losses, or the size and nature of those losses, were included in Kaul's original claim. ECF No. 53. The proposed amended claim asserts the assigned interests by relying on an entirely new set of conduct, transactions, and occurrences that were not set out in the original pleading. Accordingly, insofar as it relates to the assigned interests, the proposed amended claim does not relate back to the date of the original filing. Rather, those

interests were first asserted on October 14, 2026, or almost fourteen months after the deadline for filing a claim, making them untimely.

**CONCLUSION**

For the foregoing reasons, Infiniweb respectfully requests that the Court deny Claimant Nivedita Kaul's Motion for Leave to File Amended Verified Claim (ECF No. 104).

Respectfully submitted,

/s/ Andrew C. Adams
Andrew C. Adams (*pro hac vice*)
Drew C. Harris (*pro hac vice*)
Steptoe LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 957-3081
acadams@steptoe.com
dcharris@steptoe.com

Steven H. Levin (DC Bar No. 985290)
Steptoe LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-8169
slevin@steptoe.com

*Attorneys for Claimant Infiniweb Technology Inc.*

Dated: October 22, 2026