**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>APPROXIMATELY 225,364,961 USDT<br>Defendant, *in rem*. | Civil Action No. 25-cv-01907-AHA |

**CLAIMANT NIVEDITA KAUL'S SUPPLEMENTAL RESPONSE IN OPPOSITION TO INFINIWEB TECHNOLOGY INC.'S MOTION TO DISMISS, SUPPRESS, AND STRIKE (ECF 28)**

**TABLE OF CONTENTS**


I. PRELIMINARY STATEMENT ........ 2

II. THE MOTION SEEKS MORE THAN DISMISSAL OF THE GOVERNMENT'S COMPLAINT ........ 7

III. INFINIWEB MUST ESTABLISH ITS VERIFIER'S CORPORATE AUTHORITY ........ 9

A. The asserted title does not establish appointment or authorization ........ 9

B. Infiniweb must establish authority at the time of the verification ........ 13

C. The BIB corporate record corroborates the verifier-identification evidence ........ 14

IV. THE REPORT CONTRADICTS INFINIWEB'S ASSERTED OWNERSHIP OF THE OPERATING REVENUES ........ 15

A. Infiniweb's own exhibits do not identify the legal owner of the operating business ........ 15

B. Documented testing contradicts reliance on the description of ordinary gaming receipts... 18

C. Infiniweb must establish its interest in each claimed token group ........ 24

D. Corporate and operational integration does not establish title to the claimed balances ........ 27

V. THE PRIOR TURKISH JUDICIAL CUSTODY CONTRADICTS INFINIWEB'S CLAIM TO UNENCUMBERED RECEIPTS ........ 29

A. Group G was already under perfected judicial custody ........ 29

B. Turkish law requires priority for victim return ........ 32

C. Infiniweb must account for its response to the prior criminal seizure order ........ 33

VI. THE GOVERNMENT'S SHIFT FROM ADVERSARIAL SCRUTINY TO SETTLEMENT ALIGNMENT DOES NOT SUPPLY INFINIWEB'S PROOF ................................................ 36

A. The Government's original demands remain unanswered by settlement status .................. 36

B. Confidential treatment and settlement do not establish entitlement to distribution ............ 38

C. Proposed structure provides payment to Infiniweb but no guaranteed victim recovery ...... 39

D. DDG's investigation and independent reporting establish the need for the scrutiny the Government previously demanded .......................................................................... 40

VII. SUPPRESSION AND STRIKING DO NOT ESTABLISH ENTITLEMENT TO THE DEFENDANT PROPERTY ........................................................................................... 41

VIII. CONCLUSION ........................................................................................................... 43

## I. PRELIMINARY STATEMENT

1. Claimant Nivedita Kaul submits the proposed Supplemental Response attached to her motion for leave to file and respectfully requests leave to file it in opposition to the relief Infiniweb Technology Inc. seeks against the Defendant Property. "ECF" identifies docket entries; page citations identify ECF-stamped pages unless otherwise stated; "Report" identifies the public (redacted) Report of Findings on Infiniweb Technology Inc., dated October 25, 2026, prepared by John (Jay) Cartwright for DDG Investigations, the investigative unit of Digital Defenders Group, Inc. ("DDG"), a U.S. 501(c)(3) nonprofit, and cited by its printed page numbers; the Report is attached as Exhibit A to the Declaration of John (Jay) Cartwright under 28 U.S.C. § 1746 ("Cartwright Decl."), which accompanies this response and authenticates the Report and the registry records attached to the declaration as Exhibits B and C; citations to those registry exhibits identify their PDF pages, including their cover sheets; "Tr." identifies the official transcript of the July 23, 2026 hearing (ECF 84). Nothing in this response withdraws, narrows, or concedes any position Claimant has taken in ECF 53, 54, 79, 89, 90, 94, 97, 98, 102, 103, 104, or 109.

2. Infiniweb seeks the return of disputed property without establishing its corporate authority, the identity of its operating business, or its ownership of the claimed balances. It demands that the other 92 percent of the Defendant Property be "immediately returned to Infiniweb's wallets." ECF 28-1 at 30. The absence of substantive opposition from the Government establishes none of those matters. The motion seeks a dispositive transfer of the Defendant Property, not merely a ruling on the sufficiency of the Government's pleading. The United States cannot, through procedural concession, establish Infiniweb's ownership of property subject to Claimant's competing claim.

3. Infiniweb told the Court that "the Government apparently has no independent knowledge whatsoever of Infiniweb." ECF 28-1 at 12. The Report now provides registry records, regulatory certifications, court records, preserved captures, and completed operational tests, authenticated under penalty of perjury by the Report's author. Cartwright Decl. paras. 6-16. His qualifications and lack of any financial stake are sworn: investigations, asset tracing, and due diligence work since 2006, across more than 100 countries; no payment for his time on the Report; no recovery sought in this action. Id. paras. 4-5. Zeng Youzong verified Infiniweb's claim as its duly appointed Chief Executive Officer and authorized signatory. ECF 23 at 4. The BVI registry records identify Huang and Nguyen as the directors and shareholders; none of the filings obtained identify Zeng or record his appointment as an officer or agent. Report at 27-30; Cartwright Decl., Exs. B-C. Infiniweb must substantiate its sworn representation through the resolution, power of attorney, appointment record, or other competent instrument establishing Zeng's authority, including its effective date and scope. The asserted title does not establish the corporate act authorizing its holder to verify the claim.

4. The Report also contradicts Infiniweb's asserted account of its business revenues. The trademarks of all four brands in Infiniweb's own sponsorship exhibits (ECF 28-3 to 28-6) are recorded in the name of BOE United, not Infiniweb. Its Philippine offshore gaming license is listed as cancelled, and the Philippine SEC certified that its records contain no registration for Infiniweb (ECF 79-13). The platform identified in Infiniweb's motion accepted USDT deposits and wagers without identity verification, operated an agent program, and instructed agents not to download China's official anti-fraud application. Report at 32-33, 35-56, 71-73. The records indicate that the platform is set up for customers in mainland China, and in 2021 a Chinese court convicted three people who had supplied bank accounts used to move funds for the Baobo Sports app and other online gambling platforms. Id. at 8, 57. The existing record separately documents DDG's physical site visit and local inquiry establishing that Infiniweb's stated Philippine address does not exist; the Financial Times independently reported the false address and related corporate and operational opacity. ECF 79-15 at 2 (Ex. M); ECF 102 paras. 7-9; ECF 102-2 at 15-17 (Ex. A). Football sponsorship announcements establish neither the identity of the operating entity nor Infiniweb's ownership of the funds it claims.

5. The Government previously demanded "fulsome revelations" of Infiniweb's identity and a meaningful relationship to the property. ECF 47 at 10. It now opposes Claimant's request to submit the developed evidentiary record "due to timeliness," even as it negotiates a settlement that provides for payment to Infiniweb and directs victims to a process guaranteeing no particular recovery. Rick Blaylock, Jr., email to Andrew C. Adams and Claimant, Oct. 23, 2026; accompanying Motion for Leave para. 9; Tr. 39:22-40:25, 54:20-55:8. The priority the Government describes for traceable victims is a description of process, not of right: the Government has told this Court that the forfeiture statutes "authorize victim compensation but do

not mandate it as a matter of right." ECF 44 para. 17, at 8. Remission confers no entitlement on any victim. The Government's own principal has been differently frank about the destination of this property: Mr. Welte's sworn, unrebutted account records the United States Attorney's emphatic statement that the process should result in "getting the seized funds to the Bitcoin Reserve." ECF 102 para. 15(a); Exs. C, E. Executive Order 14233 capitalizes that reserve with forfeited bitcoin, and the United States Digital Asset Stockpile with other forfeited digital assets such as USDT, in each case unless the assets are released under section 3(d). Exec. Order No. 14233, § 3(a), (b), (d) (Mar. 6, 2025); ECF 102 para. 16(d). The division the settlement actually frames is between Infiniweb and the Government, with victims directed to a process that is discretionary and opaque. The settlement table itself is populated by conflicted parties: counsel for Claimants 119-266 simultaneously prosecutes a civil RICO action against Infiniweb on behalf of his own client while negotiating a resolution that pays Infiniweb, and counsel for Claimants 1-118 concurrently represents Chen Zhi and the Prince Group, the network identified with Infiniweb and ITECHNO. ECF 89 at 8-14. The one claimant without any such conflict is the one excluded from the agreement. That documented litigation alignment underscores the necessity of determining Infiniweb's entitlement before any distribution in its favor. The United States cannot extinguish competing private interests by treating an untested claimant as an established owner.

6. The Court should deny the relief requested in ECF 28 that depends upon Infiniweb's unproven entitlement to the Defendant Property; require a competent evidentiary showing of that entitlement; reject automatic return and blanket exclusion of independently derived evidence; and preserve adjudication of the competing interests in Group G. And the diligence standard resolves against Infiniweb on the chronology the Government itself pleads. Infiniweb's counsel

asserted its interest in these wallets in February 2025, following the earlier approach by counsel described in Complaint paragraph 239, Compl. paras. 239-240; the Government states that the balances had been frozen at Tether since November 20, 2023, Compl. para. 172; and the Turkish custody order has stood since August 11, 2023. Infiniweb has never sought release or discharge of that order in the forum that entered it. The Claimant, who was never individually notified of this action and whose victim-notification updates from the Government ended in July 2024, ECF 53 at 7, is the party the Government charges with lack of diligence, while Infiniweb, the party with the longest actual knowledge of the restraint on the property it claims, has never been asked to explain its inaction at all. The Government's pending oppositions articulate the standards it demands of Claimant's filings: diligence and an explanation of any delay in asserting the claim, ECF 107 at 2-4; strict, sworn identification of the property claimed and the interest asserted - claimants are "strictly required to promptly identify the specific property claimed and state their interest in such property under oath," ECF 107 at 6 (citing 18 U.S.C. § 983(a)(4)(A); Supp. R. G(5)(a)(i)(A)-(B)) - and a perfected interest as a prerequisite of standing: "[b]ecause Kaul does not have a perfected interest, she cannot have standing," ECF 107 at 6 (citing United States v. BCCI Holdings (Luxembourg), S.A., 46 F.3d 1185, 1191 (D.C. Cir. 1995)). The Government's demands for diligence, sworn specificity, and a demonstrated proprietary interest require evenhanded application to Infiniweb: Infiniweb's verified claim identifies all seven groups under oath, ECF 23 at 1-3, while its counsel's February 2025 assertion concerned five subject addresses, Compl. para. 240; its verifier's authority is nowhere documented; and the group-specific acquisition evidence behind its sworn assertion as to Group G remains untested. The Government has asked this Court to apply none of these standards to Infiniweb. The alignment is mutual: when the Government sought additional time to oppose Claimant's amendment,

"Claimants Infiniweb, 1-118, AWKO Claimants, and Dr. Kang do not oppose," ECF 106 at 2, while "Claimant Kaul is opposed," id. The Government's opposition concerning Claimant's amended claim is reserved for the separate response to ECF 107.

## II. THE MOTION SEEKS MORE THAN DISMISSAL OF THE GOVERNMENT'S COMPLAINT

7. ECF 28 combines a Rule G(2)(f) challenge, suppression, a request to strike Complaint paragraphs 239-240, and an attack on in rem jurisdiction. Its requested consequence is delivery of the disputed funds to Infiniweb. ECF 28-1 at 30. Infiniweb's reply repeats the request to grant its motion if the Court elects to decide it, while otherwise supporting continued abeyance for settlement. ECF 76 at 5, 12. ECF 28 also attacks in rem jurisdiction. The Government's own filings answer that attack in material part: the 144 OKX accounts were "almost exclusively accessed from the Philippines." ECF 45 at 3; see Compl. paras. 45-65, 238. The Court has indicated, without any official ruling, that "I believe there is venue here." Tr. 42:2-8. Neither ground uniquely favors Infiniweb, and neither supplies its missing proof of ownership.

8. The existing responses do not present Claimant's opposition. Claimants 1-118 took no position on substantial portions of ECF 28, joined a sequencing argument, and identified the need to retain jurisdiction over competing interests even if the Government's forfeiture case were dismissed. ECF 31 at 3-6. The Government's ECF 47 and 50 sought dismissal without prejudice or deferral rather than substantive adjudication of Infiniweb's motion; the Court's orders describe ECF 50 as the Government's "cross-motion to dismiss potential Claimant Infiniweb's motion to dismiss." Minute Order of July 7, 2026. Infiniweb relied on that omission to seek a ruling treating its motion as conceded. ECF 76 at 4, 8-11. Claimant was not a claimant of record when Infiniweb filed ECF 28 on November 7, 2025; she filed her verified claim on March 17, 2026. ECF 53. Every party that briefed ECF 28, namely the Government (ECF 47) and Claimants 1-

118 (ECF 31), has since reported, together with Claimants 119-266, "an agreement in principle" with Infiniweb, and the case is stayed pending "approval and execution of the settlement." Minute Order of Aug. 7, 2026. Claimant is not a party to that agreement. See ECF 96 at 2 (Claimant "is not one of the 2025 Parties"). Other parties' litigation positions do not constitute Claimant's consent to release of the property she claims. Infiniweb's conceded-motion theory also inverts its own conduct: on June 12, 2026, Infiniweb itself asked that all motion deadlines be held in abeyance and stated that it "would agree to a continued abeyance on Infiniweb's motion to dismiss." ECF 70 at 4-5. Four days after the stay terminated, it demanded merits treatment of the same motion as conceded. ECF 76 at 4 & n.4. The Court's observation at the hearing - "the government has missed a number of deadlines. Infiniweb has missed deadlines." Tr. 7:15-18 - addressed the motion practice as a whole, not any single party's omission.

9. Claimant's interest in the requested disposition is direct. Group G consists of 87,464,642.259005 USDT in Wallet 0x82e1d4ddd636857ebcf6a0e74b9b0929c158d7fb ("Wallet 0x82e"). Infiniweb's claim and Claimant's verified claim identify the same property. ECF 23; ECF 53; ECF 104-1. The requested transfer would dispose of that property adversely to Claimant's interest.

10. Dismissal of a forfeiture theory and entitlement to receive the Defendant Property are distinct questions. In United States v. Real Property Located at 475 Martin Lane, 545 F.3d 1134 (9th Cir. 2008), the court held that after a court-ordered dismissal of the forfeiture complaint, the district court retained in rem jurisdiction, and "had not only the jurisdiction but the duty to resolve the parties' competing claims to the res." Id. at 1145-46. Settlement cannot displace that duty: "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party ... without that party's agreement," and approval of a decree "between some of the

parties therefore cannot dispose of the valid claims of nonconsenting intervenors." Local No. 93, International Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 529 (1986). The Court itself identified the parties left outside the settlement: "We have got one claimant and one prospective claimant who aren't part of the settlement." Tr. 56:15-19. Nor can the settling parties end this action by stipulation over Claimant's objection. She has filed a claim and an answer (ECF 53; ECF 54), so a stipulated dismissal must be "signed by all parties who have appeared," and otherwise the action "may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(1)(A)(ii), (a)(2); see Supp. R. A(2). Infiniweb's demand for immediate return must be tested against those competing interests, not treated as the automatic consequence of a dispute with the Government.

## III. INFINIWEB MUST ESTABLISH ITS VERIFIER'S CORPORATE AUTHORITY

### A. The asserted title does not establish appointment or authorization

11. Zeng declared under penalty of perjury that he was the "duly appointed Chief Executive Officer" of Infiniweb and "authorized to sign this Verification" on its behalf. ECF 23 at 4. The Report identifies the BVI company as number 2015145, incorporated June 12, 2019. Its registry search found the April 21, 2022 list of directors naming Cheng-Feng Huang and Thanh Gia Bao Nguyen, and the June 30, 2026 register of members records those two as shareholders. Report at 27-30, Figures 4-4A; Cartwright Decl., Ex. B at 36-38; Ex. C at 4. The latest director filing obtained records no appointment of Zeng. The registry's transaction history, current to September 25, 2026, lists no filing of directors after April 21, 2022, so when Infiniweb filed its claim the registry named only Huang and Nguyen as its directors. Report at 30; Cartwright Decl., Ex. B at 3.

12. Infiniweb's articles authorize the directors to appoint officers and agents by resolution. Report at 30; Cartwright Decl., Ex. B at 27, regs. 12.1, 12.5-12.6. Officers "perform such duties as are prescribed at the time of their appointment," and an agent holds only the powers "set forth in the Articles or in the Resolution of Directors appointing the agent." Cartwright Decl., Ex. B at 27, regs. 12.2, 12.6. The articles do not name a "Chief Executive Officer"; such an office could exist only as one of the "other officers" the directors appoint by resolution, and absent a prescription of duties the articles give management of "the day to day affairs of the Company" to "the president." Id., regs. 12.1-12.2. Whatever office Zeng held, its existence, scope, and date depend on a Resolution of Directors. Infiniweb must therefore identify the legally effective appointment or delegation authorizing Zeng, its scope, and its effective date. The registry records contain no such instrument. The corporate records necessary to establish the asserted authorization are within Infiniweb's possession or control. Infiniweb's articles require its Resolutions of Directors to be kept at the office of its registered agent or at such other place as its directors determine. Cartwright Decl., Ex. B at 30, reg. 15.5(c).

13. BVI law requires maintenance of a register identifying directors and appointment dates, filing of that register, and filing of changes within thirty days. BVI Business Companies Act ss. 118, 118A, 118B. Infiniweb's own articles require it to file its register of directors, and any changes to it, with the Registrar. Cartwright Decl., Ex. B at 24, reg. 8.13. The Act provides that "[a] company's register of directors shall contain" the prescribed particulars, including the "date of appointment as director," s. 118A(1)(a)(iii), that a company "shall file for registration by the Registrar a copy of its register of directors," s. 118B(1), and that changes be filed "within 30 days of any changes occurring," s. 118B(3). Section 131 and Infiniweb's articles separately

authorize appointment of an agent by directors' resolution. Cartwright Decl., Ex. B at 27, reg. 12.5. Infiniweb must produce the corporate act establishing the authority it asserted in ECF 23.

14. Rule G(5)(a)(i)(C) requires that the claim "be signed by the claimant under penalty of perjury," and the 2006 Committee Note ties an entity's verification to authorization: "An artificial body that can act only through an agent may authorize an agent to sign for it." Only "[a] claimant who establishes standing to contest forfeiture may move to dismiss the action under Rule 12(b)," Rule G(8)(b)(i), and only "a party with standing to contest the lawfulness of the seizure may move to suppress," Rule G(8)(a). The same Committee Note places the burden on Infiniweb: "The claimant has the burden to establish claim standing at a hearing." Infiniweb seeks not merely participation in the action but immediate return of the Defendant Property; its demand requires adjudication of the proprietary interest on which that return depends. "A claimant who seeks to intervene in an in rem forfeiture action must first establish standing by a preponderance of the evidence." United States v. $80,020.00 in U.S. Currency, 57 F. Supp. 3d 143, 146 (D.P.R. 2014). The applicable showing depends on the procedural stage: a colorable interest at pleading, and an ownership assertion supported by evidence at summary judgment. United States v. $17,900.00 in U.S. Currency, 859 F.3d 1085, 1090-91 (D.C. Cir. 2017). The D.C. Circuit distinguishes a right to contest forfeiture from disposition of the property: "Our decision means only that the pair has a right to contest whether the money is subject to forfeiture." United States v. $17,900.00 in U.S. Currency, 859 F.3d 1085, 1094 (D.C. Cir. 2017). A claimant establishes constitutional standing by showing "an ownership or possessory interest in the seized property." $80,020.00 in U.S. Currency, 57 F. Supp. 3d at 146-47 (citing United States v. One-Sixth Share of James J. Bulger, 326 F.3d 36, 41 (1st Cir. 2003)); see Supp. R. G(8)(c)(ii)(B). Zeng's authority is therefore a threshold issue in Infiniweb's request for relief. The Court should require the

instrument establishing his appointment or agency, the relevant corporate action and date, and the governing law and corporate provisions upon which Infiniweb relies. ECF 28's supporting exhibits contain no declaration supplying the corporate act authorizing the verification or substantiating the corporate facts asserted. ECF 28 (a proposed order and eleven exhibits). Counsel of record is a firm whose published anti-money-laundering practice represents that its lawyers “furnish legal advice in connection with risk-based procedures such as KYC and enhanced due diligence of customers, financial counterparties, and other business venture partners,” and “regularly interface with the US Department of Justice (DOJ), the Financial Crimes Enforcement Network (FinCEN), OFAC, and the bank regulatory agencies.” Steptoe, Anti-Money Laundering Practice, https://www.steptoe.com/en/services/practices/investigations-white-collar-compliance/anti-money-laundering.html (as accessed Oct. 25, 2026). The public record of counsel itself corroborates the availability of these disciplines: two of the three Steptoe attorneys of record are former federal prosecutors. Per his firm biography, Andrew C. Adams “served as Acting Deputy Assistant Attorney General in the Department of Justice’s National Security Division,” and “as the Chief of the Office’s Money Laundering and Transnational Criminal Enterprises Unit” in the United States Attorney’s Office for the Southern District of New York, “while also coordinating the District’s civil and criminal asset forfeiture program.” Steptoe, Andrew C. Adams, https://www.steptoe.com/en/lawyers/andrew-c-adams.html (as accessed Oct. 25, 2026). Per his firm biography, Steven H. Levin “gained more than ten years of experience in senior positions within the government, including the US Attorney’s Office for the District of Maryland (USAO),” where “[a]s a former supervisor in the USAO, he investigated and prosecuted cases involving financial crimes, public corruption, racketeering, cybercrime, national security, narcotics, money laundering, immigration offenses, and violent crime.”

Steptoe, Steven H. Levin, https://www.steptoe.com/en/lawyers/steven-h-levin.html (as accessed Oct. 25, 2026). Counsel so versed in the identification and diligence disciplines the firm holds itself out as providing could establish the verification's authorization by declaration and the underlying records; Infiniweb has offered neither. Infiniweb should therefore produce, supported by a declaration from a person with knowledge, the identity-verification, due-diligence, and authorization records generated in counsel's intake of Zeng. The Government's own standing discovery supplies the measure of proof required: identification of all cryptocurrency wallets owned or controlled, directly or indirectly, by Infiniweb within the last five years, the date of acquisition of control or ownership, and the employees and third parties authorized to manage those wallets. ECF 37-1 at 6, Special Interrogatories 12-14.

**B. Infiniweb must establish authority at the time of the verification**

15. Infiniweb must establish Zeng's authority as of October 15, 2025, when he executed the sworn verification. ECF 23 at 4; Report at 24. It should produce the corporate act supporting the asserted appointment and authorization, identifying the approving persons, effective date, scope, and contemporaneous supporting records. The verification's assertion of a title is not independent evidence of appointment to that office.

16. Applicable entity law and competent evidence govern this inquiry. In United States v. ADT Security Services, Inc., 522 F. App'x 480, 489-90 (11th Cir. 2013), the court treated an individual's verification of a claim on an entity's behalf as "at most, excusable technical noncompliance," but held that whether the entity could "ultimately assert a valid claim" was a separate question of substantive standing, and affirmed summary judgment against the entity for lack of standing. Leniency about who signed does not prove that the signer was authorized or that the entity holds the interest claimed. Infiniweb likewise must establish the corporate act it

invokes. Its counsel's ordinary signature on the motion supplies neither the claimant's sworn factual knowledge nor the missing appointment. Infiniweb must establish the legal effect of any subsequent resolution or power of attorney under the governing corporate law, including its asserted effect on Zeng's authority as of October 15, 2025. Such an instrument would still leave Infiniweb's ownership of the Group G balances to be established by competent evidence. Any subsequent resolution, power of attorney, or asserted ratification must be produced with its actual execution date and the governing corporate-law basis for its claimed effect; a later corporate instrument cannot substitute for the transactional evidence of ownership.

**C. The BIB corporate record corroborates the verifier-identification evidence**

17. The Report identifies Zeng Youzong in Singapore corporate records as a director and sole shareholder of the company incorporated as BIB Technology Pte. Ltd. and subsequently renamed. Report at 89-91. Section 9.2 sets out the matching name and corporate relationships supporting identification of that person as the ECF 23 signatory. Infiniweb must identify its verifier and establish the capacity in which he acted. Repetition of the asserted title does not establish either identity or authority.

18. The identification rests on cumulative corporate evidence. ACRA records Zeng as BIB Technology's founding 90-percent shareholder and director and, from February 7, 2023, sole shareholder. Chen Yu Yen held the founding 10 percent. Records matching Chen's name, birth date, and address identify his ownership of the Cyprus company Ponymuah. OnyxCrown's eighteen PONYMUAH applications and DB Gaming materials connect that name to the gaming-brand records; OnyxCrown shares multiple filing particulars with BOE United, holder of the Baobo mark. Report at 78-79, 89-91. Those disclosed corporate relationships support the Report's identification inference.

19. BIB advertised United States and Canadian MSB licences and displayed United States number 31000219137978. The September 15, 2026 FinCEN search returned no matching data for that number, and the September 14 full-register search identified no BIB registrant. Report at 91-95. The Report also documents Singapore-office publicity, a LinkedIn statement that the business had no physical location, and the Washington DFI warning concerning a reported loss of $512,100 in USDT. Id. The warning describes a complaint whose allegations the agency had not verified and a relationship between the two named platforms that it had not confirmed. The Report's registry findings and preserved business representations independently bear on the asserted corporate identity and regulatory status.

20. Historical DNS records provide further corroboration. Baobo.com and bibvip.com moved into corresponding hosting blocks in July 2022 and August 2022, and into the same broader block on October 22, 2022. Report at 96-97. The Report records that three changes made in step are "consistent with the two domains being hosted through the same provider or reseller, or administered together." Id. at 96. Considered with the corporate evidence, they substantiate inquiry into the verifier's relationship to the operating network, beyond the formal sufficiency of his signature.

## IV. THE REPORT CONTRADICTS INFINIWEB'S ASSERTED OWNERSHIP OF THE OPERATING REVENUES

### A. Infiniweb's own exhibits do not identify the legal owner of the operating business

21. ECF 23 describes a BVI online gaming and wagering company and claims the USDT as its business revenues. ECF 28-1 identifies Baobo.com and relies on football-club sponsorship announcements. The Report examines those specific representations against the underlying corporate, regulatory, and operational records.

22. The Philippine trademark records place the marks for all four brands in Infiniweb's sponsorship exhibits (ECF 28-3 to 28-6) in BOE United Technology Corporation's name. Report at 71-73, Figures 25-26. Infiniweb must establish the legal relationship supporting its asserted entitlement: ownership, license, assignment, service agreement, collection mandate, or another identified basis on which money paid under those brands became this claimant's property. A sponsorship announcement establishes neither that relationship nor ownership of the specific balances at issue.

23. The operational record presents the same deficiency. PAGCOR's cancelled-licensee list identifies Infiniweb, and the Philippine SEC's April 17, 2026 certification records no registration for that company. Report at 32-33. The cancelled license was an offshore gaming license, and a committee of the Philippine Senate has reported that "POGOs came into existence because gambling is prohibited in Mainland China." Report at 32, 60 (Senate Committee Report No. 370, Dec. 3, 2024). Claimant already documented, in Exhibit M to ECF 79, a DDG team member's physical site visit and local inquiry establishing that the address Infiniweb supplied for its Philippine gaming license, Unit A, 2256 Galvez Street, Pasay City, Metro Manila, does not exist. ECF 79-15 at 2; see ECF 79-2 paras. 39-41. The Court has therefore had the physical-site finding before it since July 2026. The Financial Times had reported that same address as false in September 2023, more than two years before Infiniweb verified its claim and nine months before the June 2024 approach described in Complaint paragraph 239. ECF 102 paras. 7-9; ECF 102-2 at 16. The Government's Complaint separately records that Infiniweb's February 2025 counsel asserted an interest in five addresses without supplying additional lawful-source information. Compl. para. 240. Infiniweb must substantiate the identity and location of the actual operating

entity and the legal and transactional basis upon which its receipts became property of the BVI claimant.

24. The platform examination further establishes the absence of an identified operating counterparty. The home, help, terms, privacy, registration, financial-account, customer-service, and game-lobby pages identified neither Infiniweb nor another operating company and supplied no gaming-license information; the privacy page referred to unexplained "OPE." Report at 35-36, 56. Counsel identified Baobo.com with Infiniweb in ECF 28-1, footnote 1, but ECF 28's attachments, a proposed order and eleven exhibits, include no declaration, and none establishes ownership of the operating business. Report at 13, 25-26. The attribution of the platform's receipts to Infiniweb is contradicted by third-party brand registrations and is unsupported by an identified contractual counterparty.

25. Independent public reporting corroborates the premises, corporate-identity, and brand-ownership findings. On September 8, 2023, the Financial Times published "Premier League betting sponsors: closed doors and companies within companies," reported by James Sandy and Taro Yokosawa. Its transcript is filed as Exhibit A to ECF 102. The reporters stated that Infiniweb's Manila address supplied to the Philippine gaming regulator "turned out to be false," that its website required an agent's assistance to access, and that Philippine company-document searches led instead to the BVI. ECF 102 paras. 7-9; ECF 102-2 at 16-17. They also documented Tianyu-to-BOE brand transfers and distinguished trademark registrants and service providers from the underlying gambling operators. ECF 102-2 at 15-16. That independent investigation predates the November 2023 United States freeze request, Infiniweb's February 2025 approach to the Government, and its October 2025 verified claim. It corroborates DDG's site-visit finding and the Report's documented separation of brands, service providers, and the entities claiming

the revenue. The official regulatory record is consistent: Infiniweb appears as No. 31 on PAGCOR's cancelled-licensee list revised January 15, 2024; BOE United appears as No. 38 on the cancelled service-provider list; and Tianyu appears as No. 234. Report at 32-33, 71-77. Infiniweb's BVI status was recorded as "In Penalty - Non filing of Beneficial Ownership" from January 2, 2026 and Active from June 30, 2026. Report at 30-32. Corporate existence, regulatory status, brand ownership, and title to the claimed receipts require distinct proof. The same chronology puts ownership confidentiality in context: the registry recorded the company in penalty for beneficial-ownership non-filing from January 2, 2026; its January 16, 2026 interrogatory responses fell within that period; and it sought protection of its ownership information on January 5, 2026. ECF 37; ECF 47-1 para. 1; Cartwright Decl., Ex. C at 2; Ex. B at 2-3. The register of members Infiniweb filed on June 30, 2026, the date of its "Active" status, is the first in the registry's transaction history, filed more than eight months after its claim in this action. Report at 8, 30; Cartwright Decl., Ex. B at 2-3.

**B. Documented testing contradicts reliance on the description of ordinary gaming receipts**

26. The Report establishes an operating mechanism for anonymous USDT intake and agent-funded wagering. Deposits and wagers proceeded without prior identity verification; the agent-funded player supplied no verified name, mobile number, or email address. Report at 35-46; Cartwright Decl. paras. 12-13. The platform instructed agents not to download China's official anti-fraud application. Report at 45-46, 56, Figure 13B. It displayed yuan balances, China-only telephone binding, Chinese payment channels, and 213 mainland-Chinese bank entries among 216 listed entries. Report at 47-51; Annex D. These completed tests and preserved interfaces contradict reliance on unexplained USDT receipts as proof of lawful revenue belonging to the BVI claimant.

27. The October 16, 2026 agent test documented the complete funding sequence. Two deposits of 2 USDT were credited at CNY13.30 each, producing an agent quota of CNY26.60. A player account created through the agent's referral link received CNY5 from that quota and placed a losing wager. The system recorded the deposit, hand, and result and displayed the player's loss in green, expressly defined as agent profit. Neither account supplied verified identity, telephone, or email information. Report at 40-45, Figures 10-13; Cartwright Decl. para. 13. The agent-deposit page set limits of CNY10,000 a deposit and CNY10,000,000 a day. The completed transactions and displayed limits establish a structured third-party collection and allocation mechanism.

28. The program promoted downline recruitment, team mode, configurable commissions, and a 55-percent commission ratio. The platform attributed the test player to the agent and recorded the player's result in the agent's business account. Report at 40-44. The Report distinguishes the operational mechanism demonstrated by the test from the advertised commission rate, and records that the test recruited no one and withdrew nothing. Id. at 45, 98; Cartwright Decl. para. 13.

29. The platform called its USDT wallet "safe and stable, not subject to regulation" and recommended a cold wallet rather than an exchange because no fiat trading or registration of personal details was required. Report at 46, 48. Within the agent back office, a notice dated November 29, 2021 remained displayed on October 16, 2026 instructing agents not to download the National Anti-Fraud Centre app or related general-purpose mobile security software. Report at 44-46, 56. In combination, anonymous intake, agent funding, cold-wallet advice and that instruction support an inference of deliberate avoidance of identification and outside scrutiny. The general use of USDT as a stablecoin does not resolve those operational findings.

30. The payment and identity-verification interfaces identify the market served: yuan balances, USDT/CNY conversion, digital yuan, Alipay and mainland banking channels, China +86 as the only phone-binding option, and 213 mainland-Chinese bank entries among 216 listed entries. Report at 46-51; Annex D. The site's Rules and Terms make it a condition of use that the user not reside "in the Philippines, Taiwan, the United States, Singapore or Hong Kong" (as translated); mainland China is not among them. Report at 2, 50-51, Figure 16. Infiniweb's own Strasbourg sponsorship exhibit specified "Asie-Chine." Report at 25-26. These cumulative findings establish a platform designed for mainland-China customers, a materially more specific proposition than the claim's description of Chinese-language speakers in Asia.

31. The Report identifies adjudicated payment-support conduct involving the Baobo brand. Ninghai judgment (2021) Zhe 0226 Xing Chu 664, dated December 31, 2021, convicted three persons who supplied more than twenty bank accounts used through Tomato Pay score-running to transfer funds for the Baobo Sports application and other gambling platforms. Aggregate turnover through those accounts exceeded RMB10 million. Report at 57-58. That judgment provides a specific adjudicated example of the brand's payment-support mechanism relevant to the Report's operational findings.

32. The Report also analyzes ten Chinese decisions concerning Yabo's agent recruitment, dedicated registration links, downline betting and commissions tied to results. Report at 58-60. Chinese Criminal Law Article 303 and the October 16, 2020 joint opinions address opening gambling websites or applications, supplying them to others, agent acceptance of bets, profit-sharing, and transmission of live gambling data to organize cross-border gambling. Knowing technical, recruitment, payment and settlement support and the treatment of virtual currency used as gambling funds are expressly addressed. Report at 61-65. The joint opinions' operative terms

include “建立赌博网站、应用程序并接受投注的” [setting up a gambling website or app and accepting bets] and “担任赌博网站、应用程序代理并接受投注的” [acting as agent for a gambling website or app and accepting bets], and they expressly address knowing payment-and-settlement support for gambling operations. Claimant gives notice under Fed. R. Civ. P. 44.1 that she raises issues of the law of the British Virgin Islands, as set out in Part III, of the People's Republic of China, as set out in this section, and of the Republic of Türkiye, as set out in Part V and ECF 104-3. In determining foreign law, the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1.

33. The Report establishes the relevant factual connections: Infiniweb claims the platform; operational testing demonstrated its agent-funded wagering mechanism; the interfaces target the mainland-Chinese market; and corporate records connect the relevant brand network to the Yabo brand addressed in the cited judgments. Those findings materially contradict Infiniweb's characterization of the balances as ordinary lawful gaming revenues. ECF 23's assertion concerning United States law does not address the law governing the market the business targets. Nor does that assertion engage the forfeiture standard. The question presented is whether the Defendant Property is subject to forfeiture on the federal statutory grounds pleaded, not whether the general provision of gaming services abroad is lawful under United States law. The Government pleads the property as proceeds of wire fraud and money laundering. Compl. paras. 8-9. ECF 28-1 at 14 asserts only that providing such services abroad "is perfectly legal under U.S. law"; the legality of the service does not establish the provenance of particular receipts, and Infiniweb's lawful-source showing remains outstanding. ECF 47 at 10. In a civil forfeiture

action, "the plaintiff's burden is twofold: (1) to establish by a preponderance of the evidence that the defendant property is subject to forfeiture and (2) that there is a substantial connection between the defendant property and the alleged offense." 18 U.S.C. § 983(c); United States v. Funds From Prudential Securities, 362 F. Supp. 2d 75, 80-81 (D.D.C. 2005). Where that showing is made, "the burden shifts to the claimant to demonstrate by a preponderance of the evidence that the property is not related to any illegal activities," and the claimant must "set forth specific facts showing that the defendant funds consist of only legitimate income." Id. at 81-82. Prudential applied that formulation on summary judgment after finding the Government's burden satisfied and recognized innocent ownership as an alternative response. Here, the demand for Infiniweb's proprietary proof concerns its requested return of the property; the Government retains its statutory forfeiture burden. Infiniweb has offered the legality of its service under United States law; it has offered no proof of the lawful origin of the balances it claims. CAFRA supplies the statutory measure directly: "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture," 18 U.S.C. § 983(c)(1), and where the theory is use, facilitation, or involvement, "the Government shall establish that there was a substantial connection between the property and the offense," id. § 983(c)(3).

34. Infiniweb also invokes innocent ownership. That defense carries its own burden: "The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence." 18 U.S.C. § 983(d)(1). The statute sets different requirements for existing and later-acquired interests under subsections (d)(2) and (d)(3). The observed collection practices and regulatory representations bear on the asserted ownership, value and knowledge components. Initial standing, proof of ownership, and the innocent-owner defense

cannot be established by the single assertion "As such" made in ECF 23. The Government's separate forfeiture burden does not establish Infiniweb's entitlement to this defense or to payment. The statute also fixes the claimant's burdens: an owner "did not know of the conduct giving rise to forfeiture," id. § 983(d)(2)(A)(i), or "did all that reasonably could be expected under the circumstances to terminate such use of the property," id. § 983(d)(2)(A)(ii); a later-acquired interest requires a "bona fide purchaser or seller for value" who "did not know and was reasonably without cause to believe that the property was subject to forfeiture," id. § 983(d)(3)(A)(i)-(ii). And the D.C. Circuit separates the two inquiries: "Our decision means only that the pair has a right to contest whether the money is subject to forfeiture." United States v. $17,900.00 in U.S. Currency, 859 F.3d 1085, 1094 (D.C. Cir. 2017). Infiniweb's own articulation of the later-acquired-interest defense, invoked against Claimant, requires acquisition "for value" and "did not know and was reasonably without cause to believe that the property was subject to forfeiture." ECF 108 at 20-21. Its own brief concedes that "USDT is widely known to be subject to freeze and seizure by U.S. authorities," ECF 28-1 at 13, and that a recipient cannot know provenance "unless one has access to independent information regarding that provenance," id. The platform's practices - anonymous intake, no identity verification, agents told to avoid the anti-fraud application, Report at 35-56 - support an inference that Infiniweb was not "reasonably without cause to believe" that the property was subject to forfeiture when it acquired its asserted interest. Infiniweb's filing further concedes that fraud "may have tainted some portion of funds" reaching the subject wallets. ECF 28-1 at 8-9. The special-interrogatory stage is where its evidentiary showing on value and knowledge must now be made.

35. The geographic evidence includes completed wagering, not merely website access. The methodology identifies Turkish VPN exits for the October sessions: seven wagers settled on

October 15 and the agent-funded player's settled CNY5 loss on October 16. The completed transactions demonstrate that the platform accepted and settled wagering through Turkish network exits, rather than merely displaying an accessible webpage. Turkish law provides: "Kumar oynanması için yer ve imkân sağlayan kişi, bir yıldan üç yıla kadar hapis ve iki yüz günden aşağı olmamak üzere adlî para cezası ile cezalandırılır" - whoever provides the place or opportunity for gambling is punished with imprisonment for one to three years and a judicial fine of not less than two hundred days, TCK Art. 228 para. 1 - and where the offense is committed "bilişim sistemlerinin kullanılması suretiyle" [through the use of computer systems], the penalty is "üç yıldan beş yıla kadar hapis ve bin günden onbin güne kadar adlî para cezası" [imprisonment of three to five years and a judicial fine of one thousand to ten thousand days], id. para. 3. Unauthorized betting on sporting events is separately prohibited. Law No. 7258. Report at 36-46, 98; Cartwright Decl. para. 10. The separate October 21 survey recorded continued access to live tables through a Turkish address without further wagering. Report at 52-55; Cartwright Decl. para. 11. The Turkish judicial records separately establish the criminal seizure of the specific property addressed below.

36. The tested geographic restrictions also diverged from the platform's representations. Three United States addresses received restriction pages, but the New York restriction page's contact button opened customer service offering assistance with deposits, the latest website address, and "express deposit" service. Report at 52-54, Figure 17. Hong Kong, covered by the platform's residence prohibition, and France, named among the grounds for voiding winnings, nevertheless loaded live tables. The preserved responses establish the actual operation of the platform's restrictions and the deposit-assistance route available from a United States restriction page.

**C. Infiniweb must establish its interest in each claimed token group**

37. The Government's Complaint records that the February 2025 assertion on Infiniweb's behalf concerned five subject addresses. Compl. para. 240. According to the Government's Complaint, the Defendant Property, which comprises all seven groups, including Group G, had been frozen at Tether since November 20, 2023. Compl. para. 172. Infiniweb must reconcile the scope of its February 2025 assertion with the property identified in its October claim. ECF 23, filed October 17, 2025, claims all seven groups. It filed that claim two months after the August 22, 2025 claims deadline, four months after the complaint, and sixteen months after the June 2024 approach by counsel described in Complaint paragraph 239. Infiniweb should identify which of the five previously asserted addresses corresponds to each claimed token group, any additional addresses included in ECF 23, the records supporting their inclusion, and how each claimed balance became its property. Infiniweb itself reports that its claim was filed "[u]pon agreement of the government." ECF 64 at 2. It therefore received, and relied upon, an off-docket accommodation of the same deadline regime in which timeliness is pressed against other claimants. Its own conduct supplies no ground to strike the Claimant's filings as untimely, and it forecloses Infiniweb's reliance on the August 22 date as a weapon rather than the administrative fact it is.

38. The United States pleads an integrated laundering network and brings this in rem action against seven token groups. Compl. paras. 45-65, 195, 238. Infiniweb claims all seven. Neither joinder in one action nor allegations of common control establish a single corporation's ownership of every group. Infiniweb's request for relief covering all seven therefore requires a group-specific showing. Group G, the largest single group and the property at issue in Claimant's opposition, requires a separate determination rather than inclusion in an undifferentiated assertion of business revenues. The Complaint alleges that the 144 OKX accounts were "opened

in the names and identities of individuals believed to be unrelated to the actual control or ownership of funds," Compl. para. 238, and identifies the subject addresses as the re-consolidation point for such funds. Those attributed allegations make the group-specific showing more, not less, necessary - and none of them is answered by a sponsorship announcement. The claim's premise is lawful revenue, and no source of lawful authority for that revenue appears on this record: PAGCOR lists Infiniweb's offshore gaming licence as cancelled, the Philippine SEC has certified that its records do not show Infiniweb as registered, and “We did not identify gaming licence information, or the name of Infiniweb or of any other company operating the site, on the pages we reviewed.” Report at 8, 56. The memorandum of association produced with the September 25, 2026 registry search supplies corporate capacity, not regulatory permission: clause 5.1 makes its powers “Subject to the Act and any other British Virgin Islands legislation,” while clause 5.3 states that “there are no limitations on the business that the Company may carry on.” Cartwright Decl., Ex. B at 11, 15. A general-purpose incorporation clause does not identify the gaming license, the licensed operator, or the lawful transactional route by which these balances became Infiniweb’s revenue. Infiniweb must supply that missing connection for Group G, not repeat the fact of incorporation.

39. The necessary records include the source transactions, customer or counterparty ledgers, collection arrangements, intercompany transfers, wallet assignments, and evidence of custody or control connecting the receipts to Infiniweb. If it contends a wallet was held through another person, it should identify that person and the legal basis of the arrangement. Where technically available, a signed wallet message would supply evidence of present control; contemporaneous acquisition and title records remain necessary to establish the claimed proprietary interest. The Complaint records that Group G tokens were "burned and reissued pursuant to their seizure."

Compl. para. 230. Any proof-of-control procedure must therefore identify the original address and the relevant date; control of a replacement custodial address does not establish historical acquisition or title.

40. An asserted deficiency in the Government's tracing does not establish Infiniweb's ownership of the corresponding funds. Infiniweb must substantiate its own entitlement to the distribution requested at ECF 28-1 at 30. The Government's forfeiture burden and Infiniweb's claimed entitlement to receive the property present distinct issues. The prosecutor's own examination of Wallet 0x82e, as carried in the Grand Bazaar Network Analysis, records that its first approximately 1,100 inbound transfers were of roughly 50,000 USDT each, "possibly made to evade tracking," and that "no clue or evidence was found that the legal and factual connection had been severed." ECF 104-3 at 10 (citing Indictment p. 309). Infiniweb's "unrelated and unknown bad actor" account, ECF 28-1 at 9, and its attack on the Government's tracing, id. at 28, must contend with that filed record: Infiniweb has never identified who sent those transfers, or why eleven hundred identical lots would land in what it calls its treasury wallet.

**D. Corporate and operational integration does not establish title to the claimed balances**

41. The trademark evidence is corroborated by identified corporate relationships. Jackson M. Gacusan appears under the same tax identification number as a director and twenty-percent stockholder of BOE United in 2021-2023 and Cronyx in 2023-2025; Cronyx is the recorded YABO mark holder. BOE, Cronyx, and OnyxCrown share the tax-filing email identified in their statements, while BOE and OnyxCrown share additional contact, address, and audit particulars. Tianyu's earlier Yabo and HTH records establish a further historical connection. Report at 74-79. These cumulative overlaps support an inference of business coordination and require consideration together. The BVI Financial Services Commission has stated that Yabo Sports and

Asia Gaming, which was purporting to be a BVI registered entity, "is not a BVI registered company and has never been licensed or regulated to carry on investment business, or any financial services business, in or from within the Territory." Report at 78 (BVI FSC Public Statement 17 of 2020, Oct. 21, 2020).

42. The OnyxCrown DB Gaming and eighteen PONYMUAH applications, the DB Gaming channel's PONYMUAH materials, and the matched Chen ownership records connect the documented brand network to the Singapore company associated with Zeng. Report at 78-79, 89-91. Separately, TVT and Baobo shared identified traffic-management, address, and image-hosting infrastructure. Report at 79-81. These are documented corporate, branding, and technical connections to the exhibits upon which Infiniweb relies.

43. Operational testing also documented shared live-gaming infrastructure. Deposits and wagers on the Baobo and Kaiyun sites produced twelve paired captures of the same venue: three identical rounds, the same dealer and studio, and the same game address, with different limits and odds displayed by each branded interface. Report at 82-84. The UK Gambling Commission's records separately document TGP's white-label operation of gambling services under third-party brands, including Kaiyun and Yabo domains; TGP's 2025 surrender followed a GBP3.3 million penalty requirement, and the Commission reported failures to "sufficiently consider any activity by a third-party that is illegal, in either GB or the territory in which it is conducted." Report at 84-88. Those records reinforce the distinction between a promotional brand, an operating licensee, and the entity entitled to particular receipts.

44. The Report further documents live-studio location indicators and the FOYU/PONYMUAH/Lee Lean Pin corporate history. Report at 66-71. These identified supplier and corporate relationships require the Court to distinguish brands, production venues, collection

arrangements, and legal recipients. The cumulative record contradicts the premise that branded gambling activity establishes this BVI company's ownership of every claimed wallet.

## V. THE PRIOR TURKISH JUDICIAL CUSTODY CONTRADICTS INFINIWEB'S CLAIM TO UNENCUMBERED RECEIPTS

### A. Group G was already under perfected judicial custody

45. On August 11, 2023, the Ankara Bati 1st Criminal Judgeship of Peace entered Decision No. 2023/5986 D.Is. under CMK Articles 127-128, including Wallet 0x82e. The certified translation is already in this record. ECF 79-5. The criminal seizure order placed the wallet under perfected judicial custody as property constituting the offence. The Turkish prosecutor subsequently sought the block from Tether, and Tether's confirmation identifies the same wallet. ECF 79-6 at 2; ECF 79-7 at 2. The Grand Bazaar Network Analysis addresses the order, the absence of an objection or lifting decision in the materials examined, and the resulting custody position. ECF 104-3 at 7, 24-28 (printed pp. 6, 23-27). The August 11, 2023 criminal seizure order was executed through Tether on October 11, 2023, forty days before the November 20, 2023 United States request: the Turkish prosecutor's urgent request to Tether, ECF 79-6 at 2, and Tether's confirmation that 0x82E "is now frozen," ECF 79-7 at 2, are already in this record, the prosecutor's request in certified translation and Tether's confirmation in English.

46. Infiniweb characterizes Group G as gaming receipts and predicates suppression on a November 20, 2023 United States freeze request. ECF 23 paras. 4-5; ECF 28-1 at 14. That account omits the August 11, 2023 criminal seizure order and the subsequent Tether correspondence. Infiniweb should identify when it acquired notice of the Turkish restraint, whether it asserted an interest in that proceeding, its representations to the Turkish prosecutor or court, and any application to discharge the order before the issuing court. The omission is the more stark for Infiniweb's own words: it calls the seven addresses "treasury wallets of a

legitimate company," ECF 28-1 at 37, and says this matter "first came to Infiniweb's attention through a warrantless seizure," ECF 28-1 at 14. Either it did not know that the August 11, 2023 criminal seizure order over what it calls its treasury wallet had been executed through Tether on October 11, 2023, forty days before the United States request it complains of, or it knew and omitted that order from ECF 23, ECF 28, and its reply. Either answer is material to the suppression ground it asserts.

47. Infiniweb's requested distribution directly conflicts with the prior criminal seizure order. If Infiniweb relies on any discharge or modification of that restraint, it must produce the lifting order, variation, or other competent judicial act. An automatic-return provision directed at the United States cannot substitute for judicial disposition of the perfected Turkish custody. Infiniweb's latest filing states: "Indeed, the seizure order covers the entirety of the funds in Wallet 0x82e, but Kaul does not explain whether, how, or why she would be entitled even under Turkish law to the full contents of that wallet . . . ." ECF 108 at 17. The first clause is Infiniweb's own acknowledgment that the perfected Turkish order encumbers every dollar of the wallet it asks the Court to release; no part of the balance is unencumbered Infiniweb revenue. The second clause misfires on the record assembled in Part V.B: under CMK 131(2) and TCK 55(1), return to the victim precedes confiscation of criminal proceeds, ECF 104-3 at 29-30 (printed pp. 28-29); the prosecutor has charged that the wallet's contents are crime proceeds and asked that the victims' loss be paid from its blocked balance, id. at 11, 29-30; and the analysis identifies Claimant as the named original investigator, complainant, witness, victim, and owner under the law that seized the wallet, and party holding a statutory return priority over this specific restrained property. Id. at 26-27, 30-31; ECF 104-1 at 4, 20, 31. Her perfected payment-order interest is additionally of record in her amended claim. ECF 104-1 para. 15. The party

substituting process for proof is Infiniweb: it seeks payment of a wallet a Turkish court ordered seized as crime property, on a settlement designation, without ever having sought release of that order in the forum that entered it.

48. The Grand Bazaar Network Analysis establishes the legal effect of the completed judicial acts. The competent judge issued the decision, Tether implemented it upon the prosecutor's request, and the indictment records its continued operation. The judicial seizure is not subject to the statutory lapse applicable to an unconfirmed urgent seizure. No lifting or suspension appears in the materials examined. CMK 127, 128, 131; ECF 104-3 at 24-27 (printed pp. 23-26). Subsequent disposition in the criminal proceeding does not determine whether the prior judicial custody was issued and executed. The Government's "inchoate" characterization is contradicted by the filed Turkish-law analysis.

49. The same analysis explains why technical reissue does not extinguish the protected interest. TCK 55 reaches converted economic gains, and CMK 128 prevents third-party possession from defeating a qualifying seizure. Replacement-value provisions address property not delivered or no longer reachable; they do not bypass return priority for identified restrained property. ECF 104-3 at 28-30 (printed pp. 27-29). At the hearing, the Government itself described burn-and-reissue as new cryptocurrency representing the same value and "the same exact thing" sought. Tr. 12:14-15, 13:18-20. The issuer's technical reissue does not discharge the perfected Turkish judicial custody.

50. CMK 132(4) requires preservation of seized value; CMK 128(8) invokes TCK 289's protection against misuse or unauthorized disposition of seized property. The analysis identifies no provision by which a foreign seizure or an issuer's technical act discharges the Turkish order. ECF 104-3 at 27-28 (printed pp. 26-27). Those preservation duties support denial of automatic

transfer to Infiniweb and continued protection of the property for adjudication of the competing interests.

**B. Turkish law requires priority for victim return**

51. The Turkish indictment identifies the wallet and requests payment of the victims' remaining loss from its blocked balance, followed by confiscation of the residue. ECF 104-3 at 10-11, 26, 29-30 (citing Indictment pp. 309, 389) (printed pp. 10, 25, 28-29). The prosecutor's requested disposition implements the victim-priority framework applicable to the property already subject to the criminal seizure order.

52. The requested distribution implements mandatory law. CMK 131(2) provides for return to the victim-owner of Article 128 property when no longer needed as evidence; TCK 55(1) permits proceeds confiscation only where the benefit cannot be returned to the victim. The Grand Bazaar Network Analysis explains that this places the victim before the State and is not discretionary remission. ECF 104-3 at 29-30 (printed pp. 28-29). Under this framework the qualifying victim is treated as an owner of the property: CMK 131(2) directs return to the "victim-owner" of Article 128 property, ECF 104-3 at 25, so the victim's interest is proprietary - ownership of the property - rather than a claim for compensation. Id. That is the "ownership or possessory interest in the seized property" that constitutional standing requires. See para. 14 (quoting United States v. $80,020.00 in U.S. Currency, 57 F. Supp. 3d 143, 146-47 (D.P.R. 2014)). The analysis identifies Claimant as the named original investigator, victim, complainant, witness and party in the prosecution and describes her interest as a statutory return priority over specific restrained property, not a general creditor's claim against the offenders' estate. ECF 104-3 at 26-27, 30-31 (printed pp. 25-26, 29-30); ECF 104-1 at 20, 31. Infiniweb's requested distribution must be adjudicated against that substantive adverse interest.

53. The criminal seizure order and identification of the wallet predate Infiniweb's October 2025 verified claim by more than two years. Infiniweb must substantiate its asserted ownership against that antecedent judicial record. The two states' records thus frame the disjunction Infiniweb must face: either this USDT is the victims' money - under the law that seized it, the victim is an owner with a return priority - or it is the revenue of a customer of a laundering network. Neither account, without the required evidence of Infiniweb's ownership, acquisition, and knowledge, establishes innocent ownership under 18 U.S.C. § 983(d).

**C. Infiniweb must account for its response to the prior criminal seizure order**

54. ECF 108 challenges the timeliness and specificity of Claimant's asserted interests. ECF 108 at 18-20. Timeliness arguments from Infiniweb are inverted on its own chronology: its counsel's approaches are recorded in June 2024 and February 2025, both before the Complaint was filed; while according to the Government the funds had been frozen at Tether since November 20, 2023; and Infiniweb nonetheless filed its verified claim on October 17, 2025, after the August 22, 2025 claims deadline. Compl. paras. 172, 239-240; ECF 102 at 4. Its demand for immediate return follows its own election to wait. Infiniweb must account for its own response to the August 2023 Turkish restraint, including any timely application to assert an interest or discharge the order, and explain why its first identified judicial claim to the wallet was filed in this action in October 2025. The relevant notices, applications, and dispositions should be produced. The Government's Special Interrogatory 15 already asks whether Infiniweb has "ever had currency seized from you by law enforcement, government, or military authority on any other occasion," with the date, place, circumstances, proceeding, court, and disposition. ECF 37-1 at 6. Its answer, with supporting notices, applications, and dispositions, belongs in the evidentiary procedure governing ECF 28.

55. Infiniweb has identified no order lifting the Turkish restraint that predates its United States claim. Its pursuit of immediate return in this forum, without addressing the originating criminal seizure order, presents a concrete forum-shopping concern. The same standard applies. Infiniweb's counsel asserted its interest to the United States in February 2025. Compl. para. 240. The perfected Turkish criminal seizure order predates that assertion, and Infiniweb has never sought release or discharge of the perfected order in the forum that entered it. The asymmetry between the forums is material. The Turkish custody is a criminal seizure; this proceeding is civil. The wagering revenues Infiniweb claims are unlawful where the business operates into Türkiye: Turkish law punishes whoever "[k]umar oynanması için yer ve imkân sağlayan" [provides the place or opportunity for gambling] with "bir yıldan üç yıla kadar hapis" [imprisonment of one to three years], TCK Art. 228 para. 1, rising to three to five years' imprisonment where committed through computer systems, id. para. 3; unauthorized betting is separately prohibited, Law No. 7258. Turkish authorities have conducted sustained, large-scale enforcement against illegal betting and gambling operations, enforcement reported in the Turkish sources filed at ECF 102. ECF 102 at 26-27 & nn.5-7. A claimant describing those same receipts as lawful revenue has an evident incentive to litigate in the forum that does not treat them as criminal proceeds. The Court should require the notices, filings, and dispositions establishing Infiniweb's conduct concerning that order. The requested distribution cannot substitute for resolution of the preexisting perfected judicial custody. The restraint was equally operative at the issuer, and the issuer's own forum was Infiniweb's. On October 11, 2023, the Ankara Batı Chief Public Prosecutor's Office directed Tether Operations Limited to block Wallet 0x82e pursuant to the seizure order, and Tether confirmed in writing the same day, under Ticket No. 263780, that the wallet was frozen. ECF 79-6 at 2; ECF 79-7 at 2; ECF 79-2 para. 19. Tether Operations

Limited "was incorporated in the British Virgin Islands on March 15, 2017," U.S. Commodity Futures Trading Commission, Order Concerning Tether Holdings Limited, Tether Operations Limited, Tether Limited, and Tether International Limited, Docket No. 22-04, at 2 (Oct. 15, 2021), https://www.cftc.gov/media/6646/enftetherholdingsorder101521/download, and Infiniweb is itself a British Virgin Islands company. Report at 27, s. 3.1(i). An owner whose claimed operating revenues sit frozen at the issuer petitions the issuer; if the issuer does not relent, the owner brings its proprietary claim against the issuer in the courts of the jurisdiction both share. That forum was open and workable before the freeze: the BVI Commercial Court confirmed that cryptocurrencies are a form of property and that a claimant with "an arguable case that the stolen tokens were its property" may obtain proprietary relief. ChainSwap Limited v. The Owner of Digital Wallet et al., BVIHC (COM) 2022/0031, para. 16 (May 4, 2022). Infiniweb's filings identify none of these steps: no demand to Tether, no objection to the seizure order in the criminal forum, no application for release, no proceeding of any kind in any jurisdiction. Its own account describes discussions with the Government alone. ECF 28-1 at 8. "No judicial restraint over Group G other than the Turkish seizure is shown before May 2025." ECF 104-3 at 28. Infiniweb has thus made no showing of the efforts any putative owner would make to recover frozen funds, and the present record permits an inference: the forums Infiniweb avoided are the forums that would have required it to confront the Turkish criminal seizure order that has stood over this property since August 11, 2023, and the corporate and source-of-funds showing it has not made here.

56. All parties, the Court, and Infiniweb have been on notice of Claimant's Turkish case since March 17, 2026, when her verified claim pleaded the Turkish criminal seizure orders and the interests they secure. ECF 53 paras. 1, 25, 28. The Government's and Infiniweb's recent filings

cannot hold both positions. If the Turkish proceedings are real - as the Government's own reliance on unsolicited documents "regarding Turkish proceedings" presupposes, ECF 107 at 2; see id. at 5 n.4 - then the perfected judicial custody of Group G (Wallet 0x82e) is equally real, and it encumbers every dollar of the balance Infiniweb asks the Court to release. If they are not real, then the filings that rely on documents from those proceedings are built on materials entitled to no weight. The documents on which they lean supposedly came from the unverified defendants' side of the prosecution: materials from the criminal defendants' side establish neither lawful ownership of the proceeds nor any discharge of the criminal seizure order, and those documents have never been served on Claimant, who learned of them from the Government's email on October 22, 2026. ECF 109. The only participant in this litigation with adjudicated status in the Turkish case is Claimant, who holds granted participant (Müdahil) status in File No. 2024/277 of the Istanbul 19th Assize Court as the named original investigator, complainant, witness, victim, and party. ECF 104-1 at 20, 31; ECF 104-3 at 31. Infiniweb holds no participant status in the Turkish proceeding at all. The Government and Infiniweb must identify each document relied upon, its source, its asserted proposition, and the judicial act said to alter custody; Claimant is entitled to the material and an opportunity to answer it.

## VI. THE GOVERNMENT'S SHIFT FROM ADVERSARIAL SCRUTINY TO SETTLEMENT ALIGNMENT DOES NOT SUPPLY INFINIWEB'S PROOF

### A. The Government's original demands remain unanswered by settlement status

57. The United States told this Court that civil forfeiture requires an "immediate barrier of verifiable truth and transparency," and that Infiniweb must provide "fulsome revelations" of its identity and a meaningful relationship to the property. ECF 47 at 9-10. It explained that in forfeiture actions involving crime "the risk of false claims and shadowy identities and relationships to the property are manifest," a concern "particularly acute in a matter involving

allegations of a massive international fraud and money laundering scheme." Id. at 10. Its brief states: "The Potential claimant Infiniweb has partially answered some of the 18 special interrogatories." ECF 47 at 7. Its declaration separately confirms receipt of "substantive responses" on January 16, 2026. ECF 47-1 para. 1. Infiniweb's reply responded that objections were ordinary and noted the Government had not moved to compel or strike. ECF 76 at 8 n.3. That footnote does not deny that Infiniweb answered with objections; it refers to "Infiniweb's objections" and says only that it is "not unusual for interrogatory responses to incorporate objections in lieu of factual responses." ECF 76 at 8 n.3.

58. The Government subsequently entered settlement negotiations with Infiniweb without placing a resolution of those evidentiary deficiencies before the Court. The joint status reports document the negotiations; ECF 86 records the Government's nonopposition to Infiniweb's protective order; and the October 23, 2026 email from Rick Blaylock, Jr. records its opposition to Claimant's proposed supplemental response (accompanying Motion for Leave para. 9). Considered together, those litigation acts support an inference of functional alignment in protecting the negotiated disposition from adversarial examination of its proposed recipient. Infiniweb's own counsel confirmed the settlement's dependence on that leverage: "I fully agree with Mr. Boyle that the sword hanging above this proceeding has been a forcing function, and useful I think internally at DOJ to move this forward." Tr. 45:17-20. Infiniweb asked for deferral of the pending rulings, not their resolution. Tr. 45:20-25. Such alignment does not establish Infiniweb's authority, ownership, or entitlement to distribution.

59. The Government's own verified pleading supplies a further basis for scrutiny. It reproduces published reporting of Infiniweb's understood close links to Xionwei Technologies, accused in Philippine congressional materials of kidnapping and human trafficking, and records the absence

of additional lawful-source information from Infiniweb's counsel. Compl. para. 240. The Government has not amended the Complaint or withdrawn those allegations. The ECF 79 record also documents the enterprise context of the claims before the settlement table was set: Claimant's July 9, 2026 Public-Source Memorandum traced Infiniweb's verifier to the Prince Group ecosystem, the same network underlying the related 127,271-bitcoin proceeding in the Eastern District of New York, and the settlement table records the concurrent representation of Chen Zhi and the Prince Group Holdings by counsel for Claimants 1-118. ECF 79-1 at 18-20 & Exs. I-K; ECF 89 at 13-14. Those attributed allegations are reinforced by the earlier public-source concerns identified in ECF 102 and the distinct corporate and operational findings in the Report. Any reliance on Infiniweb's asserted business legitimacy to support distribution requires identification of the evidence resolving the deficiencies pleaded by the Government. The existence of negotiations establishes no such resolution. The Complaint also records the limit of the Government's own investigation: "open-source research regarding Infiniweb revealed minimal information about the company." Compl. para. 240. That desk-based inquiry identified no corporate records, no principals, and no operating business. The Report now documents the corporate records and principals, and records that the platform's pages name no operating company at all. Claimant's filings, beginning with ECF 79, supplied the record the Government's investigation never developed. Having demanded disclosure from Infiniweb, the Government now resists receipt of the evidence that tests its proposed settlement recipient.

**B. Confidential treatment and settlement do not establish entitlement to distribution**

60. The Court entered ECF 88 after the Government's nonopposition but expressly reminded the parties that filing under seal requires a compliant motion. On September 30 it struck ECF 92 and 93 for noncompliance with that rule and its Hubbard requirements. The governing orders

distinguish the applicable protections: protective treatment of discovery is not public proof of standing, and a protective designation is not a sealing order. The minute order states: "The court therefore strikes the sealed documents."

61. The sequence presents a specific public-interest concern: unresolved ownership questions, nonopposition to confidentiality, negotiation of payment to the claimant under scrutiny, and opposition on timeliness grounds to submission of the developed public-source investigation. None of those procedural acts satisfies Infiniweb's evidentiary burden. The existing protective framework permits examination of genuinely confidential evidence while affording affected parties access sufficient to contest it. Confidential designation does not exempt the recipient's claim from adversarial examination. Claimant requests access, under ECF 88 and any necessary implementing direction, to the portions of Infiniweb's special-interrogatory responses addressing corporate authorization, wallet ownership and control, third-party interests, and prior seizures. ECF 37-1 at 4-6. No unserved or stricken material should supply an adverse determination of Claimant's competing interest. ECF 88 also makes the reciprocal point: a confidentiality designation does not itself authorize sealing, paras. 15, 19, and Confidential material used in open court becomes public absent an order. After the September 30 strike of ECF 92 and 93 for noncompliant sealing, Infiniweb cannot keep its ownership and operational evidence from the public record by designation alone.

**C. Proposed structure provides payment to Infiniweb but no guaranteed victim recovery**

62. At the hearing, the Government described money being sent back to Infiniweb and a tiered remission process for victims, and expressly stated that the agreement did not promise any specific victim any specific amount. Tr. 39:22-40:25. The later discussion placed the Marshals' transfer process at a typical sixty days. Tr. 54:20-55:8. ECF 66 separately emphasizes that victim

compensation is discretionary rather than a matter of right. ECF 66 at 2-5. The Court's own words frame the issue: it asked how a settlement could address a claim "outside of the scope of the settlement," Tr. 53:22-54:5, and stated that any resolution must be "respecting everybody's rights who is before the Court," Tr. 59:21-60:3. Those are questions and statements from the bench, not rulings - and they state the standard Infiniweb's requested distribution must meet.

63. The disclosed settlement structure provides for payment to Infiniweb while directing victims to a process guaranteeing no individual amount. Every dollar distributed to Infiniweb reduces the property available for victim recovery. Adjudication of Infiniweb's claim therefore advances the Government's stated victim-recovery purpose. ECF 96 expressly states that the motions concerning Claimant would not be resolved by the agreement in principle. ECF 96 at 2. A negotiated distribution cannot determine the competing property interests preserved by those pending motions.

**D. DDG's investigation and independent reporting establish the need for the scrutiny the Government previously demanded**

64. Claimant's investigation and notice to the Government substantially predate the Report. Her sworn declaration records the May 11, 2026 whistleblower-complaint acknowledgment, June 17 conflict notice, and July 9 Public-Source Memorandum and receipt confirmation. ECF 79-2 paras. 45-48; Exs. G-J, ECF 79-9 to 79-12. DDG's site-visit finding was filed in July 2026. ECF 79-15 at 2. The Financial Times investigation, published September 8, 2023 and filed with ECF 102, independently corroborates the false address, agent-mediated website access, and opacity concerning operators and brand owners. ECF 102 paras. 7-9; ECF 102-2 at 15-17. The Report now consolidates and develops the corporate, regulatory, trademark, and operational evidence. Its submission follows the documented investigative chronology and repeated notice to the Government.

65. That sequence is consistent with Claimant's documented origination of her original investigation and Turkish process that preserved Group G (Wallet 0x82e) in 2023. ECF 79-2 paras. 12-20, 49. Claimant and DDG have again supplied evidence necessary to protect the Defendant Property while the Government negotiates its disposition. The Government's custody of the property does not resolve the competing private interests in it. Treating Infiniweb as an established recipient while resisting examination of its claim abandons the scrutiny the Government itself demanded. Infiniweb must establish its entitlement before any distribution in its favor.

66. Infiniweb's characterizations in ECF 108 - "futile," "inconsistent," and untimely - establish neither its verifier's authority nor its own property interest. ECF 108 at 8, 23-25. Demands for particulars from Claimant do not supply Infiniweb's missing corporate and source records. ECF 28 requires adjudication of the entitlement asserted by the party requesting release of the Defendant Property. The double standard is Infiniweb's own: for itself, "Nothing more is required at this stage," ECF 76 at 10-11; against Claimant, a "conclusory assertion of ownership" must "explain how her property or its identifiable proceeds are tied to Group G," ECF 108 at 15, and a claim must "identify the specific property claimed," id. at 21. Infiniweb's briefing also confirms that Compl. para. 239 concerns its own counsel. ECF 28-1 at 41. The request to strike those paragraphs would excise the record of the very questions its counsel did not answer for six months.

## VII. SUPPRESSION AND STRIKING DO NOT ESTABLISH ENTITLEMENT TO THE DEFENDANT PROPERTY

67. Rule G(8)(a) permits only "a party with standing to contest the lawfulness of the seizure" to move to suppress and expressly provides that suppression does not affect forfeiture based on independently derived evidence. The D.C. Circuit likewise distinguishes suppression of

unlawfully obtained proof from the existence of the Defendant Property and the Court's in rem jurisdiction and recognizes independently obtained evidence. United States v. $639,558 in U.S. Currency, 955 F.2d 712, 715 and n.5, 719 (D.C. Cir. 1992). Infiniweb must identify the seizure and evidence challenged, the basis for its own right to contest them, and the causal route by which the identified evidence was obtained. Rule G(8)(a) provides that "[s]uppression does not affect forfeiture of the property based on independently derived evidence," and the D.C. Circuit states: "Thus, other evidence, legally obtained, may be introduced to establish that the property should be forfeited to the government." 955 F.2d at 715 n.5.

68. The August 2023 certified Turkish criminal seizure order and related correspondence are independent sources predating the November 2023 United States freeze request. The independently obtained corporate, regulatory, trademark, operational, and site-visit evidence also requires source-specific consideration. A blanket suppression request neither establishes a basis for excluding those sources nor determines entitlement to receive Group G.

69. The same distinction governs the request to strike Complaint paragraphs 239-240. Claimant relies on independently sourced records, not a compromise offer. Rule 408's Committee Note explains that preexisting information is not immunized from use merely because it was presented in negotiations. Any specifically identified negotiation statement can be addressed under that rule without excluding the independent corporate, regulatory, site-visit, and operational evidence. Striking allegations from the Complaint does not extinguish that evidence. The Senate Judiciary Committee note states: "A party should not be able to immunize from admissibility documents otherwise discoverable merely by offering them in a compromise negotiation." Fed. R. Evid. 408, Notes of the Committee on the Judiciary, S. Rep. No. 93-1277.

70. The Report and the corroborating record bear on Infiniweb's threshold entitlement to relief, its requested distribution, and the evidentiary procedures necessary to determine that request. Rule G(2)(f) governs the sufficiency of the Complaint's allegations; Rule 43(c) permits the Court to receive affidavits, oral testimony, or depositions concerning facts outside the record. And because ECF 28 itself relies on matters outside the Complaint, including Infiniweb's description of its business and of Baobo.com and eleven exhibits (ECF 28-1 at 11 & n.1; ECF 28-3 to 28-13), Rule 12(d), as applied to a Rule 12(b)(6) or Rule 12(c) component of the motion, entitles every party, if those matters are considered and not excluded, to "a reasonable opportunity to present all the material that is pertinent to the motion." Neither a ruling on pleading sufficiency nor exclusion of particular evidence determines the competing proprietary interests or authorizes automatic payment to Infiniweb. Rule 43(c) provides: "When a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions." Standing, suppression, and distribution questions are addressed through the procedure applicable to each requested form of relief.

**VIII. CONCLUSION**

71. For the foregoing reasons, Claimant requests that the Court:

a) Deny ECF 28 on the present threshold record, or defer it pending determination of Infiniweb's entitlement to invoke its remedies; in either event, deny the request for automatic return of the disputed property and reject any contention that the Government's alleged concession establishes Infiniweb's entitlement as against Claimant;

b) Before considering relief on Infiniweb's motion that depends on its asserted interest, require a competent showing of the source, scope, and effective date of Zeng's corporate

authority and of Infiniweb's relationship to each group for which it seeks relief, with particular attention to Group G;

c) That showing should state, under oath: when Infiniweb learned of the August 11, 2023 criminal seizure order; whether it objected, sought lifting, or asserted an interest in the Turkish proceeding; who sent the approximately 1,100 initial deposits to Wallet 0x82e and under what arrangements; how purported gaming revenue came to rest in a cold wallet registered to no exchange; any dealings with the network entities identified in the Turkish and Complaint records; and who has held the wallet's private keys, at all relevant times, and since when; and to permit responsive evidence and a focused hearing if material facts remain contested;

d) Reject blanket suppression or striking of independently derived evidence, and require evidence-specific treatment of the Turkish judicial records and the Report's independent sources;

e) Preserve the Court's ability to adjudicate the competing interests in Group G and decline any release to Infiniweb through ECF 28 before that adjudication;

f) Set any necessary further evidentiary procedure expressly, with appropriate protective treatment, rather than allowing the settlement parties' alignment to substitute for the showing required of Infiniweb. That procedure should include access under ECF 88 to the pertinent special-interrogatory responses and a hearing if the resulting material factual disputes require one.

g) Direct that no stipulation, consent judgment, or order releasing or disposing of any part of the Defendant Property in Infiniweb's favor be submitted or entered without notice to Claimant, an opportunity for her to be heard, and a prior determination of Infiniweb's

standing and of the competing claims to Group G. Claimant's requests in ECF 98 and 99 to treat the missed opposition deadlines as conceded remain before the Court; the Government had moved to strike ECF 79 on August 14, 2026 (ECF 91). ECF 79 seeks a preliminary injunction against any disposition of Group G pending adjudication, bifurcation, and advancement of the trial, and ECF 96 confirmed that the settling parties were not seeking a stay of that motion. ECF 96 at 2. The relief requested here is cumulative of, and consistent with, those motions and the requested non-opposition determinations.

72. ECF 28 cannot authorize distribution of the disputed property to Infiniweb without adjudication of its entitlement and Claimant's competing interest.

Dated: October 26, 2026

Respectfully submitted,
/s/ Nivedita Kaul
Nivedita Kaul, Claimant, Pro Se
5001 Ramon Road, Building 3 #1005
Palm Springs, CA 92264
Tel: +1 724 413 8167
nivie@digitaldefendersgroup.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 26, 2026, I filed the foregoing supplemental response and the Cartwright Declaration with its Exhibits A-C through the Court's CM/ECF system, which will send notice of electronic filing to all counsel of record.

/s/ Nivedita Kaul
Nivedita Kaul, Claimant, Pro Se